# **<u>EXHIBIT E</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:19-cv-24047-MGC

YOLAISY PEREZ, as presumptive
Personal Representative of the
Estate of Lester Jesus Machado,

        Plaintiff,

vs.

CITY OF HIALEAH, et al.,

        Defendants.
_____/


VIDEOTAPED DEPOSITION OF MARIA BENITEZ
(VOLUME 1)

*** CONTAINS "CONFIDENTIAL" INFORMATION ***

Taken on Behalf of the Defendant pursuant to a Notice of
Continued Videotaped Zoom Deposition


DATE TAKEN:  Monday, April 26, 2021
TIME:        9:13 a.m. - 1:08 p.m.
PLACE:       Via Zoom Platform


Examination of the witness taken before:

Iliana Lugo, Court Reporter
National Reporting Service
66 West Flagler Street, Ste. 310
Miami, Florida 33130

Page 2

1                            APPEARANCES

2    For the Plaintiff:

3        RODRIGUEZ LAW OFFICE, LLC
          BY:  DOMINGO C. RODRIGUEZ, ESQ.
4        95 Merrick Way, Suite 720
          Coral Gables, Florida 33134
5
          RICHARD J. DIAZ, P.A.
6         BY: RICHARD J. DIAZ, ESQ.
          3127 Ponce de Leon Blvd.
7         Coral Gables, Florida 33134

8    For Defendant City of Hialeah:

9        GAEBE, MULLEN, ANTONELLI & DIMATTEO
          BY:  DEVANG DESAI, ESQ.
10        420 So. Dixie Highway, Third Floor
          Coral Gables, Florida 33146
11
      For Defendant Antonio Luis:
12
          BOWMAN AND BROOKE, LLP
13        BY:  CHRISTINE L. WELSTEAD, ESQ.
          Two Alhambra Plaza, Suite 800
14        Coral Gables, Florida 33134

15   For Defendants Abel, Elias, Garcia, Gato, Holland,
      Vidal, Hernandez, Rodriguez, Burke and Pico:
16
          SWITKES & ZAPPALA, P.A.
17        BY:  ROBERT L. SWITKES, ESQ.
          407 Lincoln Road, Penthouse SE
18        Miami Beach, Florida 33139

19    Also Present:

20        JULIO OJEDA, Paralegal, Rodriguez Law Office

21        MAJOR HUBERT RUIZ, City of Hialeah Police
                        Department
22

23

24

25

Confidential

Page 3

1

2                    INDEX  (VOLUME 1)

3   Witness            Direct      Cross (Cont.)

4   MARIA BENITEZ
     (By Ms. Welstead)   --          5
5

6   Pages 51-56        Transcription of testimony from the
                Zoom video recording.
7
     Pages 67-69        Testimony Designated "CONFIDENTIAL"
8

9
                EXHIBITS FOR IDENTIFICATION
10
                    (None)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1   THEREUPON:

2                    MARIA BENITEZ

3   was called as a witness and, after having been first

4   duly sworn and responded "Yes, ma'am," was examined and

5   testified as follows:

6              CONTINUATION OF CROSS EXAMINATION

7   BY MS. WELSTEAD:

8       Q.   Ms. Benitez, my name is Chris Welstead.  Nice

9   to meet you.

10             As I stated earlier, I represent Lieutenant

11   Luis.

12       A.   Good morning.

13       Q.   I have some questions for you about your

14   testimony regarding Lieutenant Luis.  But, first I want

15   to find out if you are represented by counsel today.

16       A.   No, ma'am.

17       Q.   Have you ever been represented by any of the

18   counsel that are on this Zoom deposition?

19       A.   No, ma'am.

20       Q.   You told us you came in to Mr. Rodriguez'

21   office to discuss your testimony before you gave the

22   testimony in this case; is that correct?

23       A.   No, ma'am.

24             MR. RODRIGUEZ:  Objection to form.

25   BY MS. WELSTEAD:

Confidential

Page 5

1    Q.   Explain to me the sequence of events then.

2    A.   The sequence of events were once our --

3        MR. SWITKES:  Excuse me, you're going to have

4    to speak up.  I can hardly hear when you're

5    speaking.

6    A.   The sequence of events was that when I was on

7    this case Mrs. Hernandez, the attorney, she had contact

8    me.  I contact her back.  I was dismissed from this

9    case.

10        After I was dismissed from this case, I was

11   looking for an attorney for a personal matter, so I

12   started to Google different attorneys.  I contacted

13   different attorneys.  And it happens to be that during

14   my Google Search, Mr. Domingo --

15        THE WITNESS:  Is that how you pronounce --

16        MR. RODRIGUEZ:  Rodriguez.

17    A.   Mr. Rodriguez' information popped up after I

18   had called maybe ten different attorneys.  I spoke to

19   him.  Once I contacted his office, I did not know that

20   he was on this case.  I called.  I left a message.

21   Then, I called again 'cause my call dropped.  I called

22   again, and I spoke to him.

23        And then he asked me if I was feeling -- if I

24   was going through any legal -- any legal process.  I

25   told him no, I was not.

Confidential

Page 6

1          And then he says that he will call me back.

2    He called me back and then he asked me, again, was I

3    being represented by someone in any type of case; and I

4    said no.  I said:  I would like to come into your office

5    and speak to you.

6          Once I came into his office to speak to him, I

7    was not a part of this case.  I would have been

8    dismissed.  And I have e-mail and documentation of that.

9       Q.   Wonderful.  You have e-mail and documentation

10    indicating when you went in to see -- when you first

11    contacted Mr. Rodriguez?

12       A.   Well, I have information and documents.

13    Documents, e-mail when Mrs. Hernandez contacted me in a

14    different case.

15       Q.   My question was:  Do you have documentation

16    and e-mails indicating when you went to see

17    Mr. Rodriguez?

18       A.   I don't think you understand my answer.  I

19    said I have documentation of Mrs. Hernandez when she

20    removed me from the case.

21       Q.   Do you understand my question?

22       A.   Yeah.  And I answered your question.

23       Q.   You didn't answer my question.

24          You have documentation and e-mails when you

25    went to go see Domingo Rodriguez?

Confidential

Page 7

1    A.   Of course not.  Why would I have an e-mail?

2  That was the first time I contacted him.

3    Q.   Did you make an appointment to go see him?

4    A.   Yes, I did.

5    Q.   Did you confirm that appointment by e-mail?

6    A.   No, ma'am.

7    Q.   You said you called him not once but more than

8  once because the phone call dropped.  Do you have a

9  record of that call on your cell phone?

10    A.   No, I do not.  I would have it in my recent

11  calls.

12    Q.   Have you checked your recent call log?

13    A.   It wouldn't be there.  A recent call log only

14  takes a certain amount of calls.

15    Q.   The question was:  Did you check?  Have you

16  checked your recent call log to see if it's there?

17    A.   No, I have not.

18    Q.   Who else besides Mr. Domingo did you speak to

19  at his office?

20    A.   The day I came in to -- Julio Ojeda was

21  present.

22    Q.   Anyone else?

23    A.   No, no one else.

24    Q.   When was the meeting?

25    A.   I would have to try to ask Mr. Domingo.  I

Confidential

Page 8

1    don't know off the top of my head.

2       Q.   Mr. Domingo was there and Mr. Ojeda was there?

3       A.   Yes.

4       Q.   Anyone else?

5       A.   No.

6       Q.   Was it during business hours, meaning was the

7    office open?

8       A.   The office was open because I came in.

9       Q.   Perfect.  And how long did you spend with

10   Mr. Ojeda and Mr. Rodriguez?

11      A.   A few hours.

12      Q.   More than two?

13      A.   A few hours.

14      Q.   Do you know if it was more than two hours that

15   you spent meeting with Mr. Rodriguez and Mr. Ojeda?

16      A.   A few hours, ma'am.

17      Q.   Do you know whether it was more than two,

18   ma'am?

19      A.   I could not answer that question.  I said a

20   few hours.  Maybe it was two, maybe it was under two,

21   maybe it was over two.

22      Q.   So you don't know whether it was more than two

23   hours; correct?

24      A.   Correct.

25      Q.   Okay.  Did you have to pay for parking at that

Confidential

Page 9

1   location?

2       A.   Did I have to pay for parking at that location

3   when I came in?  Well, you have to pay for parking.  If

4   I paid or not, I don't remember, but I know you have to

5   pay the meters.

6       Q.   Did you park in the building?

7       A.   I parked on the side of the road.

8       Q.   On the side of the building on a street?

9       A.   Yes, on a meter.

10      Q.   Did you get a ticket that day?

11      A.   Nope.

12      Q.   Did you have to go down and refill the meter

13   at any point in time?

14      A.   No.

15      Q.   How do you know that it was after your

16   dismissal?

17      A.   Because I have an e-mail.

18      Q.   From who?

19      A.   From Mrs. Hernandez.

20      Q.   And --

21      A.   And I had spoken to Mrs. Hernandez.

22      Q.   Excuse me?

23      A.   I had an e-mail from Mrs. Hernandez saying

24   that I was dismissed from the case, and I had spoken to

25   Mrs. Hernandez and her secretary.

Page 10

1      Q.   And that's how you learned that you had been

2   dismissed from the case, from Attorney Elizabeth

3   Hernandez?

4      A.   Yes.

5      Q.   And Attorney Elizabeth Hernandez represented

6   you in this litigation that we're here on today;

7   correct?

8      A.   Yes, but I never met with her in person.

9   That's what she told me.

10      Q.   Okay.  Did you understand her to be your

11   lawyer?

12      A.   Well, I didn't want her to be my lawyer.  She

13   just told me that she was -- the City had hired her on

14   this case and that she was getting me dismissed from the

15   case.

16      Q.   And did there come a point in time where she

17   was dismissed as your counsel?

18      A.   Well, I told her -- I sent her a text message.

19   We communicated through text message.  And we

20   communicated -- the whole time we communicated through

21   text message and also communicated through e-mail.  And

22   I sent her an e-mail because she reached out to me, and

23   I told her that I didn't want her to represent me or

24   anyone that had to do anything to do with the City of

25   Hialeah.

Confidential

Page 11

1      Q.   Okay.  And was that notification to

2   Ms. Hernandez that you did not want her to represent you

3   before or after your meeting with Mr. Rodriguez and

4   Mr. Ojeda?

5      A.   Repeat the question.

6      Q.   Sure.  Was that written notification to

7   Elizabeth Hernandez, that you did not want her to

8   represent you, before or after your in-person meeting

9   with Mr. Rodriguez and Mr. Ojeda?

10     A.   I was already dismissed from the case.

11        MR. SWITKES:  I couldn't hear that answer.

12     Could you repeat that?

13     A.   I was already dismissed from the case.

14   BY MS. WELSTEAD:

15     Q.   Okay.  Let's talk about the dismissal.  You

16   said you received notification of your dismissal in

17   writing?

18     A.   Yes.

19     Q.   And is that something that Ms. Hernandez sent

20   you?

21     A.   Mrs. Hernandez -- well, it came from

22   Mrs. Hernandez' office.  There was also a gentleman, I

23   don't know his name, that was working in her office.

24   Him I spoke to on the phone.  And, he was on the case.

25     Q.   And he told you you had been dismissed?

Confidential

Page 12

1    A.   Yes.  And he was doing the draft -- he was

2  doing the final draft of dismissal.

3    Q.   Did you get a copy of the Final Notice of

4  Voluntary Dismissal that the Plaintiffs filed in this

5  case?

6    A.   I got -- I received an e-mail -- I received an

7  e-mail from Mrs. Hernandez' office.

8       MS. WELSTEAD:  Madam Court Reporter, do I have

9    the ability to share my screen?

10       THE COURT REPORTER:  Yes, you do.

11       MS. WELSTEAD:  Okay. Thank you.

12  BY MS. WELSTEAD:

13    Q.   Can you see that document?

14    A.   Yes, I do.

15    Q.   Plaintiff's Notice of Voluntary Dismissal as

16  to Maria Benitez.

17       Do you recognize this document?

18    A.   I'm reading it.  Give me just one second.

19    Q.   Sure.

20    A.   I would have to check the document.  From what

21  it seems like, it seems like I might have it in my

22  phone.  I have to make sure -- just to make sure that

23  it's exactly the same one that I have on the phone.

24       So, if I can look at my phone in my e-mail, I

25  can check.

Confidential

Page 13

1    Q.   Can you do that now?

2    A.   Yes, sure.

3         Yes, it is.

4    Q.   Okay.  So Exhibit -- Defendant's Exhibit 5 to

5    this deposition, you have identified Plaintiff's Notice

6    of Voluntary Dismissal as to Maria Benitez as a document

7    you were sent; correct?

8    A.   Correct.

9    Q.   And you agree with me that this document

10   prominently says the name "Domingo Rodriguez" and

11   includes his address and telephone number; correct?

12   A.   Correct.

13   Q.   But you deny that this is where you got

14   Mr. Rodriguez' information from?

15   A.   Correct.

16   Q.   Are you currently present at 95 Merrick Way?

17   A.   Yes, I am.

18   Q.   Are you sitting in Suite 720?

19   A.   Yes, I am.

20   Q.   Are you at the Rodriguez Law Office today?

21   A.   Yes, I am.

22   Q.   Okay.  Are you represented by any lawyer?

23   A.   No.

24   Q.   No lawyer currently represents you for any

25   reason?

Confidential

Page 14

1    A.   Any reason.

2    Q.   Do you have any ongoing claims?

3    A.   No, I don't.

4    Q.   Are you currently participating in any

5    criminal investigations, either as a victim, a subject

6    or a witness?

7    A.   Just a witness in this case.

8        THE COURT REPORTER:  I'm sorry -- I'm sorry,

9    can I have the witness repeat the answer?

10       THE WITNESS:  I said, "Just a witness in this

11   case," ma'am.

12   BY MS. WELSTEAD:

13   Q.   For your arbitration proceedings in the City

14   of Hialeah you were represented by PBA counsel; correct?

15   A.   Correct.

16   Q.   Is that Simone Lopez?

17   A.   Yes.

18   Q.   Does Attorney Lopez currently represent you?

19   A.   No, ma'am.

20   Q.   When did she stop representing you?

21   A.   As soon as I was done in that case.

22   Q.   So that would have been the date of the

23   arbitration award?

24   A.   Yes.

25   Q.   Did you get a copy of the arbitrator's award?

Confidential

Page 15

1    A.   Yes, I did.

2    Q.   And can you tell us based on the arbitration's

3  findings the reason that -- the reason that your

4  termination was upheld?

5    A.   Yes.  Because my attorney that was

6  representing me at the time didn't do due process.  She

7  didn't subpoena the witnesses.  She dropped the ball.

8    Q.   Is that what the arbitrator found?

9    A.   No, it's not.

10    Q.   Okay.  Did the arbitrator find that you were

11  untruthful?  Is that the reason that your termination

12  was sustained?

13       MR. RODRIGUEZ:  Objection to form.

14    A.   Repeat the question.

15  BY MS. WELSTEAD:

16    Q.   Did the arbitrator in his award find you to be

17  untruthful?

18       MR. RODRIGUEZ:  Form.

19    A.   Yes, because of the reason that I did not have

20  a fair trial.

21  BY MS. WELSTEAD:

22    Q.   Okay.  So the reason that you lost the

23  arbitration is because Attorney Simone Lopez dropped the

24  ball?

25    A.   Yes.

Confidential

Page 16

1     Q.   Did you make a complaint against Ms. Lopez to

2   any agency or organization?

3     A.   You cannot.  I called the arbitration and they

4   told me because it was final and binding, I could not

5   file a complaint.  I did go into the office.  I spoke to

6   her.  And I spoke to the person in charge in the office

7   at the PBA.

8     Q.   What person in charge at the PBA did you speak

9   to about your dissatisfaction with the representation

10   you received from Attorney Lopez?

11     A.   Well, I spoke to the secretary and then I

12   spoke to the gentleman.  I think he's like the head

13   counsel or attorney over at the PBA.

14     Q.   Maybe the general counsel?

15     A.   Maybe.  I don't know his name.

16     Q.   You don't know his name?

17     A.   No, I don't.

18     Q.   Did you lodge a written complaint with The

19   Florida Bar?

20     A.   No, I did not.  They told me I couldn't do

21   anything because it was final and binding and it was an

22   arbitration.

23     Q.   And do you agree with that?

24     A.   Do I agree with it?  Well, if that's what they

25   tell me.  They said it was binding.  And I looked it up

Confidential

Page 17

1   and it is final and binding.

2       Q.   Did you consult any other counsel about

3   pursuing a claim either against the City, the PBA, or

4   its lawyers?

5       A.   Yes.  They told me that it couldn't be done.

6       Q.   Who did you consult with about pursuing such a

7   claim?

8       A.   Different attorneys.

9       Q.   Any that took your case?

10      A.   They spoke to me about it.  There was this one

11  attorney that I spoke to in Fort Lauderdale close to the

12  courthouse, and he said:  Because the claim is against

13  Hialeah, good luck.

14      Q.   Okay.  So he didn't take you on as a client?

15      A.   No.  He said he didn't want to deal with

16  Hialeah.

17      Q.   Is this the matter, the arbitration and your

18  dissatisfaction with the award, the reason that you went

19  to go see Attorney Rodriguez?

20      A.   No, it's not.

21          MR. RODRIGUEZ:  Objection to form.

22  BY MS. WELSTEAD:

23      Q.   Why did you go see Attorney Rodriguez?

24      A.   For a personal matter.

25      Q.   What is the nature of that matter?

Confidential

Page 18

1   A.   I won't discuss it.  It's personal.

2   Q.   Did he --

3        MR. RODRIGUEZ:  I would also, again, assert

4   attorney-client privilege regarding the substance

5   of any communications that Ms. Benitez and I have

6   had unrelated to this matter.

7        MS. WELSTEAD:  Are you her counsel?

8        MR. SWITKES:  Did you say, Counsel:  "Relating

9   to this matter"?

10       MR. RODRIGUEZ:  No, I don't think that -- I

11   don't think you heard me correctly, Mr. Switkes.

12       MR. SWITKES:  That's why I wanted you to

13   repeat it.

14       MR. RODRIGUEZ:  I do not currently represent

15   Ms. Benitez in any matter.  As we have said before

16   and disclosed to you all, Ms. Benitez came to see

17   me about an unrelated personal matter and that --

18   it did not go any further than her consulting with

19   me about it.

20       But, insofar as that consultation occurred,

21   the attorney-client privilege attaches to our

22   communications concerning that matter,

23   notwithstanding the fact that I may not have -- or

24   that I did not undertake her representation at that

25   time.

Confidential

Page 19

1      MR. SWITKES:  But that one thing -- that

2  wouldn't include the reason why she came to talk to

3  you?

4      THE COURT REPORTER:  I'm sorry, Mr. Switkes, I

5  didn't get the last part.

6      MR. SWITKES:  That would not include the

7  reason she came to speak to Mr. Rodriguez, which is

8  not privileged.

9      MR. RODRIGUEZ:  I respectfully disagree,

10  Mr. Switkes.  And if you want to take that up with

11  the Court, I'd be happy to do so, but I'm not

12  waiving attorney-client privilege with respect to

13  any communications that I had with Ms. Benitez when

14  she came to see me to ask me for a consultation on

15  an unrelated personal matter.

16      MR. SWITKES:  The question was not any

17  communications she had with you.  The question was

18  what was the reason she came to consult with you,

19  which is not privileged and is not part of your

20  communications with her.

21      MR. RODRIGUEZ:  Same question.  I would

22  suggest that we -- if you guys want to pursue that,

23  we can take it up with the Magistrate, but I am not

24  going to let her inadvertently or intentionally

25  waive her attorney-client privilege.

Confidential

Page 20

1          MS. WELSTEAD:  All right.  Let's just make a

2     record.

3   BY MS. WELSTEAD:

4     Q.   Ms. Benitez, what was the reason you were

5   looking for a lawyer at the time that you found

6   Mr. Rodriguez?

7          MR. RODRIGUEZ:  Ms. --

8     A.   Personal matter.

9   BY MS. WELSTEAD:

10    Q.   And what is the nature of the matter?

11    A.   Personal.

12         MR. RODRIGUEZ:  Ms. Benitez, hold on a minute.

13    I do not represent you now.

14         THE WITNESS:  No, you don't.

15         MR. RODRIGUEZ:  But I just want you to know

16    that you have the right to refuse to answer

17    questions based on the attorney-client privilege

18    which belongs to you, actually.  So, if you don't

19    want to answer questions about the nature of why

20    you came to see me, you can refuse.  And then,

21    ultimately, it may or may not get decided by the

22    Judge.  But, I'm just letting you know that you can

23    do that and we will, the attorneys, take it up

24    later with the Judge, if necessary.

25         THE WITNESS:  Okay.

Confidential

Page 21

1          MS. WELSTEAD:  And, again, I just want to make

2      sure that the record is clear so that the Court --

3      when the Court is asked to determine whether or not

4      you have a valid privilege, that my questions to

5      you are perfectly clear and your answers are

6      perfectly clear for the Court to consider.

7          Okay, Ms. Benitez?

8          THE WITNESS:  Okay.

9   BY MS. WELSTEAD:

10     Q.   The personal matter that you went to go see

11  Mr. Rodriguez about, did you ever resolve that matter?

12     A.   That's personal.  Like I told you, I'm not

13  going to discuss it.  I think I've told you four times

14  already that's personal.

15     Q.   Right.  So -- and the reason you're not

16  telling me is because it is personal, not because it has

17  anything to do with any attorney-client privilege;

18  correct?

19          MR. RODRIGUEZ:  Objection to form.

20     A.   It's personal.  I don't want to discuss it.

21  BY MS. WELSTEAD:

22     Q.   It's personal and you don't want to discuss

23  it.  And you think that that's a valid answer given your

24  appearance in a deposition today, that you can select

25  what you want to discuss and what you don't want to

Page 22

1    discuss; right?

2         MR. RODRIGUEZ:  Objection --

3    A.   It has --

4         MR. RODRIGUEZ:  Hold on.  Let me object to the

5    form of the question, the argumentative nature of

6    the question as well.

7         You can go ahead and answer that question, if

8    you can.

9    A.   Okay.  Ma'am, again, it's personal.  It has

10   nothing to do -- we're not here to discuss the personal

11   case I came to talk to Mr. Domingo about.  We're here to

12   discuss a police-involved shooting that ended up being a

13   homicide, and that's what I'm here for.

14   BY MS. WELSTEAD:

15   Q.   After you met with Mr. Rodriguez, did he

16   decline to represent you in your personal matter?

17   A.   Did he -- excuse me, did he --

18   Q.   Yes, after you met with Mr. Rodriguez, did he

19   decline to represent you in your personal matter?

20   A.   Yes, he never represented me.

21   Q.   Okay.  And were you given a reason?

22        MR. RODRIGUEZ:  Objection to form.

23   A.   You still -- I see that you're still trying in

24   a different form to find out the reason why I came.

25   And, again, if you're going to keep questioning me on

Confidential

Page 23

1  the personal matter why I came here, you're not going to

2  get an answer because it's personal.  If you want to

3  continue to question me about the incident that took

4  place and why we're here, then I'll answer all your

5  questions.

6  BY MS. WELSTEAD:

7      Q.   Ms. Benitez, did Mr. Rodriguez give you a

8  reason as to why he could not represent you in your

9  personal matter?

10     A.   You might want to ask him.

11     Q.   You're the one that's here.

12     A.   I have --

13     Q.   You're the one that's under oath, Ms. Benitez.

14     A.   And I --

15     Q.   Did Mr. Rodriguez advise you that he had a

16  conflict of interest and could not represent you in your

17  personal matter?

18        MR. DIAZ:  All right, guys.  Hold on.  Hold

19     on.  Hold on.  We're all going to make a record

20     here, but I have to make mine, okay. I want to be

21     very clear.

22        The Florida Bar rules require lawyers to be

23     respectful to each other and to witnesses.  And

24     with all due respect to you, Ms. Welstead, I think

25     it's getting a little heated.  I'm not saying

Page 24

1  you've stepped over the line.  But, I just want to

2  please remind everybody of that.

3      If you want to take a five-minute break, take

4  a deep breath and a cup of coffee, fine.  If not,

5  I'm fine with that too.  But I'm just -- at this

6  point in this deposition I'm just putting in my two

7  cents worth.  Thank you.

8      MR. DESAI:  Thank you.  I just think at the

9  end the day there's no need for a break. The

10  witness can't dictate what questions get asked by

11  counsel.  However, she has a right to not answer.

12  She can plead the Fifth.  She can refuse on some

13  attorney-client privilege.  And I think that that's

14  all we're asking for.

15      So, Ms. Benitez is not here, as everybody

16  knows, to dictate the course of today's deposition.

17  It's a question/answer.

18      And I respect what you said, Mr. Diaz.

19  Everybody is above board and should hopefully act

20  that way today and every other day.  But, for

21  purposes of making a good record, it's a question

22  and an answer; and if there's no answer, no

23  problem, we can simply move on.

24      MR. DIAZ:  Devang, let me make a suggestion,

25  if I might, okay, and it might resolve this whole

Page 25

1   issue.

2       I don't mind taking on a five-minute break or

3   two-minute break, let Mr. Domingo speak with the

4   witness.  If it turns out that it's personal to

5   her, but maybe we can agree to have it sealed in

6   the record or confidential, and it may just be

7   maybe -- you know, a family matter regarding

8   adoptions, if we agree -- and I'm not saying we

9   have to agree now -- but if there is a description

10   that sufficiently addresses your concern and it

11   addresses hers that it's not going to be a public

12   record, maybe we can resolve it.

13       If you want to take two minutes and do that

14   exercise?

15       MR. SWITKES:  Well, I'm a little bit confused.

16   Is Mr. Rodriguez representing this witness or not?

17   And if he's not, there's no reason to take any

18   break.  There's no way it's attorney-client

19   privileged as to why she went to see Mr. Rodriguez.

20   That's not asking what conversations they had.

21       She is refusing because she says it's

22   personal.  And everybody on this call knows there

23   is no such thing as a personal privilege.

24       So, to avoid coming back, without talking to

25   anybody 'cause nobody represents her, the witness

Confidential

Page 26

1   should be told if she doesn't answer these

2   questions we're going to go through this again.

3       So, I think it was a very simple question:

4   What was the reason you went to Mr. Rodriguez?

5       If there is something inherently personal

6   about it that she doesn't want to share, at the end

7   of the deposition we can clearly address that and

8   maybe agree to seal that portion of it.  But, to

9   have this kind of discussion about attorney-client

10   privilege for the reason she went to see

11   Mr. Rodriguez is absurd.

12       MR. DIAZ:  Well, then -- and I don't disagree

13   with you, Mr. Switkes.  Maybe the thing to do is

14   let's just keep going with the deposition so we

15   don't have further interruptions.  And then she,

16   during one of the breaks, can think about it on her

17   own.

18       And she, certainly for purposes of answering

19   that question, can engage Mr. Rodriguez on a break

20   and say:  I want to hire you to get a legal opinion

21   as what I should do here.

22       So I don't think that we want to play that

23   game because I know how to play it, if you want to

24   play it.  I do think --

25       Look, we had this issue come up with Suarez

Page 27

1   where he wouldn't give me the answer as to why he

2   went to Pembroke Pines and said it's personal. You

3   know what?  I backed off because I wanted to be

4   respectful to him.

5        I'm not criticizing Ms. Welstead for not

6   wanting to give that courtesy to Ms. Benitez.

7   That's her call.  But, I do understand that

8   people -- you know, police officers don't want

9   their phone numbers on these depositions, and we've

10   accommodated that.  And I think that opposing

11   counsel should accommodate the witness' ability to

12   think about her answer.  We can either do it now or

13   one of the breaks.

14        But I don't think that you can say that

15   because in this deposition, with all due respect,

16   Mr. Switkes, Domingo and I are not her lawyers, and

17   you're right about that, that she cannot ask us and

18   engage us for the limited purposes of should I

19   answer that question and us advise her accordingly.

20   I don't think you can do that to her.

21        But, let's continue, Ms. Welstead, unless you

22   want to do something else.  If you're -- she's your

23   witness right now.

24        MS. WELSTEAD:   Yeah.

25        Where are we?  I mean, did we get an answer to

Confidential

Page 28

1    that last question?

2        THE COURT REPORTER:  I'd have to go back,

3    Counsel.  If you'd give me a minute, see if we did

4    get a response to that.

5        MS. WELSTEAD:  Thank you.

6        MR. SWITKES:  I think you'd be better off

7    asking it again.  It was such a long colloquy.

8        MS. WELSTEAD:  Well, you know, the whole point

9    of this is to make a record.  So I want to know

10    what the record says.

11        MR. SWITKES:  Okay.

12        THE COURT REPORTER:  Give me one second,

13    please.

14        (Thereupon, the following was read by the

15  Court Reporter:

16        "Question:  Ms. Benitez, did Mr. Rodriguez

17    give you a reason as to why he could not represent

18    you in your personal matter?

19        "Answer:  You might want to ask him.")

20        THE COURT REPORTER:  And then we have the

21    discussion that took place.

22        MS. WELSTEAD:  Okay.  Very good.

23  BY MS. WELSTEAD:

24    Q.   Ms. Benitez, are you ready; to continue or do

25  you need a break?

Confidential

Page 29

1      A.   I can continue.

2      Q.   Okay.  Perfect.

3           Following your contact with Mr. Rodriguez

4   regarding your personal matter, did you then engage

5   counsel?

6      A.   No, I did not.

7      Q.   You never had a lawyer represent you for your

8   personal matter that you don't want to disclose today;

9   is that correct?

10     A.   Correct.

11     Q.   Okay.  Did you ever engage Mr. Rodriguez,

12   Mr. Pertierra, or Mr. Diaz on a limited basis for advice

13   concerning your testimony in this case?

14     A.   I don't understand the question.

15     Q.   Did you ever ask them whether or not you would

16   be put in any legal jeopardy for coming forward to

17   testify in this case?

18          MR. RODRIGUEZ:  Objection to form.

19     A.   I do not understand the question.

20   BY MS. WELSTEAD:

21     Q.   Did you ever ask Mr. Rodriguez for legal

22   advice as it relates to this case?

23     A.   No, I did not.

24     Q.   Okay.  You previously identified Exhibit --

25   Defense Exhibit 5, which is the Notice of Voluntary

Page 30

1  Dismissal.  That document is dated February 18, 2020.

2  How soon after that voluntary dismissal was filed did

3  you go in to have your communication with Mr. Rodriguez

4  and Mr. Ojeda about this police-involved shooting?

5      A.   Well, I already knew I was dismissed from the

6  case prior to receiving that notice because

7  Mrs. Elizabeth Hernandez and the gentleman -- I don't

8  know his name -- had told me from the beginning that I

9  was being dismissed.

10     Q.   Okay.  So you think that you --

11     A.   So I can't give you a date because I don't

12  remember.  But, prior to me receiving this notice I

13  already knew that I was being dismissed from the case.

14     Q.   Okay.  How soon before your February 2nd, 2021

15  deposition did you have that hours long meeting with

16  Mr. Rodriguez and Mr. Ojeda?

17     A.   From when did you say, February what?

18     Q.   You were deposed in this case February 2nd,

19  2021.  Do you remember that?

20     A.   Yes, I do.

21     Q.   Okay.  How soon before that deposition did you

22  have your hours long meeting with Mr. Rodriguez and

23  Mr. Ojeda?

24     A.   To prepare -- ask me the question again.

25     Q.   Sure.

Confidential

Page 31

1          How long before your February 2nd, 2021

2     deposition in this case did you have your hours long

3     meeting with Mr. Rodriguez and Mr. Ojeda?

4     A.   A few months before.

5     Q.   A few months?

6     A.   A few months before.

7     Q.    How many times did you meet with them?

8          MR. RODRIGUEZ:  If you remember.

9     A.   I don't remember how many times I met.

10         MS. WELSTEAD:  Mr. Rodriguez --

11         MR. RODRIGUEZ:  Yeah.

12         MS. WELSTEAD:  -- I don't need your commentary

13     to the witness:  "If you remember," followed

14     quickly by the witness responding:  "I don't

15     remember."  It's inappropriate.

16   BY MS. WELSTEAD:

17     Q.   Ms. Benitez, do you have any calendars, phone

18     records, anything that would help you remember how many

19     times you met with Mr. Rodriguez and Mr. Ojeda?

20     A.   No, ma'am.

21     Q.    During any of those meetings did Mr. Rodriguez

22     or Mr. Ojeda show you any documents?

23     A.   Yes.

24     Q.    What documents did they show you?

25     A.    I saw the videos of the incident, the chase

Confidential

Page 32

1   that night.

2       Q.   There are several videos of the incident.  Do

3   you want to describe which ones you reviewed with

4   Mr. Ojeda and Mr. Rodriguez?

5       A.   All the videos that the City gave to him.

6       Q.   And how about audio?  Did you listen to the

7   communications --

8       A.   Yeah.

9       Q.   -- tapes?

10          How about documents, did you look at any

11  documents?

12      A.   Documents?  I don't remember.

13      Q.   Did you review any general records from the

14  police department?

15      A.   Yes.

16      Q.   Which ones?

17      A.   The chase policy.

18      Q.   The one that was in effect at the time?

19      A.   I don't know which was in effect at the time.

20  The chase policy has changed several times.

21      Q.   And did they show you all the versions of the

22  chase policy or just one?

23      A.   The one the City gave them.

24      Q.   Did you review any deposition testimony?

25      A.   No.

Confidential

Page 33

1     Q.   Do you know what any of the witnesses have

2   testified to in this case?

3     A.   No.

4     Q.   Have you ever reviewed the State Attorney's

5   closeout memo?

6     A.   Yes.

7     Q.   Where?

8     A.   I Googled it on my phone.

9     Q.   You what?

10    A.   I searched it on my phone.

11    Q.   Where is it -- how did you get it on your

12   phone?

13    A.   I searched it.   Shooting -- Hialeah Shooting

14   involving officer, and Benitez, and then it comes up.

15    Q.   You reviewed the State Attorney's closeout

16   memo through a Google search?

17    A.   Yes, I did.

18    Q.   When?

19    A.   Right after -- I would say like right after

20   the case was closed.  And I also reviewed it -- once the

21   City received it, I also reviewed it.

22    Q.   You were not provided a copy of it by the

23   State Attorney; correct?

24    A.   No.  The copy that I saw, like I said, I did a

25   Google search on it.  But the first time that I heard of

Page 34

1   the closing memo, I obtained -- I didn't physically

2   obtain a copy.  I read it off of -- Carlos Garcia

3   provided me with the information.

4        Q.   And do you know how soon after that memo was

5   issued did Carlos Garcia provide you with a copy?

6        A.   No, I can't -- I don't remember.

7        Q.   Was the State Attorney's closeout memo one of

8   the documents you reviewed when you were preparing for

9   your deposition with Mr. Rodriguez and Mr. Ojeda?

10       A.   No.

11       Q.   I want to go through the timeline a little

12   bit.  Do you know the date of the State Attorney's

13   closeout memo?

14       A.   No, I don't.

15       Q.   All right.  September 18, 2018, does that

16   sound right to you?

17       A.   I wouldn't be able to tell you.  When I read

18   the memo, I just read the memo.  I didn't look at the

19   date.

20       Q.   Okay.

21       A.   Just read it to see what it said.

22       Q.   If you want to look at it, I'll pull a copy

23   for you at some point so we can get the timeline down.

24            What was the date you were terminated from the

25   Hialeah Police Department?

Confidential

Page 35

1      A.   Well, I was terminated on -- I was terminated

2   in August, but you would have to ask the City of

3   Hialeah, because after I was terminated, like, I was

4   relieved of duty pending termination, and I was

5   already -- the determination was already made, they

6   brought me back to work for a week.  So, to get the

7   exact date of the day that I was dismissed or fired or

8   terminated, you would have to ask the City what date do

9   they have.

10      Q.   Here, let me show you Defense Exhibit 1.  This

11   is a Police Department Memo to Human Resources from the

12   Chief of Police, dated August 28, 2018.  Can you see

13   that on your screen?

14      A.   Yes, I do.

15      Q.   This document indicates:  "Termination Date:

16   August 20, 2018."  Is that accurate?

17      A.   Well, they have -- on documents that I have,

18   it says August 18, 2018.  They have here August 20th,

19   2018.

20           So, like I said, you would have to ask them.

21   And that just says there:  "Release of final pay."

22           So, you would have to ask them what they have

23   as the termination date.

24      Q.   Okay.  I did ask them, and the City of Hialeah

25   produced this document and said:  "Termination Date:

Confidential

Page 36

1  August 20, 2018."

2       Can we agree that you've never worked for the

3  City of Hialeah after August 20, 2018?

4     A.   I would have to look to see that year where I

5  was the first day of school, because I took the day off.

6  I took the day off, and they forced me to come in to

7  work after approving my day off.  That's why I say you

8  would have to ask them what date they have because in my

9  documents it's not August 20th.

10     Q.   What does your document say?

11     A.   I don't have the document here, but it's not

12  August 20th.

13     Q.   It's some time before August 20th?

14     A.   Yes.

15     Q.   Okay.  Before you were terminated, you were on

16  administrative leave; is that correct?

17     A.   Yes, I was on administrative leave.  But, like

18  I said, I was terminated and brought back to work to

19  work for a week.  I even worked -- I even worked an

20  off-duty.  I worked the road and I worked an off-duty.

21       And, if you want, you can talk to them and

22  they can provide you with the e-mail that was sent out

23  telling me to come back to the station to pick up my

24  uniform, my gun belt, the City gun issued, and report

25  back to work.

Confidential

Page 37

1      Q.   When were you placed on administrative leave

2   prior to your termination?

3      A.   In April.

4      Q.   And how long were you out on administrative

5   leave?

6      A.   A few months.

7      Q.   Okay.  Let me show you your Performance

8   Evaluation.  Can you see the -- your Performance

9   Evaluation for the appraisal period June 7, 2017 through

10   June 7th, 2018?

11      A.   Yes.

12      Q.   Okay.  We'll scroll down here.  This

13   indicates, section 7:  Discipline:  Officer Benitez was

14   placed on administrative leave from April 3, 2018

15   through August 6th, 2018.

16          Is that accurate?

17      A.   Well, you see, there you have another date.

18   You have August 6th.  Then you're showing me a document

19   that says:  August 20th.  I'm telling you you have

20   another document that says before August -- before

21   August 20th.  And then at the same time, that evaluation

22   that you have there, I received it, and then they went

23   ahead and said not to turn it in.  They told the

24   sergeant not to turn it in, that he needed to re-do it,

25   and that he couldn't give me the points.  Meaning, the

Page 38

1  way that he did the evaluation was incorrect.  So that

2  evaluation, you have it but nobody else has it.

3      Q.   Were you on administrative leave from April 3,

4  2018 to August 6, 2018?

5      A.   I don't know about August 6th.  Remember, it

6  says there August 6th.  Your letter says August 20th.

7  I'm telling you it was before.  I'm telling you they

8  brought me back to work -- they terminated me and

9  brought me back to work for a week on the road.

10     Q.   You --

11     A.   So, obviously, I cannot say that I agree with

12  August 6th, 2018.

13     Q.   Is August 6th, 2018 the date that you met with

14  the Mayor for your pre-disciplinary hearing?

15     A.   Repeat the question.

16     Q.   Was August 6th, 2018 the date that you met

17  with the Mayor about the first of two pre-disciplinary

18  hearings you had with the Mayor of the City of Hialeah?

19     A.   I can't tell you the date, but I can tell you

20  that I met with him twice because what they wanted to

21  do, they wanted to split the case.  And after I ran to

22  see him and they said, okay, we're going to terminate

23  her.  And then, the second time they said they're going

24  to terminate her, and then they brought me back to work.

25  So maybe you can ask the City of Hialeah to provide you

Confidential

Page 39

1   with that letter, which is an e-mail that was sent out.

2       Q.   You were not terminated on August 6th; were

3   you?

4       A.   No, I was not.

5       Q.   You were terminated on August 14th; correct?

6       A.   I don't know if August 14th.  I don't know the

7   date.  I told you I knew it was before August 20th.  I

8   don't know the exact date.

9       Q.   Okay.  Going back to the timeline, your -- you

10  never worked for the City of Hialeah after August 20th,

11  2018; do you agree with that?

12      A.   Yes, I agree with that.

13      Q.   Okay.  And then the State Attorney's closeout

14  memo comes out and Carlos Garcia provides it to you.

15  Can you at least now recall that at the time Carlos

16  Garcia gave you a copy of that closeout memo you were

17  not working at the City of Hialeah; correct?

18      A.   Well, I wasn't -- when you say "not working,"

19  I still had contact with him.  I was placed on

20  administrative leave.  Even after I was terminated, I

21  still had contact with.  And -- so I wouldn't be able to

22  tell you a timeline as a date of when.  I can't tell you

23  that.  But I know before the memo came out, I knew that

24  the shooting was going to be labeled a justified

25  shooting.

Confidential

Page 40

1    Q.   And how did you know that?

2    A.   Because Carlos Garcia told me.

3    Q.   Does Carlos Garcia work at the State

4  Attorney's Office?

5    A.   No, but he cleans up the dirt for the Chief.

6    Q.   Carlos Garcia cleans up the dirt for the

7  Chief?

8    A.   Yes.

9    Q.   When you learned from Carlos Garcia that the

10  shooting was going to be deemed justified, did you

11  report the information you had in order to change that

12  outcome?

13    A.   Repeat the question.

14    Q.   Sure.

15        After you learned that the shooting was going

16  to be deemed justified, did you come forward to disclose

17  the information that you had about the shooting?

18    A.   Well, I knew that -- I knew that the shooting

19  was going to be justifiable way before the memo came

20  out.

21    Q.   Okay.  Your testimony in this case in February

22  of 2020 really puts into question your sworn statement

23  of October 1st and October 5th of 2018.  Do you agree

24  with that?

25    A.   No, I don't agree because it wasn't 2020.

Confidential

Page 41

1     Q.   Your sworn testimony in this case in February

2   of 2021 puts into question the accuracy of your sworn

3   statements given in the police investigation conducted

4   into the shooting of Lester Machado and your sworn

5   statements of October 1 and October 5th of 2017;

6   correct?

7          MR. RODRIGUEZ:  Objection to form.

8          You can answer.

9     A.   Repeat the question.  I don't understand your

10   question.

11         MS. WELSTEAD:  Sure.

12         I'll have the Court Reporter read it back.

13         (Thereupon, the following was read by the

14   Court Reporter:

15         "Question:  Your sworn testimony in this case

16         in February of 2021 puts into question the accuracy

17         of your sworn statements given in the police

18         investigation conducted into the shooting of Lester

19         Machado and your sworn statements of October 1 and

20         October 5th of 2017; correct?")

21         THE WITNESS:  What do you mean by that?

22         That question is for the attorney, of course.

23         THE COURT Reporter:  I'm sorry, the question

24   is what?

25         THE WITNESS:  I know that you read the

Confidential

Page 42

1      question.  But, my reply to not to you.  It's to

2      the attorney, that what does she mean by that?

3  BY MS. WELSTEAD:

4      Q.   Your testimony in this case is that you were

5  lying on October 1 and October 5th, 2017; correct?

6      A.   No, it's not correct.

7      Q.   You describe it.  What is the takeaway from

8  your testimony in this case about your prior sworn

9  statements?

10     A.   I don't know how to answer that question.

11  What do you mean "What is the takeaway"?

12     Q.   Well, what do you come forward to tell about

13  those statements?

14     A.   Well, I answered what they wanted me to

15  answer.

16     Q.   Did you answer the truth?

17     A.   I answered the truth, but I didn't answer

18  completely.

19     Q.   Did you withhold information?

20     A.   I answered what they asked me.

21     Q.   Did you withhold information?

22     A.   I answered what they asked me.  That's what

23  you're supposed to answer.  You answer what they ask

24  you.  That's common practice in Hialeah.  You answer

25  what they ask you.

Confidential

Page 43

1      Q.   There is information that you did not disclose

2   during those two sworn statements, correct, information

3   you had about the shooting that you did not disclose;

4   right?

5      A.   Correct, because I answered what they asked

6   me.  And they said:  You're going to answer what we ask

7   you.

8      Q.   Did you come forward at any point prior to

9   February 2nd, 2021, when you were deposed in this case,

10   to let someone know that there was information you had

11   but nobody had asked for?

12      A.   Repeat the question.

13      Q.   At any point prior to February 21st of 2020,

14   when you gave your -- 2021, when you gave your

15   deposition in this case, did you come forward to let

16   people know that you had more information?

17      A.   Well, they know I had more information.  Prior

18   to giving my testimony on the 1st and the 5th, Carlos

19   already knew what had happened.  And that's why my

20   testimony -- my recorded statement is the way that it

21   is, because they said -- okay, I told them what

22   happened.  He says:  You're going to answer what we ask

23   you.

24         So, that's why my statement was incomplete.

25      Q.   Carlos knew what had happened because you told

Confidential

Page 44

1    him before your statement was recorded; correct?

2        A.   Correct.

3        Q.   And do you remember what time in the morning

4    your statement was recorded?

5        A.   No, I don't remember the time.

6        Q.   Do you remember how much time you spent with

7    Carlos telling him all of the information you knew about

8    the shooting but were not going to give if he didn't ask

9    the right questions?

10       MR. RODRIGUEZ:  Objection to form.

11       A.   He knew everything that happened in the

12   case from --

13   BY MS. WELSTEAD:

14       Q.   He knew everything that happened from you?

15       A.   He knew everything that happened that night

16   prior to the shooting, during the chase, at the first

17   scene, at the second scene, and afterwards.

18       Q.   Did he know it because you told him?

19       A.   Yes.

20       Q.   And when did you tell him?

21       A.   I told him on -- when he was driving to the

22   scene of the shooting.

23       Q.   How long did you spend telling him while he

24   was driving to the scene of the shooting?

25       A.   Well, you have to see how fast he got to the

Confidential

Page 45

1   scene.  And right after he arrived at the scene, that he

2   walked around, then he spoke to me again --

3       Q.   And how many minutes --

4       A.   -- and he took my statement.

5       Q.   Well, you said by the time that he took your

6   statement he already knew the truth but he wasn't going

7   to ask you for the truth; is that correct?

8       A.   Well, he already knew the truth.  He knew

9   everything.  He knew everything that had happened

10   and then --

11       Q.   And he --

12       A.   Go ahead.

13       Q.   Did he know everything that you knew before

14   you gave your sworn statement?

15       A.   Yes.

16       Q.   Okay.  So when did you tell him that, on the

17   car ride to the scene?

18       A.   On the car ride and before he put me on tape.

19       Q.   Okay.  So how many minutes was that that you

20   spent telling him everything you knew?

21       A.   I can't tell you how many minutes.  I wasn't

22   talking to him looking at my watch.

23       Q.   You can't judge time unless you look at your

24   watch?

25       A.   No, I just can't tell you.  I'm not going to

Confidential

Page 46

1   make something up just to give you an answer.  I don't

2   know how much time.

3       Q.   Okay.  Did you spend less than an hour with

4   him?

5       A.   I spent the whole night with him.

6       Q.   The whole night of October 1st?

7       A.   Yes.

8       Q.   What about the morning of October 1st?

9       A.   And the morning hours also and after we left

10   the scene.  The whole day.

11       Q.   You spent the whole --

12       A.   Yes, the whole day, yes.

13       Q.   You spent the whole day with Carlos Garcia on

14   October 1st, 2017?

15       A.   Yes, I did.

16       Q.   Okay.  So any sworn statements or recorded

17   statements we have that were taken by Carlos Garcia that

18   day, it's your testimony that you were present during

19   those sworn statements?

20       A.   Repeat the question.

21       Q.   Sure.  Carlos Garcia had some official duties

22   on October 1, 2017; did he not?

23       A.   Yes, he did.

24       Q.   And that included taking sworn statements;

25   didn't it?

Confidential

Page 47

1    A.   Yes, from other officers, yes.

2    Q.   In fact, he took your sworn statement; right?

3    A.   Correct.

4    Q.   And it's your testimony today that you were

5   with him the entire day, October 1, 2017; correct?

6    A.   Correct.

7    Q.   Were you with him when he was taking sworn

8   statements from other officers?

9    A.   Yes, I was.

10    Q.   Okay.  Was -- did there ever come a point in

11   time on October 1, 2017, when you and Carlos Garcia were

12   not together?

13    A.   Well, obviously when I went home to shower,

14   when I went to the restroom.  You can say most of the

15   day, yes.

16    Q.   Well, that's not what you said.  You said "the

17   whole day."  So, that's not true?

18    A.   Well, it wasn't the whole 24 hours that the

19   day holds, but you can say most of the day.

20    Q.   Okay.  And the reason that you only answered

21   the questions you were asked and provided no other

22   information was because that's the way it was done at

23   Hialeah; correct?

24    A.   Correct.

25    Q.   How come you did not come forward after you

Page 48

1   were no longer with the City of Hialeah?

2       A.   Come forward to where?

3       Q.   To anywhere?

4       A.   What's "anywhere"?

5       Q.   What about the State Attorney's Office?

6       A.   What about the State Attorney's Office?  State

7   Attorney's Office said that it was justifiable.

8       Q.   The State Attorney's Office didn't say it was

9   justifiable at the time that you left Hialeah.  You left

10  Hialeah in August of 2018.  Their closeout memo doesn't

11  come out for a month later.  Why didn't you go to the

12  State Attorney's Office when you left Hialeah to tell

13  them the information that had not been revealed in the

14  investigation?

15      A.   Because prior to this memo coming out and

16  right after the shooting when Carlos Garcia went into

17  State Attorney's Office, I don't know what floor it is,

18  but it was the person that was in charge of this case, I

19  went with him, and I heard the whole conversation.  I

20  sat in the conference room and I heard the whole

21  conversation that this was going to be a justifiable

22  shooting.

23      Q.   You sat in a conference room with what State

24  Attorney?

25      A.   Whoever was taking care of the case at the

Confidential

Page 49

1  time.

2      Q.   So you were present when Carlos Garcia

3  provided his summary of his investigation to the State

4  Attorney's Office?

5      A.   Yes.

6      Q.   You were present?

7      A.   Yes.  And when they spoke about how many shots

8  were fired and how many hit Justin Machado, I was there,

9  how the casings -- they couldn't tell what casings came

10  out of what gun.  Yes, I was present.

11      Q.   Okay.  And were you employed at the City of

12  Hialeah at that time?

13      A.   Was I employed?  I believe so.

14      Q.   Okay.  My question was:  When you were no

15  longer employed by the City of Hialeah, why didn't you

16  return to the State Attorney's Office to let them know

17  you had information that was not disclosed in the

18  investigation?  Do you understand that question?

19      A.   Yes, I do.

20      Q.   Okay.  Tell me.  Why after your separation

21  from the City of Hialeah didn't you return to the State

22  Attorney's Office to let them know the information that

23  you had but did not disclose?

24      A.   Because they were not going to do anything

25  about it.

Confidential

Page 50

1    Q.   Well, they would have taken it down; right?

2    A.   Yes.

3    Q.   They would have made a record of it; correct?

4    A.   Yes.  Really?  Just like they did with the

5    Menocal case.

6    Q.   Can you answer the question?  They would have

7    taken it down and made a record of it; correct?

8    A.   And I'm saying:  Really, they would?

9        I don't know that.  I don't think so.  My

10   perception is they were not going to do anything about

11   it.

12   Q.   Did you go in after your termination from the

13   City of Hialeah and register a complaint with Internal

14   Affairs about the way you were treated in this

15   investigation?

16   A.   Did I go into the City and file a complaint?

17   Q.   Yes.

18   A.   No, I did not.  And the reason why I did not

19   is because the City is not going to do anything about

20   it.  Remember, they're the ones involved in the

21   shooting.

22   Q.   You're familiar with the Professional

23   Compliance Bureau; correct?

24   A.   With the what?

25   Q.   Internal Affairs.  It's now PCB.

Confidential

Page 51

1    A.   Yes, I am.

2    Q.   Okay.  And you're familiar that the police

3  departments have an obligation to make a record of

4  civilian complaints; correct?

5    A.   That's what they are supposed to do, correct.

6  Supposed to do, correct.

7    Q.   You've taken advantage of that; haven't you?

8    A.   I have gone in and filed --

9        (Thereupon, the Court Reporter experienced

10  technical difficulties and lost the Zoom connection.

11  The videotaped deposition continued being recorded via

12  Zoom with no court reporter present.)

13        (Thereupon, the following testimony was

14  transcribed from the Zoom video recording:)

15  BY MS. WELSTEAD:

16    Q.   You've taken advantage of that; haven't you?

17    A.   I have gone in and filed complaints, and it

18  turns around that you make the complaint and you end up

19  the one getting in trouble for making the complaint.

20    Q.   Is that what happened to you?

21    A.   Well, I didn't go in for this case, like I

22  said.

23    Q.   My question is:  Why didn't you go in for this

24  case?  Why didn't you go in and make a citizen's

25  complaint with PCB so that they would have a written

Confidential

Page 52

1   record of your position that you withheld information

2   during the investigation into this police-involved

3   shooting?

4        MR. RODRIGUEZ:  Objection to form.

5        A.   Because I would have been terminated even

6   earlier than --

7   BY MS. WELSTEAD:

8        Q.   Excuse me?

9        A.   I would have been terminated right there on

10   the spot.

11        Q.   You were trying to protect your job?  That's

12   why you didn't tell the truth?

13        A.   Yes.

14        Q.   Yes?

15        A.   Yes.

16        Q.   Okay.  So my question is:  After you lost your

17   job, which occurred in August of 2018, why didn't you

18   report your information to the Hialeah Police

19   Department, to the State Attorney's Office, or to any

20   official agency?  Why didn't you do that?

21        A.   Well, I was not going to have any contact with

22   the Hialeah Police Department.  That's number one.

23        Q.   Okay.  Why didn't you go to the State

24   Attorney's Office?

25        A.   Because the State Attorney's Office is not

Confidential

Page 53

1   going to do anything about it.

2      Q.   Okay.  Well, why didn't you go to the FBI?

3      A.   Because I didn't know I could contact the FBI.

4      Q.   You keep talking about Menocal.  Didn't -- the

5   FBI, aren't they the ones that arrested Menocal?

6      A.   Yes.

7      Q.   So you've been following that case pretty

8   closely.  So you knew that the FBI --

9      A.   Well, I didn't --

10     Q.   -- would take a step and do something that the

11  Hialeah Police Department would not do, according to

12  you.  Why didn't you, when you read about Menocal's

13  arrest, walk into the FBI and advise them that you had

14  information about this police-involved shooting?

15     A.   Like I said, I didn't know I could contact the

16  FBI on an open, ongoing investigation.  I didn't know

17  that.

18     Q.   You didn't know that you could contact the FBI

19  to discuss --

20     A.   Discuss --

21     Q.   -- to report what you have told us here today

22  was a homicide?  You didn't know you could report a

23  homicide to the FBI?

24     A.   On an ongoing investigation to discuss it with

25  somebody else?  No.

Confidential

Page 54

1      Q.   Okay.  What about after the investigation was

2   closed?

3      A.   The investigation is still not closed.

4      Q.   The police investigation into the shooting of

5   Lester Machado remains open?

6      A.   Yes.

7      Q.   What agency has an open investigation on that?

8      A.   Well, like you said, the investigation that

9   would have it open is the FBI now, with everything

10   that's going on.

11      Q.   Okay.  Does the FBI have an open investigation

12   on this case?

13      A.   Do they have an open case now?

14      Q.   Yes.

15      A.   I believe so.  I would think so.

16      Q.   And why would you think that?

17      A.   Because the coverup.

18      Q.   And did you report the coverup to the FBI?

19      A.   No.  Who would I contact?

20      Q.   Excuse me?

21      A.   I said no.

22      Q.   Why not?

23      A.   Because who am I supposed to contact?

24      Q.   Your local FBI bureau.  You can Google it just

25   like you Googled the State Attorney's memo.

Confidential

Page 55

1    A.   Google --

2    Q.   Did you Google the FBI?

3    A.   No, I did not.

4    Q.   What about the U.S. Attorney's Office, did you

5    speak with anyone at the U.S. Attorney's Office about

6    the alleged coverup at Hialeah?

7    A.   No, I did not.

8    Q.   Why not?

9    A.   Because I didn't know that I could contact

10   them.

11   Q.   Well, you spent three or four hours, maybe

12   less, with Mr. Rodriguez and Mr. Ojeda. Mr. Ojeda is a

13   former homicide investigator; correct?

14   A.   Well, three or four hours?  I said a few

15   hours. I never said if it's three or four or two or

16   eight. I don't know.

17   Q.   Okay. During the few hours that you spent with

18   Mr. Rodriguez and Mr. Ojeda, did he tell you that he was

19   a former homicide investigator?

20   A.   No.

21   Q.   Did he tell you that you could report your

22   concerns to the FBI?

23   A.   No, we didn't discuss that.

24   Q.   Did you discuss bringing your information to

25   any investigating agency at all?

Confidential

Page 56

1          (This concludes the transcription of the

2     testimony from the Zoom video recording wherein the

3     Court Reporter was not present.)

4          (Thereupon, the Court Reporter was able to

5     re-connect via Zoom platform, and the deposition

6     continued as follows:)

7          THE COURT REPORTER:  I'm sorry.  Counsel, this

8        is the court reporter.  I lost connection.  I don't

9        know if you noticed.  I had gone frozen and I tried

10        to connect back on.

11          So the last I have -- it probably was about a

12        minute ago.

13          MS. WELSTEAD:  Okay. Has the recording kept

14        recording or did we lose the video recording as

15        well?

16          THE COURT REPORTER:  Well, the recording is

17        being recorded through Zoom, so I'm sure if you

18        lose connection through me, I think it would have

19        gone too. I don't know how that really works with

20        Zoom, because it wasn't showing on my end that I

21        had anything going. I didn't even have any of you

22        showing up.

23          The last part I have is when you were talking

24        about -- let me see.

25          (Thereupon, the following was read by the

Confidential

Page 57

1   Court Reporter:

2       "Question:  And you're familiar that the

3   police departments have an obligation to make a

4   record of civilian complaints; correct?

5       "Answer: That's what they are supposed to do,

6   correct.  Supposed to do, correct.

7       "Question: You've taken advantage of that;

8   haven't you?

9       "Answer: I have gone in and filed --")

10      THE COURT REPORTER:  And that's where I had a

11  frozen screen come up.

12      MS. WELSTEAD:  Okay.  So, yeah, that's more

13  than a minute ago.

14      Is there any way we can check whether -- what

15  the status is of the video recording so I need to

16  know whether or not we're going to have to re-do

17  those questions again?

18      THE COURT REPORTER:  If you give me one second

19  to contact my office and let me find out from

20  them if --

21      MS. WELSTEAD:  How about if we go off the

22  record and take our five-minute break?  And I'll,

23  of course, give you time for your break as well,

24  Madam Court Reporter.  But, if we could get an

25  answer on that to see if we have a video recording.

Confidential

Page 58

1        THE COURT REPORTER:  I will.  I'll get that

2    back to you.  And I apologize.

3        MS. WELSTEAD:  Oh, no --

4        THE COURT REPORTER:  I tried putting the

5    information on the chat but it wouldn't --

6        MS. WELSTEAD:  You know, maybe if we have your

7    cell phone or something, and I'll give you my cell

8    phone number in the chat, and you can just pin me

9    if that happens again.

10       THE COURT REPORTER:  And I'll do the same.  If

11    you see me disappear -- I actually went on a

12    hotspot.

13       MS. WELSTEAD:  Yeah, I'm not looking at

14    whether you're on the screen.  Sorry.

15       THE COURT REPORTER:  Right.  I apologize.  Let

16    me put my information on the chat too, in case

17    anyone notices that I'm gone from the thing. It

18    shouldn't happen because I went off my WiFi

19    completely and I'm doing it via a hotspot.

20       MS. WELSTEAD:  Okay.  So let's take five

21    minutes and we'll reconvene and figure out where we

22    are in the record.

23       MR. RODRIGUEZ:  Okay.

24        (Thereupon, at 10:18 a.m. a recess was taken

25    until 10:30 a.m., after which the deposition continued

Confidential

Page 59

1   as follows:)

2        MS. WELSTEAD:  So the Court Reporter has said

3        apparently we have a recording of what was lost,

4        but we don't have a written record.  Once we see

5        the video, I guess I'd like counsel to take a look

6        at it and see if we can stipulate that the video

7        record is accurate, but just in case I need to go

8        back and clarify a couple of things.  Is that an

9        acceptable procedure for everyone?

10        MR. RODRIGUEZ:  Sure.

11   BY MS. WELSTEAD:

12   Q.   Okay.  Ms. Benitez, I was asking you about

13   complaints, whether you voluntarily went to any law

14   enforcement agency to report the information you had

15   about this police-involved shooting but that you did not

16   disclose during the Hialeah investigation.

17        What is your answer to that question?  Did you

18   report your information to any law enforcement agency?

19   A.   No, I did not.

20   Q.   The only people you reported the information

21   you had was to Domingo Rodriguez and Julio Ojeda; is

22   that correct?

23   A.   Well, it's not I reported.  It's when I had my

24   deposition I came up and I spoke about it.

25   Q.   Okay.  You spoke about it before your

Confidential

Page 60

1   deposition to those two gentlemen; correct?

2       A.   Correct.

3       Q.   But you've never reported it to any law

4   enforcement agency; correct?

5       A.   Correct.  I never went to the State Attorney's

6   because I didn't trust -- I didn't have faith in them

7   that they were going to do anything and also at the time

8   I didn't know that I can report it to them.

9       Q.   Okay.  You're in law enforcement yourself;

10  were you not?

11      A.   Yes.

12      Q.   For over a decade; right?

13      A.   Correct.

14      Q.   And it's your testimony that being a law

15  enforcement officer for over ten years you had no

16  knowledge that you could report your concerns about a

17  police-involved shooting investigation to the FBI?  Is

18  that your testimony?

19      A.   That I did not know, yes.

20      Q.   Okay.  And how about the U.S. Attorney's

21  Office, you had no knowledge based on your years in law

22  enforcement activity that you could report wrongdoing

23  and corruption in the Hialeah Police Department to the

24  U.S. Attorney's office; is that your testimony?

25      A.   Yes, I thought that you could only report it

Confidential

Page 61

1  to the State Attorney's Office, and I didn't have faith

2  in the State Attorney's Office.

3      Q.   What about FDLE, how come you didn't report it

4  to FDLE?

5      A.   I didn't know you could report it to FDLE.

6      Q.   Why not?  How do you not know that?

7      A.   I didn't know it.  I found out afterwards that

8  when you want to make a complaint at an officer, just an

9  officer or just not an incident, that you could contact

10  the FDLE and that the FDLE also does an investigation.

11  I didn't know that.

12      Q.   How did you learn that?

13      A.   Excuse me?

14      Q.   How did you learn that?

15      A.   Because when I called FDLE to find out about

16  my status with my certification.

17      Q.   When did you do that?

18      A.   After I was terminated.

19      Q.   How soon after you were terminated did you

20  contact FDLE?

21      A.   A few months after.

22      Q.   So a few months after you were terminated.  So

23  would that have been 2018 or 2019?

24      A.   Could have been either or.

25      Q.   Okay.  What is your current status with FDLE?

Confidential

Page 62

1      A.   Active.  Meaning I still have my

2   certification.

3      Q.   And how long is it active for?

4      A.   I have no idea.

5      Q.   Did you call FDLE to let them know that you

6   were separated from the City of Hialeah Police

7   Department?

8      A.   Yes, I did.

9      Q.   How soon after your termination did you

10   contact them to let them know that information?

11      A.   When I contacted them to find out about my

12   certification.  But they already knew.

13      Q.   Okay.

14      A.   The Department lets FDLE know that you're

15   terminated.

16      Q.   But you contacted --

17          I'm sorry, did you finish your answer?

18      A.   I said that as soon as you separate or you're

19   terminated from law enforcement, the Department contacts

20   FDLE and lets them know.

21      Q.   And you contacted them yourself?

22      A.   Well, when I contacted them to find out about

23   my certification, they already were aware that I was

24   terminated.

25      Q.   And what did you ask them?

Confidential

Page 63

1      A.   I asked them if -- what was the reason for

2   termination.

3      Q.   And what did they tell you?

4      A.   Well, the person I spoke to said that the

5   reason why I was terminated was because I didn't pass a

6   training.

7      Q.   And was that accurate?

8      A.   No, that's not.

9      Q.   Did you correct that information with FDLE and

10   give them the real reason for your termination?

11      A.   Well, I told them the reason why they

12   terminated me.

13      Q.   Do you know if it's been corrected on FDLE's

14   record?

15      A.   I don't know.

16      Q.   During that telephone call did you learn that

17   you were able to make a complaint against an officer

18   with FDLE?

19      A.   No.  No.

20      Q.   When did you learn that information?

21      A.   It was after the phone call, and I went into

22   their website and I started reading.

23      Q.   And when was that?

24      A.   After I contact them, whenever I contact them.

25   I can't give you a date.

Confidential

Page 64

1    Q.   Can you give me a month?

2    A.   No, I can't give you a month.

3    Q.   Can you put it in relation to your termination

4 date?

5    A.   It was after the termination.

6    Q.   How much after?

7    A.   I can't tell you that.  I don't know.  I don't

8 keep notes like that.  I call, contact them and that's

9 it.  I don't keep notes.

10    Q.   Did you send an e-mail?

11    A.   I believe I sent an e-mail way after that.

12    Q.   To FDLE?

13    A.   Yes.

14    Q.   About what?

15    A.   So that they can send me the information.

16    Q.   For what?

17    A.   As to the reason why they had me terminated.

18    Q.   Did they do that?

19    A.   Yes, they sent me an e-mail.

20    Q.   And what did they send you?

21    A.   A form.  A form that was provided by the City

22 of Hialeah.

23    Q.   What does the form say?

24    A.   The reason why I was terminated.

25    Q.   What reason is given on the form?

Confidential

Page 65

1     A.   Well, I can't tell you off the top of my head.

2   I would have to see the paper, the document, so I can

3   read it off of there and tell you.

4     Q.   Do you have the document in your e-mail?

5     A.   Not on my phone, no.

6     Q.   So you have the e-mail from your prior counsel

7   on your phone, but you don't have the e-mail from FDLE

8   on your phone?  Yes?

9     A.   Correct.

10     Q.   But you have different e-mail addresses that

11   you use?

12     A.   Yes, I do.

13     Q.   What is the one that you use for your

14   communications with FDLE?

15     A.   I don't wish to share that.

16     Q.   We can stop the video recording but that's

17   information that I'm going to need, your contact

18   information, Ms. Benitez.

19     A.   Well, I'm not going to give you my personal

20   e-mail.

21     Q.   On what basis?

22     A.   The basis that I don't want to give it to you.

23     Q.   What is the e-mail address that you used to

24   communicate with FDLE?

25     A.   Ma'am, I just told you.  I'm not going to give

Confidential

Page 66

1   you my personal email.

2        Q.   Okay. What is the cell phone number that you

3   used to communicate with FDLE?

4        A.   I have to give you my cell phone on the

5   record?

6        Q.   I am more than happy to go off the video

7   record and to maintain your personal contact information

8   private, particularly given that there's a State statute

9   protecting the private information of law enforcement

10   officers.  So, that's never been a problem for anyone.

11           So I would like to know what your personal

12   contact information is.

13        A.   My cell phone --

14        Q.   Would you like to do it off the record?

15        A.   Yeah, you can do it off the record.

16        Q.   Excuse me?

17        A.   I said:  Can you do it off the record?

18        Q.   I said:  Would you like to do it off the

19   record?

20        A.   Yes, that's fine.

21           MS. WELSTEAD:  Okay.  Great.

22           Can we stop the video recording?

23           (Thereupon, the video recording was paused.)

24

25

Confidential

Page 67

1          *** THIS PAGE IS CONFIDENTIAL ***

2          (Thereupon, the deposition continued off the

3   video record, and the following testimony is designated

4   "CONFIDENTIAL":)

5   BY MS. WELSTEAD:

6      Q.   Okay.  Ms. Benitez, what is your cell phone?

7          THE COURT REPORTER:  I'm sorry, Counsel.  I'm

8      sorry, Counsel.  You wanted the video stopped and

9      you want the Reporter to continue?

10         MS. WELSTEAD:  I want the Reporter to

11     continue.  We'll maintain this section of the

12     deposition "Confidential" and it will not be

13     video-recorded.

14         Do you understand, Ms. Benitez?

15         THE WITNESS:  Yes, I understand.

16         MS. WELSTEAD:  Okay.  And you agree with those

17     conditions?

18         THE WITNESS:  Yes.

19   BY MS. WELSTEAD:

20     Q.   Okay.  Your cell phone, please?

21     A.

22     Q.   And what is your current address?

23     A.   My mailing address is                          .

24     Q.

25     A.   Yes.

Confidential

Page 68

1         *** THIS PAGE IS CONFIDENTIAL ***

2    Q.   And the city and zip, please?

3    A.                              .

4    Q.   And you have another address that you are

5  physically living at?

6    A.   Yes, but I don't know it.

7    Q.   What's the street?

8    A.   I don't know the street.

9    Q.   Excuse me?

10   A.   I don't know the street.

11   Q.   You don't know which street that you --

12   A.   No, I don't.

13   Q.   You what?

14   A.   I do not know the physical address.  I don't

15  know it.

16   Q.   I didn't ask the number of the home.  I asked

17  for the street.  You don't know which street you live

18  on?

19   A.   No, I don't.

20   Q.   Do you know what city you live in?

21   A.   Well, I stay at two places.  I stay in the

22  address I gave you in Hialeah or, if not, in Pembroke

23  Pines.  I don't know the address.

24   Q.   And what's the best e-mail address to contact

25  you at?

Confidential

Page 69

1        *** THIS PAGE IS CONFIDENTIAL ***

2     A.

3     Q.   And do you have a professional e-mail address

4   that you use to communicate with the FDLE?

5     A.   It should be the

6                               .

7     Q.   Would it be                        or something

8   else?

9     A.                      .

10     Q.

11     A.   Yes.

12        MS. WELSTEAD:  Okay.  Those are all the

13     personal questions regarding contact information.

14        So, let's start up the video record again.

15      *** END OF "CONFIDENTIAL" INFORMATION ***

16

17

18

19

20

21

22

23

24

25

Confidential

Page 70

1          (Thereupon, the video recording resumed, and

2     the deposition continued as follows:)

3     BY MS. WELSTEAD:

4          Q.   Ms. Benitez, since your termination from the

5     Hialeah Police Department have you applied to any other

6     agencies?

7          A.   No.

8          Q.   Are you currently working?

9          A.   No.

10         Q.   Have you worked since your termination from

11    the Hialeah Police Department?

12         A.   Have I worked since the termination?  No.

13         Q.   Okay.  Going back to our timeline.  You have

14    mentioned a couple of times in your prior deposition the

15    Menocal case.  Do you remember that?

16         A.   Yes.

17         Q.   Did you have any personal involvement in the

18    Menocal case?

19         A.   No.

20         Q.   Do you know what agency was investigating

21    Sergeant Menocal?

22         A.   That be would Hialeah.

23         Q.   Do you know what agency arrested Sergeant

24    Menocal?

25         A.   The FBI.

Confidential

Page 71

1    Q.  And how did you learn that?

2    A.  It made -- it was on the news.

3    Q.  And did you see it on the news?

4    A.  Yes, I did.

5    Q.  And after you saw it on the news, did you

6  contact the FBI to let them know that you had personal

7  information about corruption in the City of Hialeah?

8    A.  No, I did not.

9    Q.  Why not?

10    A.  I figured they would find out as soon as

11  they're investigating Hialeah -- an officer in Hialeah.

12  So at the end of the day whatever other corruption is

13  out there is going to come out.

14    Q.  At the end of the day, you chose to not come

15  forward and provide your information?

16    A.  Excuse me?

17    Q.  At the end of the day, you chose to not come

18  forward and provide your information to the FBI; is that

19  correct?

20    A.  No, that's not correct.

21    Q.  Okay.  When did you go to the FBI?

22    A.  I didn't go to the FBI.

23    Q.  Why did you choose not to go to the FBI?

24    A.  It's not that I chose not to go to the FBI.  I

25  didn't know that I could go to the FBI.

Confidential

Page 72

1    Q.   Did you figure it out once you saw that

2   Menocal was arrested by the FBI?

3    A.   No.

4    Q.   Did Mr. Ojeda tell you that he was formerly a

5   police officer?

6    A.   Yes.

7    Q.   And did you provide him with the information

8   that you had regarding this police-involved shooting?

9    A.   We spoke about it.

10    Q.   Okay. So you let him know the information

11   that, say, Carlos Garcia didn't ask you about when he

12   was asking you in your sworn statement; correct?

13    A.   I told him what happened.

14    Q.   You gave Mr. Ojeda the whole story; right?

15    A.   Right.  I gave him the whole story of what

16   happened the night of the shooting.

17    Q.   Got it.  So did Mr. Ojeda give you the name of

18   anyone at the FBI or the U.S. Attorney's Office that you

19   could tell that story to?

20    A.   No.

21    Q.   What about Mr. Rodriguez, did Mr. Rodriguez

22   give you the name of any law enforcement agency you

23   could give your story to?

24    A.   No.

25    Q.   Has anyone from the FBI ever contacted you

Confidential

Page 73

1    about what information you may have?

2        A.   No.

3        Q.   Do you know if Mr. Ojeda has contacted the FBI

4    about your information?

5        A.   I don't know.

6        Q.   Do you know if any of the lawyers in this case

7    have contacted the FBI about your information?

8        A.   I don't know.

9        Q.   Have you ever seen a copy of your deposition

10   transcript?

11       A.   Yes, I did.

12       Q.   When did you see that?

13       A.   Saturday.

14       Q.   And where was it on Saturday that you reviewed

15   it?

16       A.   I reviewed it in Rick -- Rick Diaz' office.

17       Q.   Had you seen it before Saturday?

18       A.   No.

19       Q.   Who else was present in Rick Diaz' office on

20   Saturday when you reviewed your transcript?

21       A.   Mr. Domingo.

22       Q.   Anyone else?

23       A.   There was a gentleman there.

24       Q.   Anyone that you knew?

25       A.   No.

Page 74

1    Q.   Did the other gentleman remain in your meeting

2  with Mr. Diaz and Mr. Domingo?

3    A.   He was in and out.

4    Q.   And what did you spend your time doing on

5  Saturday?

6    A.   I got the depo -- a transcript of the depo and

7  I was supposed to read it, to review it, and to make

8  sure that I was available Monday morning.  And, here I

9  am.

10    Q.   Did you review the transcript for accuracy?

11    A.   Well, to be honest with you, I took the

12   transcript home, but I didn't have time to look at it.

13   So it was obviously in the back seat of my car.

14    Q.   Okay.  So, as you sit here today, you have not

15   reviewed your deposition transcript?

16    A.   Correct.

17    Q.   Okay.  You just have seen it.  You know that

18   it exists and you have a copy of it; right?

19    A.   Correct.

20    Q.   So how long did you spend at Mr. Diaz' office

21   on Saturday?

22    A.   About an hour.

23    Q.   And what did you do for an hour?

24    A.   I got the transcript.  Like I said, they told

25   me to make sure -- you know, just to look over it.  And

Page 75

1   then I was on the phone -- most of the time I was on the

2   phone, and I was also doing something on my iPad.  I was

3   doing personal stuff.  And that's about it.

4        Q.   Who were you on the phone with?

5        A.   I have to give you that information too?

6        Q.   You were on the phone with someone other than

7   Mr. Diaz and Mr. Rodriguez?

8        A.   Yes.

9        Q.   And you were on your iPad doing personal

10  business while you were at Mr. Diaz' office?

11       A.   Yes.

12       Q.   I'm more interested in your interactions with

13  Mr. Diaz and Mr. Rodriguez on Saturday.  What were those

14  interactions?

15       A.   Interactions?  I arrived.  It took me a while

16  to make contact with them because I was on a personal

17  phone call.  Then, I walked in and said:  Good morning.

18       I was -- I got the transcript.  Then, I got

19  back on the phone, on my phone.  And then they told me

20  to -- you know:  This is the deposition so you can read

21  it.  This is everything that was said -- that you said,

22  you know, if you want to take a look at it.

23       Then, I got on the iPad -- on my iPad, and I

24  got back on the phone.

25       Then, they were talking amongst each other.

Confidential

Page 76

1  Then, one of us received a phone call.  Then, we spoke

2  very briefly.  And then the other attorney got on his

3  phone.  So, we really didn't have much interaction

4  because I was taking care of personal issues.

5      Q.   What was the purpose of the meeting?

6      A.   The purpose of the meeting was so I can pick

7  up the transcript and to make sure that I will be

8  available today for this depo.

9      Q.   Okay.  And do you know why the meeting was in

10  person then?

11      A.   Why it was in person?

12      Q.   Yeah.

13      A.   Because they needed me to pick up the depo --

14  the transcript, I'm sorry.  The transcript of my

15  deposition.

16      Q.   And what did you discuss with Mr. Diaz about

17  the case?

18      A.   I just discussed briefly -- we just spoke

19  briefly about the case.  We didn't get too much into

20  detail.

21      Q.   I understand.  So, just the surface level

22  then?

23      A.   He told me to read it, that that was my

24  transcript for my deposition, that there was a copy,

25  just to go over it, if I needed to go over it.  That's

Confidential

Page 77

1   it.

2       Q.   Right.  So I'm curious as to why you didn't

3   leave after you got the deposition transcript.

4       A.   Because I was on the phone and I was doing

5   something on my iPad.  If I go ahead and walk out, then

6   I need connection from the hotspot from my phone to my

7   iPad.

8       Q.   So you spent an hour at his office doing

9   personal business and not discussing the case; is that

10  your testimony today?

11      A.   I didn't spend a whole hour doing personal

12  business.  I just told him:  Excuse me for a second.  I

13  need to do something.

14          And they were fine with it.

15      Q.   Okay.  You still have not told me anything

16  that you discussed with the lawyers on Saturday.

17      A.   I just told you that we went -- that we

18  discussed that that was the transcript to my deposition,

19  for me to look over it.  I told you that they were on a

20  phone call, that I was on a phone call, that I was on my

21  iPad.

22          I don't know what answer you're looking for.

23      Q.   Well, you said you discussed the case but not

24  in detail.  Tell me what you discussed about the case.

25      A.   Okay.  I'm going to repeat it again.  We

Confidential

Page 78

1  discussed --

2      Q.  No, I don't need you to repeat it again.  I'm

3  asking you:  You have not yet disclosed the subject of

4  your conversation with the lawyers.  I understand it

5  wasn't in detail, but you haven't disclosed at all what

6  the conversation was.

7      A.  Okay.  So what details do you want?  The time?

8  It was Saturday, whatever date Saturday was, Saturday,

9  about some time in the morning.  We were sitting in

10  Mr. Richard Diaz' office.  I was on my personal cell

11  phone.  I was on my personal iPad.  They gave -- they

12  handed me over the transcript to my depo.  They told me

13  to look over it and read it, if I needed to.  They were

14  on personal phone calls also.  And, that's it.

15      Q.  Do you know who has been deposed in this case?

16      A.  Who is being deposed?

17      Q.  Do you know who has been deposed in this case?

18      A.  Well, from my perception it's everyone that's

19  involved.

20      Q.  How about from your information from Mr. Diaz

21  and Mr. Rodriguez, did they tell you?

22      A.  They told me that they've talked to officers

23  on this case, yes, but we didn't get into details.

24      Q.  Did you learn what any of the officer in this

25  case have testified about you?

Page 79

1     A.   No.

2     Q.   Were you provided with the deposition

3  transcripts of any other witness?

4     A.   No.

5     Q.   Did you review any documents on Saturday while

6  you were at Mr. Diaz' office?

7     A.   No.  All they did was hand me the transcript

8  to my depo.

9     Q.   Does the transcript to your deposition have

10  exhibits attached?

11     A.   I don't know.  I didn't look at it, like I

12  told you.  They handed it me over and it's probably

13  sitting in the back seat of my car.

14     Q.   Okay.  Did you do anything else to prepare for

15  today's deposition?

16     A.   No.

17     Q.   Did you review the videotapes in this case

18  since the time of your deposition?

19     A.   No.

20     Q.   What about the audio recordings?  Did you

21  review any audio recordings?

22     A.   No.

23     Q.   After the time of your administrative leave --

24  during the time of your administrative leave, did you

25  have any reason to go to the police department?

Confidential

Page 80

1    A.   Well, I had two administrative leaves.

2    Q.   I'm talking about the one that began on April

3    3, 2018.

4    A.   Did I have any reason to?

5    Q.   Yeah.  Did you have any reason --

6    A.   When they called --

7    Q.   -- to go to the police department?

8    A.   When they called me in to report in, yes.

9    Q.   When did they call you in to report in, about

10   three months later?

11   A.   I wouldn't be able to tell you a time.  It

12   was -- while I was on administrative leave I went

13   several times to the police station.

14   Q.   For what reason?

15   A.   I went in for my -- for them questioning me.

16   I also went in for supposedly the case of perjury.  I

17   went for that also.  So I went in several times.

18   Q.   Okay.  As part of your administrative leave,

19   were you supposed to not be in the police department?

20   A.   I was never trespassing but I didn't have no

21   reason to go over there.  I would only go when they

22   would call me to go.

23   Q.   It's your testimony that while you were on

24   administrative leave you only went to the police

25   department when someone called you to go; is that

Confidential

Page 81

1    correct?

2       A.   Yes.

3       Q.   Do you know a Mayrelis Chavez?

4       A.   Yes, I do.

5       Q.   How do you know her?

6       A.   Co-worker -- ex-co-worker.

7       Q.   Did you have any problems with Ms. Chavez?

8       A.   No, I didn't have problems.  She had problems

9    with me.  She was harassing me.  If you have a copy of

10   the complaint, you will see it on there, if you had time

11   to go through it.

12      Q.   Ms. Chavez made a complaint against you; is

13   that what you're telling me?

14      A.   No, that's not what I'm saying.  You asked me

15   if I had problems with her.  And I said:  No, she had

16   problems with me.

17      Q.   Okay.  So how would I know she had problems

18   with you?  What do you want me to look at?

19      A.   Well, on my -- when they took my recorded

20   statement, it's all in there.

21      Q.   Okay.  Is it your testimony that you never had

22   a problem with Mayrelis Chavez?

23         MR. RODRIGUEZ:  Form.

24      A.   No, I did not.

25   BY MS. WELSTEAD:

Page 82

1    Q.   Excuse me?

2    A.   I said no, I did not.

3    Q.   You never had a problem with her?

4    A.   Nope, never had a problem with her.

5    Q.   Okay.  Did anyone accuse you of being jealous

6  of her?

7    A.   Me jealous of her?  I'm not jealous of her.

8    Q.   Yes, ma'am.

9    A.   Ha ha.

10   Q.   Did anyone ever accuse you of that?

11   A.   No.

12   Q.   Did you go into the Hialeah Police Department

13  on May 29 of 2018, while you were on administrative

14  leave, to file a civilian complaint against Mayrelis

15  Chavez?

16   A.   I went in -- I don't know if the date is

17  correct.  But, I did go into the police department to

18  file a complaint on an Officer of wrongdoing, which was

19  Mayrelis Chavez.

20   Q.   And this is an officer that you just testified

21  you had no problem with whatsoever, but you reported her

22  to PCB; correct?

23   A.   Correct.

24   Q.   And you swore on a statement accusing her of

25  wrongdoing; right?

Page 83

1      A.   Correct.

2      Q.   Okay.  So that was a voluntary complaint that

3   you presented to the Hialeah Police Department based on

4   your own volition; am I right?

5      A.   Correct.

6      Q.   Okay.  And do you have a copy of the closed

7   PCB investigation?

8      A.   At home.

9      Q.   Okay.  So you were provided a copy and you

10  know what the outcome of that complaint was; correct?

11     A.   Correct.

12     Q.   Was she -- was the complaint sustained against

13  Ms. Chavez?

14     A.   That -- I don't know if it's sustained or not.

15     Q.   Okay.  Am I correct that this occurred while

16  you were on administrative leave?

17     A.   Correct.

18     Q.   Okay.  And then they called you back to

19  clarify a portion of your statement; right?

20     A.   They called me and they also went to my house,

21  yes.

22     Q.   That was the next day, May 30, 2018?

23     A.   Yeah, and they took a state -- a non-recorded

24  statement outside of my house, yes.

25     Q.   Okay.  And then a month later you appear again

Page 84

1   to give a third statement regarding that complaint.

2   Only that time you were represented by counsel; right?

3   That's when Ms. Simone Lopez --

4       A.   I was ordered -- I was ordered to go in and

5   give a statement.  And the statement was taken outside

6   of my house.  I was ordered.  But, of course, that

7   statement that was taken outside of my house was never

8   brought up.  I was set up.

9       Q.   The setup occurred after you voluntarily

10  appeared in the police department to report Mayrelis

11  Chavez; correct?

12      A.   Wrong.  The setup was -- the setup from the

13  beginning, ever since the papers were left in the

14  mailbox.

15      Q.   Okay.  And this whole incident is the subject

16  of your eventual termination for untruthfulness from the

17  Hialeah Police Department; correct?

18      A.   It was a setup, correct.

19      Q.   Okay.  Had you ever made a complaint to IA --

20  to PCB before that day in May 2018 when you reported

21  Ms. Chavez?

22      A.   Have I ever made a complaint?

23      Q.   Yeah.

24      A.   No, I've never made a complaint.  Whenever

25  I've had a problem, I've spoken to the officer myself or

Page 85

1   the supervisor.

2      Q.   Okay.  You knew that you could report problems

3   with other officers to IA and PCB and they have an

4   obligation to investigate; correct?

5      A.   Wrong.

6      Q.   What's wrong about that statement?

7      A.   It doesn't work like that.

8      Q.   Why not?

9      A.   It doesn't work like that.  It all depends who

10   the officer is and what the complaint is about.

11      Q.   And have you ever worked in IA yourself?

12      A.   No, but I have made complaints about sexual

13   harassment and nothing was ever done about it.

14      Q.   Okay.  When did you make a complaint of sexual

15   harassment?

16      A.   When Sergeant Joseph Harmon was there.  And

17   you can pull the records of it, because they never

18   documented the sexual harassment.  All they did was

19   moved that supervisor from Sector 4 station, they moved

20   him to Sector 1 station, so he wouldn't bother me

21   anymore.  And then he still came back -- while he was on

22   duty would come to Sector 4 and then he would go to

23   Sector 4 and would still mess with me.

24         So, I even brought it up -- at the time I

25   brought it up to my commander, which no longer works

Page 86

1   there, and I told him.  So they had a sit-down meeting

2   with him.  They told him to leave me alone.  Then, the

3   next day he was right back to where I'm at.  So there is

4   a complaint.  Nothing happened about it.

5        Q.   Is it documented?

6        A.   Is it documented?  You have to ask that to the

7   Department.  I told them about it.

8        Q.   And did you get any documentation?

9        A.   And if it's not documented, then you can ask

10  why was he moved from Sector 4 to Sector 1.  But,

11  everybody was aware.  The Chief was aware of it.  The

12  commanders were aware of it.  The Major was aware of it.

13       Q.   Give me the year so I can know what Chief

14  you're talking about.

15       A.   Sergio Velazquez.

16       Q.   And what's the year?

17       A.   The year?  I can't tell you.  It was probably

18  a year maybe or two years.  It was right before Joseph

19  Harmon retired.

20       Q.   And that's who you swore the complaint out

21  against?

22       A.   Yes.

23       Q.   Other than Sergeant Harmon and May Chavez,

24  have you filed a complaint against any other officer?

25       A.   No, I've never filed a complaint, no.

Confidential

Page 87

1      Q.   Have you ever requested that the State

2   Attorney file charges against anyone?

3      A.   No.

4      Q.   Were you aware that that was something that

5   you could do?

6      A.   No.

7      Q.   You were not aware that you could go to the

8   State Attorney and swear out a complaint against

9   someone?

10     A.   You said "file charges."  In order to file

11   charges you need to be a victim.  I'm not a victim -- at

12   the time I haven't been a victim of anything.  So how am

13   I going to file charges?

14     Q.   You often answer my questions with questions.

15   And I understand --

16     A.   Yeah, because I'm trying to make sure we're on

17   the same page.  You're telling me if I filed charges,

18   and I'm telling you in order for me to file charges I

19   need to be a victim of something.  How am I going to

20   file charges?

21     Q.   And then I asked --

22     A.   I can't file charges being a witness.

23     Q.   And then I asked the second question, if you

24   ever went to the State Attorney and swore out a

25   complaint.  Do you remember that?

Page 88

1     A.   Yes.

2     Q.   Okay.  Did you ever do that?

3     A.   No.

4     Q.   Were you aware that the State Attorney could

5   handle such a complaint?

6     A.   Which complaint?

7     Q.   Any complaint that you may have against a law

8   enforcement officer.

9     A.   Well, I told you from -- I told you before, I

10   had no faith in the State Attorney's Office.  I told you

11   that.  Just like I told you that I didn't like how you

12   all filed a complaint.

13     Q.   So you knew you could do it and chose not to;

14   right?

15     A.   No, I didn't choose not to.  I told you in the

16   beginning that I didn't know I could go file a complaint

17   at the State Attorney's office.  That's what I told you.

18     Q.   Okay.  You were involved in an incident at

19   Disney on Ice in Broward County on March 30, 2018.  Do

20   you remember that incident?

21     A.   I do.

22     Q.   And were you arrested that day?

23     A.   No, I was not.

24     Q.   Did the Sunrise Police Department arrest any

25   person?

Confidential

Page 89

1    A.   No, they did not.

2    Q.   Did you want them to arrest someone?

3    A.   Yes.

4    Q.   And did they tell you why they didn't arrest

5  anyone?

6    A.   Yes, because they said they didn't have any

7  witnesses, which they did have a witness.

8    Q.   And what did the investigating officer of that

9  incident tell you to do?

10    A.   He told me that to just leave it alone.  Said:

11  Just leave it alone.

12    Q.   Isn't it true that that investigating officer

13  told you that if you wanted to pursue it, go to the

14  State Attorney's Office?

15    A.   No, he did not tell me that because I even

16  went afterwards -- if you contacted the Department, I

17  went -- I left Disney on Ice and I drove myself to the

18  police department of the Department that responded.

19    Q.   And did you --

20    A.   I'm glad you bring up that incident.  I'm glad

21  that you brought up that incident so you can see.  This

22  was never an Internal Investigation incident.  They

23  never investigated.  Hialeah never got involved, never

24  did anything.  I was the one that called Hialeah and

25  told them what had happened.

Confidential

Page 90

1    Q.   Did the incident occur in Hialeah?

2    A.   Doesn't matter.  I was an officer.  When an --

3    Q.   Did the --

4    A.   When an officer gets involved in something,

5  you need to contact your Department, and they send

6  Internal Affairs -- someone from the Internal Affairs

7  Department out to the location.

8    Q.   Is it your understanding that the Hialeah

9  Police Department had jurisdiction to arrest the

10  individual involved in your altercation in Sunrise,

11  Florida?

12    A.   That's not what I said.  I never asked Hialeah

13  to arrest anyone.  The officer that responded from the

14  Department that was there -- there was even a Hialeah

15  officer that was there with his family, which I did not

16  know that he was there, and he even came to me and spoke

17  to the officer from that Department and said that he saw

18  the whole incident, that why weren't they arresting the

19  other party.

20    Q.   Does the Hialeah Police Department know about

21  that individual that was at Disney on Ice the day that

22  you were in an altercation?

23    A.   Yes, they did.

24    Q.   And is that because they conducted an

25  investigation into your report?

Confidential

Page 91

1    A.   No.  That's because the officer called -- in

2   front of me called the Hialeah Police Department and

3   said:  If anything comes out of this, you let me know

4   because I will be a witness in this case.

5    Q.   And did anything come out of it?  Did you go

6   to the Sunrise Police Department and make a complaint

7   against the woman that you claim assaulted you?

8    A.   No.  The incident -- like I told you before, I

9   drove to the Department, whichever department responded

10   to the Disney on Ice, to the arena, and I spoke to them

11   and I told them what had happened.  And I told them:  I

12   don't know how your department works, but you didn't

13   even get someone to come out and take photos of the

14   injuries.

15    Q.   Did you take photos of your injuries?

16    A.   Yes, I did.

17    Q.   And did you turn them over to anyone?

18    A.   No, I just left it alone.

19    Q.   So you didn't go to the State Attorney's

20   Office, like the Sunrise Police Department told you you

21   could, to report the assault that occurred at Disney on

22   Ice; correct?

23    A.   Let me correct you, again.  The Sunrise police

24   officer or the Department -- I'm going to say "Sunrise"

25   because that's what you are saying responded.  I don't

Page 92

1  remember.  I know it was a department from Broward.  He

2  never told me or she never told me to go to the State

3  Attorney's Office and file charges.

4      Q.   So, if that's what's included in his report,

5  his report is inaccurate?

6      A.   I never picked up the report.

7      Q.   Okay.

8      A.   I never got --

9      Q.   The report --

10     A.   I never got a copy of the report.  I never

11  requested the report.  I never saw the report.

12     Q.   Why not?

13     A.   Because I left it alone.  If they didn't do

14  anything there, I left it alone.

15     Q.   Okay.  So you left it alone but you wanted

16  Hialeah to do something about it?

17     A.   No, I never said I wanted Hialeah to do

18  something about it.  Where did you get that from?

19     Q.   Because you just told me that Hialeah failed

20  to investigate the incident that you reported to them.

21  Isn't that your testimony?

22     A.   No, I said now that you're bringing that up --

23  I said just like this:  Now that you're bringing it up,

24  and I'm glad you're bringing it up, Hialeah never

25  investigated like they're supposed to investigate,

Confidential

Page 93

1  because if I was a Hialeah officer at the time and I was

2  involved in an incident, they're supposed to investigate

3  it.  And they didn't investigate.

4      Q.   They didn't take a statement from you?

5      A.   Excuse me?

6      Q.   Hialeah didn't take a statement from you about

7  that incident?

8      A.   Nope.  I called them on the phone, and I told

9  them what happened.

10      Q.   You didn't -- you didn't know that the Hialeah

11  Police Department contacted Sunrise Police dispatch

12  about your report?

13      A.   Nope.  I didn't know that.

14      Q.   This happened -- your incident happened when,

15  on a Friday morning?

16      A.   Yep, it was a Friday morning.

17      Q.   And you reported it to Hialeah by telephone;

18  correct?

19      A.   Correct.

20      Q.   Did you ever report in person to give them a

21  sworn statement about what happened to you?

22      A.   I did it over the phone.

23      Q.   Okay.  And did you know that the Hialeah

24  Police Department took a sworn statement from Detective

25  Goitia?

Confidential

Page 94

1      A.   I didn't know that.

2      Q.   Isn't that what you would expect them to do

3   when they would investigate something that you reported?

4      A.   Right.  But, like I told you before, I just

5   finished telling you that they never investigated.

6           Now, if they investigated after, I don't know.

7   But, I'm telling you they never investigated it.  To my

8   knowledge, they never investigated it.

9      Q.   Well, that's kind of the point.  You've

10   testified under oath the City of Hialeah did not

11   investigate your report of an incident at Disney on Ice,

12   but you have no idea whether they investigated it or

13   not; correct?

14      A.   If you're part of an investigation, the

15   correct way you're supposed to do is you're supposed to

16   let the officer know or the person involved that you're

17   being investigated or that you're involved in an

18   investigation.

19      Q.   But you don't know whether they investigated

20   it or not; do you?

21      A.   No, I don't.  And, to my knowledge, they did

22   not investigate it.  I never received a letterhead

23   signed by the Chief saying that you're being

24   investigated under PC and a number.  I never received

25   that.

Page 95

1    Q.   Whether you received anything or not has

2  nothing to do with whether the Hialeah Police Department

3  investigated your report of an incident at Disney on

4  Ice; correct?

5    A.   Well, then, how am I supposed to know?

6    Q.   Well, you feel very comfortable testifying

7  that they didn't investigate.  And --

8    A.   Well, you're --

9    Q.   -- I am trying to find out --

10    A.   How can you investigate if I'm a party

11  involved and you don't call me in or come out and take

12  my statement?  I called them and told them what was

13  going on.

14    Q.   Did you give your statement over the phone,

15  Ms. Benitez?

16    A.   Yeah, but it wasn't a formal statement.  I

17  called and said:  Listen, I'm here on Disney on Ice with

18  my family and this is what just happened.

19    Q.   Okay.  And what is it that you wanted the

20  Hialeah Police Department to do?

21    A.   I was just telling them, like you are supposed

22  to do.  You're supposed to let the Department know when

23  you are involved in an incident, and that's exactly what

24  I was doing.

25        It wasn't about investigating or not.  It was

Confidential

Page 96

1   about me calling them -- when I called them, it was me

2   calling them and letting them know what was going on.

3   Because, then, if you fail to let them know what's going

4   on, then you're violating the Department's rules and

5   regulations.

6        So, I wasn't looking for Hialeah to do

7   anything, because I know Hialeah cannot do anything.

8   They're out of the jurisdiction.

9     Q.   Did you ever speak with Officer Carrasquillo

10   of the Sunrise Police Department again after the

11   incident on March 30, 2018?

12     A.   I don't know who Officer Carrasquillo is.

13     Q.   You don't know the name of the officer that

14   responded to your incident at the Disney on Ice show?

15     A.   No, I do not.

16     Q.   And you never got a copy of the report, so you

17   can't tell me whether or not --

18     A.   I never got a case card either, a case number.

19   I went into their department, walked into the lobby.

20   They have a front desk.  Went to the front desk.  I told

21   them that I was just involved in an incident at the

22   arena.

23        I said:  I don't know the address to the

24   arena.

25        I said:  Officers arrived.  I do not know the

Confidential

Page 97

1   officer.

2       So they called the Communications Department.

3   And then I had a gentleman -- I don't know what his rank

4   was -- come out and speak to me about it.

5       Q.   Was he able to find your incident?

6       A.   Yes, he was.

7       Q.   So he had the case number and you chose not to

8   write it down; right?

9       A.   Who failed to write it down?

10      Q.   You.  You said you don't have the case number.

11      A.   No, I never knew the case number.  The

12  gentleman came out and he spoke to me.

13      Q.   Did you identify yourself as a Hialeah police

14  officer?

15      A.   Yes, I did.  And I told him that I was

16  off-duty, that had nothing to do.  I told him:  Listen,

17  just so you know, I am an officer but I am not working.

18      Yes, I did let them know.

19      Q.   So your purpose in going to the Sunrise Police

20  Department was to complain about how they investigated

21  your incident; correct?

22      A.   Correct.

23      Q.   Okay.  Did you ever respond to any law

24  enforcement agency to complain about the way Hialeah

25  investigated this police-involved shooting?

Confidential

Page 98

1    A.   No.

2    Q.   Got it.

3         Have you ever filed a complaint against

4    Lieutenant Luis?

5    A.   No.

6    Q.   Has Lieutenant Luis ever filed a complaint

7    against you?

8    A.   I don't know if he's done it on the record or

9    off the record, but I had an incident with Tony Luis

10   once.

11   Q.   If it was on the record you would get

12   notification; correct?

13   A.   Correct.

14   Q.   Okay.  So you have never gotten notification

15   that Lieutenant Luis made a complaint against you on the

16   record; right?

17   A.   That I can remember, no.

18   Q.   Okay.  In your deposition you told us that

19   Lieutenant Luis was a higher ranked officer and he tried

20   to get you in trouble before.  Do you remember that

21   testimony?

22   A.   Yes, I do.

23   Q.   What are you referring to?  When did

24   Lieutenant Luis try to get you in trouble?

25   A.   It was when he worked Sector 1 before he was

Confidential

Page 99

1   demoted and then promoted again, where Sergio Velazquez

2   was in charge of Sector 1, where there was an incident

3   outside of the Hialeah Police Department parking lot

4   with some other officer, and he went and told the

5   officer to go file a complaint against me.

6          And at that time I called Sergio Velazquez,

7   called him on his cell phone, and I told him what was

8   going on.  And he told me not to worry about it, that he

9   was going to take care of it.

10     Q.   Who was the other officer that Lieutenant Luis

11   told to file a complaint against you?

12     A.   First name is Leyanis (phonetic).  She

13   doesn't --

14          UNIDENTIFIED SPEAKER:  Ask Charlie to come up

15   here, please.

16          THE COURT REPORTER:  I'm sorry, who spoke?

17          MS. WELSTEAD:  I don't know.

18          MR. SWITKES:  The witness spoke but I couldn't

19   hear it either.  Could you say that answer again,

20   ma'am, the name?  We couldn't hear it.

21          MR. RODRIGUEZ:  Christine, you're doing the

22   questioning now.  So I'm not sure what it is that's

23   being asked.

24          MR. SWITKES:  I'm asking the witness to repeat

25   the answer.  I couldn't hear it.

Confidential

Page 100

1          THE WITNESS:  Leyanis.  She doesn't work

2     here -- she doesn't work for Hialeah anymore.

3          MR. SWITKES:  But what is the name?  Can you

4     spell it?  I can't hear it.

5          THE WITNESS:  I don't know how to spell it.

6     Leyanis.

7   BY MS. WELSTEAD:

8     Q.   What is the name, ma'am?

9     A.   For the fourth time, Leyanis.

10     Q.   And do you know the first name?

11     A.   That is the first name.

12     Q.   Do you know the last name?

13     A.   No, I do not know the last name.

14     Q.   Did officer first name Leyanis make a

15   complaint against you?

16     A.   Yes, she did.

17     Q.   And what was it for?

18     A.   Her complaint was -- I think she put --

19   believe -- I think that the complaint was that I

20   threatened her.

21     Q.   On duty?

22     A.   Yes, on duty.

23     Q.   Were there any witnesses to her complaint of

24   being threatened?

25     A.   Yes.

Confidential

Page 101

1    Q.  Who?

2    A.  Other officers.

3    Q.  Did any officers give any testimony against

4  you?

5    A.  Against me, no.  They said exactly what

6  happened.

7    Q.  Was Tony Luis one of those officers?

8    A.  No.  All he did was help the officer file a

9  complaint.

10   Q.  But he didn't give sworn testimony against

11  you; correct?

12   A.  Correct, but he helped the officer file the

13  complaint.

14   Q.  And this was before Sergio Velazquez was Chief

15  of Police?

16   A.  Correct.

17   Q.  So how many years ago was that?

18   A.  It was a few years before he became Chief.

19   Q.  How many years before?

20   A.  A few years before he became Chief.

21   Q.  Got it.  And is it your testimony that Sergio

22  Velazquez took care of that complaint on your behalf?

23   A.  Yes.

24   Q.  Were you on Sergio Velazquez' good list at

25  that time?

Confidential

Page 102

1      A.   I don't know if you want to call it the "good

2   list," but you can say that I had a good working

3   relationship.

4      Q.   Isn't that your word "list"?  In Sergio

5   Velazquez' good list that you testified to in this case?

6      A.   He has two sides.  You're either in the club

7   or out of the club.

8      Q.   So I take it when he was in charge of Sector 1

9   you were in the club?

10      A.   Nope, never in the club.  I never accepted

11   anything from him.  I didn't want to be a part of the

12   club.  I was just independent.

13      Q.   Were you exonerated in the complaint made by

14   Officer Leyanis?

15      A.   I don't remember.

16      Q.   You said that you were not reprimanded; right?

17      A.   But I don't know how they closed it out.

18      Q.   Did they close it out in the correct way?

19      A.   Well, nothing happened.  They had -- they had

20   statements from witnesses as to what happened.  There

21   are statements that said exactly what happened.

22      Q.   Okay.

23      A.   I didn't receive a reprimand.  I didn't

24   receive a write-up.  I didn't receive suspension.  But,

25   I don't know how they closed it out.  I can't remember.

Page 103

1    Q.   So they got the right result in that case;

2  right?

3        You didn't hear that question?

4    A.   I didn't hear you.

5    Q.   Did the City of Hialeah come to the right

6  result in that complaint filed by Officer Leyanis?

7    A.   I don't know if they came to the right result

8  or not, but they heard exactly what happened.  They had

9  witnesses.  Not one witness; they had a few witnesses.

10   Q.   Okay.  So the result had nothing to do with

11  whether you were on a good list or a bad list or whether

12  Lieutenant Luis was out to get you or whether Sergio

13  Velazquez was out to protect you; right?  They just came

14  to the right result?

15   A.   Well, if you have witnesses that are saying

16  exactly what happened, you can't cover that up.

17   Q.   If you have witnesses who are saying exactly

18  what happened, you can't cover that up; is that your

19  testimony?

20   A.   Yeah.  They have video cameras.

21   Q.   Video evidence.  Any other evidence they had

22  in your case?

23   A.   Well, I know there was video.  I don't know

24  what other evidence was used.

25   Q.   Any, say, 911 or other audio recordings?

Confidential

Page 104

1      A.   911?

2      Q.   Yeah.  You know, they record calls when you

3   call 911.

4      A.   Did she call 911?  I don't know.

5      Q.   You know they record calls when you call 911;

6   right?

7      A.   Yes, ma'am, but I don't know if she called

8   911.

9      Q.   Have you ever been confronted with a 911

10   communication in any IA investigation involving you?

11     A.   Yes.

12     Q.   And did the 911 communication accurately

13   record your statements?

14     A.   Yes. They record --

15     Q.   Was there interaction --

16     A.   -- all statements.

17     Q.   Excuse me?

18     A.   They record all statements.  All calls coming

19   into 911 are recorded.

20     Q.   Was that 911 call you made during a road rage

21   incident?

22          Did you answer?  I didn't hear?

23     A.   You didn't finish the question.

24     Q.   Was the 911 call you made during a road rage

25   incident?

Confidential

Page 105

1    A.   Did I make a 911 call?  Yes.

2    Q.   Was it during a road rage incident?

3    A.   Yes.

4    Q.   And do you remember if that incident resulted

5  in an IA investigation?

6    A.   Yes, it did.

7      MR. RODRIGUEZ:  Objection to form.

8  BY MS. WELSTEAD:

9    Q.   And who was the complaining party?

10    A.   There were two complaining.  I was the

11  complaining party at one and --

12      MR. RODRIGUEZ:  Form.

13    A.   -- the other party was a complaining party.

14  BY MS. WELSTEAD:

15    Q.   So you both simultaneously reported that an

16  incident to the Hialeah Police Department for

17  investigation; correct?

18    A.   Well, we called 911.

19    Q.   You both called 911?

20    A.   Yes.

21    Q.   Okay.  And then I'm talking about a later

22  investigation.  That incident where you and a civilian

23  both called 911 resulted in a Hialeah Police

24  investigation; correct?

25    A.   Yes.

Page 106

1    Q.   Did it result in any discipline against you?

2    A.   Yes.

3    Q.   What was the discipline?

4    A.   Suspension.

5    Q.   For how long?

6    A.   You have to look at the document that

7    suspended.

8    Q.   Okay.  I want to go back to Lieutenant Luis.

9    So you described one incident where he told Officer

10   Leyanis to make a complaint against you back a couple of

11   years before Sergio Velazquez became Chief.  Are there

12   any other incidents in your history with Lieutenant Luis

13   that you believe him to be out to get you?

14   A.   Not that I can think of from the top of my

15   head.

16   Q.   During the 10 or 12 years that you were a

17   Hialeah police officer was he always a higher rank than

18   you?

19   A.   Yes.

20   Q.   Did he ever, himself, do anything to you that

21   you believe exhibited some desire to get you?

22       MR. RODRIGUEZ:  Object to form.

23   A.   That incident there that I can remember.

24   BY MS. WELSTEAD:

25   Q.   Anything else?

Confidential

1     A.   I said not that I can remember.

2     Q.   Okay.  Was there something about that incident

3   years before Sergio Velazquez became Chief that caused

4   you to not want to tell the truth about what Lieutenant

5   Luis did on October 1, 2017?

6     A.   Repeat the question.

7     Q.   Sure.  Is there anything about that incident

8   involving Officer Leyanis that occurred several years

9   before Sergio Velazquez ever became Chief that would

10  cause you to be concerned that Lieutenant Luis was out

11  to get you?

12    A.   I didn't understand the question.

13    Q.   Okay.  Let's go back to your testimony in this

14  case.

15    A.   Okay.

16    Q.   You testified that the reason you didn't tell

17  anyone about a PIT maneuver is because Luis is a higher

18  ranked officer and he tried to get you in trouble?

19    A.   Correct.  That's one reason.

20    Q.   Okay.  What's the other reason?

21    A.   The second reason is, like I told you when we

22  first started, that you will only answer the questions

23  that I ask you and that's what you're going to stick to.

24    Q.   So it had nothing to do with Tony Luis

25  wanting -- being of a higher rank than you; right?

Confidential

Page 108

1     A.   It had to do with him being higher rank,

2   number one; and number two, because you will only answer

3   the questions that we ask you.

4     Q.   He never did anything to hinder or hurt your

5   career; did he?

6     A.   Well, he did with that incident, I'm sure.

7     Q.   Do you remember being involved in an auto

8   accident a few months before this Machado shooting where

9   you were trying to avoid a bicyclist that was later

10  Baker-Acted?

11    A.   Yes.

12    Q.   And were you found to be at fault in that

13  incident?

14    A.   No, I was not at fault.

15    Q.   And wasn't Lieutenant Luis one of the officers

16  on the scene there that was able to confirm that you

17  were not at fault in that incident?

18    A.   Yes, along with the witnesses.

19    Q.   Right.

20    A.   Yes.

21    Q.   Excuse me?

22    A.   I said yes, along with civilian witnesses.

23    Q.   That occurred August 6th, 2017; correct?

24    A.   I don't know the date.

25    Q.   Do you want to look at the report for the date

Confidential

Page 109

1   or will you trust me it's August 6th, 2017?

2       A.   No, I'll look at it.

3       Q.   You'll look at it?

4       A.   Yeah.

5       Q.   Let me pull it up for you.

6            Hialeah Police Department, Supervisor Report

7   of Vehicle Accident.  Driver:  Maria Benitez.  Date of

8   accident:  August 6, 2017.

9            Do you see that?

10      A.   Okay.  I see the report.

11      Q.   Is this the incident where Lieutenant Luis was

12   on scene and supported your version of events?

13      A.   He supported what happened, along with what

14   the witness testified to.

15      Q.   So, he told the truth?

16           Did you answer that?

17      A.   I'm reading the report.

18           Okay.  What was your question?

19      Q.   My question was:  Did he tell the truth?

20      A.   Did he tell the truth?  That's what the report

21   says.  And they found me not at fault.

22      Q.   And he supported that decision; correct?

23      A.   He supported what happened.

24      Q.   By accurately reporting what he saw; right?

25      A.   If he put there what he saw, then that's what

Confidential

Page 110

1    it is, that's what he's testifying to.

2        Q.   Right.  Well, my question was:  This occurred

3    in August of 2017, just a few months before the Machado

4    incident; correct?

5        A.   August, yes.

6        Q.   And so if he was really out to get you, don't

7    you think that this at-fault accident might -- this not

8    at-fault accident might have turned out a little bit

9    differently?

10       A.   Well, what is -- wait. Now you're saying that

11   he's out to get me.  I never said in the shooting that

12   he was out to get me.  The incident that I said he was

13   out to get me, I said that happened a few years prior to

14   the Chief becoming Chief.  This is 2017.  Find out when

15   the Chief became Chief, the date, and then take it a few

16   years before that.

17       Q.   Thanks for the clarification.

18           So, in 2017, at the time of this incident, you

19   had no problems with Lieutenant Luis; is that correct?

20       A.   Correct.

21       Q.   Okay.  So let's talk about what you testified

22   you saw Lieutenant Luis do on October 1, 2017.  During

23   the chase portion of these events in the morning of

24   October 1, 2017 were you caravanning?

25       A.   Yes, I was the last -- when the chase started

Confidential

Page 111

1   I was the last vehicle.

2       Q.   And how many vehicles were in front of you

3   when it started out?

4       A.   Several vehicles.

5       Q.   How many vehicles make a caravan?

6       A.   More than three.

7       Q.   So you would have been at least the fourth

8   vehicle to join the chase?

9       A.   It was more than that.

10      Q.   Excuse me?

11      A.   There was more vehicles than that.

12      Q.   So you would have been at least the fourth to

13  join the chase?

14      A.   No, not the fourth.  I said more vehicles.  It

15  was more than four vehicles.

16      Q.   And I said "at least four."  I didn't give you

17  an exact number.  Were you at least the fourth?

18      A.   No.  Yeah, maybe six vehicles.  Fifth, sixth.

19      Q.   Okay.

20          At the time you joined the chase there were

21  already five vehicles following Mr. Machado?

22      A.   About.

23      Q.   So at the time you joined the chase you

24  violated Department policy by caravanning?

25      A.   Correct.

Confidential

Page 112

1    Q.   And how long did you continue to caravan in

2    this chase in violation of Department policy?

3    A.   For as long as the chase went on.

4    Q.   So the entire time you were caravanning?

5    A.   Yes.

6    Q.   Did there ever come a point in time when you

7    were paralleling the chase?

8    A.   Yes.

9    Q.   What is "paralleling"?

10   A.   Paralleling means that you are on the side of

11   another vehicle driving in the same direction.

12   Side-by-side.  You might have a few feet or length in

13   between.

14   Q.   Does "paralleling" mean that you are on the

15   same street or does it mean you're on a different

16   street?

17   A.   The same street.

18   Q.   During the time in this chase when you

19   previously testified you were paralleling the Machado

20   vehicle, were you always on the same street?

21   A.   No.

22   Q.   Okay.  Did there come a point in time when you

23   were on a different street when you pulled off of the

24   chase in order to try and intercept the Machado vehicle

25   at some other location?

Confidential

Page 113

1      A.   Well, there is times where I was on another

2   street, I was on another street when Machado was

3   driving -- yeah, he was driving on another street and I

4   was like a few blocks away, correct.

5      Q.   Let's talk about Lieutenant Luis.  Where were

6   you in relation to Lieutenant Luis' vehicle?

7      A.   I was in a lot of places.  You have to narrow

8   that question down.

9      Q.   Sure.  How about after the first shooting and

10   before the second shooting.  Does that narrow it down

11   for you?

12      A.   There you're talking about the first shooting

13   took place between East 7th Avenue and East 8th Avenue

14   and 25 Street.  And then -- that's the first shooting.

15         And the second shooting was -- the final stop

16   was 35 and 79.  So you have a pretty -- a few blocks

17   there.

18         So, it depends what are you trying for me to

19   say, or where are you trying for me to describe, where

20   is it exactly that you want to position me at.  You need

21   to give me a little bit more.

22      Q.   You tell me.  During the entire time from East

23   8th and 25th to the final stop at 35th and 79th --

24      A.   Okay.

25      Q.   -- where were you in relation to Lieutenant

Confidential

Page 114

1  Luis' vehicle?

2      A.   I was on the -- when he first took off from

3  East 7 and 25 --

4      Q.   You're talking about Machado when you say

5  "he"; correct?

6      A.   No, I'm talking about Lieutenant Luis.

7      Q.   When Lieutenant Luis first took off?

8      A.   Right.  Let me -- let me say, okay.  Machado

9  takes off.  Then Lieutenant Luis takes off.  Then, a few

10  vehicles.

11         So, I do a U-turn and I go on the opposite

12  lane driving eastbound on 25 Street.  So I am -- when he

13  first takes off, I'm not parallel on the opposite lane.

14  Then, I'm parallel.

15         So I am next to on the opposite lane --

16  remember, you have two lanes going westbound, two lanes

17  going eastbound.  And you have a wide median in the

18  middle.  So, I am on the other side of traffic,

19  parallel.  So I'm parallel, maybe starting at -- after

20  East 8th Avenue all the way to 37th, you go over the

21  railroad tracks, then you cross that first light into

22  Northwest 37.  And, then he does the PIT maneuver.  I'm

23  still there.  So that whole time.

24      Q.   Where is your car when you observe Lieutenant

25  Luis do a PIT maneuver?

Confidential

Page 115

1      A.   My vehicle was on the westbound lane facing

2   eastbound.

3      Q.   So you were on the opposite side of the

4   median?

5      A.   Opposite side of traffic.

6      Q.   Were you on the opposite side of the median?

7      A.   Yes.

8      Q.   And Lieutenant Luis' vehicle was on the

9   eastbound lane?

10      A.   He was on the eastbound lane, yes, correct.

11      Q.   And which lane on the eastbound side?

12      A.   I don't remember which lane.  There's two

13   lanes.

14      Q.   My question is -- I'm aware there's two lanes,

15   ma'am.  My question is:  Which lane was Lieutenant Luis'

16   vehicle on?

17      A.   I would have to see the video.

18      Q.   I'm asking you from your personal

19   recollection.  You said you saw a PIT maneuver.  Which

20   lane was Lieutenant Luis' vehicle in when he did the PIT

21   maneuver?

22      A.   I don't remember.

23      Q.   What lane was Machado's vehicle in, the

24   vehicle that you were paralleling?

25      A.   I can't remember.  He was in front of Tony

Confidential

Page 116

1   Lewis.

2       Q.   What lane was he in?

3       A.   I can't remember.

4       Q.   That was the vehicle you were chasing for nine

5   minutes; correct?

6       A.   That I was chasing?  Which vehicle?

7       Q.   The Machado vehicle.

8           MR. RODRIGUEZ:  Objection to form.

9       A.   I wasn't chasing his vehicle.  I was in the

10  caravan, but I was on the opposite -- on the opposite

11  lane of traffic.

12      Q.   Nine minutes you were following this vehicle

13  around the city of Hialeah; correct?

14      A.   Not the whole time.  Remember, I wasn't the

15  whole time behind the vehicle.  If you listened to my

16  testimony, I wasn't behind the vehicle at all times.

17      Q.   If you'll listen to my question, I didn't say

18  whether you were behind --

19      A.   You said --

20      Q.   -- on the side or in front, okay.  This

21  vehicle was the vehicle that the caravan was chasing;

22  correct?

23      A.   Correct.

24      Q.   And my question is:  At the time you're

25  paralleling the vehicle, what lane was it in?

Confidential

Page 117

1      A.   Well, like you said, I was chasing the whole

2   time, so where are you trying to put me?  Where are you

3   trying to put my vehicle and at what time?  Meaning the

4   incident, what time of the incident?

5      Q.   I'm asking about the PIT maneuver.

6      A.   Okay.

7      Q.   You testified you saw the PIT maneuver.

8      A.   Yes, I did.

9      Q.   You swore that under oath.

10     A.   Yes, I did.

11     Q.   And do you stand by that testimony as you sit

12   here today?

13     A.   Yes.

14     Q.   And you are very familiar with the

15   consequences of lying under oath, right, because you

16   lost your job for the same reason; right?

17        MR. RODRIGUEZ:  Objection to form.

18     A.   I didn't lose my job -- I didn't lose my job

19   for perjury.  I told you why I lost my job.

20   BY MS. WELSTEAD:

21     Q.   Right.

22     A.   And now that you want to bring that up, if it

23   would have been perjury and I did commit the perjury,

24   where is the charges from the State Attorney's Office?

25   There was no charges filed.  I was never arrested.

Confidential

Page 118

1        We just had two officers arrested for perjury.

2   And you know there are people getting arrested for

3   perjury.  So where's the charges?

4        Or, did the State Attorney, once again, fail

5   to get an officer for doing wrong?  Can you answer that

6   question?

7     Q.   Well, you're the officer doing wrong in this

8   situation; correct?

9     A.   Counselor, can you answer that?  You want to

10   bring up the --

11     Q.   I'm not under oath and I'm asking the

12   questions.

13     A.   I know --

14     Q.   I know you have a lot of questions.

15     A.   You're bringing it up.  Was I charged with --

16        MR. DIAZ:  Hold on.

17     A.   Was I charged with perjury, ma'am?

18        Guys -- guys.  Please hold on.  I've got to

19        interject something here, okay.

20        I think that it is improper -- we take a

21        deposition of the witness.  She's sworn under oath.

22   I think it is highly improper to remind the

23        officer -- when you ask them a question and they

24        give an answer you don't like, to remind them of

25        them being under oath.  I think it is

Page 119

1   argumentative.

2      I don't represent Maria Benitez, but as an

3   officer of the court and the Florida Bar, which I

4   cited earlier, we have to treat each other with

5   respect.  And I think it is highly improper in the

6   middle of deposition to remind a person they're

7   under oath when they just gave you an answer you

8   don't like.

9      Go ahead.

10      MR. SWITKES:  I object to the speaking

11   objection from one of two attorneys proposing that

12   they're not representing the witness but

13   interjecting on her behalf, ultimately.

14      MS. WELSTEAD:  I believe the word you're

15   looking for, Mr. Diaz, is "Form."

16      MR. DIAZ:  I believe as an officer of the

17   court and a member of the Florida Bar I have an

18   obligation to make sure that a witness who is being

19   badgered and falsely accused and intimidated, that

20   the attorney doing it has an obligation to not do

21   it.  And if I don't stand up to that attorney --

22   I'm not defending the witness.  I'm protecting the

23   system and I'm protecting the Bar rules.

24      So, yes, form, and plus, plus, plus, dot, dot,

25   dot, Ms. Welstead.

Confidential

Page 120

1          MR. DESAI:  Thank you very much for that,

2     Mr. Diaz.  We ask that same courtesy when you're

3     deposing every defendant/officer/witness in this

4     case as well.  Let's move on.

5   BY MS. WELSTEAD:

6     Q.   Ms. Benitez --

7     A.   Yes.

8     Q.   -- you stand by your previous testimony in

9   this case that you observed Lieutenant Luis commit a PIT

10   maneuver on the Machado vehicle?

11     A.   Yes.

12     Q.   Let's concentrate at that precise time, so

13   there's no question later on.  I'm talking about your

14   testimony regarding observing a PIT maneuver.

15          It's a very simple question.  What lane was

16   the Machado vehicle in at the time Lieutenant Luis

17   committed a PIT maneuver?

18          MR. RODRIGUEZ:  Objection to form.  This is

19     repetitive and has been asked and answered.

20     A.   If you want me to answer that question, you

21   can go ahead and you can share the screen, you can play

22   the video, and I can tell you.  I'm not going to testify

23   to say one lane or the other one and I make an honest

24   mistake and then you're going to grab on to that and

25   say:  Oh, you're lying again.

Page 121

1           So just like I told you, I witnessed it.  You

2    can see it in the video.  You can see where the car is

3    driving off, when the PIT maneuver is performed, and you

4    can see the headlights of the vehicle I was driving that

5    morning.

6    BY MS. WELSTEAD:

7       Q.   Ms. Benitez, is it your testimony that you do

8    not recall what lane the Machado vehicle was in at the

9    time of the PIT --

10      A.   Can't remember.  I used the word "remember."

11   Cannot remember.

12      Q.   You cannot remember?  As you sit here --

13      A.   Ma'am, if you want to get on and move forward

14   with this question, you can play the video, and I can

15   testify the same way, and I can tell you under oath that

16   I did see it, that I did observe it, and we can move on

17   to the next question.

18      Q.   We're not moving on until I get an answer to

19   this question.

20           What lane was the Machado vehicle in when you

21   observed the PIT maneuver?

22      A.   I'm going to answer you again --

23           MR. RODRIGUEZ:  Objection, Christine.  You

24        have asked that question at least three times.

25           MS. WELSTEAD:  You tell me.  What lane was he

Page 122

1    in, Domingo?

2        MR. RODRIGUEZ:  She answered the question.

3    I'm not going to speak for her.  But she -- you've

4    asked that question three times and she's answered

5    it three times.

6  BY MS. WELSTEAD:

7    Q.   What lane was -- very simple.  What lane was

8  he in when you observed the PIT maneuver?

9        MR. RODRIGUEZ:  Form.

10   A.   Play the video and I can answer the question.

11  BY MS. WELSTEAD:

12   Q.   That's not an answer.

13   A.   Even if you were to answer the question for

14  me, I'm still not going to agree with your answer.

15  Mr. Domingo can answer the question for me; I'm still

16  not going to agree to his answer.  Until I don't see the

17  video myself, I cannot answer the question.

18   Q.   So --

19   A.   We're here --

20   Q.   So you can't answer the question without

21  watching the video; is that your testimony?

22   A.   Yeah.  You know when was the last time I saw

23  the video?  I don't have a copy of the video.  I don't

24  have a copies of the evidence in this case.  If I had a

25  copy of it, maybe I would saw the video before coming

Confidential

Page 123

1   in.  I don't have that information.

2       Q.   I guess that's --

3       A.   I didn't request the City and ask them to give

4   me all the evidence they have in this case so I can

5   prepare.  I'm going off the top of my head, and I'm

6   telling that you can't remember.

7       Q.   Right.

8       A.   I told you I can't remember the times.  I

9   can't remember the date, just like I told you.

10      Q.   Just so we're clear, I'm not asking you about

11  what's on the video.  I'm asking you what you saw.

12  Those are two different things.

13           You were in a different location than the

14  camera that recorded the video.

15      A.   Okay.

16      Q.   I want to know from your perspective, so we're

17  clear, what you saw from your position what lane Machado

18  was in.  What did it look like from your position?

19           MR. RODRIGUEZ:  Objection to form.

20      A.   Okay.  Let me answer your question.  What was

21  the date of this incident?  October 1st, what year?

22  BY MS. WELSTEAD:

23      Q.   2017.

24      A.   Okay.  And what year are we in?

25      Q.   Ma'am, if you don't know what year we're in,

Page 124

1   we're going to have to start over.

2      A.   No, no, no.  I'm asking you to see if from

3   2017 to now, 2021, you want me to answer a question of

4   which lane he was in, like if that's going to make a

5   difference, if the PIT maneuver, if I saw it or not.

6   I'm telling under oath that I saw the PIT maneuver.

7      Q.   What did you see?

8      A.   Okay.  What did I see?  I saw when Lieutenant

9   Tony Luis impacted -- the corner of his vehicle

10   impacted -- his front bumper impacted the rear side

11   bumper of Lester Machado's car, which caused him to spin

12   out of control and hit the pillar.

13      Q.   Which side?

14         MR. RODRIGUEZ:  Form.

15      A.   The side of the front of his car -- of Tony

16   Luis' car --

17   BY MS. WELSTEAD:

18      Q.   The driver's side or the passenger's side?

19      A.   The front bumper side that impacted Lester

20   Machado's car is going to be the opposite.  So, meaning,

21   for example, if he hits with -- Tony Luis impacts Lester

22   Machado's vehicle with -- to give you an example, with

23   the driver's side front bumper, he would have to impact

24   Lester Machado's rear passenger side and vice versa.

25      Q.   I'm not looking for an example.  I'm looking

Confidential

Page 125

1  for an answer to my question.  Which side, the driver's

2  side or the passenger's side, of Tony Luis' vehicle did

3  you see strike the Machado vehicle?

4      A.   From what I -- from -- I'm going off because,

5  again, you don't want to show the video, the same way I

6  told you that I don't remember which lane the car was

7  in, it's going to be Tony Luis' -- and I know this is

8  under oath, but I'm going to say it again, okay, I'm

9  going off of the top of my head.  I would have to see

10  the video, which you refuse to show it.  I don't know

11  why.  I don't know what they're trying to hide or cover

12  up.  But, I believe it's Tony Luis' front bumper on the

13  driver's side with Lester's rear passenger side.

14      Q.   Based on that description can you now answer

15  my question as to which lane Machado was in and which

16  lane Luis was in --

17      A.   No.

18      Q.   -- or are you going to defer to the video?

19      A.   I need to look at the video.

20      Q.   And where were you when you personally

21  observed from your vehicle the front bumper of

22  Lieutenant Luis' vehicle impact the rear bumper of the

23  Machado vehicle?  Where were you?

24      A.   I was on the -- I was on the eastbound lane

25  driving -- no, sorry, I was on the -- I was on the

Confidential

Page 126

1    westbound lane driving eastbound.

2        Q.   How close to the Machado vehicle are you in

3    car lengths?  Were you --

4            MS. WELSTEAD:  If somebody is speaking, can

5        they please mute their mic?  I'm questioning the

6        witness.

7            UNIDENTIFIED SPEAKER:  Rick -- Rick --

8            MR. DIAZ:  If that was me, I apologize.

9    BY MS. WELSTEAD:

10       Q.   In terms of car lengths, where -- how far

11   behind the Machado vehicle were you at the time you

12   observed the PIT maneuver?  Do you understand that

13   question?

14       A.   Yes.  I was -- again, I wasn't following

15   behind.  I was on the opposite side of traffic.  Meaning

16   Lester Machado is driving on the eastbound lane and I'm

17   driving on the westbound lane but I'm driving eastbound,

18   okay.  And I say that I was parallel to Tony Luis'

19   car -- police marked vehicle, and he was -- he was

20   pretty close.  He was like right on Lester Machado's

21   vehicle.

22           So the only space that I have from Lester

23   Machado is that I am on the opposite side of traffic.

24       Q.   You're on the opposite side of traffic and

25   you're even with Tony Luis' vehicle; correct?

Confidential

Page 127

1     A.   Right.

2     Q.   And describe the median that's separating the

3  westbound traffic where you are and the eastbound

4  traffic where the Machado and Lieutenant Luis' vehicles

5  are.

6     A.   Okay.  It's a median and in the middle of the

7  median there's some grass patches and some rocks.

8     Q.   Anything else in the median?

9     A.   Yes, they have columns but they're not close

10  together.  It's the pillars, like the column pillars

11  that hold up the Metrorail.

12     Q.   And how large are they?

13     A.   Well, they hold up the Metrorail.

14     Q.   They're not insignificant in width; correct?

15     A.   Excuse me?

16     Q.   They're not insignificant in width; are they?

17        MR. RODRIGUEZ:  Objection to form.

18  BY MS. WELSTEAD:

19     Q.   Can you give me an estimate on how big those

20  pillars are?

21     A.   I can't.

22     Q.   Okay.

23     A.   But you can see.  It's not like it's a wall

24  that you can't see to the other side.  Do you

25  understand?

Page 128

1     Q.   I think we can defer to the video on that;

2   right?

3     A.   Right.  Or, if you drive by there you can see

4   it also.

5     Q.   So what was your speed at the time you were

6   driving parallel to Lieutenant Luis?

7     A.   I don't know what the speed was.

8     Q.   You don't know what speed you were traveling

9   at that time?

10    A.   No, I do not.

11    Q.   Did you observe at any point at or around the

12   time of this impact that you observed brake lights?

13        MR. RODRIGUEZ:  Objection to form.

14    A.   Did I observe brake lights?  I don't remember.

15    Q.   Yes, ma'am.

16    A.   Ma'am, at the time I had a tunnel vision, and

17   at the same time I have an officer that's shooting at a

18   moving vehicle, constantly shooting, shooting, shooting.

19   You think I was worried about the speed or the brake

20   lights on the vehicle?  That was the least of my worry.

21    Q.   At the time you observed the PIT maneuver,

22   were there offices shooting at a moving vehicle?

23    A.   The shooting, yes, because the shooting --

24   there were shots being fired, I would say, on the west

25   side of the railroad tracks.  So the railroad tracks is

Confidential

Page 129

1   between -- it's right after East 10th Avenue where they

2   have like actual Tri-rail stop and the Metrorail stop.

3   So the shooting started way before that.

4          So the shooting started on the west side of

5   East 10th Avenue.

6      Q.   Were shots being fired at the time you

7   observed the PIT maneuver?

8      A.   Yes.

9      Q.   And from what direction were they coming?

10     A.    They were coming from -- the vehicle were

11   driving eastbound.  So they were shooting from -- the

12   vehicle is driving eastbound and the officer is in the

13   car, he has to be shooting in whichever direction.  He

14   could be shooting -- if you're in a car -- I'm not

15   observing the officer that's shooting.  But, if you're

16   sitting in the car and the car is driving eastbound,

17   right, you could be shooting eastbound, you could be

18   shooting northeast, you could be shooting anywhere.  You

19   would have to ask the officer.  But, I'm telling you the

20   vehicle was driving eastbound and the officer was

21   shooting.

22     Q.    Did the shooting begin before the vehicle

23   swerved left and hit the pillar?  Do you understand that

24   question?

25     A.   Swerved left?  Okay.

Confidential

Page 130

1          MR. RODRIGUEZ:  Objection to form.

2      A.   Yeah, ask the question again just to make sure

3   that I answer correctly.

4   BY MS. WELSTEAD:

5      Q.   Did the shooting begin before the Machado

6   vehicle swerved left and spun out hitting the column?

7          MR. RODRIGUEZ:  Objection to form.

8      A.   I just answered that question.  I said the

9   shooting started west of the railroad tracks and west of

10   the railroad tracks is West -- East 10th Avenue -- East

11   10th Avenue.

12   BY MS. WELSTEAD:

13      Q.   Got it.  Got it.  So the shooting occurred

14   before the PIT maneuver?

15      A.   They started shooting.  There was shooting

16   going on before the PIT maneuver.

17      Q.   Okay.  What vehicle was immediately behind

18   Machado?

19          MR. RODRIGUEZ:  Objection to form.

20      A.   Tony Luis'.

21   BY MS. WELSTEAD:

22      Q.   Tony Luis'?

23      A.   Yeah.

24      Q.   And was Lieutenant Luis shooting at the

25   Machado vehicle?

Confidential

Page 131

1    A.   No.

2    Q.   So it was an officer behind Lieutenant Luis

3   that was firing shots towards Machado?

4    A.   Well, there was other officers at that time.

5   I don't know who the officer is.

6    Q.   Was it an officer in a vehicle driving behind

7   Lieutenant Luis?

8    A.   There was -- yeah, there was, but I can't tell

9   if you it was the first car, the second car, the third

10   car, the fifth car.  I can't tell you.  But, yeah, it

11   was after Tony Luis.  Because, first it was Lester

12   Machado, then it was Tony Luis, and then there were

13   other vehicles.

14    Q.   An officer behind Lieutenant Luis was firing

15   shots in Lieutenant Luis' -- an officer behind

16   Lieutenant Luis was firing shots towards Lieutenant Luis

17   in an effort to get to the Machado vehicle that was in

18   front of Lieutenant Luis; is that your testimony?

19        MR. RODRIGUEZ:  Objection to form.

20    A.   I cannot answer that question.  You would have

21   to ask the officer if he was shooting towards Tony Luis.

22   I don't know where the officer was shooting.  I'd just

23   say that I heard shots fired as Lester Machado is

24   driving, Tony Luis is behind him, and then there are

25   other vehicles.

Confidential

Page 132

1        If the officer was shooting towards Tony Luis,

2    you would have to ask the officer that shot.

3    BY MS. WELSTEAD:

4        Q.   When you first heard shots fired at the moving

5    vehicle, did you announce on the radio:  "Shots fired"?

6        A.   Yes.

7        Q.   Would that be immediately at the time you

8    first heard the shots starting?

9        A.   Yes.

10        MS. WELSTEAD:  So, it's 12 o'clock now.  I

11        still have a little bit more to go, but I'd like to

12        advise the witness we're going to go past lunch and

13        make sure that you get some food on a break so

14        you're ready to continue.

15        THE WITNESS:  All right.  Thank you.

16        MS. WELSTEAD:  Maybe Mr. Rodriguez will buy

17        you lunch.  If you need to put an order in now, can

18        we do that and maybe break?  Want to take five now

19        and then come back with a plan?

20        MR. SWITKES:  Sounds good.

21        MR. RODRIGUEZ:  That works.

22        (Thereupon, at 12:01 p.m. a recess was taken

23    until 12:11 p.m., after which the deposition continued

24    as follows:)

25    BY MS. WELSTEAD:

Confidential

Page 133

1    Q.   During the break did you have a conversation

2   with any attorney about your testimony?

3    A.   No, ma'am.

4    Q.   Okay.  So, let's stay at this location where

5   you observed the PIT maneuver.

6        Would you agree with me that in order to see

7   the front bumper of Lieutenant Luis strike the rear

8   bumper of the Machado vehicle you would have to be at

9   least parallel to the Lieutenant Luis vehicle; correct?

10       MR. RODRIGUEZ:  Objection to form.

11    A.   Do you have me parallel to the vehicle?

12  BY MS. WELSTEAD:

13    Q.   Yeah, you would have to be -- at least be

14   parallel to where Lieutenant Luis' vehicle is in order

15   to see the front of his car?

16       MR. RODRIGUEZ:  Form.

17    A.   I don't agree.

18  BY MS. WELSTEAD:

19    Q.   Okay.  So were you at least at the same

20   distance behind Machado as Lieutenant Luis at the time

21   you saw the PIT maneuver?

22       MR. RODRIGUEZ:  Objection to form.

23    A.   No.

24  BY MS. WELSTEAD:

25    Q.   How far back were you or were you in front?

Confidential

Page 134

1     A.   I was behind but on the opposite lane.

2     Q.   How far behind the Machado vehicle?

3     A.   Not too far.

4     Q.   Was there any police vehicle closer to you on

5   the west side -- westbound lanes than you?

6     A.   No.

7     Q.   Did you ever get ahead of Lieutenant Luis?

8     A.   No.

9     Q.   Out of what window did you observe the PIT

10   maneuver?

11     A.   What window?  Out of my vehicle.

12     Q.   The front or the side?

13     A.   The vehicle.  I can't answer that question.

14   Out of the vehicle.

15     Q.   You don't know if it was the front window or

16   the side window?

17     A.   Right.

18     Q.   And I asked you about brake lights.  You said

19   you had tunnel vision.  So, let me -- just to be clear,

20   did you observe either the -- did you observe the

21   Machado vehicle's brake lights go on?

22         MR. RODRIGUEZ:  Form.

23     A.   I can't answer that.

24   BY MS. WELSTEAD:

25     Q.   How about during the entire chase, do you

Confidential

Page 135

1   recall whether those brake lights went on at any point

2   in time --

3       A.   I don't remember.

4       Q.   -- during the chase?

5       A.   I don't remember, ma'am.

6       Q.   Did you see Lieutenant Luis' brake lights go

7   on?

8       A.   Don't remember.

9       Q.   Did you see what occurred after the impact of

10   these two vehicles?

11      A.   After the PIT maneuver?

12      Q.   Yes, after the impact of the two vehicles.

13      A.   Yes.

14      Q.   And where did you observe that from?

15      A.   From my vehicle, from inside my vehicle.

16      Q.   From the westbound lane?

17      A.   Yes.

18      Q.   How far away were you?

19      A.   From?

20      Q.   The Machado vehicle.

21      A.   Not too far.

22      Q.   How about in car lengths?

23      A.   It would be at an angle.  So I would say

24   maybe -- maybe three car lengths.

25      Q.   You were three car lengths behind the Machado

Confidential

Page 136

1   vehicle at the time of the PIT maneuver?

2       A.   No.  That's not what you asked.

3          MR. RODRIGUEZ:  Objection to form.

4       A.   You asked that after the car impact -- both

5   cars impacted, right --

6   BY MS. WELSTEAD:

7       Q.   Yes.

8       A.   -- and Machado's car spun and hit the pillar,

9   how close was I or how far was I from the Machado

10  vehicle.  And I said I wasn't too far from his vehicle.

11         And then you said:  Well, how close were you

12  to the vehicle?

13         And you said:  Give me car lengths.

14         And I said:  At an angle.  Because, remember,

15  his final stop, he was facing an angle, and I am on the

16  opposite side of traffic.

17         So, at an angle I would say about three cars.

18      Q.   Okay.  At the time that you observed the PIT

19  maneuver were you traveling at the same rate of speed as

20  the Machado vehicle?

21      A.   As the Machado vehicle?  No.

22      Q.   Were you traveling at the same rate of speed

23  as Lieutenant Luis?

24      A.   I don't know his speed but I was parallel to

25  his vehicle.

Confidential

Page 137

1    Q.   And you were keeping up with him?

2    A.   I was parallel.

3    Q.   You were keeping up with him?

4    A.   I was parallel to his vehicle.

5    Q.   Does that mean you were going approximately

6  the same speed?

7    A.   I don't know what speed he was going.

8    Q.   Were you going approximately the same speed?

9  You don't have to know what speed he was going to tell

10  me whether you were going approximately the same speed.

11    A.   That's not true.  I don't agree with that.

12    Q.   Okay.  Was your car at about the same location

13  away from the Machado vehicle as Lieutenant Luis' was?

14    A.   No.

15    Q.   Do you know whether Lieutenant Luis was going

16  faster than you?

17    A.   I don't know.  I can't answer that question.

18  I don't know how fast he was going.  I don't know how

19  fast I was going.  All I can say that I was parallel --

20    Q.   Were they --

21    A.   -- on the opposite side of traffic.

22    Q.   Were you trying to keep up with the Machado

23  vehicle from the westbound lanes?

24    A.   No, I was just driving.  I wasn't trying to

25  keep up.  I was just parallel to Tony Luis' vehicle.

Confidential

Page 138

1    Q.   Were you trying to keep up with Tony Luis?

2    A.   No, I was just traveling.

3    Q.   You were just traveling?

4    A.   Yeah, driving, driving the vehicle, driving

5  the vehicle parallel.

6    Q.   To do -- for what purpose, ma'am?

7    A.   I was driving.

8    Q.   Well, you weren't just driving.  You were in

9  the middle of a police chase; were you not?

10    A.   Okay.  Then, the police chase --

11    Q.   Okay.

12    A.   -- but I was driving.  In order to be involved

13  in  the police chase I have to drive; correct?

14    Q.   Yes.  And my question is:  What was your

15  intent at this point paralleling?

16    A.   I don't know what my intent was.  I was just

17  driving.

18    Q.   Well, tell me about your police training.

19  What does your police training tell you when you're

20  involved in a high speed -- or in a chase, a police

21  chase, and you're paralleling, what does your police

22  training tell you that your purpose is at that point?

23    A.   Well, we don't have police training in chases.

24  We just get your -- what is it called -- the order, you

25  read it, and that's it.  But there's no -- actually,

Confidential

Page 139

1   there's no training.

2       Q.   Did you have to undergo any training maybe at

3   the police academy on driving, defensive driving, police

4   chases, anything like that --

5       A.   No, they --

6       Q.   -- where you're actually in a car driving?

7       A.   They teach you about driving but not about

8   chasing.  They don't teach chasing vehicles.  They teach

9   you about applying stops, but they don't teach you about

10  chasing vehicles.  Well, not when I went to the academy.

11  I don't know about now.

12      Q.   Okay. So after your 10, 12 years on the force,

13  did you have any experience in police chases?

14      A.   No.

15      Q.   Okay.  So you wouldn't be qualified to testify

16  regarding what the proper police practices were in

17  police vehicle chases; correct?

18      A.   Correct.

19      Q.   Okay.  Were you driving in the westbound lanes

20  in an attempt to maintain visual sight of the Machado

21  vehicle?

22      A.   Repeat the question, please.

23      Q.   Were you driving in the westbound lanes --

24      A.   Okay.

25      Q.   -- in an attempt to maintain visual contact

Confidential

Page 140

1   with the Machado vehicle?

2       A.   Yes.

3       Q.   You wanted to keep eyes on it; correct?

4       A.   Correct.

5       Q.   What did you do when you observed the impact?

6           If you need to make a phone call, you can make

7   a phone call, but you can't have this on the record.

8       A.   Okay, listen, I'm just checking up on my son.

9       Q.   Okay.

10          MR. SWITKES:  Okay.  You and the attorney are

11       checking the phones at the same time.

12          MS. WELSTEAD:  I mean, we can absolutely take

13       a break if we need to --

14          THE WITNESS:  Yes, ma'am.

15          MR. RODRIGUEZ:  I'm getting a message from my

16       assistant, if that's okay with you, Mr. Switkes.

17  BY MS. WELSTEAD:

18      Q.   So, Ms. Benitez, if you need to check on your

19   son, we can absolutely do that, but I just want to get

20   an answer to my question and then we'll take a break.

21   Okay?

22          Answer my question, please.

23      A.   Go ahead.  Go ahead.  Can you repeat the

24   question?

25          MS. WELSTEAD:  Yeah.  Let's just read it back.

Page 141

1          (Thereupon, the following was read by the

2    Court Reporter:

3          "Question: What did you do when you observed

4      the impact?

5          "If you need to make a phone call, you can

6      make a phone call...")

7    BY MS. WELSTEAD:

8      Q.   What did you do when you observed the impact,

9    Ms. Benitez?  That's the pending question.

10     A.   Okay.  Before the impact, when Tony Luis'

11   bumper impacted the rear bumper of Lester Machado's

12   vehicle, I came to a complete stop.  So while the car

13   was spinning, my vehicle was stopped.  When Lester

14   Machado's vehicle hit the Metrorail column I was already

15   stopped.

16     Q.   When did you hit the brakes?

17     A.   I hit the brakes when Lieutenant Tony Luis'

18   vehicle impacted the rear of Lester Machado's vehicle.

19     Q.   Okay.  So, am I correct then when you observed

20   the impact between Lieutenant Luis and the Machado

21   vehicle you hit the brakes; correct?

22     A.   Yes.

23     Q.   Yes?

24     A.   Yes.

25     Q.   Why is that?

Confidential

Page 142

1     A.   Because the car was going to spin out of

2   control.  I didn't want to get -- I didn't know if the

3   car was going to hit me or not.

4     Q.   How close did you come to the car hitting you?

5     A.   Not close.  But that was just my reaction.

6     Q.   Okay.  Your reaction was to hit the brakes?

7     A.   Yes.

8     Q.   Did you have to hit them hard in order to

9   bring your vehicle to a stop?

10    A.   No, I just stopped.  I hit the brakes.

11    Q.   So how long did it take you to stop?

12    A.   When I hit the brakes the vehicle stopped.

13    Q.   Okay.

14    A.   The car kept going.  I hit the brakes; the car

15   would stop.

16    Q.   Okay.  Did your car stop eastbound -- I mean,

17   westbound of where Lieutenant Luis' car stopped?

18        MR. RODRIGUEZ:  Form.

19    A.   My vehicle stopped as I was driving on east --

20   on the westbound lane, so that's where my vehicle

21   stopped.  Tony Luis' car passed -- drove past Lester

22   Machado and the pillar where he hit and then he stopped.

23   So, no, my car did not stop where Tony Luis' car

24   stopped.

25   BY MS. WELSTEAD:

Page 143

1    Q.   Your car stopped west of where Lieutenant

2   Luis' vehicle stopped; correct?

3    A.   No.  No.

4    Q.   No?

5    A.   No.  I'm driving -- okay, I'm driving

6   eastbound on the westbound lane, okay.  Tony Luis is

7   driving eastbound on the eastbound lane.  He hits the

8   vehicle, right, the car.  Both cars impact.  They make

9   contact.  The car spins out of control.

10       I'm already stopped.  I'm stopped on the

11   westbound lane facing eastbound, I'm stopped there.  I'm

12   stopped right before the pillar that Lester Machado's

13   vehicle hits.  So, I'm stopped there.

14       Tony Luis' car impacts.  The car spins out of

15   control.  And his car stops where Lester Machado's car

16   comes to a stop.  He goes past that just a little bit

17   and then his car stops -- Tony Luis' car stops.  So,

18   we're not --

19    Q.   Tony --

20    A.   So, we're not in the same direction or in the

21   same location.

22    Q.   Well, you are in the same direction; aren't

23   you?  Didn't you testify that all three of you were

24   going eastbound?

25    A.   Yes, ma'am, but what I mean is the same

Confidential

Page 144

1   location.  What I'm saying is Tony Luis is on the

2   eastbound -- maybe I confused you.  Tony Luis is on the

3   eastbound lane.  I'm on the westbound lane.  So

4   that's where we're now.

5          So, yeah, we're facing the same direction but

6   we're not in the same place.  He's on the one side of

7   the road and I'm on the other side of the median.

8      Q.   Maybe it was my question that wasn't clear.

9   And that's absolutely possible.

10          You, Lester Machado and Tony Luis are all

11   heading east; correct?  You're in an easterly direction

12   at this point; am I correct?

13      A.   Yes.

14      Q.   And you've been very clear, you're

15   paralleling, you're on the westbound lanes and these two

16   cars are on the eastbound lanes, but you're all

17   traveling in the same direction of travel, which is

18   eastbound; correct?

19      A.   Yes.

20      Q.   At the time of the impact between Lieutenant

21   Luis' vehicle and the Machado vehicle, did Lieutenant

22   Luis brake his car?

23      A.   Yes, he came to a stop.

24      Q.   Okay.  And did he come to a stop east of your

25   location?

Confidential

Page 145

1      A.   He came to a stop south of my location.

2      Q.   Was he also east of your location?

3      A.   He was south -- okay, south and he's east

4   because he was driving east.  So you can say southeast

5   location.

6      Q.   Okay.  And you are driving east as well;

7   right?

8      A.   I'm driving east, yes.

9      Q.   And you did not brake until you saw the

10   impact; am I correct?

11      A.   Yes.  The impact of both vehicles, not the

12   impact of the vehicle with the column.

13      Q.   You saw the impact of both vehicles and you

14   hit your brakes; correct?

15      A.   Correct.

16      Q.   And you don't know how long it took your car

17   to stop; right?

18      A.   No, I said when I hit the brakes the car

19   stopped.

20      Q.   So it doesn't stop immediately, it travels

21   some distance in order for the brakes to kick in and

22   bring the vehicle from your speed to zero; correct?

23      A.   No.  When I hit the brakes, the car stopped.

24         MR. RODRIGUEZ:  Can we take a break?  Somebody

25      is banging at my door in the office.

Confidential

Page 146

1         Hold on.  Just pause for a second.

2         MS. WELSTEAD:  Yep.

3         (Thereupon, there was a brief interruption,

4    after which the deposition continued as follows:)

5    BY MS. WELSTEAD:

6       Q.   Ms. Benitez, when you braked, your testimony

7    is your car stopped immediately?

8       A.   Yeah, I braked and my car stopped.  It's not

9    like I brake and the car kept going and then finally

10   came to a stop.  No, I hit the brake and the car

11   stopped.

12      Q.   Well, you hit the brakes and the car slows

13   down until it comes to a stop.  Isn't that the way

14   brakes work?

15        MR. RODRIGUEZ:  Objection to form,

16        argumentative.

17         You can answer.

18      A.   When you brake the car stops.

19   BY MS. WELSTEAD:

20      Q.   Doesn't it slow down?

21      A.   Well, I would have to go outside to my car.

22   Maybe it does.  I'm telling you -- you're asking me did

23   you brake, did the car stop?  Yes, the car stopped.

24      Q.   I'm asking you how long it took to come to a

25   complete stop from the time that when you hit the

Confidential

1   brakes.

2      A.   Okay.  When I press the brakes it's not like

3   it went a few car lengths or a few blocks.  That

4   wasn't -- or if the brakes squeaked and the car didn't

5   stop.  That wasn't the case.  Whichever way the brakes

6   work, I know that when I press the brakes the car

7   stopped.  Yeah, it didn't do a hard stop but the car

8   stopped.

9      Q.   You did not do a hard stop?

10      A.   It wasn't -- it wasn't a hard like -- it

11   wasn't a hard stop that everything in my car fell over,

12   my laptop fell over, no.

13      Q.   Got it.  Are there portions of this incident

14   that you've testified to that you only observed on video

15   as opposed to having personally observed them?

16      A.   No.  I personally observed the impact of the

17   two vehicles.  I personally observed the impact of

18   Lester Machado's car with the column.

19          What I said so I can't testify correctly,

20   because I couldn't remember, was if I can see the video

21   to testify as to what lane the vehicles were in when the

22   cars -- when -- what lane was Tony Luis' car traveling,

23   that's the question you asked me, and what lane was

24   Lester Machado traveling in.  That's what I said I

25   needed to see the video.  But not because I only

Page 148

1  observed it on video.  No, that's not the case.

2      Q.   Got it.  And we talked about the timing of the

3  shots.  The shots that you heard fired at this location,

4  shots started -- you first heard shots before you

5  braked; correct?

6      A.   Yes.

7      Q.   Okay.  And did you ever get in the crossfire

8  yourself?

9      A.   At which location?

10      Q.   At that location where you've braked now after

11  the impact.

12      A.   Well, I'm on the opposite side of traffic.

13  So, remember, I am in the westbound.  The shooting was

14  coming from the eastbound traffic lane.

15      Q.   So that's a no?  No, you were never in the

16  crossfire?

17      A.   Well, I don't know which way the officers are

18  shooting.  Remember I said there was an officer that was

19  shooting.  And he's traveling on the eastbound lane.

20  I'm traveling on the westbound lane, which that was one

21  of the reasons why I went on the westbound lane was so I

22  wouldn't get shot.  Because, from the first scene when

23  Lester Machado left they were shooting.  So, if I would

24  have been behind his car or behind Tony Luis' car, I

25  would have got shot.  So that's one of the main reasons

Page 149

1  why I'm on the opposite side of the lane parallel --

2  driving parallel, traveling eastbound.

3      Q.   Okay.  So you're paralleling this chase in an

4  effort not to get shot, not because the general orders

5  prohibit caravanning; correct?

6      A.   Repeat that again.

7      Q.   Is it your testimony that you're on the

8  westbound lanes paralleling this chase because you don't

9  want to get shot and not because you're trying to avoid

10  caravanning?

11         MR. RODRIGUEZ:  Objection to form.

12      A.   Well, I said I didn't want to get shot, that

13  is one of the reasons I was traveling --

14  BY MS. WELSTEAD:

15      Q.   Did Tony Luis' car get shot?

16      A.   I don't know that.

17      Q.   Did you ever observe Lieutenant Luis' car

18  after the impact?

19      A.   I observed where it had been to the final

20  stop, but I never walked up to his car and looked around

21  at the car.  No, I did not do that.

22      Q.   Did anyone tell you that his car got hit by

23  rounds?

24      A.   No.  I never had any discussion or I never

25  questioned if his car got hit or not.

Confidential

Page 150

1    Q.   You had numerous discussions with Carlos

2  Garcia; correct?

3    A.   Correct.

4    Q.   Did he ever mention to you that Lieutenant

5  Luis' car was shot?

6    A.   No.

7    Q.   Okay.  So from your position where your car

8  came to a final resting point after the impact of the

9  Machado vehicle with the pillar, were you ever in the

10  crossfire?

11    A.   Well, I don't know what directions the other

12  officers that were behind Tony Luis were shooting, so I

13  wouldn't be able to answer that question.

14    Q.   I'm just really asking you based on your

15  personal observations.  You remained in your vehicle

16  after it came to a complete stop; am I correct?

17    A.   I got out of the vehicle.

18    Q.   Immediately?

19    A.   Maybe a few seconds after.

20    Q.   Okay.  Well, that's my question.  During the

21  few seconds that you're in the car in your vehicle and

22  it's in a complete stop, were shots being fired?

23    A.   Yes, shots were being fired.

24    Q.   And am I correct shots were not being fired in

25  your direction because you chose to get out of the

Confidential

Page 151

1  vehicle; correct?

2      A.   Well, I can't answer that question.  I don't

3  know what direction the other officers were shooting.

4      Q.   Well, if you had any perception of shots

5  coming your way you would not have gotten out of your

6  vehicle; correct?

7      A.   No, I got out of my vehicle.  When I stepped

8  out of my vehicle, I stepped out of my vehicle, I was

9  putting on my vest, and I stood to the side of my car.

10  Because even --

11      Q.   Where?

12      A.   On the driver's side, a little bit to the

13  rear, not all the way.

14          Because even if you're sitting in your car and

15  you're getting shot at, you're going to get hit.

16      Q.   I'm aware.

17      A.   It's not going to save you.

18      Q.   I'm aware.

19          Did you put the engine block of your car in

20  between you and where you perceived the shots coming

21  from?

22      A.   No.

23      Q.   Did you get in a safe location?

24      A.   I believe it was a safe location.

25      Q.   And that was in your driver's side door?

Confidential

Page 152

1     A.   Well, I said I got a little bit -- I got out

2   of the car on the driver's side door, but it wasn't like

3   right outside the door.  It was probably like a little

4   bit more rear, maybe, a little more rear, like the tire

5   or the back driver's side door, somewhere in that

6   location there.

7     Q.   Okay.  And why did you get to that location?

8   What were you there for?

9     A.   For cover.

10    Q.   And while you were in that location for cover,

11  did you observe any rounds, bullets coming towards you?

12    A.   No.  I just remember -- I could hear the shots

13  and I remember Tony Luis saying:  "Cease fire."

14    Q.   Okay.  That's something you heard on the

15  radio; correct?

16    A.   Correct.

17    Q.   So that was from your handheld radio, right,

18  not the vehicle radio?

19    A.   No, from my handheld radio.

20    Q.   Got it.  And do you make any transmissions

21  over the radio at that time?

22    A.   At that time, no.

23    Q.   Did there come a point in time when you left

24  that location where you had sought cover?

25    A.   Excuse me?

Confidential

Page 153

1    Q.   Did there come a point in time where you left

2    that location where you had sought cover?

3    A.   No.

4    Q.   You stayed there the whole time?

5    A.   Yes.

6    Q.   Until when?

7    A.   Until -- remember, I exit the car.  I walked

8    back there.  Tony Luis is already saying:  "Cease fire."

9    And then the only time that I moved was the shots

10   were -- already had stopped, and then I walked up to

11   Lester Machado's vehicle.

12   Q.   That's my question.

13        So you do not approach -- you do not leave

14   your place of safety where you have sought cover by your

15   driver's side door near the tire until all shots had

16   stopped; correct?

17   A.   Correct.  It happened fast.  The car spins out

18   of control.  The shooting is going -- the car is

19   spinning out of control.  The car hits the pillar.

20   They're still shooting.  Lieutenant Luis says:  "Cease

21   fire."  The fire stops. And then I walk up to Lester

22   Machado's vehicle.

23   Q.   Does the rounds being fired continue for some

24   period of time after Lieutenant Luis says to cease fire?

25   A.   Yes.  It didn't stop like right away.

Confidential

Page 154

1    Remember, there's shots being fired as he's talking on

2    the radio.  So there's a lot of people that can't hear

3    it.

4       Q.   Right.  So just to kind of put it in

5    chronological order then.  You don't leave your cover

6    location because Lieutenant Luis says:  "Cease fire."

7    You leave your cover location once all shots have

8    stopped being fired; correct?

9       A.   Correct.  That's common sense.

10      Q.   Just I'm trying to get a clear record of the

11   timing, okay.

12           And what did you observe from your location by

13   your driver's side door after the firing -- the shots --

14   the rounds stop being fired?

15      A.   Lester Machado reaches to the back, to the --

16   you know, to the back seat or the back of the vehicle

17   behind the passenger -- behind the passenger's seat.

18   The door opens -- the rear passenger door opens.  And

19   it's like if he's like trying to like climb to the back

20   seat.  And then --

21           I'm telling you this like this 'cause to me it

22   was like, I'm telling you, like slow motion.

23           He goes to the back seat.  The door opens.

24   And then I guess he's trying to make his way out.  And

25   then he just falls and he lays there.

Confidential

Page 155

1          As then when he lays there, as that's going

2     on, I'm approaching the vehicle.  And then he's laying

3     on the passenger's side of the vehicle.  He's laying

4     there.  I walk up to him.  I -- he's still breathing.  I

5     look at him.  I make eye contact with him.  He's still

6     breathing.  And then he takes his last breath.

7          Q.   And what else did you see?

8          A.   His body laying there, dead body.

9          Q.   You didn't mention seeing any police officers

10    at this time?

11         A.   There was a Metro -- after that there was a

12    Metro-Dade officer in full uniform that was standing --

13    that was standing there.  I don't know who the officer

14    is.

15         Q.   At the time that you saw Lester Machado take

16    his last breath, the Metro-Dade police officer is

17    present on the scene?

18         A.   I think he's making his way there.

19         Q.   Making his way close enough so that you can

20    observe him; correct?

21         A.   Right.

22         Q.   And who's closer to Machado at this point, you

23    or the Metro-Dade officer?

24         A.   I am.  And then Officer Hernandez is like a

25    few feet away from me.

Confidential

Page 156

1     Q.   But you're in front of Officer Hernandez;

2   correct?

3     A.   Right.

4     Q.   Okay.  So, when you're behind your driver's

5   side door and the Lester Machado car comes to a rest and

6   the vehicle -- his vehicle stopped by the pillar,

7   correct, and you're outside of your car taking cover and

8   the shots are being fired.  Do you understand where I am

9   in the chronology?

10     A.   Right.

11     Q.   I want to know how far away you are from the

12   Machado vehicle.  You're standing outside your open

13   driver's side door.

14     A.   Well, remember earlier before I told you it

15   was about three car lengths, about.

16     Q.   Right.

17     A.   So, I'm right -- if it's the three car

18   lengths, I'm right there.  Like, I can see, I can see

19   inside the vehicle.  I can see Lester Machado sitting in

20   the driver's seat.  That's how close I am.

21     Q.   Got it.  So Lester Machado is sitting in the

22   driver's seat after his car makes impact with the

23   pillar; correct?

24     A.   Correct.

25     Q.   And he's alive; correct?

Confidential

Page 157

1    A.   Correct.

2    Q.   And you see him moving inside of his car;

3   correct?

4    A.   Yes, he's reaching back -- back, to the rear,

5   to the back seat.  And then movement in the passenger

6   rear door.

7    Q.   Okay.  Do you hear any officers shouting any

8   commands at Machado at this point?

9    A.   I don't remember.

10    Q.   Do you know -- had he made it into the back

11   seat by the time the shooting stopped?

12    A.   Yes.

13    Q.   Does the door open before the shooting stops

14   or after?

15    A.   Before -- wait.  The shooting --

16    Q.   Yes.

17    A.   The shooting -- they stopped the shooting.  He

18   reaches to the back and then the door opens.  So when

19   he's opening the door, there's no shooting.  There's no

20   shots being fired.

21    Q.   Got it.

22        Did you have a shield that day?

23    A.   No, not everybody in the City of Hialeah where

24   I was working had a shield.

25    Q.   And the bulletproof vest, you put that on in

Confidential

Page 158

1   your car?

2       A.   Yes.

3       Q.   How long did that take you to put on?

4       A.   Well, I put it over my shirt.  So it was

5   quick.  I just threw it over.

6       Q.   Got it.  That's not a tactical vest; right?

7   It's a regular bulletproof vest?

8       A.   It's -- yeah, regular bulletproof.

9       Q.   Were you the closest Hialeah police officer to

10   Lester Machado at this point?

11      A.   Well, it's myself and Tony Luis.

12      Q.   Who's closer?

13      A.   I would say Tony Luis.

14      Q.   And Hernandez is behind you?

15      A.   She's a few -- a few -- you're saying when

16   we're in the car or not in the car?  Or, when I'm

17   outside of the car?

18      Q.   When you're -- you're still by your driver's

19   side door, correct --

20      A.   Yeah.

21      Q.   -- when you observe him come out of the

22   passenger door; am I correct or no?

23      A.   Yes, you're correct.

24      Q.   That's what I'm talking about.

25      A.   She's also -- she's also in the westbound lane

Confidential

Page 159

1  facing eastbound, a few feet away from my car.  Like,

2  her vehicle is a few feet away from my vehicle.

3      Q.   Did you see any other police vehicles in the

4  eastbound lanes besides Lieutenant Luis' vehicle?

5      A.   In the eastbound lanes?

6      Q.   Yes, ma'am.

7      A.   There was a few other vehicles, several

8  vehicles.

9      Q.   And did you look at them at this point from

10  your driver's side cover?

11      A.   Did I look at them?

12      Q.   Yeah.

13      A.   While I'm taking cover?

14      Q.   Yeah.

15      A.   I don't remember.  I don't -- I remember --

16  everything happened so quick.  I know there were other

17  vehicles there, but I didn't take my eyes away from

18  staring.  I was looking at Lester Machado's vehicle, in

19  his direction.

20      Q.   While you're deciding to leave cover, okay, do

21  you look to see if there are any other officers in the

22  area?

23      A.   Yes, I saw other officers in the area, yes.

24      Q.   Okay.  Great.  What did you see?

25      A.   When or what did I see?

Confidential

Page 160

1    Q.   What?  What?  What did you see?

2    A.   I saw other vehicles.  I saw other vehicles.

3  I saw officers standing outside of their cars.

4    Q.   Was there anything obstructing your view of

5  the eastbound lanes from where you were in the westbound

6  lane?

7    A.   A few feet back, yeah.  Because then there's

8  another pillar, so I couldn't see past.  But I could see

9  about -- about five cars, five police cars.

10    Q.   And any of them closer --

11        Sorry.  Did you finish your answer?

12    A.   No, no, I was going to say five cars.  I could

13  see about five cars.

14    Q.   Were any of the five police cars in the

15  eastbound lanes closer to the Machado vehicle than where

16  your car came to rest?

17    A.   No.

18    Q.   How do you know that?

19    A.   Because Lester Machado's car was already at --

20  was stopped.  He was outside of the car.  His body was

21  laying there.  The only closer car than me was Tony

22  Luis' car.

23    Q.   But Tony Luis' car was beyond Machado's car;

24  right?

25    A.   Yeah, but not that much -- not that much

Page 161

1    beyond.  Luis was the closest car and then it's me

2    after.  And then after leaving the second closest car,

3    then you have two cars.  They weren't really like

4    parallel like at the same distance.  But there were two

5    others cars.  And there was another car and there was

6    another car.

7        Q.   So all of the police cars in the eastbound

8    lanes were farther away from the Machado vehicle than

9    your car, except for Tony Luis.  Is that what you recall

10   seeing?

11       A.   Not so much far.  I don't know what you mean

12   by "far."  How far you mean?  I dont' mean that far.

13           You said:  Who was the closest?

14           The closest was first Tony Luis.  Second was

15   I.  And then right after it was somebody else's vehicle.

16   I don't know whose vehicle it was, but it was somebody

17   else's vehicle.  But, it's not far.  It's pretty close.

18           But, if you're telling me:  Who is the

19   closest?  Again, Tony Luis is first.  I'm second.  Then

20   there's another car and then right behind there's

21   another car and then the other car.

22       Q.   Okay.  So is it possible one of those cars in

23   the eastbound lanes was as close to the Machado vehicle

24   as you were?

25       A.   No.

Confidential

Page 162

1    Q.   Well, you didn't measure; right?  I mean, it's

2  possible; isn't it?

3    A.   Well, anything is possible.

4    Q.   Okay.  What about your observations?  Based on

5  your observations you said it's pretty close.  Is it

6  possible that your perception is wrong and one of those

7  cars was closer than yours?

8        MR. RODRIGUEZ:  Objection to form.

9    A.   Well, anything is possible, ma'am.  You're

10  asking me what I saw, and I'm telling you what I saw.

11        Now, if you go out there with a measuring

12  tape, maybe you'll find another car is closer.  I can't

13  answer that.  I'm telling you what I saw, what I

14  remember, and that's what I'm answering to.

15  BY MS. WELSTEAD:

16    Q.   Okay.  I asked you about brake lights.

17  Remember those questions?

18    A.   Yes.

19    Q.   And you never saw any brake lights come on at

20  all during the chase that you can recall?

21    A.   No, not that -- I can't answer yes or no.  Do

22  you understand?

23        What I'm saying is you asked me:  Do you

24  remember any brake lights coming on?  I'm saying no.

25  I'm not saying that there weren't any brake lights.  I

Confidential

Page 163

1   just don't remember.  I wasn't worried about who had

2   brake lights on and who didn't have brake lights.

3       Q.   Okay.  Did you observe the Machado vehicle

4   stopping short in an effort to get Lieutenant Luis to

5   run into him?

6       A.   Repeat the question.

7       Q.   Did you observe Mr. Machado stopping short in

8   an effort to get Lester -- to get Lieutenant Luis to run

9   into him?

10      A.   I remember him --

11           MR. RODRIGUEZ:  Objection to form.

12      A.   -- slowing down.  I do remember him slowing

13   down.  It was -- like, there were intersections that he

14   had to cross, so I do remember him slowing down.

15   BY MS. WELSTEAD:

16      Q.   That's not my question, though; right?  You

17   understood my question?

18      A.   Yeah.  I didn't answer your question?

19      Q.   Did you see Lester Machado stopping short when

20   Lieutenant Luis was behind him in an effort to get

21   Lieutenant Luis to hit him?

22      A.   I remember him stopping.  I do remember him

23   stopping.

24      Q.   Okay.  When did you --

25      A.   I do remember that Tony Luis almost hit him in

Confidential

Page 164

1  the back, you know, with his front bumper, almost

2  rear-ended Mr. Machado.  I do remember that.

3      Q.   You just testified you saw Lester Machado

4  stop?

5      A.   No, I didn't see him stop.  I saw him -- like

6  how could I say?  To cross an intersection you have to

7  stop or slow down some.  So, because it's a fresh

8  pursuit, it's a fresh chase, he's chasing.  So, if

9  Lester Machado is driving and Tony Luis is behind him,

10  you know, they're pretty close.

11     Q.   I agree.

12     A.   Once Lester Machado stops or slows down,

13  right, Tony Luis has to do the same thing.

14     Q.   Okay.

15     A.   So there was a time when he almost hit him

16  from behind.

17     Q.   Okay.  What I'm describing is like a little

18  bit different, okay.  Not because of an obstruction, not

19  because of a traffic signal, not because of a

20  pedestrian.  I'm talking about some kind of an

21  intentional movement on the part of Lester Machado, like

22  where he slammed on his brakes in an effort to get

23  Lieutenant Luis to ram into him from the back.

24         Did you see that?

25         MR. RODRIGUEZ:  Objection to form.

Page 165

1      A.   One of the times that I remember that

2   happening is on East 10th Avenue.

3   BY MS. WELSTEAD:

4      Q.   Right.

5      A.   But, come to think about it, I don't know if

6   it's because of the railroad tracks or is it

7   intentionally.

8      Q.   Okay.  But you observed him slam on the

9   brakes?

10      A.   Right.  I observed him -- not slam on the

11   brakes.  The car, you know, shifts.  You understand?

12          But, like I said, is it intentionally/

13   unintentionally?  At the time I would say that it would

14   be intentionally.

15          Now, there's a railroad tracks there.  So

16   because of the railroad tracks you do have to slow down.

17   If not, you're going to lose control of your vehicle.

18      Q.   So, you know, two different things:  Slowing

19   down and slamming on the brakes.

20      A.   Okay.

21      Q.   And my question is slamming on the brakes.

22   Did you observe him slamming on the brakes in an effort

23   to get Lieutenant Luis to ram into him?

24      A.   I can't say if he slammed --

25          MR. RODRIGUEZ:  Objection to form.

Confidential

Page 166

1      A.   I can't say if he slammed the brakes.  I'm

2   telling you that he slowed down.  To me it could be

3   slowing down and he slammed on the brakes or it could be

4   he slammed on the brakes and he was slowing down.

5   BY MS. WELSTEAD:

6      Q.   Could it be he was slamming on the brakes to

7   try and get one of the police cars to run into him?

8         MR. RODRIGUEZ:  Objection to form.

9      A.   I said the police vehicle almost rear-ended

10   him, yes, I did say that.

11   BY MS. WELSTEAD:

12      Q.   Okay.  Are you familiar in, you know, your

13   driving experience with a vehicle trying to do that,

14   trying to instigate a collision by slamming on the

15   brakes?

16         MR. RODRIGUEZ:  Objection to form.

17      A.   Repeat the question.

18   BY MS. WELSTEAD:

19      Q.   Is that something that you're familiar with in

20   your driving history, with somebody slamming on the

21   brakes in an effort to cause a collision?

22         MR. RODRIGUEZ:  Form.

23      A.   If I'm familiar?  I know about it, yes.  I

24   know about it.

25   BY MS. WELSTEAD:

Page 167

1      Q.   Okay.  And remember during your first

2    deposition you were asked many questions about what is

3    ram, what's not a ram.  Would that be considered a

4    ramming situation, if somebody slams on the brakes in an

5    effort to intentionally cause a collision with the car

6    in back of them?

7           MR. RODRIGUEZ:  Objection to form.

8      A.   To me "ramming" is that you intentionally are

9    hitting another vehicle, you're striking another

10   vehicle.

11   BY MS. WELSTEAD:

12     Q.   Okay.  So what would it be then if a car in

13   the lead is slamming on the brakes, again, in an effort

14   to cause a collision?

15           MR. RODRIGUEZ:  Form.

16   BY MS. WELSTEAD:

17     Q.   What would you call that?

18     A.   What would I call that?  Getting someone to

19   rear-end you.

20     Q.   Getting what?

21     A.   Getting someone to rear-end you.

22     Q.   Okay.  So that's still a -- if you are doing

23   that intentionally with the purpose of getting someone

24   to rear-end you, that's still the cause of the

25   collision; isn't it?

Confidential

Page 168

1        MR. RODRIGUEZ:  Form.  Objection to form.

2     A.   Well, the collision, meaning the accident,

3   yes.  If somebody hits you from the back, it's not --

4   BY MS. WELSTEAD:

5     Q.   If somebody hits you from the back because you

6   slammed on your brakes in an effort to cause a

7   collision, is that an intentional act?

8        MR. RODRIGUEZ:  Objection to form.

9     A.   Yes.

10  BY MS. WELSTEAD:

11    Q.   Okay.  Has that ever happened to you?

12    A.   Has that ever happened to me?  Yes.

13    Q.   Okay.  When did it happen to you?

14    A.   A few times.

15    Q.   Did it happen to you during the road rage

16  incident?

17    A.   Yes, it happened to me in the road rage

18  incident, yes.

19        MR. RODRIGUEZ:  Objection to form.

20  BY MS. WELSTEAD:

21    Q.   Did you give a sworn statement where you

22  described that Andres Caredegua tried to cause a

23  collision with you by pulling in front of you and

24  slamming on his brakes?

25        MR. RODRIGUEZ:  Objection, form.

Confidential

Page 169

1    A.   I don't know if that's his name.  But, yeah,

2   that's what he did.

3   BY MS. WELSTEAD:

4    Q.   His name is in the PCB file on the incident;

5   correct?

6    A.   Could be, yes.

7    Q.   And you provided a sworn statement where you

8   described that the complainant drove past your car,

9   pulled into your lane directly in front of you, and then

10   began slamming on his brakes continually, almost causing

11   you to crash into his car; right?

12       MR. RODRIGUEZ:  Form.

13    A.   Continuously, yes.

14   BY MS. WELSTEAD:

15    Q.   Okay.  Did you observe anything like that by

16   Mr. Machado on this evening?

17    A.   Continuously, no.

18    Q.   Okay.  How about occasionally?

19    A.   No.

20    Q.   Once or twice?

21    A.   I did give you an incident of once.  Yes, I

22   did give you an incident of once.

23    Q.   Okay.  Did you observe Lester Machado ever

24   attempt to come to a stop?

25    A.   Did I ever witness -- say that again, I'm

Confidential

Page 170

1   sorry.

2        MR. RODRIGUEZ:  Form.

3   BY MS. WELSTEAD:

4     Q.   Did you ever observe Lester Machado attempt to

5   stop his vehicle under his own volition?

6        MR. RODRIGUEZ:  Objection to form.

7     A.   I never -- I never observed him attempting to

8   stop his vehicle.  The only time I saw his vehicle

9   stop --

10  BY MS. WELSTEAD:

11    Q.   Was at the collision?

12    A.   Yes, the collision.  The vehicle stopped at

13  the collision.

14    Q.   Did you see him run any red lights?

15    A.   Yes.

16    Q.   Was he traveling over the speed limit?

17        MR. RODRIGUEZ:  Form.

18    A.   The speed limit?  I'd say he was probably

19  going a little bit over the speed limit.  I can't tell

20  you how fast he was going, but he was going over the

21  speed limit.  There was times he was going over the

22  speed limit.  There was times where he wasn't, he was

23  driving slower.  So, it wasn't a constant pattern of him

24  being on a high-speed chase.

25  BY MS. WELSTEAD:

Confidential

Page 171

1    Q.   And do you know why that was?

2    A.   No.  I wish I did.

3    Q.   Did you observe him engaging in any reckless

4  driving?

5    A.   Well, what do you mean by "reckless driving"?

6    Q.   You're a police officer for 12 years.  You

7  tell me what reckless driving is.

8    A.   Well, that's what I'm asking you.  Reckless

9  driving could be one thing to me but to you something

10  else.

11        When you're saying "reckless driving" what do

12  you mean "reckless driving"?

13    Q.   I mean reckless driving based on your years as

14  an officer --

15    A.   Reckless driving, you need at least three or

16  more traffic infractions.

17    Q.   Thank you for the definition.  Can you now

18  give me an answer to the question?

19    A.   And the question, again?

20    Q.   Did you observe Lester Machado engaging in

21  reckless driving?

22        MR. RODRIGUEZ:  Objection to form.

23    A.   No.

24  BY MS. WELSTEAD:

25    Q.   You didn't see him commit three or more

Page 172

1  traffic infractions?

2          MR. RODRIGUEZ:  Form.

3      A.   He committed some traffic infractions, yes.

4  BY MS. WELSTEAD:

5      Q.   Three or more?

6      A.   I would say two.

7      Q.   And which two did you observe?

8      A.   A red light and the speed limit.

9      Q.   Did you see him yield the right-of-way to any

10  vehicles at stop signs?

11      A.   Well, the only stop sign that I can recall is

12  a stop sign from East 7th -- East 7th Avenue and 25

13  Street.

14      Q.   And did he come to a complete stop, yield at

15  the traffic at that location?

16      A.   That would be three, ma'am.

17      Q.   Okay.  Does that mean under your definition

18  that you observed Lester Machado engaging in reckless

19  driving?

20      A.   Well, because he committed three traffic

21  infractions.  I'd say he committed three traffic

22  infractions.  Yes, he committed three traffic

23  infractions.

24      Q.   So did you observe him engaging in reckless

25  driving?

Page 173

1        MR. RODRIGUEZ:  Objection, form.

2   BY MS. WELSTEAD:

3       Q.   Did you answer?

4       A.   Oh, I was waiting for you to finish reading.

5       Q.   No, I asked a question.  I'm waiting for your

6   answer.

7       A.   And your question, again?

8        MS. WELSTEAD:  Read it back, please.

9        (Thereupon, the following was read by the

10  Court Reporter:

11       "Question:  So did you observe him engaging in

12       reckless driving?")

13       MR. RODRIGUEZ:  Form.

14      A.   Well, I observed him, okay, commit three

15  traffic infractions.

16  BY MS. WELSTEAD:

17      Q.   Thank you for the clarification.

18       But, can you answer my question yes or no and

19  then give a clarification?

20      A.   I said that reckless driving was committing

21  three or more infractions.  So I'm saying he committed

22  three, the red light, the speed and the stop sign.

23      Q.   Okay.  So that's a yes?

24      A.   That's a yes.

25      Q.   Okay.  Thank you.

Confidential

Page 174

1        You told us that you observed Mr. Machado was

2   still alive when he came out of the passenger door;

3   correct?

4     A.   Correct.

5     Q.   At the time you made that observation was

6   there any police officers closer to Mr. Machado than

7   you?

8     A.   No.

9     Q.   Did there come a point in time when a police

10   officer got closer to Mr. Machado than you?

11     A.   Well, when I walked away the Miami-Dade police

12   officer was still standing there.

13     Q.   When did you walk away?

14     A.   A few seconds after.

15     Q.   A few seconds after what?

16     A.   After he took his last breath.

17     Q.   Okay.  A few seconds after he took his last

18   breath.  Up until the point that he took his last

19   breath, had any police officer gotten closer to

20   Mr. Machado than you?

21     A.   No.

22     Q.   Okay.  And then you walked away?

23     A.   Yes.

24     Q.   Where were you going?

25     A.   Back to my vehicle.

Page 175

1    Q.   To do what?

2    A.   Just walked back to my vehicle to do nothing.

3    I walked back to my vehicle.

4    Q.   You turned around and walked away?

5    A.   I walked away --

6        MR. RODRIGUEZ:  Objection to form.

7    BY MS. WELSTEAD:

8    Q.   Is that what you did?

9    A.   I walked away, ma'am.

10   Q.   Okay.  And at the time that you walked away

11   was any police officer closer to Mr. Machado than you?

12       MR. RODRIGUEZ:  Objection to form.

13   A.   When I walked away the one that stood there

14   was the Miami-Dade police officer.

15   BY MS. WELSTEAD:

16   Q.   Okay.  Did you observe anything else at that

17   time before you walked away?

18       MR. RODRIGUEZ:  Form.

19   A.   No, I just observed his body, his lifeless

20   body there.

21   BY MS. WELSTEAD:

22   Q.   And no one was closer to him than you at that

23   time; right?

24       MR. RODRIGUEZ:  Objection to form.

25   A.   I just finished telling you that when I walked

Confidential

Page 176

1   away the Miami-Dade officer stood there.  So after I

2   walked away the person closest to his body was the

3   Miami-Dade officer.

4       Q.   Got it.

5          MS. WELSTEAD:  We're at 1:06 p.m. I think it's

6   time for our lunch break.

7          MR. RODRIGUEZ:  I agree.

8          MR. DESAI:  How long are we taking?

9          MS. WELSTEAD:  However long.  You know, it's

10  up to the witness.  And then after her, it's up to

11  the Court Reporter.  The lawyers are really

12  irrelevant in this.

13         How long do you want, Ms. Benitez?

14         THE WITNESS:  Two o'clock.

15         MS. WELSTEAD:  You want an hour?

16         THE WITNESS:  Yes, I want an hour.

17         MS. WELSTEAD:  Up to you.  We'll be here

18  later, but it's up to you.

19         THE WITNESS:  Thank you.

20         MS. WELSTEAD:  See you at 2:00.

21         (Thereupon at 1:08 p.m. a luncheon recess was

22  taken.)

23

24

25

Confidential

Page 177

1                  CERTIFICATE OF OATH

2
   STATE   OF   FLORIDA)
3                    ) SS
   COUNTY OF MIAMI-DADE)
4

5          I, the undersigned authority, certify that

6   MARIA BENITEZ appeared before me via a Zoom platform,

7   that witness' identification (Driver's license) was

8   produced, and was duly sworn.

9          WITNESS my hand and official seal this 27th day

10  of May, 2021.

11

12

13   _____
                  ILIANA LUGO
         Notary Public - State of Florida
14        Commission No. DD733630
         Commission Expires: 11/08/2023
15

16

17

18

19

20

21

22

23

24

25

Confidential

Page 178

1              REPORTER'S DEPOSITION CERTIFICATE

2
   STATE   OF   FLORIDA)
3                     ) SS
   COUNTY  OF  MIAMI-DADE)

4

5         I, Iliana Lugo, Court Reporter, certify that I

6   was authorized to and did stenographically report the

7   deposition of MARIA BENITEZ; that a review of the

8   transcript was requested; and that the transcript is a

9   true and correct record of my stenographic notes

10   and a true and correct record of a transcription of the

11   recorded video.

12         I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   parties' attorney, or counsel connected with the action,

15   nor am I financially interested in the action.

16         DATED this 27th day of May, 2021.

17

18         _____
           ILIANA LUGO, Court Reporter

19

20

21

22

23

24

25

Page 179

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:   19-CV-24047-MGC

YOLAISY PEREZ,
as presumptive Personal Representative
of the Estate of Lester Machado,

     Plaintiffs,

Vs.

CITY OF HIALEAH, et al.

     Defendants.

_____/

Via Zoom:
April 26, 2021
2:03 p.m.

DEPOSITION OF MARIA BENITEZ
(VOLUME 2)

    Taken before LORI HART, Certified Electronic
Reporter and Notary Public in and for the State of
Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.



Page 180

APPEARANCES


For the Plaintiffs:

RICHARD J. DIAZ, ESQUIRE
RICHARD J. DIAZ, P.A.
3127 Ponce De Leon Boulevard
Coral Gables, Florida  33134
rick@rjdpa.com

ROBERTO PERTIERRA, ESQUIRE
ROBERTO E. PERTIERRA, P.A.
2655 Le Jeune Road, Suite 1105
Coral Gables, Florida  33134
robertopertierra@gmail.com



For the Defendants:

ROBERT L. SWITKES, ESQUIRE
SWITKES & ZAPPALA, P.A.
407 Lincoln Road, Penthouse SE
Miami Beach, Florida  33139
rswitkes@switkeslaw.com


CHRISTINE L. WELSTEAD, ESQUIRE
BOWMAN AND BROOKE, LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida  33134
Christine.welstead@bowmanandbrooke.com

DEVANG DESAI, ESQUIRE
GAEBE, MULLEN, ANTONELLI & DIMATTEO
420 South Dixie Highway, 3rd Floor
Coral Gables, Florida  33146
ddesai@gaebemullen.com


Also Present:

HUBERT RUIZ
JULIO OJEDA
MARK ANTONELLI



National Reporting Service   (305) 373-7295

Page 181

                              INDEX

WITNESS:  MARIA BENITEZ

                         DIRECT      CROSS      REDIRECT

BY MS. WELSTEAD:                      183

BY MR. SWITKES:                       186



Page 182

NO EXHIBITS PROVIDED



Page 183

1            (Thereupon, pursuant to the taking of the

2       lunch recess, at 2:03 p.m. the deposition

3       continued as follows:)

4        THEREUPON:

5                        MARIA BENITEZ,

6       resumed.

7              CONTINUATION OF CROSS EXAMINATION

8   BY MS. WELSTEAD:

9       Q.   Ms. Benitez, did you get some lunch?

10      A.   Yes, ma'am.   Thank you.

11      Q.   Did you talk to anyone about your testimony

12  so far?

13      A.   No, ma'am.

14      Q.   Did you review any documents or videos while

15  you were on the break?

16      A.   No, ma'am.

17      Q.   Okay.   Let's continue to where we left off.

18  And I think that was on 35 and 79, the final scene,

19  correct; is that where we were?

20      A.   Yes, ma'am.

21      Q.   Okay.   You described for us in great detail

22  how you were traveling in those westbound lanes,

23  heading east.   Can you tell me how long you were in

24  the westbound lanes on 79th Street?

25      A.   All the way from East 8th Avenue, all the

Page 184

1  way to Northwest 35th Avenue, which would be, maybe,

2  equivalent to, maybe like, East 13th Avenue, which

3  doesn't exist, but I'm just trying to give you an

4  equivalent.

5       Q.    Thank you.  That's about five blocks?

6       A.    Yes, ma'am.

7       Q.    In those five blocks did you have to avoid

8  any oncoming traffic?

9       A.    Not at that time, no.

10      Q.    Okay.  And by, "not at that time," you mean

11  because of the time of the morning it was?

12      A.    No, because of while I was driving.  While I

13  was driving there was no vehicles, no traffic.

14      Q.    Got it.  When you were driving eastbound in

15  the westbound lane, did you have your lights and

16  sirens activated?

17      A.    Yes, ma'am.

18      Q.    Were they activated the entire time that you

19  were a part of this chase?

20      A.    Yes.

21      Q.    Okay.  And your vehicle was, what, a Crown

22  Vic, blue; if you remember?

23      A.    I don't remember if it was the white one or

24  the blue one.

25      Q.    Got it.  When you -- you said there was a



Page 185

1  point in time when you left cover on your driver side

2  door to approach Machado; do you remember that

3  testimony?

4      A.   I said I had exited the vehicle, and then I

5  stood a little bit back from the driver door, almost

6  to where the rear driver tire is.

7      Q.   Right.  Correct me if I'm wrong; I thought

8  there was a point in time after the shooting stopped

9  that you left cover and approached Mr. Machado.

10     A.   Yes, correct.

11     Q.   Okay.  Tell me the direction that you

12  traveled to approach Mr. Machado from your vehicle.

13     A.   I walked east.

14     Q.   Okay.  Did you walk east in the westbound

15  lanes?

16     A.   Yes.

17     Q.   Did you, at any time, cross over the median

18  and walk in the eastbound lanes?

19     A.   No.  I didn't because his car was at an

20  angle.

21     Q.   Excuse me?

22     A.   No, I didn't.  His car was in an angle.

23     Q.   His car was in an angle facing -- was his

24  car in an angle facing you?

25     A.   Yes.



Page 186

1      Q.   So the -- his headlights would have almost
2  been pointing at you, correct?

3      A.   Somewhat, yes.

4      Q.   Were they; did those headlights obstruct
5  your view of anything?

6      A.   No.

7      Q.   And did you walk directly towards the car
8  from your car?

9      A.   Yes.

10     Q.   And were any officers in your way or at
11 Mr. Machado before you arrived?

12     A.   No.

13     Q.   Okay.

14          MS. WELSTEAD:  Okay.  Those are all the
15      questions I have for you, Ms. Benitez.  I'm going
16      to pass the witness.

17          I know the other lawyers here have some
18      questions for you.

19          THE WITNESS:  Okay.  Thank you.

20          MS. WELSTEAD:  Thank you.

21                    CROSS EXAMINATION

22 BY MR. SWITKES:

23     Q.   Ms. Benitez, my name is Bob Switkes, and I
24 represent most of the officers in this case except for
25 Lieutenant Luis.



1        You said you met with the plaintiff's

2   attorney and watched the videos, correct?

3        A.   With who?  I'm sorry.

4        Q.   You said in the testimony today you met with

5   the plaintiff's attorneys and watched the videos;

6   isn't that correct?

7        A.   Yes.

8             MR. RODRIGUEZ:  Object to form.

9             MR. SWITKES:  Devang, can you put up the

10       video?

11            MR. DEVANG:  Sure.  Lori, do I have shared

12       screen?

13            THE COURT REPORTER:  Let me see.  Yes.

14            MR. DEVANG:  Okay.  Great.

15  BY MR. SWITKES:

16       Q.   Do you see the screen of the video, before

17  it starts, ma'am?

18       A.   Yes.

19       Q.   Okay.  We're going to play the video, and

20  I'm going you to ask it to stop at various parts and

21  want you to explain your location.

22            MR. SWITKES:  But why don't we start it

23       at -- it's at :01 right now.  Let's play a few

24       seconds of it.

25            (Video recording played.)



Page 188

1           MR. DESAI:  And for the record, this is the

2       Church Video.

3           MR. SWITKES:  You can move it up to the

4       first headlights appearing in the top corner.

5           MR. DESAI:  Okay.

6           MR. SWITKES:  Stop.

7           (Video recording is stopped.)

8   BY MR. SWITKES:

9       Q.   At 2:26, we see a car going eastbound in the

10  right-hand lane; do you see that Madam Witness?

11      A.   Yes.

12      Q.   Okay.  And can you delineate on this video

13  the right lane, which is the lane closest to the

14  sidewalk, and the left lane, which is closest to the

15  median?

16      A.   I can't hear you.  You need to speak up.

17      Q.   Excuse me?

18      A.   I can't hear you, sir.

19      Q.   Can you, on the video, see the difference

20  between the lane closest to the sidewalk, eastbound,

21  and the left-hand lane going eastbound, on this video?

22      A.   Going eastbound?

23      Q.   Yes, there's two lanes, right?

24      A.   (Inaudible).  I didn't hear you.

25      Q.   I couldn't hear your response; can you sit



Page 189

1  closer to the mic?

2      A.   Yes.  I said, there's a total of four lanes

3  and a median in the middle.

4           MR. SWITKES:  Okay.  Why don't we keep

5       playing it.

6           (Video recording is played.)

7  BY MR. SWITKES:

8      Q.   Here at 4:43, approximately, you see the

9  headlights coming, right, ma'am?

10     A.   Yes.

11          MR. SWITKES:  And stop it there.

12          (Video recording is stopped.)

13 BY MR. SWITKES:

14     Q.   At 4:56, now, in between the columns and the

15 eastbound lane, how many police vehicles do you see,

16 approximately, ma'am?

17     A.   On the eastbound lanes?

18     Q.   Yeah.

19     A.   How many police cars do I see there in the

20 video?

21     Q.   Yes, that was the question.

22     A.   I see one, I see two, I see three.  And

23 then, the rest, you just see lights.  It's blurry.

24     Q.   And how many vehicles do you see in the

25 westbound lane coming east?



Page 190

1      A.   In the westbound lanes coming east?

2      Q.   Excuse me?

3      A.   You can't see anything there.

4      Q.   But I thought you just testified, ma'am,

5  that your vehicle was parallel to Lieutenant Luis'

6  vehicle?

7      A.   Okay.  Let the video keep playing.

8      Q.   But wait a second.  We're at 4:56.

9      A.   Okay.

10      Q.   It appears that the Machado vehicle, or

11  Lieutenant Luis' vehicle, are just past the first

12  column before we get to the intersection.

13           If you are parallel with Lieutenant Luis'

14  vehicle, there are one, two, three columns visible,

15  but your vehicle is not visible, is it?

16           MR. RODRIGUEZ:  Objection to form.

17           THE WITNESS:  He has to keep playing the

18      video.  I can't see.  There's a palm tree there

19      that I can't see.  There is a gate where I can't

20      see.  That's why I said keep playing the video.

21  BY MR. SWITKES:

22      Q.   So up until this point on the video, ma'am,

23  are you telling me the palm trees and the columns are

24  blocking the view of a vehicle, with your emergency

25  lights, headlights, coming eastbound in the westbound



Page 191

1  lanes; and up until 4:56, you couldn't see your

2  vehicle?

3           THE WITNESS:  (Inaudible).

4           MR. RODRIGUEZ:  Objection to form.

5           MR. SWITKES:  Play it back again, Devang.

6      Go backwards, before, when it starts seeing any

7      headlights in the vehicle.

8           (Video recording is played.)

9  BY MR. SWITKES:

10      Q.   Okay.  Now you see the first headlights

11  at 4:48.  They're coming eastbound.

12           MR. SWITKES:  Stop it there.

13           (Video recording is stopped.)

14  BY MR. SWITKES:

15      Q.   Are there any vehicles coming eastbound in

16  the west lane at 4:53, ma'am?

17      A.   Well, from the video that I'm seeing at

18  4:53, if you're looking at the top, right-hand corner

19  of the TV, or the screen, you see some lights.

20           You don't know if those lights are on the

21  westbound lane, or they're on the eastbound lane.

22  That's why I say you have to let the video finish

23  playing.

24           MR. SWITKES:  Okay.  Play it for

25      another --



Page 192

1        THE WITNESS:  I don't know if you can see

2    the same thing that I can see.

3        MR. SWITKES:  Okay.  Play it for another

4    five seconds and then stop.

5        (Video recording is played.)

6        MR. SWITKES:  Stop.

7        (Video recording is stopped.)

8        MR. RODRIGUEZ:  That wasn't five seconds.

9        MR. SWITKES:  I'm going to stop it when I

10   want to, Counselor.

11 BY MR. SWITKES:

12   Q.   Do you see vehicles in the eastbound lane,

13 at this point in time, ma'am?

14   A.   Sir --

15       MR. RODRIGUEZ:  Objection to form.

16       THE WITNESS:  Sir, can you see the lane; can

17   you see it clear?  Because I can't see it clear.

18   I see the palm tree.  I see a black fence.  And

19   then I see on top, a border of white.   And then

20   I don't know if that -- I see columns.  And at

21   the top, I don't know if that's the median.  I

22   don't know if that's the eastbound lane, or if

23   it's the westbound lane.

24 BY MR. SWITKES:

25   Q.   Look at the first vehicle headlight that you



National Reporting Service   (305) 373-7295

Page 193

1  can see the headlight of a vehicle traveling

2  eastbound, just peeking out of the second column

3  before the intersection; do you see that?

4      A.  Can you repeat the question?  I couldn't

5  hear you.

6      Q.  Do you see behind the second column, before

7  the intersection, one headlight?

8      A.  Yes, I see one headlight, or one light.  I

9  do see one light.

10      Q.  And then do you see behind that, what

11  appears to be part of a car in the right-hand, or

12  closest to the sidewalk, also going eastbound?

13          MR. RODRIGUEZ:  Objection to form.

14          THE WITNESS:  I see lights, is what I see.

15  BY MR. SWITKES:

16      Q.  Behind that, also, if you look to the left

17  of the third column, another vehicle what appears to

18  be in the left-hand lane of eastbound traffic; you see

19  lights from that car, right?

20          MR. RODRIGUEZ:  Objection to form.

21          THE WITNESS:  Sir, what I see is a flash of

22      the lights.

23  BY MR. SWITKES:

24      Q.  Okay.  And in between the second and third

25  column, do you see more lights?



Page 194

1      A.   I see a flash of lights.  I don't see a
2  vehicle.  I see just a flash of lights.
3      Q.   Okay.  Do you see any flashes of lights in
4  the westbound lanes, ma'am?
5      A.   Like I told you before, you see the first
6  column, second column, you see the third column.  And
7  then you see something black.  And then you see, like,
8  a little circle on it.  If you see, like I said
9  before, you can't tell.  The first vehicle, the light,
10  you see that it's on the other side of the pillar or
11  the column -- if that's what you refer to -- you see
12  it on the eastbound lane.
13           After that, you see lights, which I told you
14  is like a flash of lights.  Then you see a second
15  flash of lights.  And like I told you, due to the
16  fence, you can't tell if it's on the westbound or the
17  eastbound lane.
18      Q.   So if I hear you correctly, your answer was,
19  at 4:55 on this tape, you're telling me you can't tell
20  if those flashes of lights are on the eastbound lanes
21  or on the westbound lanes?
22      A.   I can tell --
23           MR. RODRIGUEZ:  Objection to form.
24      Argumentative.
25           THE WITNESS:  I can tell what the second



Page 195

```
 1      pillar is.  Yes, I can tell you what the second

 2      pillar -- because the pillar or the column is

 3      obstructing the vehicle.  So by it being --

 4  BY MR. SWITKES:

 5      Q.   Well, it can't be in the westbound lanes if

 6  the column is blocking that vehicle; wouldn't that be

 7  fair to say?

 8           THE WITNESS:  That's what I just told you.

 9           MR. RODRIGUEZ:  Objection to form.

10           MR. SWITKES:  Excuse me?

11           THE WITNESS:  That's what I just explained

12      to you.  How do you know the second flash, the

13      third flash, and the other, is blocked?

14  BY MR. SWITKES:

15      Q.   Okay.  But you would admit ma'am, that the

16  columns, which are in between the eastbound lanes and

17  the westbound lanes, if you're looking from the church

18  video where this is taken from, those columns wouldn't

19  obscure any vehicles in the westbound lanes, would

20  they?

21           MR. RODRIGUEZ:  Form.

22           THE WITNESS:  No.  Sir, I'm not saying that,

23      and I'm not going agreeing.  I'm saying -- what

24      I'm telling you is that from the view that we

25      have here from the church, that big column
```



Page 196

```
 1      obstructs the vehicle.  Because you can see that
 2      it cuts out the object, which is a vehicle.
 3      After the second flash of light and the third
 4      flash of light, you don't see that.
 5            Now, if you have a better view or a zoom-in
 6      of that camera, then I can answer that question.
 7      But, like I said, the palm tree, the black fence,
 8      the white fence, or the white border of the
 9      fence, and even on the other side of that
10      property, looks to be like it could be a fence or
11      something.  You could even see it on the part
12      where you have that dot.  I don't know if it's a
13      green door, or what it is.  You can't -- It's not
14      clear.
15 BY MR. SWITKES:
16      Q.   And you testified that your vehicle has
17 lights and sirens.  So your overheads and your
18 headlights are on, but yet at 4:55, there is not one
19 vehicle from the time this video started till this
20 point, which shows any police vehicle in the westbound
21 lanes coming eastbound; isn't that true?
22            MR. RODRIGUEZ:  Objection to form.
23            THE WITNESS:  Well, sir, that's your
24      opinion.  Because I just told you, it's not a
25      clear video.  I just told you that if you have
```



1      another video clip or you can zoom in, then I can

2      answer the question.

3  BY MR. SWITKES:

4      Q.   So you're saying that the average person

5  looking at what we've looked at, wouldn't be able to

6  tell that all the vehicles, so far in the video, are

7  all on the eastbound lanes; is that what you're

8  saying?

9          MR. RODRIGUEZ:  Objection to form.

10     Argumentative.

11         THE WITNESS:  I'm not saying what the

12     average person -- I'm answering for myself.  I'm

13     not answering in general.

14         MR. SWITKES:  Okay.  Play a few more

15     seconds, Devang.

16         (Video recording is played.)

17         MR. SWITKES:  Stop it again.

18         (Video recording is stopped.)

19  BY MR. SWITKES:

20     Q.   Did you see the movement of all of the

21  vehicles in the eastbound lanes with their headlights

22  on, ma'am?

23     A.   Yes, I see the vehicle with the headlights

24  on.

25     Q.   Did you see any vehicle traveling eastbound

Page 198

1  in the westbound lanes, up until the time we stopped

2  the video at 4:56?

3          MR. RODRIGUEZ:  Objection to form.

4          THE WITNESS:  Again, I'm going to repeat,

5      the lane is not clear due to a palm tree, a black

6      fence, a white border fence on the top and on the

7      other property.

8  BY MR. SWITKES:

9      Q.   So the answer to the question is you have

10 not been able to see any headlights or overhead lights

11 on a police vehicle, up until 4:56 on the video,

12 despite all the obstructions you talked about to this

13 point, correct?

14         MR. RODRIGUEZ:  Objection to form.

15         THE WITNESS:  That's not my answer.  My

16     answer is that I cannot see it.  It's not clear

17     on the video.

18 BY MR. SWITKES:

19     Q.   Okay.

20     A.   I'm not giving you an answer.  I'm telling

21 you that I cannot see it.  Now, if that's what you

22 want me to say, then that's something different.

23         I'm answering you as to what I'm seeing here

24 in the video.  Now if that's the answer that you want,

25 I can't give it to you, because I can't see it



Page 199

1  clearly.

2      Q.   Ma'am, I only want the truth.  And the

3  question is that anybody looking at this video could

4  clearly see numerous police vehicles and the Machado

5  vehicle in the eastbound lanes of the street, correct?

6           MR. RODRIGUEZ:  Objection to form.

7  BY MR. SWITKES:

8      Q.   You don't have any trouble seeing those

9  vehicles on the eastbound side, do you?

10          MR. RODRIGUEZ:  Form.

11          THE WITNESS:  Of course not.  There's

12      nothing obstructing it but the pillar, which is

13      the column.

14          Again, I'm going to tell you again --

15  BY MR. SWITKES:

16     Q.   It's obstructed but only to --

17     A.   Do you want to go ahead and talk and I'll

18  listen?  We can't both --

19     Q.   Go ahead.  I'll let you explain why you can

20  see vehicles only on the eastbound side of the street,

21  which is further away from the video camera, than you

22  can see on the westbound side of the street.  Go

23  ahead, answer.

24          MR. RODRIGUEZ:  Form.

25          THE WITNESS:  Okay.  Because, of course,



Page 200

```
 1       because of the angle of where the camera is

 2       positioned.  Maybe if the camera was positioned

 3       somewhere else, or you had another clip from

 4       another direction, then you can see both the

 5       westbound and the eastbound lane.

 6  BY MR. SWITKES:

 7       Q.   So as the video is recording it in real

 8  time, only the westbound lanes would be obstructed, is

 9  what your testimony is?

10            MR. RODRIGUEZ:  Objection to form.

11            THE WITNESS:  No, because if you look at

12       the video and you see in the church where they

13       have, one, two, three, spaces, marked

14       handicapped, and you look out into the street,

15       you can see that clearly.  But you can't see

16       on top of the clip -- on the top of the screen,

17       you can't see the lane clear.

18  BY MR. SWITKES:

19       Q.   Okay.  Can you see the headlights on the

20  eastbound lanes, ma'am?

21       A.   I see headlights in the eastbound lane.  I

22  see the --

23       Q.   How many of those headlights do you see?

24       A.   Excuse me?

25       Q.   Can you count how many vehicles there are
```

Page 201

1  with their headlights that you can visualize further

2  away from the church?

3      A.   Headlights, I only see the first vehicle at

4  a stop sign.  You see the two dots that appear to be

5  headlights.

6      Q.   In the eastbound lanes, right?

7      A.   In the eastbound -- but that's just two

8  dots.  That could be headlights, the same way it could

9  be the lights from the police vehicle.

10     Q.   Okay.  And then go just to this second

11  column.  Can you see what appears to be the first

12  headlight of another vehicle on the eastbound lane?

13     A.   Which your --is that where you have the

14  cursor at?

15     Q.   No.  It's going to be in that middle one,

16  right there; do you see that?

17     A.   Okay.  You keep moving your cursor.

18          MR. SWITKES:  Move it back to the second

19     column.

20  BY MR. SWITKES:

21     Q.   There we go.  Do you see --

22     A.   Okay.  That is a light.  That can be

23  headlights, the same way it can be police headlights.

24     Q.   Okay.

25     A.   It could go either way.  It could be



Page 202

1  headlights of a vehicle, or it could be the headlights

2  of a police vehicle.

3           MR. SWITKES:  Okay.  And move it back one

4      more column Devang.

5  BY MR. SWITKES:

6      Q.   Do you see another vehicle's headlights?

7      A.   Right.  There you see two dots.  You see

8  another flash of light on the top.

9      Q.   And --

10     A.   But none of those three lights -- those

11 three that you saw, none of them look the same.

12     Q.   Okay.  And would you perceive to be that

13 vehicle that is now being pointed out to the left of

14 the third column, to be a police vehicle; or is that

15 too obscure for you, ma'am?

16     A.   That could be a police vehicle.  It could be

17 a police vehicle, or it could be two vehicles.  It

18 could be a total of four headlights.

19     Q.   Okay.  And there's no question in your mind

20 that vehicle is also in the eastbound lanes, right,

21 ma'am?

22     A.   Excuse me?

23     Q.   There's no question that that vehicle at the

24 third column would be in the eastbound lane, correct?

25     A.   Yes, it's in the eastbound lane.



Page 203

1        Q.   And in this vehicle, now at 4:56, do you see

2    what you perceive to be any headlights, or any lights

3    whatsoever, from any vehicle in the westbound lanes,

4    yes, or no?

5            MR. RODRIGUEZ:  Objection.

6            THE WITNESS:  Can you remove that palm tree,

7        to make it clearer?

8    BY MR. SWITKES:

9        Q.   We can't remove any of the obstacles from

10   this video.

11           So the question is simply, despite whatever

12   obstacle you believe exists, do you see -- have you

13   seen, up until this point in the video, any headlights

14   in the westbound lanes, yes, or no?

15           MR. RODRIGUEZ:  Objection to form.

16           THE WITNESS:  Again, I told you I can't

17       answer that question.  Because it's not clear.

18   BY MR. SWITKES:

19       Q.   You can say, I did see it.  Or you can say,

20   I didn't see it.  But you can't say, I can't say.

21       A.   Well, if I can't -- If I tell you that I

22   don't have a clear view, I cannot say yes or no.  I do

23   not have a clear view.

24       Q.   So you have a clear enough view of all the

25   vehicles you've identified, or all the lights you've



National Reporting Service   (305) 373-7295

Page 204

1  identified, in the eastbound lanes.  But as the video

2  is rolling, you haven't once seen any light in the

3  westbound lane.  But you can't say that that's true?

4          MR. RODRIGUEZ:  Objection to form.

5          THE WITNESS:  It's not saying it's true or

6      not.  I'm saying the view of the angle of the

7      camera -- I guess you're looking at the same

8      video that I'm looking at.  It's not a clear

9      view.

10  BY MR. SWITKES:

11      Q.  So your testimony is that up until 4:56, you

12  haven't been able to view one light in the westbound

13  lanes; isn't that correct?

14          MR. RODRIGUEZ:  Objection to form.  Asked

15      and answered.

16          THE WITNESS:  My testimony is that I do not

17      have a clear view.  That's the testimony.  That's

18      what I've been telling you for the past minute or

19      so that we've been discussing this.

20  BY MR. SWITKES:

21      Q.  Okay.  Just to give you a better view, I'll

22  let it play a little bit longer.  And I want you to

23  pay particular attention to the westbound lanes,

24  despite any obstructions, to see if you can point out

25  a headlight or a light in the westbound lanes.



Page 205

1           MR. SWITKES:  Go ahead, Devang.  Play a

2      bit more.

3           (Video recording is played.)

4           MR. SWITKES:  Stop it.

5           (Video recording is stopped.)

6  BY MR. SWITKES:

7      Q.   Can you now visualize, despite all the

8  obstructions, headlights or overhead lights on any

9  vehicles in this picture stopped at 4:59?

10     A.   Now if you review it very slowly, like you

11 told me to watch carefully -- if you review it -- if

12 you rewind just a little bit, you will see what

13 appears to be lights on the eastbound -- on the

14 westbound lane.

15          MR. SWITKES:  Okay.  Go back again, Devang.

16     We all want to see what you thought you saw.

17          (Video recording is played.)

18 BY MR. SWITKES:

19     Q.   And tell them where to stop it where you saw

20 a headlight in the west lane.

21          Stop it now?

22     A.   No.  Keep going. Right there.  Stop.

23          (Video recording is stopped.)

24 BY MR. SWITKES:

25     Q.   Nope.  Any -- so you saw one in there?

1      A.   Well, I saw the flash of a light.

2      Q.   Okay.  You saw a flash from a vehicle in the

3  westbound lanes, when this clearly shows there's still

4  no vehicle in the westbound lanes, right?

5           MR. RODRIGUEZ:  Objection to form.

6  BY MR. SWITKES:

7      Q.   Right?

8      A.   (No audible response.)

9      Q.   Right?

10     A.   Did you hear that I said I saw a flash of a

11 light?

12     Q.   Okay.  We know we see --

13     A.   You saw it right on top -- it was right on

14 top of the palm tree that I was telling you that was

15 in the camera in the corner of -- if you look on the

16 top right-hand corner where the fence meets with the

17 L-shape, where the palm tree is, not that flash that

18 you see up there now, but right before that flash came

19 out, you saw a flash.

20     Q.   Okay.  Are you telling me that came from a

21 vehicle in the westbound lane, yes, or no?

22           MR. RODRIGUEZ:  Form.

23           THE WITNESS:  I'm telling you what I see.

24 BY MR. SWITKES:

25     Q.   Okay.  Now in this video stopped at exactly



Page 207

1  this spot, do you see where Lieutenant Luis' vehicle

2  is?

3       A.   Yes, I do.

4       Q.   And where is it in relation to the pillar

5  where the Machado vehicle is stopped?

6       A.   It's right where -- first you see Antonio

7  Luis' vehicle.  Then you see the pillar.  Then you see

8  the pillar west of that.  And then you see a fuzz,

9  which is Lester Machado's car.  And then you see a

10  flash of light.  And you can see a pole.  You see a

11  pole.  And then it's the opening of the median, that

12  has a palm tree in the middle.  But the palm tree is

13  not in the middle of the street.  It's on the property

14  of the church.

15       Q.   Right.

16       A.   And then you see something that's fuzzy.  I

17  don't know what it is.  It could be a person.  I don't

18  know what it is.  Then you have another pillar.  Then

19  you have the palm tree.  You have something fuzzy

20  there.  I don't know what it is.  And then you have a

21  flash of lights.

22       Q.   Okay.  And ma'am --

23       A.   But you can't see the street.  Because

24  again, you can't see the street.  Because again, you

25  have the black gate with the top border that is



Page 208

1  blocking -- completely blocking the traffic.  It's

2  blocking the traffic lane.

3     Q.   Okay.  So between the pillar before the

4  Machado vehicle in this video, which would be to our

5  right, and the pillar that he is up against, there is

6  no police vehicle between those two pillars on the

7  west side, is there?

8     A.   Repeat the question.

9     Q.   Between the two pillars that are on the

10 outside of this intersection, there are no police

11 vehicles on the west side of this road, are there?

12          MR. RODRIGUEZ:  Form.

13          THE WITNESS:  Because I'm telling you, you

14     can't even see the street.  All you see is a

15     little piece of the sidewalk.  You can't see the

16     street.

17 BY MR. SWITKES:

18     Q.   Oh, so you can't see any street to the right

19 of this --

20     A.   No, you can't see -- I told you the palm

21 tree is there --

22     Q.   Ma'am, when I'm speaking, you can't be

23 speaking.

24     A.   Okay.  Then it's the same thing.

25     Q.   I won't interrupt you.



National Reporting Service   (305) 373-7295

1          So let's start with that again.  There is a

2    pole in this planter in the church parking lot.  Can

3    you see that, ma'am?

4          A.   A what?

5          Q.   There is a utility pole.

6               MR. SWITKES:  Devan, can you --

7    BY MR. SWITKES:

8          Q.   Right there.  Do you see that pole, ma'am?

9          A.   Permission to speak.  Yes, I see that pole.

10         Q.   Okay.  Do you see the street on the

11   westbound lanes between the pole and the next pole

12   with the gate?

13         A.   Yes.

14         Q.   Do you see a car in that area on the street

15   westbound?

16         A.   No.

17         Q.   Okay.  And if you go to the right of there,

18   can you see the street between the fence?

19         A.   You see the street.

20         Q.   Do you see any police car with its

21   headlights and emergency lights on in the westbound

22   lanes in this photo?

23         A.   No.

24         Q.   Do you see -- so if there is no police

25   vehicle there, that's exactly where you described your



Page 210

1  vehicle was; isn't that correct?

2          MR. RODRIGUEZ:  Objection to form.

3          THE WITNESS:  Sir, you're incorrect.  I

4      never said that.  I said that my vehicle, okay,

5      remember, if you look backward, if you have any

6      way of reading my deposition from February 2nd,

7      and I said it today when the other attorney

8      questioned me -- I said that after the PIT

9      maneuver, that the car spun out of control and

10     hit the pillar, Tony Luis continued driving.

11         That's where you see his car stopped.  And

12     then she asked me, how far was your car from

13     Lester Machado's vehicle when it struck the

14     pillar, which is the column.  And I said, it

15     wasn't too far.  It was pretty close.

16         And she said, okay, well, can you give me an

17     idea using cars.  And I said, well, to be on the

18     safe side, I would say about three.

19         I never said -- okay, to make it clear, I

20     never said that my vehicle was parallel to Tony

21     Luis' vehicle after the PIT maneuver was

22     administered and that my car was stopped right

23     next to his car.  I never said that.  So I don't

24     know where you got that from.

25  BY MR. SWITKES:



Page 211

1     Q.   Are you done?

2     A.   Are you done?

3     Q.   I am not even close to done.

4     A.   Okay, perfect.  So we have enough time.

5     Q.   You're done.  Okay.

6          So if you said you were the closest vehicle

7     today to the Lester Machado vehicle, you obviously can

8     see headlights and police vehicles that are much

9     closer than any vehicle visible in the westbound

10    lanes, because there are none, correct, ma'am?

11              MR. RODRIGUEZ:  Objection to form.

12              THE WITNESS:  Sir, on this camera angle

13         here, you do not see my vehicle.  My vehicle --

14         okay, and if you want, we can bring it up and

15         someone can share the screen.  After I stopped my

16         vehicle and exit my vehicle, my vehicle was never

17         moved again.

18              And if you want, you can go online and you

19         can bring this up on Channel 7, or you can U-Tube

20         it, and you'll see exactly where my vehicle is

21         that has a better angle, where it is not

22         obstructed.  Because it's a full view of the

23         street.

24    BY MR. SWITKES:

25         Q.   Try to answer my question.  On this video,

Page 212

1  at this point, your vehicle is not in the

2  intersection, which is encompassed between the two

3  metrorail pillars, correct?

4          MR. RODRIGUEZ:  Objection to form.

5          THE WITNESS:  I --

6  MR. SWITKES:

7      Q.   I don't want to talk about any other video.

8  I want to talk about this video and the image you have

9  in front of you.

10          MR. RODRIGUEZ:  Objection to form.

11  BY MR. SWITKES:

12      Q.   Is your vehicle between these two pillars,

13  yes, or no?

14      A.   What was the question?

15      Q.   Is your vehicle visible between the two

16  pillars encompassing this intersection, yes, or no?

17          MR. RODRIGUEZ:  Objection to form.

18          THE WITNESS:  Well, from the video, no.

19          and from what happened in that incident that

20          night, no.  Because I never said my car was

21          between the two pillars.  I don't know why you

22          keep putting my car between the two pillars.  I

23          never testified that my car was between the two

24          pillars.

25  BY MR. SWITKES:



 1      Q.   You testified your car was the closest to

 2  the Machado vehicle.  And it's clearly not even close

 3  to being the closest vehicle; isn't that true?

 4           MR. RODRIGUEZ:  Objection.  Argumentative.

 5           THE WITNESS:  Because you don't have a clear

 6      view.  Give a clip where you can see a clear

 7      view, and then I can testify to it.

 8  BY MR. SWITKES:

 9      Q.   Ma'am, this video isn't even close to

10  finished.  And trust me, we're going to show you

11  exactly when your vehicle shows up.

12           MR. SWITKES:  Play a little bit more of this

13      please.

14           MR. RODRIGUEZ:  Move to strike your

15      gratuitous commentary.

16           (Video recording is played.)

17           MR. SWITKES:  Stop.

18           (Video recording is stopped.)

19  BY MR. SWITKES:

20      Q.   Did you see the puff of smoke, ma'am?

21      A.   Yes.

22      Q.   Did you see any vehicles in the westbound

23  lane?

24      A.   Do I see it?  No, again, because it's

25  obstructed.  Do you see the lights -- the flash?



Page 214

1  Because I bet you if that palm tree wasn't there,

2  you'd be able to see my vehicle, sir.

3          MR. SWITKES:  Devang, move it back.

4  BY MR. SWITKES:

5      Q.   And during this entire sequence, when you're

6  seeing all the vehicles in the eastbound lane, you

7  tell me when you see any headlights in the westbound

8  lane, and we'll stop the video exactly at that spot.

9          MR. SWITKES:  Go ahead.  Play it.

10         (Video recording is played.)

11         MR. SWITKES:  It's at 5:27.  Keep going.

12         Stop.

13         (Video recording is stopped.)

14  BY MR. SWITKES:

15      Q.   For the first time, ma'am --

16         MR. SWITKES:  What is the time we have here,

17      Devang?

18         MR. DESAI:  AT 5:48.

19  BY MR. SWITKES:

20      Q.   At 5:48, are you able to see two headlights

21  at the very top of the screen, for the first time, a

22  vehicle coming westbound, yes, or no?

23         MR. RODRIGUEZ:  Objection to form.

24         THE WITNESS:  It's not a clear view.  Let

25      the video keep playing.



Page 215

1 BY MR. SWITKES:

2     Q.   Do you see two headlights in the top portion

3 of the screen, reflecting a vehicle coming westbound,

4 yes, or no?

5           MR. RODRIGUEZ:  Objection to form.

6           THE WITNESS:  I can't answer that.  Let the

7      video keep playing to make sure that that's what

8      you're saying that it did.

9 BY MR. SWITKES:

10     Q.   Do you see where there are two lights at the

11 top of the screen at 5:48, yes, or no?

12           MR. RODRIGUEZ:  Objection to form.  We

13      missed the first part of your question.  It was

14      very garbled.

15 BY MR. SWITKES:

16     Q.   Do you see two lights in the top of the

17 screen at 5:48, in what appears to be the westbound

18 lanes?

19           MR. RODRIGUEZ:  Form.

20           THE WITNESS:  No, I don't.

21           MR. SWITKES:  Play another five seconds,

22      please.

23           (Video recording is played.)

24 BY MR. SWITKES:

25     Q.   Do you see a vehicle that's stopped or two



Page 216

1  points of light in the top right-hand corner, still

2  at 6:02, that haven't moved, which is the only

3  vehicle, so far, visible on this video on the

4  left-hand lanes?

5         MR. RODRIGUEZ:  Objection to form.

6  BY MR. SWITKES:

7      Q.   Do you see that ma'am?

8         MR. RODRIGUEZ:  Form.

9         THE WITNESS:  I saw a vehicle.  But then

10     again, these don't -- leave it right there.

11        (Video recording is stopped.)

12        THE WITNESS:  Can you see the vehicle now?

13        MR. SWITKES:  Ma'am, I'm attempting to --

14        Devang, keep it going.

15        THE WITNESS:  I'm asking if you see the

16     vehicle.

17        (Video recording is played.)

18        MR. SWITKES:  Right there.

19        (Video recording is stopped.)

20  BY MR. SWITKES:

21     Q.   Do you see those two lights, ma'am?

22     A.   I see those -- I see two lights, yes.

23     Q.   Okay.  And you haven't noticed that those

24  lights haven't moved in the last five seconds?

25     A.   Rewind it just a little bit.



Page 217

1              MR. SWITKES:  Sure.

2              (Video recording is played.)

3              THE WITNESS:  Stop.

4              (Video recording is stopped.)

5              THE WITNESS:  Press play.

6              (Video recording is played.)

7  BY MR. SWITKES:

8       Q.   Do you see four of those light?

9       A.   Do you see the car moving?  The car is

10  moving.  And there's another car that has stopped.

11  And the car hasn't moved.  The car keeps moving.  Do

12  you see the car keeps approaching?  It's still -- now

13  you can't see the car.  Now you can see the flash of

14  lights, and you still can't see the car.  The car

15  continued.  All you see is some lights, a flash of

16  lights.  You still can't see the car.

17              MR. SWITKES:  Okay.  Stop it.

18              (Video recording is stopped.)

19              THE WITNESS:  Like I said, it's not a clear

20         view.  I know don't know what you don't

21         understand.

22              Now if there's an answer that you want me to

23         give you, then we can discuss it.  But I can only

24         testify to what I see there and testify to what

25         happened.  And that's what I'm doing.

Page 218

```
 1            I am answering your questions honestly.  I
 2       cannot sit here and tell you what didn't happen,
 3       and what I do not see, or what is not clear.
 4            So just like there, you saw those lights
 5       moving.  Where's the car now?  It's nowhere on
 6       the screen.  Thank you.
 7            MR. SWITKES:  Devang, we're going to do it
 8       again.
 9  BY MR. SWITKES:
10       Q.  Because these two headlights in the top
11  haven't moved.  But those headlights, you can clearly
12  see, went from the westbound lanes into the eastbound
13  lanes.
14            Did you see that, or no; I was the only one
15  who saw that?  You didn't see that, ma'am?
16            MR. RODRIGUEZ:  Objection to form.  I don't
17       even know what you're asking at this point.
18            MR. SWITKES:  That's not important.  It's
19       what the witness knows.  You object to the form.
20            MR. RODRIGUEZ:  Well, actually, it is
21       important.  I need to understand your questions
22       that you're asking too.
23            MR. SWITKES:  No.  No, you don't.
24            MR. RODRIGUEZ:  You don't get to teach me
25       how to practice law, Mr. Switkes.
```



Page 219

1          So why don't you ask a proper question and

2      quit badgering this witness?

3          MR. SWITKES:  You are making speaking

4      objections.

5          MR. RODRIGUEZ:  Actually, no.  I'm telling

6      you to quit badgering this witness.

7  BY MR. SWITKES:

8      Q.   Ma'am, as you're looking at this stoppage of

9  this video, are you able to see, despite the fence,

10  the palm trees, and anything else you might think

11  obstructs your view, a significant number of police

12  vehicles in the eastbound lane, or headlights in the

13  eastbound lane?

14      A.   You lost me.

15      Q.   Can you see headlights in the eastbound lane

16  at the time we stopped this video right now?

17      A.   You've asked me three different questions.

18  What's your question, sir?

19      Q.   That was a good try.  I asked you one.  Can

20  you see headlights in the eastbound lane at the

21  portion where we stopped this video right now?

22      A.   No, I do not.  I see lights, what appears to

23  be police lights.  I see lights -- a flashing of

24  lights --

25      Q.   Which lane are they in?



Page 220

1    A.   Do you want me to finish answering the
2  question, or do you want to keep cutting me off, sir?
3    Q.   I want you to answer what lane they're in.
4  That was the question.
5         MR. RODRIGUEZ:  Well, you've got to let her
6         finish answering.  If you ask her a question,
7         you've got to let her finish answering before you
8         cut her off, Mr. Switkes.  You know better than
9         that.
10  BY MR. SWITKES:
11    Q.   What lane are they in?
12         MR. RODRIGUEZ:  Objection to form.
13         THE WITNESS:  Do you have another way of
14         asking that question?
15  BY MR. SWITKES:
16    Q.   What in what lane are they in, didn't you
17  understand?
18         MR. RODRIGUEZ:  Objection to form.
19  BY MR. SWITKES:
20         THE WITNESS:  (No audible response.)
21  BY MR. SWITKES:
22    Q.   Are you going to testify as to what lane
23  they're in, or are you still --
24    A.   If you can be respectful and ask the
25  question correctly, yes.  I'm not going to sit here



Page 221

1  and let you talk to me any kind of way sir.  It's not

2  going to happen.

3      Q.   Are they in the eastbound lanes, yes, or no?

4           MR. RODRIGUEZ:  Objection to form.

5           THE WITNESS:  Is what in the eastbound lane?

6  BY MR. SWITKES:

7      Q.   Excuse me?

8      A.   Is what in the eastbound lane?

9      Q.   The headlights and vehicles.

10          MR. RODRIGUEZ:  Form.

11          THE WITNESS:  There's headlights.  I see

12      lights, what appears to be police lights.  I see

13      a flash of lights.

14  BY MR. SWITKES:

15     Q.   Are they in the eastbound or the westbound

16  lane?

17          THE WITNESS:  He's not letting me finish.

18          MR. RODRIGUEZ:  Please do not interrupt the

19      witness while she's answering, sir.

20  BY MR. SWITKES:

21     Q.   Answer the question.

22     A.   Are you going to let me finish, or do I have

23  to start all over again, please?

24     Q.   For the sixth time, are they in the

25  eastbound or westbound lanes?  You don't need to



Page 222

1  describe anything everybody looking at this video can

2  see.

3          MR. RODRIGUEZ:  Objection to form.

4          THE WITNESS:  Again, what I see in the

5      video, is what appears to be police lights and

6      flashes of lights on the eastbound lane.

7  BY MR. SWITKES:

8      Q.   That wasn't so hard, was it?

9          MR. RODRIGUEZ:  That's not even a form of a

10      question.  I wouldn't answer it.

11  BY MR. SWITKES:

12      Q.   Can you see, or point out, on that same

13  video that you were able to see lights on the

14  eastbound lane, any lights or vehicles in the

15  westbound lanes?

16      A.   What do you want me to point it out with?

17      Q.   Whatever you want, ma'am.

18      A.   So you can see when I point it out?  When I

19  touch this thing, it's going to light up on your

20  screen?

21      Q.   Do it verbally, like you've done the whole

22  deposition.  Give us a point of reference, using the

23  columns, using the intersection, using anything you

24  like.  Do it verbally.

25      A.   What is the question, sir?



Page 223

1      Q.    Excuse me?

2      A.    What is the question, sir?

3      Q.    I've asked you to identify any lights or

4   police vehicles in the westbound lanes at 6:03 of this

5   video screen.

6      A.    Okay.  At 6:03, like I said, and like we saw

7   before when we got into the back and forth when

8   Mr. Devang played the video, you can see a police

9   vehicle in the beginning.  And then you don't see

10  anything else, because it's being obstructed by the

11  fence.

12         So I cannot tell you, oh yeah, there's a

13  vehicle there, because you're going to say, that

14  vehicle is not there.  So it's not a clear view.  I

15  told you that.  And I repeated that.  And I guess you

16  don't understand me.  It's not a clear view.  You saw

17  it yourself when I told you, stop the video, play the

18  video again.  I said, okay, there you see the car, you

19  see the car, and now, the car disappeared.

20     Q.    Are you done?

21     A.    (No audible response.)

22     Q.    Are you done?

23     A.    (No audible response.)

24     Q.    So I'm assuming you're done.

25         Looking at the video, at 6:03, I want you to



Page 224

1  show me on this stoppage of the video, where you claim

2  there are any headlights or police vehicles in the

3  westbound lanes.

4       A.   Right behind the palm tree.

5       Q.   Which palm tree are you talking about?

6       A.   The palm tree in the church parking lot,

7  which is private property that belongs to the church

8  that turned in the video -- that turned over the video

9  to the Hialeah Police Department.

10            Right there in the corner there is a palm

11  tree.  And right where that palm tree is, right behind

12  the palm tree, there's the police vehicle.  Can you

13  see the vehicle, sir?

14            MR. SWITKES:  I want you to play the video

15       again, back.

16  BY MR. SWITKES:

17       Q.   And I want you Madam Witness, to tell us

18  when to stop, when you can point out headlights in the

19  westbound lanes.

20            MR. SWITKES:  Go ahead.  Put it back about

21       twenty seconds, Devang.

22            MR. DESAI:  Okay.

23            (Video recording is played.)

24  BY MR. SWITKES:

25       Q.   You tell us when to stop, when you can point



Page 225

1  out a vehicle or headlights in the westbound lane.

2      A.   You need to rewind it some more.

3           MR. DESAI:  Thank you, Mr. Devang.

4           (Video recording is played.)

5           THE WITNESS:  Thank you, Mr. Devang.

6           Stop it.

7           (Video recording is stopped.)

8  BY MR. SWITKES:

9      Q.   Now --

10          THE WITNESS:  Mr. Devang, can you rewind

11      again, just a little bit, not too much?

12          (Video recording is played.)

13          THE WITNESS:  Stop right there.

14          (Video recording is stopped.)

15          THE WITNESS:  And play.

16          (Video recording is played.)

17          THE WITNESS:  Stop.

18          (Video recording is stopped.)

19          THE WITNESS:  Okay.  Right before when I

20      said stop, it went a little bit more.  You can

21      see the light on the column where the utility

22      pole is.  And then there's a part where Lester

23      Machado's at.  That pillar there, count one, then

24      you count two, and then you count three.  You can

25      see the lights of the police vehicle.  But it's

Page 226

```
1        so quick that you see the light -- even the
2        light reflects into the dark part of the property
3        next to the church.  And if you want, you can
4        play it again, so you can see it, and so everyone
5        can see it.
6             (Video recording is played.)
7             THE WITNESS:  There.
8  BY MR. SWITKES:
9        Q.   Okay.  When you say, "there," show me where
10 you're saying there's a police vehicle in the
11 westbound lane.
12            MR. RODRIGUEZ:  Form.
13            THE WITNESS:  Well, if you rewind it, I
14       don't know how I'm going to show you.  Because
15       it's not like I can point.
16 BY MR. SWITKES:
17       Q.   Just show verbally.  When I say --
18       A.   I did.  I just said, it's on the top where
19 the palm tree is, like right around -- wait.
20            Move the cursor.  You have the cursor on the
21 palm tree.  Move it a little bit to the right.  A
22 little bit more, can you see it reflect there?
23            And go a little bit more into the darker --
24 a little bit more, a little bit more, a little bit
25 more.  You see it all in there.  A little bit more.
```



1  There, now you -- stop right there.

2          THE WITNESS:  Now, rewind and play again so

3      he can see the light that I'm talking about.

4  BY MR. SWITKES:

5      Q.   Let's just stop it right here.  This

6  is 4:59.  The Machado vehicle has already impacted.

7  There are two police vehicles very close to his

8  vehicle.  You see it in between the columns at the

9  intersection -- you see the Luis vehicle to the middle

10 center, way past the column.

11         And you're pointing to one, two, three,

12 columns to the right, almost at the top of the

13 photograph, as identifying a vehicle in the westbound

14 lane, ma'am?

15         MR. RODRIGUEZ:  Objection to form.

16         THE WITNESS:  No, that's not what I said.

17 BY MR. SWITKES:

18     Q.   So what are you pointing out, way back here,

19 three columns back?

20     A.   So that you can see when the vehicle --

21 there's a vehicle that -- I answered.  I said that

22 there's two vehicles when I testified, that I was the

23 first vehicle in that lane.

24         The second vehicle in that lane, was Officer

25 Hernandez.  Just like you see the headlights and then



Page 228

1  you don't see the headlights, same thing as going on

2  here.  You see the headlights --

3       Q.   Okay.

4       A.   There he goes, cutting me off again.

5       Q.   So you're telling us that on this video

6  stoppage, at 4:59, your vehicle and the Hernandez

7  vehicle are visible in the westbound lane; is that

8  correct?

9            MR. RODRIGUEZ:  Objection to form.

10           THE WITNESS:  That's not what I said.

11 BY MR. SWITKES:

12      Q.   Okay.

13      A.   That's not what I said.  What I said, and

14 I'm going to repeat it again, sir, just to make sure

15 that we're clear -- we're both clear -- we're

16 understanding this, okay?

17           I said -- you asked me, do you see a vehicle

18 in that lane.  I keep telling you -- we haven't been

19 able to move forward.  I keep explaining to you that

20 there's not a clear view, because just like the palm

21 the tree and the fence that looks dark, looks black,

22 with the white border, which is I guess, is the fence

23 from the other property, does not let you see a clear

24 view of the street.

25           I explained that to you, I don't know how



Page 229

1  many times, which is fine.  I just want to make sure

2  that we both understand.  I explained that to you.

3          Just like we saw that vehicle cross into the

4  camera view, you see it one minute, and the next

5  minute you don't see it.

6          I'm not saying that that vehicle that came

7  out is my vehicle.  It's not my vehicle.  My vehicle

8  was already -- the police vehicle was already there.

9  If you want --

10     Q.   Your police vehicle --

11     A.   If you want, you can replay the video again

12  so you can see how the lights are clear, and then the

13  car disappears.

14     Q.   Ma'am, we're going to play it back as many

15  times as you want us to.

16          But I want you to explain as the video's

17  moving forward, how we can see all the vehicles in the

18  eastbound lane, but we can't see one vehicle in the

19  westbound lane, which is --

20     A.   Of course --

21     Q.   Stop.  Let me ask the question.

22     A.   Okay.

23     Q.   So your vehicle -- you claim you were coming

24  in the westbound lane.  Show me anytime you want me to

25  stop this video.



```
1              Show me where your vehicle is during the

2    sequence, even as it moves in between these palm trees

3    or these poles, or the fences.  It has to be visible

4    with headlights coming.  You're seeing all the

5    vehicles visible in the eastbound lanes, aren't you?

6              MR. RODRIGUEZ:  Objection to form.

7              THE WITNESS:  You can see the other vehicles

8         because there's nothing obstructing -- the only

9         thing that obstructs the other vehicle is the

10        column, which is the pillar.  And it obstructs

11        it, meaning that it cuts it out.

12             But because of the fence -- again, because

13        of the fence, okay, and the palm tree, you cannot

14        see it.

15             If you follow -- if you follow the sidewalk

16        that's in front of the church, follow it from one

17        corner to the other, we all know there's a

18        sidewalk there, we know the sidewalk goes all the

19        way to the other street, all the way to 37th

20        Avenue, where there's a traffic light.

21             You see -- I know you see the sidewalk.  Do

22        you see the sidewalk after the palm tree and that

23        corner?  No, you do not see the sidewalk.  And we

24        all know there's a sidewalk there.

25             The sidewalk cannot be seen due to the fact
```



Page 231

1        of the angle of the camera and the obstruction of

2        the fence.

3              That's what I've been trying to tell

4        you.  I don't know which other way I can explain

5        it to you.

6              That's why I told you if you have another

7        clip or another angle, you can see the police

8        vehicle, even if you go by the evidence that the

9        Hialeah Police Department provided, when they

10       took overalls of the pictures, you will also see

11       where my vehicle was stopped.

12             If you also go into U-tube -- you can go to

13       Channel 10, and you can go into Channel 7, and

14       you can go into U-tube, you will also see that.

15             Now, from the church, you're not going to

16       see it, because it's obstructed.  Just like you

17       can't see the sidewalk, it's the same exact

18       thing, sir.

19  BY MR. SWITKES:

20       Q.   Can you see the sidewalk between the two

21  columns at the stopped video right now, ma'am?

22       A.   Can I see where, the sidewalk, where?

23             MR. RODRIGUEZ:  Objection to form.

24             MR. SWITKES:  Can you put your cursor

25       between the two columns and show the sidewalk in



```
                                            Page 232

 1      front of the church, Devang?

 2  BY MR. SWITKES:

 3      Q.   Can you see the sidewalk, ma'am?

 4      A.   Yeah, but I never said my vehicle was there.

 5  That's not where I placed my vehicle, sir.  That is

 6  not what I said.

 7           You keep thinking that I testified that my

 8  car was parallel to Tony's car, after he administered

 9  the PIT maneuver.

10           And I never testified to that.  I never

11  testified -- if you want, we can take a short break,

12  and you can pull up my depo from -- my transcript from

13  my depo, and you can read it.

14           I never testified that my vehicle was

15  parallel past Lester Machado's vehicle.  I never

16  testified to that, because that never happened.

17      Q.   Okay.  Can I ask the question again?

18           MR. DESAI:  Mr. Switkes, hang on a second.

19      We seemed to have lost Christine Welstead.  So

20      before we go further.  Hold tight.  I'm going

21      to try to call.

22           MR. SWITKES:  Okay.

23           MR. RODRIGUEZ:  While you do that, I'm going

24      to go to the bathroom.

25           MR. DESAI:  Okay.
```



Page 233

1          (Pause in the proceeding.)

2          MS. WELSTEAD:  Apologies, continue.

3    BY MR. SWITKES:

4      Q.   Ma'am, you did testify today that you went

5    up to the Lester Machado vehicle when the Metro-Dade

6    officer did, is that correct?

7      A.   I couldn't hear you.  I'm sorry.  Give me

8    just one second.  I couldn't hear your question.

9      Q.   You testified today that you went up to the

10   Lester Machado vehicle with a Metro-Dade officer,

11   correct?

12          THE WITNESS:  That I did what?  I couldn't

13      hear him.

14          MR. RODRIGUEZ:  It's coming through a little

15      garbled.  I don't know if you've gotten a little

16      further away from your mic, or what the problem

17      is, but --

18          MR. SWITKES:  Can you hear me?

19          MR. RODRIGUEZ:  That's better.  It's a

20      little better.

21          MR. SWITKES:  I've got it turned up 100

22      percent.

23   BY MR. SWITKES:

24      Q.   You testified today, ma'am, that you walked

25   up to the Lester Machado vehicle at the same time as a

Page 234

1  Metro-Dade officer, correct?

2        A.    No.  I said that I walked up -- when I

3  walked up to Lester Machado, he was outside of his

4  vehicle before he took his last breath.  And then the

5  Metro-Dade officer was walking up then.  And then when

6  I walked away, the Miami-Dade officer stayed there

7  with the body of Lester Machado.

8        Q.    Okay.  But you will admit that you weren't

9  the first officer to walk up to Lester Machado's

10  vehicle after the crash, correct?

11       A.    Yes, I was.

12       Q.    Ma'am, do you remember watching the video,

13  where, number one, over the dispatch you heard that

14  Lieutenant Luis asked for a shield, correct?

15       A.    Say that again.

16       Q.    Lieutenant Luis asked for a shield at the

17  scene; isn't that correct?

18       A.    I don't remember that.

19       Q.    And then nobody had a shield, so Lieutenant

20  Luis put on his SWAT vest before he approached,

21  correct?

22       A.    You said, because everyone had a shield?

23       Q.    Nobody had a shield, so Lieutenant Luis put

24  on his SWAT vest; are you aware of that?

25       A.    That, I don't -- I cannot testify to that.



1  Because I didn't see him put his vest on.  So I cannot

2  testify to that.

3      Q.   And then Lieutenant Luis was the first

4  person that approached the body; isn't that correct?

5      A.   The body?  He approached the vehicle, not

6  the body.

7      Q.   The body and the vehicle were pretty close

8  to each other, weren't they?

9      A.   Sir, we approached the vehicle on the

10  driver's side.  The body was outside of the vehicle on

11  the passenger's side.

12      Q.   Who is, "we approached the vehicle on the

13  driver's side"?

14      A.   Okay, when I first went up to the vehicle,

15  as I was walking up and I make contact with -- what I

16  mean when I say I made contact with, is when I saw

17  Lester Machado. a few feet behind me was Officer

18  Hernandez.

19      Q.   Okay.  So you --

20      A.   That's what I meant by "we."

21      Q.   Okay.  And you walked up on the driver's

22  side, is what you're saying, correct?

23      A.   Negative.  I did not walk up on the driver's

24  side.  I walked on the passenger's side.

25      Q.   You and Officer Hernandez, and you were the



Page 236

1 first two to approach the car?

2     A.   I approached the vehicle -- I mean, I

3 approached his body first.  I walked towards the

4 vehicle.  When I'm walking towards the vehicle, he's

5 already laying on the ground, on the passenger side.

6     Q.   Listen to my --

7     A.   When I walked up to the vehicle, okay, on

8 the driver's side that he's laying there, I made eye

9 contact with him.  A few steps behind me is Teannie

10 Hernandez.

11     Q.   Let me ask you for a third time:  Who is the

12 first officer to approach the car and the body?

13           MR. RODRIGUEZ:  Form.

14           THE WITNESS:  The first officer to approach

15      the car was Lieutenant Tony Luis.  And I believe

16      that there was another officer with him.  For

17      sure, for sure, a hundred percent, Tony Luis

18      approached the vehicle.  There was another

19      officer.  I can't tell you who the other officer

20      was.  But it was Lieutenant Tony Luis.  And he

21      approached the vehicle.

22 BY MR. SWITKES:

23     Q.   And he --

24     A.   He didn't approach the body.  He approached

25 the vehicle.  So to answer your question, Tony Luis



Page 237

1  approached the vehicle.

2         I approached the vehicle and ended up on the

3  passenger side where Lester Machado's body was laying

4  on the ground outside of the vehicle, when he was

5  still breathing, until he took his last breath.

6      Q.   Did you testify in your deposition that you

7  saw Lester Machado open the car door and fall out of

8  the vehicle, yes, or no?

9      A.   Say that again.

10     Q.   Did you testify during the deposition that

11  you saw Lester Machado open the vehicle and fall onto

12  the pavement?

13     A.   Yes.  I testified that I saw him reaching

14  from inside his vehicle, him being in the driver's

15  side -- no, being in the driver's seat, he reaches to

16  the back of the vehicle.  The door of the rear

17  passenger side opens, he makes his way to the

18  backseat, and then he falls out of the car.

19         Well, he -- how can I put it?  It's not that

20  he crawls.  He doesn't stand up.  But he maneuvers his

21  way out.  I don't know how to explain it.  And he

22  falls onto the floor or the pavement.  And he's laying

23  next to his car on the driver's side.

24     Q.   And where were you when that happened,

25  physically?



Page 238

1      A.   Outside my police vehicle.

2      Q.   And where was that in the roadway, ma'am?

3      A.   What do you mean, where was what in the

4 roadway?

5      Q.   Where was your vehicle in the roadway, in

6 relation to Lester Machado's vehicle, when you say you

7 saw what you just testified to?

8      A.   Okay.  You see, we still have this screen

9 up?  Well, I have it on this, and I don't know if you

10 have it on your end.  But if you can see the screen

11 that's up?  Can you see it?

12      Q.   I see the screen.

13      A.   Do you have the church screen up on your

14 screen, sir?

15      Q.   Yes.  I just said, yes.

16      A.   Okay.  I didn't hear you.

17           Okay.  Do you see where the palm tree is in

18 the corner of the lot?

19      Q.   Yes.

20      A.   Right behind the palm tree, okay, closer to

21 that pillar.  Closer to the pillar, right, is where my

22 vehicle was.

23      Q.   Your -- so you can see the roadway through

24 the palm trees, correct, ma'am?

25           MR. RODRIGUEZ:  Objection to form.



Page 239

```
 1           THE WITNESS:  Sir, I'm talking to you about
 2      the palm trees.  I'm trying to give you an idea
 3      so you can place the vehicle.  I'm not saying my
 4      car was on the palm tree.
 5 BY MR. SWITKES:
 6      Q.   Can you see any headlights visible on the
 7 roadway through those palm trees?
 8      A.   Do you see any what?  I'm sorry.
 9      Q.   Headlights, or overhead flashing lights from
10 a police vehicle, in the westbound lane?
11      A.   Do you see any -- no I don't see any here on
12 the video.  No, I don't.
13      Q.   But that's where you claim your vehicle was.
14 And this is a video real time.  But you're claiming
15 you could see all these other vehicles, but not yours?
16           MR. RODRIGUEZ:  Objection to form.
17           THE WITNESS:  No.  I said that you can see
18      the vehicles on that lane, just the same way that
19      you saw for yourself.
20           You just don't want to admit to it, that
21      when you first saw the vehicle, you said, does
22      that look like headlights to you.  And I said,
23      yes.  And then I said, there, you see, you see
24      it, you see it, and now the car disappeared.
25 BY MR. SWITKES:
```



Page 240

1        Q.    Amazing how that happens.

2        A.    Yeah.  I know.  Maybe a UFO picked up the

3    car and took it.

4        Q.    If we watch the video -- and roll it.

5              MR. SWITKES:  Let's roll the video a little

6        further.

7              (Video recording is played.)

8    BY MR. SWITKES:

9        Q.    And I want you to identify when you come

10   into the picture approaching the vehicle.

11       A.    Stop it right there.

12             (Video recording is stopped.)

13             THE WITNESS:  Okay.  Stop it right there.

14        And it came out before.  But if you stop right

15        there, do you see the palm tree that we were

16        talking about before?

17             MR. SWITKES:  The palm tree is still there.

18             THE WITNESS:  But you pressed play.  So...

19             MR. DESAI:  I re-winded it.

20             THE WITNESS:  Okay.  Okay, sir.  Mr. Devang,

21        the palm tree that we were talking about that's

22        in the corner, okay, you see those lights there

23        on the top, those lights?  Okay.  From that flash

24        okay, the flash is not being blocked by the

25        pillar.

Page 241

```
 1          If that police vehicle with the lights on,
 2     was on the eastbound lane, we would not be seeing
 3     that flash like that, on that side of the pillar.
 4     So if I see the flash of that light, okay, it
 5     lets you know that there's a police vehicle
 6     there.
 7          And that's why I said, from this angle, from
 8     the actual camera from the church, you don't see
 9     the vehicle.
10          And that's why I told him that if he wanted
11     to, he can play Channel 7, or Channel 6, or
12     whatever channel it came on, and you would see
13     exactly where my vehicle was positioned.
14          MR. SWITKES:  Okay.  Put the tape on again,
15     so we'll be able to see where those light are
16     coming from.
17          (Video recording is played.)
18 BY MR. SWITKES:
19     Q.   Those are all behind the pillar, ma'am, on
20 the eastside.
21          (Video recording is stopped.)
22     A.   No, it's not, sir.
23     Q.   Oh.
24     A.   No, it's not.
25     Q.   Oh, okay.
```



Page 242

1           MR. SWITKES:  Keep playing the video.

2           (Video recording is played.)

3           MR. SWITKES:  Stop.

4           (Video recording is stopped.)

5  BY MR. SWITKES:

6      Q.   The car door just opened.  We're at 5:31

7  or 2.  You're saying we should be able to see your

8  vehicle at this point in the westbound lane?

9           MR. RODRIGUEZ:  Form.

10          THE WITNESS:  The vehicle's been there.

11  BY MR. SWITKES:

12     Q.   It's there.  So show us where it is.

13     A.   I already explained that to you.  Do you

14  want me to explain it again?  I'll explain it again.

15     Q.   No, I don't want you to explain.  I want you

16  to -- let Devang put the pointer again and show us.

17  Tell him to move right, left, wherever you want him to

18  move it.  Tell us where it is.

19     A.   Okay.  Devang, move it just -- okay, right

20  there.  But I'm using the palm tree as an object of

21  where the vehicle is.  The vehicle is right there.  If

22  the palm tree wasn't there, that's where you will see

23  the vehicle at.

24     Q.   So through the palm trees we can't see it,

25  but it's there.



Page 243

1          Okay.  Now tell us when you watch the video,

2    when it displays your walking to the passenger side of

3    the Lester Machado vehicle.

4          MR. SWITKES:  Go ahead, Devang, play it.

5          (Video recording is played.)

6          MR. SWITKES:  Stop it.  Stop it.  Stop it.

7          (Video recording is stopped.)

8    BY MR. SWITKES:

9       Q.   Ma'am?

10      A.   Yes.

11      Q.   Do you see the car going westbound in the

12   westbound lanes?

13      A.   Yes.

14      Q.   You see the taillights of that vehicle?

15      A.   Do I see, the what?

16      Q.   Taillights of the vehicle going west in --

17      A.   Yes, I do.

18      Q.   -- the westbound lanes?

19      A.   Yes, I do.

20      Q.   Do you see it through the palm trees?

21      A.   Let it keep playing.

22      Q.   So you can see a vehicle going westbound in

23   the westbound lane, but you're telling us we can't see

24   a vehicle going eastbound in the westbound lanes?

25          MR. RODRIGUEZ:  Objection to form.



Page 244

1        MR. SWITKES:  Keep going.

2        THE WITNESS:  Keep playing it please.

3        (Video recording is played.)

4        MR. SWITKES:  A little bit further.

5        Stop.

6        THE WITNESS:  Okay.  Stop right there.

7        (Video recording is stopped.)

8        THE WITNESS:  Where is the car now?  Can you

9   see the car?

10       MR. SWITKES:  I see the ---

11       THE WITNESS:  Exactly what I'm saying.  Do

12   you see the car now?  You do not see the car.

13       Sir, can you press play?  Devang, just press

14   play.  Not rewind, just press play.

15       MR. SWITKES:  Did you ask me a question?

16       THE WITNESS:  No.  Just press play,

17   Mr. Devang, please.

18       (Video recording is played.)

19       MR. SWITKES:  Are you going to let me

20   answer?

21       THE WITNESS:  Okay.  See, you still don't

22   see the car?  Do you see the car, or not, sir?

23   No, you do not see the car, because the fence is

24   blocking the view, exactly what I said.  You see

25   the car there, you see the tail -- the brake



Page 245

1   light, he presses play, the car disappears.

2        MR. SWITKES:  Keep playing it.  Does it

3   appear again?

4        THE WITNESS:  I did not see the car appear

5   again.  I see it appear all the way at the end.

6   But there was a time there where the car

7   totally disappeared.  So if you stop it for a

8   second please.

9        (Video recording is stopped.)

10       THE WITNESS:  So just how you see the car,

11  then -- exactly how I was pointing out, the palm

12  tree, you didn't see the car.  As he's going past

13  the palm tree, that he's going past the fence,

14  you don't see the car.

15       Even there's a little, like, I don't know if

16  it's a pole, but there's, like, something black

17  or dark that looks like, I don't know, like, a

18  stick or something.  At that point, you still

19  don't even see the car or the brake lights.

20       MR. SWITKES:  Okay.  Keep going.

21       THE WITNESS:  The car continues.  And then

22  the car appears.  And that's just a car just

23  driving normal.  Now here we are driving on a

24  chase, right?

25       I'm driving.  So, like I said, I don't know



Page 246

1  how fast I'm going.  Honestly, I don't know.

2  But everything happens so quickly, you didn't see

3  the car.  So it makes my point.

4      Just like you said on the video, okay --

5  can you -- Mr. Devang, can you let the video

6  continue to play, please?

7      (Video recording is played.)

8      THE WITNESS:  There goes another truck.  And

9  let it keep playing.

10     MR. SWITKES:  You saw it the whole time,

11  didn't we, ma'am?

12     MR. RODRIGUEZ:  Form.

13     THE WITNESS:  Of course.  It's -- look at

14  the size.  Can you stop it for a minute,

15  Mr. Devang?

16     (Video recording is stopped.)

17     THE WITNESS:  Look at the size of that truck

18  compared to the size of the first vehicle, before

19  the truck got passed by, compared to the size of

20  the police vehicle.

21     Then on top of that, before we headed into

22  this discussion, you sat there and stated, oh,

23  look, I did see the vehicle of Lester Machado's

24  back door opening.

25     Sir, I still haven't seen the car open.



Page 247

1       It's not like the video clip is zoomed in.  To

2       this point, you still haven't even seen the door

3       open.

4            And you just said, before we got into this

5       discussion, oh, look, the door is opening.

6       So I don't know, maybe you're watching a

7       different clip that I don't have.  Or maybe

8       you're zooming in and I don't have that

9       capability to zoom in.

10           I don't know what's going on.  But I'm

11      testifying to what happened that day, to what I

12      know, and what I'm seeing here in the video.

13  BY MR. SWITKES:

14      Q.   Okay.  Can you see the back door open on

15  this point at 6:44, ma'am, yes, or no?

16      A.   Can I see a back door open?

17      Q.   (No audible response.)

18      A.   Is that your question, sir?

19      Q.   That was it, if you listen.

20      A.   Okay.  A back door open to what, to the

21  church, to the hotel across the street, a back door

22  open to?

23      Q.   Is the back door of the Lester Machado

24  vehicle open, at this point, yes, or no?

25      A.   I can't see that in the video.

Page 248

1    Q.   Okay.

2         MR. SWITKES:  Keep playing the video.  Well,

3    go back a little bit, Devang.

4  BY MR. SWITKES:

5    Q.   And if you watch the right passenger rear

6    door, you -- maybe you can or maybe you can't see

7    the door open.  Let's do it again.

8         (Video recording is played.)

9         (Video recording is stopped.)

10  BY MR. SWITKES:

11    Q.   Okay.  It's closed now.  Can you see that

12  ma'am, at 6:26?

13         MR. DEVANG:  At 5:26.

14         MR. SWITKES:  At 5:26.  Excuse me.

15  BY MR. SWITKES:

16    Q.   Can you see that ma'am?

17    A.   Can I see - I see -- rewind it just a little

18  bit more.

19         (Video recording is played.)

20         THE WITNESS:  Okay.  Press --

21  BY MR. SWITKES:

22    Q.   Okay.  Tell me when you see the door open.

23         Now?

24    A.   (No audible response.

25         MR. SWITKES:  Stop.



Page 249

1                (Video recording is stopped.

2    BY MR. SWITKES:

3        Q.    Do you see the difference in color, ma'am,

4    when it was all white, and now it appears that the

5    backdoor is open?

6        A.    Yes, I do see that.

7        Q.    At 5:34, correct, ma'am?

8        A.    Right.

9        Q.    Okay.

10              MR. SWITKES:  Keep rolling.

11   BY MR. SWITKES:

12       Q.    And you're going to tell me when you first

13   appear in this video.  Just stop it when you see

14   yourself.

15              (Video recording is played.)

16              THE WITNESS:  The car just disappeared

17        again.

18              MR. SWITKES:  Stop.

19              (Video recording is stopped.)

20   BY MR. SWITKES:

21       Q.    Now, ma'am, would you admit at up until 7:12

22   of this video, you now have not appeared in the video

23   to approach the car?

24              MR. RODRIGUEZ:  Object to form.

25              THE WITNESS:  Okay.  How would I appear if,



Page 250

```
 1      again, if the car is where I told you where the
 2      palm tree is?  Can you see a clear view from that
 3      palm tree to the front of Lester's car?  No, you
 4      cannot.
 5           You see a palm tree.  You see a pole,
 6      like, a skinny pole.  Then you see another palm
 7      tree.  Then you see the stop sign, the actual
 8      part that says, "stop."  And then you see
 9      something green, which I think is a bus stop
10      sign.
11           You don't have a clear view of the front of
12      Lester Machado's car.  So if I was to walk in
13      front of that car, or anyone was to walk in front
14      of that car, you would not be able to see them.
15      Because it's not, again, a clear view.
16      Q.   Okay, ma'am --
17      A.   I know you can see the stop sign.  And I
18 know that you can see what appears to be, like, a bus
19 stop sign, that looks like it's green, or
20 greenish/blueish color.  And then you see the palm
21 tree.  So there is not a clear view.
22           So of course, you're not going to see me,
23 because it's not a clear view.  The questions that
24 you're asking me are questions that you cannot -- that
25 you cannot, and I cannot, say, oh yeah, I see it here.
```

Page 251

```
1              I can't make out the facts because it's not
2    clear.  If it was clear, and you were to ask me these
3    questions, then I can say, yes or no.  But you want me
4    to answer a question that you can't get a clear answer
5    to as to what is in the video, because it's
6    obstructed.
7         Q.   You know, when I ask you a question, you can
8    describe the whole scene that we all see that you
9    don't have to describe for an hour.
10             When I ask you a question to point out where
11   you are, all you have to say is, I haven't been able
12   to see myself.  And that would answer it.
13        A.   I said that, sir, before.  And I told you
14   why I couldn't see myself.  I told you that I can't
15   see myself and the reason why I couldn't see myself.
16   I explained that to you.
17        Q.   And I never have asked you why you couldn't
18   see yourself.  My question was, tell me in the video,
19   when you appear.  And if you can't see it, all you
20   have to say is, I haven't seen myself.  You don't have
21   to tell me all the other things we all can see in the
22   video.
23             So let's go to what you can see.  If you
24   look at the video stopped at 7:12, can you see an
25   officer approaching from the east side, towards the
```



Page 252

1  back of the Machado vehicle, yes, or no?

2       A.   Do you see someone in the rear?  Yes, you

3  do.

4       Q.   Okay.  And that's not you, is it ma'am?

5       A.   No, it's not.

6       Q.   Okay.  That's a male officer.  And --

7       A.   It is?  It's a male officer?  You can see

8  it's a male officer?

9       Q.   Okay.  If we watch the video a little bit

10  more, you might be able to see it.  But here's the

11  first officer that anybody watching this video could

12  see approaching the Machado vehicle; is that fair?

13            MR. RODRIGUEZ:  Objection to form.

14            THE WITNESS:  No, that is not fair.  Because

15       you don't have a clear view of the front of the

16       car.

17  BY MR. SWITKES:

18       Q.   Maybe you didn't hear --

19       A.   You see an officer approach from the rear,

20  but you don't see if there's an officer approaching

21  from the front of the car.  You only see the rear.

22       Q.   Okay.  Maybe you didn't hear my question.

23  It's not what we can't see, it's what we can see.

24            So on the video, the first officer you can

25  see is this vehicle to the left of the Machado vehicle



Page 253

1   in this stoppage at 7:12, correct?

2        A.   It's not correct.

3        Q.   Okay.

4             MR. SWITKES:  Play a little bit more.

5             (Video recording is played.)

6   BY MR. SWITKES:

7        Q.   Do you see three officers --

8             MR. SWITKES:  Stop it now.

9             (Video recording is stopped.)

10  BY MR. SWITKES:

11       Q.   -- approach the Machado vehicle on the

12  passenger side rear?

13       A.   Yes, I see three officers.  Yes, I do.

14       Q.   And none of those three officers, is you,

15  are they?

16       A.   No.

17            MR. SWITKES:  Okay.  Play a little bit more.

18            (Video recording is played.)

19            THE WITNESS:  Stop it please.  Can you stop?

20            (Video recording is stopped.)

21  BY MR. SWITKES:

22       Q.   Excuse me.  They leave him at 7:28.

23            THE WITNESS:  Can you rewind that

24       Mr. Devang, just a little bit?

25  BY MR. SWITKES:



Page 254

1      Q.   Answer my questions in my sequence.

2           THE WITNESS:  Mr. Devang, can you please

3      rewind it for a second?

4  BY MR. SWITKES:

5      Q.   He's not going to do it right now.  You're

6  going to answer my questions.

7           From 7:28 --

8      A.   Yes, what's the question?

9      Q.   You can't hear it if you keep interrupting

10  me.

11          At 7:28, as those officers began to leave, I

12  want you to tell me the next time, and tell me on the

13  clock on the tape, when the next officer approaches

14  that vehicle.

15          MR. SWITKES:  Go ahead and play it.

16          (Video recording is played.)

17  BY MR. SWITKES:

18     Q.   That's at 7:48 ma'am, isn't it?

19     A.   At 7:48 there's another officer approaching

20  the vehicle from the rear.

21     Q.   And that wasn't you, ma'am --

22     A.   You can clearly see it.

23     Q.   And that wasn't you, ma'am, was it?

24          THE WITNESS:  Can you rewind please,

25     before 7:28, Mr. Devang?



Page 255

1         I think you need to rewind it -- can you put it

2         at 7:20, to see, please?  Thank you.

3              (Video recording is rewind.)

4              MR. SWITKES:  Stop.

5              (Video recording is stopped.)

6    BY MR. SWITKES:

7         Q.   At 7:49, is that you, ma'am?

8         A.   Excuse me?

9         Q.   Is that you?

10        A.   No, it's not me.

11             MR. SWITKES:  Keep playing it.

12             (Video recording is played.)

13   BY MR. SWITKES:

14        Q.   Is that you?

15        A.   No, it's not.

16        Q.   So that's four -- five other officers there,

17   but not you yet?

18        A.   (No audible response.)

19        Q.   Were you there with all those officers?

20        A.   No.

21        Q.   At 8:32.

22             The first Metro officer appearing at

23   about 8:58, walking.  Do you see that?

24        A.   Yes, I do.

25        Q.   The first Metro officer vehicle shows up at



Page 256

1  about 9:10.  Two officers get out and approach.

2  That's the time when you went up to Mr. Machado,

3  correct?

4       A.   No, it's not.

5       Q.   That's your testimony.  You went --

6            THE WITNESS:  Right there -- can you pause

7       that, Mr. Devang?

8            Okay.  Go ahead and talk, sir.

9  BY MR. SWITKES:

10      Q.   You said, when the Metro officer was there,

11  that's when you were near the Machado body.

12      A.   I said, before, that I was there before,

13  yes.  I said first that I was there before.  And then

14  as I was approaching -- I said something as to when I

15  was first there, I approached the body.  And I

16  approached the body by myself.  And that Officer

17  Teannie was a few steps behind me.  That's what I

18  said.

19           And then I said -- and then, yes, there was

20  a county officer in uniform, that I never got his

21  name -- to this day, I wouldn't even be able to point

22  him out because I don't know who he is -- that then

23  walked up to the body.  He was standing there; I was

24  standing there.  And then I left back to my car.  I

25  walked away back to my car.  And then you're asking me



Page 257

1   are any of those officers on there are me.  And I'm

2   telling you no, because I never approached the vehicle

3   from the rear.  I approached Lester Machado from the

4   front.

5        Q.   And the problem is, you haven't been able to

6   stop the video at any point to show me one officer

7   approaching from the front.  But we saw all of those

8   officers from the rear, right?

9        A.   Of course, we have a clear view.  And that's

10  why I told Mr. Devang to stop.  Because the county

11  officer that was just walking on the sidewalk, where

12  is he now?  You can't see him.  He didn't disappear.

13  He hasn't walked back to the police car, and I don't

14  see him anywhere on the screen.

15       Q.   So all the vehicles -- all the --

16       A.   Do you see him on the screen?  I don't think

17  you see him either.  Because I don't see him on the

18  screen, sir.

19       Q.   So only your vehicle and you are invisible

20  on the screen, but everybody else, their vehicles,

21  their headlights, and their bodies, appear on the

22  video.

23            MR. RODRIGUEZ:  Objection to form.

24            THE WITNESS:  That's incorrect.  Just like

25       the first vehicle that drove by, the dark car



Page 258

1       with the -- that we first saw with the

2       taillights, and then we did not see it, the car

3       disappeared.  The same thing.

4            The only one that we could keep -- that

5       stayed in the camera view, was the front part of

6       the 18-wheeler of the truck, because due to its

7       size.  That's why he never came out of the

8       camera.  He always stayed on the screen.

9            But the other car that drove right before,

10      you saw it at first, and then right when it got

11      to the palm tree, you couldn't see it anymore.

12      And then it didn't appear till all the way up in

13      the corner of the screen.

14      Q.   So you weren't in the first group of

15 officers; you weren't in the second group of the

16 officers; and when you did approach, you were in when

17 the officer from Metro-Dade showed up, three minutes

18 later?

19      A.   It wasn't three minutes later.  I told you

20 that I approached from the front.  When I first

21 approached -- I approached, and the only time that I

22 approached was from the front, sir.  I never

23 approached from the back.

24      Q.   Ma'am, when you reported Ms. Chavez to I.A.

25 that was the first time that you had filed an I.A.



Page 259

1  complaint in the 12 years you were Hialeah, correct?

2       A.   No, it was not.

3       Q.   How many other --

4       A.   That was the first time that it was

5  documented.

6       Q.   Oh.  So it's the first documented.  And it

7  just happened to be that that women also was seeing

8  Detective -- your boyfriend, correct?

9            MR. RODRIGUEZ:  Objection to form.

10           THE WITNESS:  No, it wasn't my boyfriend.

11      It was -- how can I say, not to be disrespectful?

12      It was -- if he was dating her, or wasn't dating

13      her, it wasn't my problem.  I'm not worried about

14      somebody's past or somebody's future.  I'm not

15      worried about that.  So that wasn't the case.

16           The case is -- if you want, you can bring

17      Commander Clavijo -- okay -- you can bring him on

18      the scene.  You probably won't because he won't

19      show his face, of course.  But you can ask him

20      why is it that he set up the whole thing of

21      leaving the documents in my mailbox.

22  BY MR. SWITKES:

23      Q.   We'll get --

24      A.   And if you want, you can put under oath --

25      Q.   Okay.



Page 260

```
 1      A.   You can put under oath -- and you can put

 2 him, and you can put Officer Ramirez who has

 3 disappeared, okay, as the one who told me that all

 4 this was going down.

 5      Q.   Yeah.  When you were --

 6      A.   Thank you very much for bringing it up.

 7      Q.   Okay.  I didn't bring up anything about that

 8 yet, but I will.

 9      A.   Okay.  That's fine.

10      Q.   At 9130 -- try to follow my questions.

11 Don't tell me about what else I can find.

12      A.   Well, you're asking me a question.  You're

13 bringing something up.  So I'm just making sure we're

14 clear, we're both understanding.

15      Q.   That has nothing to do with Ms. Chavez,

16 correct?

17      A.   Yeah.  You should have never brought it up.

18      Q.   Okay.

19      A.   It doesn't bother me.  We can talk about it

20 here.  We can continue it for tomorrow.  We can

21 continue talking about it.  It doesn't bother me, sir.

22      Q.   Leilani, when you had a problem with her,

23 that was over her not returning your handcuffs, right?

24      A.   With who?

25      Q.   Leilani Diaz, remember her?
```



National Reporting Service   (305) 373-7295

Page 261

1        A.   Yes, I remember her.

2        Q.   Okay.  And were you angry because she hadn't

3   returned your handcuffs, right?

4        A.   No, I was not angry.  I lent her my

5   handcuffs because she had just came back from

6   maternity leave and didn't have money to purchase

7   handcuffs.  So I gave her my handcuffs and Officer

8   Paulina Perez took her handcuffs and didn't want to

9   give it to her.  And she had to go make an arrest.

10  And because of officer safety, I gave her my

11  handcuffs.

12       Q.   I just asked you a simple question.  You --

13       A.   Well, I'm telling you.

14       Q.   No.  It had nothing to do with my questions.

15  You were angry with her, because she didn't return

16  your handcuffs, was the question.  You can answer that

17  with a yes or a no.

18       A.   No, I was not.

19       Q.   Okay.  So when you said to her, don't worry,

20  I'm going to get my handcuffs one way or the other; do

21  you remember saying that to her?

22       A.   Yes, I did.

23       Q.   Okay.  And then she said to you, don't

24  threaten me; do you remember that?

25       A.   Yes, I do.



Page 262

1       Q.   And then you said, I didn't know I was

2  fucking Santa Claus to be giving shit away; do you

3  remember that?

4       A.   No, I never said that.

5       Q.   That was recorded.  And that was in the I.A.

6  file; you don't remember saying that?

7       A.   That I wasn't fucking Santa Claus?  No.

8       Q.   Maria, you're invading my space, get off me;

9  do you remember her saying that to you?

10      A.   Get off of her?  I was on her?  That's not

11  true either.

12      Q.   And then you responded, I don't give a fuck

13  about your personal space.  If you don't like it, walk

14  away; are you telling me those weren't angry words

15  when you said that?

16      A.   I never -- first of all, you're asking me --

17  I'm going to answer your question.  I never said that

18  I wasn't fucking Santa Claus, number one.  Number two,

19  I was never on top of her.  That's number two.  I was

20  never on top of her.  They even had CCTV on that case

21  and they had witnesses.

22      Q.   And they had an audio tape of you saying

23  those exact words.  Because --

24      A.   They had an audio tape of me saying those

25  exact words?  So why didn't I get reprimanded,



Page 263

1  suspended, fired, or a report of assault or even

2  ag assault because I'm a police officer with a gun on

3  my waist?

4       Q.   Ma'am, you remember another I.A. of the 14

5  you had, 12065; remember that one?

6       A.   Which one, sir?

7       Q.   That was a road rage incident; do you

8  remember that one?

9            MR. RODRIGUEZ:  Object to form.

10           THE WITNESS:  Which one?

11           MR. SWITKES:  Excuse me?

12           THE WITNESS:  I said, which one?

13  BY MR. SWITKES:

14       Q.   Oh, you had multiple road rage incidences?

15       A.   I don't know.  I don't know what you're

16  talking about.  You're talking in general.  Can you

17  tell me which one?

18       Q.   I just gave you the case number: 12-064 --

19       A.   Sir, can you tell me the incident?  I don't

20  walk around with case numbers in my pocket.

21       Q.   Okay.  Let me tell you what your language

22  was over the radio.  You said, you're fucking lucky

23  you're not -- oh, excuse me -- you're lucky you are

24  not a fucking dude or I would cap your ass; do you

25  remember saying that ma'am?



Page 264

1      A.    What case is that, sir?  You gave me a case

2   number.  Give me an incident.  Give me a location.

3      Q.    You had a road rage incident and a complaint

4   filed against you, ma'am.  And it's for Case

5   Number:  12065; do you remember saying the words I

6   just used during one of your many of road rage --

7      A.    Okay.  Can you put up the document?

8      Q.   I can --

9      A.    You could be -- sir, you're talking -- show

10  me something.  When the other attorney showed me --

11  she showed me -- she gave me a name of the

12  complainant.  She told me where the incident took

13  place.

14          You're just going off, oh, this is what you

15  said.  You're just giving me a case number.  I don't

16  walk around with case numbers.  I don't have case

17  numbers locked in.  If you can give me the incident,

18  give me a location, give me a name, or you can share

19  the screen.  And on the screen, you can put -- on the

20  screen, you can put the PC Number, which is the

21  internal affairs investigation, and I can read it.  I

22  can't just go off what you're saying.

23      Q.    So all you had to say is, I don't remember

24  that.

25      A.    No, because I don't remember, that means



Page 265

1  that it could have happened, it could have not

2  happened.

3     Q.   Do you remember it, or not?

4     A.   No, I don't remember that.

5     Q.   Okay.  And then he said, I'm calling the

6  cops.  And then you said over the radio, you guys

7  better send 315.  You guys better get over here,

8  because if I get ahold of this guy, it's going to be

9  over; do you remember saying that to someone during a

10  road rage incident, yes, or no?

11          MR. RODRIGUEZ:  Object to form.

12          THE WITNESS:  Over the radio, sir?  I used

13      that on the radio -- you can't talk on the radio

14      like that.  So can you tell me what incident

15      you're talking about?

16  BY MR. SWITKES:

17     Q.   All you have to say is, I remember, or I

18  don't remember.

19     A.   Okay.  So tell me the incident so I can try

20  to remember.

21     Q.   Do you, or don't you, remember?

22     A.   Can you tell me the incident, sir?

23     Q.   I just --

24     A.   So I can answer your question.

25     Q.   How many road rage incidences have you had?



1            MR. RODRIGUEZ:  Object to form.

2            THE WITNESS:  I don't know.  Pull my

3       internal affairs file and look.

4  BY MR. SWITKES:

5       Q.   How many road rage incidences have you had,

6  ma'am?

7            MR. RODRIGUEZ:  Object to form.

8            THE WITNESS:  You need to look into my file,

9       sir.

10  BY MR. SWITKES:

11       Q.   I've looked at your file.  I'm asking you.

12       A.   Okay.  So how many have you seen?

13       Q.   All you've got to do is say you don't

14  remember.

15       A.   You don't answer my questions.  I'm telling

16  you -- let's finish with the first thing.  You said I

17  had a road rage incident where I've said this.  I'm

18  telling you, tell me the road rage incident.  All you

19  had to do was tell me the case number.  You're

20  throwing numbers at me from 2012.

21       Q.   You --

22       A.   I'm telling you --

23       Q.   Okay.  Here's the next quote -- and all

24  you've got to say is, I remember, or I don't remember:

25  If not, I'm going to ram my car into him; do you

Page 267

1   remember saying that?

2          MR. RODRIGUEZ:  Form.

3          THE WITNESS:  No, I've never said that.

4   BY MR. SWITKES:

5      Q.   Is it --

6      A.   And I'm going to say that on the radio?  I'm

7   going to assault somebody and say it on the recorded

8   line?  Really?

9          Sir, show me the document where it quotes me

10  where I say it.  Don't show me your notes.  Show me

11  the documents where I'm quoted that I said it -- that

12  it's signed by someone, an investigator, in internal

13  affairs; can you provide that?

14     Q.   Here's the next quote, ma'am.  And if you

15  can remember, you can tell me you remember, or you

16  don't:  I'm going to fuck him up.  I'm glad you guys

17  are recording this shit; do you remember saying that

18  over the radio?

19         MR. RODRIGUEZ:  Objection to form.

20         THE WITNESS:  No, sir.

21  BY MR. SWITKES:

22     Q.   You still don't remember how many road rage

23  incidents you had as a police officer?

24         MR. RODRIGUEZ:  Objection to form.

25         THE WITNESS:  No, sir.



Page 268

1  BY MR. SWITKES:

2      Q.   Was it more than five?

3      A.   I don't remember, sir.

4           MR. RODRIGUEZ:  Objection to form.

5  BY MR. SWITKES:

6      Q.   Was it more than ten?

7      A.   I don't remember, sir.

8      Q.   More than a hundred?

9           MR. RODRIGUEZ:  Form.

10          THE WITNESS:  I don't remember, sir.

11 BY MR. SWITKES:

12     Q.   So it could have been more than a hundred

13 road rage incidences you were involved in while

14 wearing a uniform for the Hialeah Police Department?

15     A.   I don't remember, sir.

16     Q.   Okay.  Ma'am, on October 1st, 2017, the very

17 day this incident occurred, you gave a sworn statement

18 at approximately eight in the morning; is that

19 correct?

20     A.   At eight o'clock in the morning?  I don't

21 remember the time, but that morning I gave two

22 statements, two recorded statements.

23     Q.   Okay.  And I happen to have that statement

24 in front of me.  I want to go over your statement with

25 you.



Page 269

1    A.    You have both, sir, or you have one?

2    Q.    I have one that's in front of me.  That is a

3  free and voluntary statement and it's taken by

4  Detective Garcia in Hialeah Police Case

5  Number:  2017-30325; do you remember that statement,

6  ma'am?

7    A.    Well, I remember it being free and

8  voluntary.  All statements in Hialeah are free and

9  voluntary.  But I need to know from which of the two

10  are you referring to.  I gave two that morning.

11    Q.    Well, I can't give you any better definition

12  than reading exact words from the statement, ma'am.

13  And I'm looking at it.

14        MR. SWITKES:  Devang, do you want to put it

15        up?  This witness seems to have trouble

16        remembering things.

17        MR. RODRIGUEZ:  Is that a question,

18        Mr. Switkes; or are you deriding us with your

19        commentary?

20        MR. SWITKES:  It's a request of your client,

21        because she can't remember.

22        THE WITNESS:  Your client?  I'm not your --

23        I haven't hired you.  I'm not your client.

24        MR. RODRIGUEZ:  I know you're not my client.

25        Is there a question pending, Mr. Switkes?



Page 270

1           MR. SWITKES:  If your client wants it on the

2      screen --

3           MR. RODRIGUEZ:  I don't know who you're

4      talking about, my client, but you might want to

5      rephrase your question.

6           MR. SWITKES:  I'm fine with the question.

7           Devang, are you going to put it up?

8           MR. DESAI:  Yes.  Do you want me to play the

9      audio?

10          THE WITNESS:  You're playing the audio --

11          MR. SWITKES:  Or the transcript, either one.

12          MR. DESAI:  Okay.

13          THE WITNESS:  Mr. Devang, excuse me, sir.

14      Are you playing the statement that he's talking

15      about from the statement from October 1st?

16          MR. DESAI:  That's correct.

17          THE WITNESS:  Okay.  Thank you, yes.

18          (Audio recording is played.)

19          (Audio recording is stopped.)

20  BY MR. SWITKES:

21      Q.   Ms. Benitez, do you understand that you're

22  being sworn to tell the truth at this point?

23      A.   Yes.

24          MR. SWITKES:  Okay.  Play the tape.

25          (Audio recording is played.)

Page 271

```
 1           MR. RODRIGUEZ:  We can't understand a word
 2      of what you're playing.  It's just garbled.
 3           MR. SWITKES:  I'm going to read it, make it
 4      easier.
 5           MR. DESAI:  I can put the transcript of it
 6      up, if you like.
 7           MR. SWITKES:  Let's do that.
 8           MR. DESAI:  Bear with me one second.
 9           So this is a transcript of the audio that we
10      were just listening to.
11 BY MR. SWITKES:
12      Q.   Okay.  So I think we stopped it at where you
13 could hear it at Line 23.  He asked you how long
14 you've been employed.  You said, since '98.
15           Let's go to the next page.  Then it says,
16 last night were you on duty.  Your answer was, I was
17 working an off-duty job.
18           Now, you were working at the casino, right,
19 ma'am?
20      A.   Yes, sir.
21      Q.   And you happened to have forgotten to call
22 in, correct?
23      A.   Yes, I did not go in service.
24      Q.   So if you're not in service, why would you
25 be responding as a back-up?
```



Page 272

1      A.   Because the officer said she needed extreme

2  back-up; she needed a 315.

3      Q.   What do you mean, extreme?  It was a 315 --

4      A.   Well, the three means extreme.  So a 315

5  means the officer needs emergency back-up.  So that

6  means that if you are in the location, you need to go

7  and back-up the officer.

8      Q.   Okay.  But you weren't on duty.

9      A.   Okay.  I wasn't on duty.  But still, not

10 being on duty, I still had a duty to perform.

11     Q.   How much were you being paid by the casino

12 to work as their security?

13     A.   Excuse me?

14     Q.   How much were you getting per hour to work

15 at the casino?

16          MR. RODRIGUEZ:  Objection to form.

17          THE WITNESS:  I believe, at the time, was --

18      I don't know if it was $30 or $35 or $25.  I

19      can't remember.

20 BY MR. SWITKES:

21     Q.   Okay.  It goes on to say that you proceeded

22 to back her up, you got involved at East 4th and

23 about 28th.

24          And then it asks -- Page 23 -- from there:

25 "Where did you get involved in this incident on East



Page 273

1   4th and 28th -- East 4th and 28th, and what did you

2   see?  I see the white vehicle was driving out of

3   control"; do you see those words, ma'am?

4        A.   Yes, I do.

5        Q.   Why did you have so much trouble answering

6   Christine Welstead's question about whether he was

7   driving recklessly, if on the morning of this

8   incident, you were saying he was driving out of

9   control?

10            MR. RODRIGUEZ:  Objection to form.

11       Argumentative.

12            You can answer.

13  BY MR. SWITKES:

14       Q.   Answer.

15       A.   Out of control is one thing, and reckless is

16  something else.

17       Q.   So if you're going 115 miles an hour --

18       A.   And you're still within the lane --

19       Q.   Don't interrupt me.

20       A.   I can't hear you sir.

21       Q.   Unless there's (inaudible).

22       A.   You're cutting out.

23       Q.   What did you say?

24       A.   I said, you're cutting off.  You're coming

25  in and out.



Page 274

```
 1    Q.   Only because you're interrupting me.
 2         MR. RODRIGUEZ:  Actually, not, Mr. Switkes.
 3         Your audio is very inconsistent.  You're fading
 4         in and out.  And at times it's garbled and
 5         completely not understandable.
 6         It's not the first time during the course of
 7         this deposition that I've advised you that we
 8         could not hear you well.  So don't pretend
 9         otherwise, please.
10    BY MR. SWITKES:
11    Q.   Ma'am, here's the question again:  If
12    someone's driving 115 miles an hour, can that person
13    be cited for reckless if you didn't see him commit two
14    other violations, yes, or no?
15         MR. RODRIGUEZ:  Objection to form.
16         THE WITNESS:  Repeat the question, please.
17    BY MR. SWITKES:
18    Q.   If someone's driving 115 miles an hour in
19    a 35 zone --
20    A.   You changed the question, but go ahead.
21    Q.   What?
22    A.   You just changed the question.  You said, if
23    someone's driving at 115 in a 35?
24    Q.   Are you done?
25    A.   I'm asking you, sir.  You're asking me a
```



Page 275

1  question.  I need to make sure I understand the

2  question that you're asking me.

3      Q.    Someone's driving 115-miles-an-hour in

4  a 35-mile-an-hour zone, can he be cited for reckless

5  driving, even though he hasn't committed two other

6  traffic violations, yes, or no?

7          MR. RODRIGUEZ:  Objection to form.

8          THE WITNESS:  Can he be cited?  He can be

9      cited for going over the speed limit and because

10     it's such a big difference, he has to go to

11     court.  It's mandatory court.  It's not reckless.

12     What they do, is on the ticket, you must show up

13     for court.

14  BY MR. SWITKES:

15     Q.    So you can't cite someone for reckless

16  driving for driving 115 miles an hour in a 35 zone;

17  that's your answer?

18         MR. RODRIGUEZ:  Objection to form.

19         THE WITNESS:  Did you hear my answer, sir?

20         MR. SWITKES:  You didn't give me one to this

21     question.

22         THE WITNESS:  I said, no, that you will get

23     a citation, and you will have to show up to

24     court.

25  BY MR. SWITKES:



Page 276

1      Q.   Very good.  Ma'am, you worked 12 years as a

2  police officer.  If someone works as a confidential

3  informant, if they lie under oath, are they useless

4  thereafter?

5           MR. RODRIGUEZ:  Objection to form.

6           THE WITNESS:  I don't know.  I've never

7      worked confidential.  I've never worked in

8      that.

9  BY MR. SWITKES:

10     Q.   You don't know whether a confidential

11 informant that has lied twice under oath becomes

12 totally useless as a witness?

13          MR. RODRIGUEZ:  Objection to form.

14          THE WITNESS:  Not in Hialeah.

15 BY MR. SWITKES:

16     Q.   So your answer is, no, in your opinion?

17          MR. RODRIGUEZ:  Form.

18          THE WITNESS:  Well, you're asking me a

19     question.  I'm telling you what I dealt with --

20     not in Hialeah.

21 BY MR. SWITKES:

22     Q.   I didn't ask you Hialeah.  Stop changing

23 my --

24     A.   So do you want to tell me, in general, or...

25     Q.   In general.



Page 277

1      A.   In general, supposedly, yes.

2      Q.   Supposedly.  How many times have you lied

3  under oath, ma'am?

4           MR. RODRIGUEZ:  Objection to form.

5           THE WITNESS:  How many times have I lied

6      under oath?  I haven't lied under oath.

7  BY MR. SWITKES:

8      Q.   Excuse me?

9      A.   I said, no I've not lied under oath.

10     Q.   You've never lied under oath?

11     A.   I have not.

12     Q.   In the two I.A. matters that led to your

13  termination, didn't you give three different versions

14  of how those two incidents occurred?

15          MR. RODRIGUEZ:  Objection to form.

16          THE WITNESS:  No, I did not.

17  BY MR. SWITKES:

18     Q.   Okay.  So when you went to the class with

19  Lieutenant Proveyer, did you show up late?

20     A.   Yes, I did.

21     Q.   Did you show up talking on the telephone?

22     A.   No, I did not.  I was not talking on the

23  phone.

24     Q.   Did he tell you to go wait in the lobby?

25     A.   No, he told me to go wait outside.



Page 278

1    Q.   So when you were brought up on the internal

2  affairs, and you were specifically told to wait in the

3  lobby, you said you couldn't wait in the lobby,

4  because there was an officer having a loud

5  conversation in the lobby; didn't you testify to that?

6          MR. RODRIGUEZ:  Objection to form.

7          THE WITNESS:  No, I did not.  I said that

8      he told me to go wait outside.  And he pointed

9      outside the classroom, so I went to stand in the

10     lobby.  I could've stand in the lobby or I

11     could've stand outside by the door.  Outside is

12     outside the classroom.

13         When I went to go stand in the lobby so he

14     can see me through the door, there was an officer

15     talking on the phone on a personal matter.  She

16     was having a discussion.  And I said that.  And I

17     said she was having a personal conversation.  I

18     was not going to stand there and listen to the

19     conversation.

20         So I stood outside of the building, through

21     the glass doors, where he can still have a visual

22     of me.  That's what I said.

23  BY MR. SWITKES:

24     Q.   And the problem with that lie was that there

25  was a video of the lobby which showed there was nobody



Page 279

1  in the lobby, which was your reason for not waiting

2  there, correct?

3          MR. RODRIGUEZ:  Objection to form.

4          THE WITNESS:  No, it's not.  It showed that

5      that officer was sitting in the lobby.

6  BY MR. SWITKES:

7      Q.  So when --

8      A.  You might want to get your facts right.

9      Q.  I have the facts in writing, ma'am.

10     A.  You said, the video.

11     Q.  And you were giving the version that you

12 couldn't stand in the lobby because somebody was

13 having a loud conversation.  Then they showed the

14 video tape.  There was nobody in the lobby.  So --

15     A.  The officer even testified --

16         MR. RODRIGUEZ:  Objection to form.

17 BY MR. SWITKES:

18     Q.  You can't interrupt my question.

19     A.  Okay.  Go ahead.

20     Q.  Either you were lying or the video was

21 lying; which one do you think it was?

22         MR. RODRIGUEZ:  Objection to form.

23         THE WITNESS:  Nobody was lying.  Because the

24     officer testified and the video showed it also.

25 BY MR. SWITKES:



Page 280

1      Q.   Okay.  And then since you were being
2  harassed, you said, by the department, even though
3  they were able to prove that you committed perjury,
4  you were given another chance, correct?
5           MR. RODRIGUEZ:  Objection to form.
6           THE WITNESS:  Excuse me.  That I -- repeat
7      that again.
8  BY MR. SWITKES:
9      Q.   Are you having trouble hearing me; am I --
10     A.   Yes, I do have trouble hearing you.
11          I do.  You're coming in and out again.
12     Q.   Okay.  You tell me when.  Because I want to
13 make sure the court reporter gets us both down.
14     A.   Okay.
15     Q.   You then had another I.A., where you claim
16 an officer handed you records you weren't supposed to
17 have with a note on it, correct?
18          MR. RODRIGUEZ:  Objection to form.
19          THE WITNESS:  Negative.  I never said on
20     there -- and nowhere on there did I ever say that
21     an officer handed me those documents.  That's not
22     what it says.  Read it.
23 BY MR. SWITKES:
24     Q.   And then you said, you can never guess which
25 officer it was, correct?



Page 281

1            MR. RODRIGUEZ:  Objection to form.

2            THE WITNESS:  That's not what I said either.

3   BY MR. SWITKES:

4      Q.   And then when they asked you to name the

5   officer you said, I didn't get it from an officer,

6   someone left it in my mailbox, right?

7            MR. RODRIGUEZ:  Objection to form.

8            THE WITNESS:  Those were not my words,

9       either.

10  BY MR. SWITKES:

11     Q.   Excuse me, did you then say, I received it

12  in my mailbox with a note?

13     A.   That's not what I said.  I said, they were

14  left in my mailbox.

15     Q.   With a note.

16     A.   I said, with a sticky.  It was left in my

17  mailbox.  I never said an officer handed it to me.

18  That never came out of my mouth.

19     Q.   We're past that portion of the --

20     A.   Oh, okay.

21     Q.   -- whether or not you claim it was put in

22  your mailbox with a note.  And now you're claiming the

23  note was a sticky, not a note?

24     A.   Yes, it's a note.  It's a sticky note.  You

25  know how you get --



Page 282

1      Q.   And you --

2      A.   Do you want me to answer?  You don't let me

3  finish answering the question.

4      Q.   I think, yes, was appropriate, but go ahead.

5      A.   You asked me, you said, so you're telling me

6  it's a sticky note.  A sticky note can be written on a

7  sticky or it can be written on a piece of paper.  It's

8  a note.

9      Q.   So it's a note; and what did the note say?

10     A.   What did the note -- really?  You have the

11  transcript.  You can read what the note says.

12     Q.   What did the note say was the question.

13  Answer the question.

14     A.   It's on the transcript.  I don't remember

15  what the note said.

16     Q.   Did you testify to what the note said?

17     A.   Yeah, I testified, what, two years ago?

18     Q.   Excuse me?

19     A.   I don't remember, sir.

20     Q.   But you're claiming --

21     A.   It's on the transcript.

22     Q.   You testified -- ma'am, if I want to go look

23  at a transcript, I could do that.  This is my one

24  opportunity to question you.  So don't tell me what I

25  can look at, or what transcript I can review.  I



Page 283

1  want to --

2       A.   I said I don't remember.

3       Q.   -- argue with you.  That's fine.  Don't tell

4  me what to review as an answer.

5            MR. RODRIGUEZ:  There's no question pending.

6  BY MR. SWITKES:

7       Q.   So my question was during the I.A.

8  investigation, did you testify what was on the note?

9       A.   I did testify to what's on the note.

10      Q.   Okay.  And then you were brought up on

11  disciplinary charges because you not only gave one

12  version, you not only gave two versions, but under

13  oath, you gave three versions of those events; is

14  that --

15           MR. RODRIGUEZ:  Objection to form.

16           THE WITNESS:  Excuse me.  I didn't get the

17      last part.

18  BY MR. SWITKES:

19      Q.   You gave three different versions of how you

20  came in possession of those documents; isn't that

21  true?

22      A.   No, it's not.

23      Q.   And then you had a grievance procedure,

24  where you gave even a different version.  And the

25  finding was that you had lied repeatedly by the



Page 284

1  arbitrator, correct?

2          MR. RODRIGUEZ:  Form.

3          THE WITNESS:  Wrong.

4  BY MR. SWITKES:

5      Q.   So the arbitrator found that you had not

6  committed perjury and told any lies, correct?

7          MR. RODRIGUEZ:  Objection to form.

8          THE WITNESS:  You're wrong about that, sir.

9  BY MR. SWITKES:

10     Q.   I'm wrong?  Well, tell me what the

11 arbitrator's result was.

12     A.   You're asking me two different questions.

13     Q.   Answer that question.

14     A.   Okay.  What is the question?

15     Q.   What was the arbitrator's decision?

16     A.   The decision that he made, that I was going

17 to be terminated.

18     Q.   Because of what?

19     A.   Because of perjury, which they couldn't

20 prove.

21     Q.   What do you mean they couldn't prove?  He

22 was the one that found you did commit perjury on

23 multiple occasions, correct?

24         MR. RODRIGUEZ:  Object to form.

25         THE WITNESS:  He did?  He did?



Page 285

1  BY MR. SWITKES:

2      Q.   Did he?

3      A.   I'm asking you, did he?  Because perjury is

4  a crime, sir.  Perjury is a serious crime.  And --

5      Q.   Answer the question.  Did he find you

6  responsible for having committed perjury, yes, or no?

7           MR. RODRIGUEZ:  Object to form.

8           THE WITNESS:  That's what he claimed.

9  BY MR. SWITKES:

10     Q.   And that was in his final report, correct?

11     A.   Do you understand that I did not have a fair

12 trial; do you understand that?

13     Q.   Let me ask a very simple question.  Was it,

14 or was it --

15     A.   Did you hear me, sir?

16     Q.   Was it, or was it not, in his report that he

17 found you had committed multiple acts of perjury?

18           MR. RODRIGUEZ:  Objection to form.

19           THE WITNESS:  He wrote on there that I was

20      terminated for perjury but that he couldn't prove

21      what one or the other one said.  That's what he

22      said.

23           MR. SWITKES:  Could you read back what her

24      answer was, Madam Court Reporter?

25           THE COURT REPORTER:  Yes, one second.



Page 286

1            (Reads back previous answer.)

2  BY MR. SWITKES:

3       Q.   Did he find that you had multiple acts of

4  perjury, yes, or no?

5            MR. RODRIGUEZ:  Objection to form.

6            THE WITNESS:  I don't know how to answer

7       that question.

8  BY MR. SWITKES:

9       Q.   You can answer it yes, or no.

10      A.   I don't know how to answer that question.

11      Q.   What don't you understand?

12      A.   That I do not know how to answer that

13 question, sir.

14      Q.   Did you read his report?

15      A.   Yes, I did.  And I said that I did not know

16 how to answer that question.

17      Q.   So you're saying the report does not confirm

18 that you committed multiple acts of perjury?

19           MR. RODRIGUEZ:  Objection to form.

20           THE WITNESS:  I said, that I do not know how

21      to answer that question -- is what I said.

22 BY MR. SWITKES:

23      Q.   After reading the report, you don't know how

24 to answer that question?

25      A.   Excuse me?



Page 287

1     Q.   After reading the report, you don't know how
2  to answer that question?
3     A.   I don't know how to answer your question.
4  No, I don't.
5     Q.   Do you know what perjury is?
6     A.   Yes, I know what perjury is.
7     Q.   Okay.  Did the arbitrator find that you had
8  committed multiple acts of lying under oath, yes, or
9  no?
10         MR. RODRIGUEZ:  Repetitive.  And at this
11     point, you are just badgering the witness.
12         MR. SWITKES:  Answer the question.
13         THE WITNESS:  I can't answer that question.
14  BY MR. SWITKES:
15     Q.   Why can't you answer that one?
16     A.   Because I don't know how to answer it.
17     Q.   This was your termination arbitration --
18     A.   Correct.
19     Q.   -- and you've read it.  And you're telling
20  me you don't know how to answer that question?
21     A.   Your question?
22     Q.   Okay.  So after, you say you saw the vehicle
23  driving out of control; what do you mean by out of
24  control?
25     A.   Out of control, the way I saw the vehicle



Page 288

1  driving.

2      Q.   What does that mean?

3      A.   Driving out of control could mean that he

4  made a wide turn into oncoming traffic --

5      Q.   So all you're referring to was a wide turn?

6      A.   Excuse me?

7      Q.   All you're referring to was a wide turn?

8      A.   Well, you asked me and I answered you.

9      Q.   I'm asking you to clarify.

10     A.   Yes, sir.  Yes.

11     Q.   So the only thing that you're referring to

12  was a wide turn?

13     A.   A wide turn, he ran a red light.  He didn't

14  stop at a stop sign.

15     Q.   So reckless?

16     A.   Well, I said, out of control.  If you want

17  to label it reckless, you can.

18     Q.   It's what you're considering it.  Did you

19  consider it reckless?

20     A.   Was that a question?

21     Q.   Yes.

22     A.   Okay.  What is your question?

23     Q.   Do you consider it reckless?

24     A.   I said, out of control.  That's what I said

25  in my statement, out of control.



Page 289

1      Q.   You're not -- and my question following up

2   is, was his driving reckless, yes, or no?

3           MR. RODRIGUEZ:  Object to form.

4           THE WITNESS:  (No audible response.)

5   BY MR. SWITKES:

6      Q.   And your answer?

7      A.   I answered it.

8      Q.   No, you didn't.

9      A.   Okay.  Ask me the question again, sir.

10     Q.   Was his driving reckless?

11     A.   His driving was out of control.

12     Q.   Okay.  So we go down to Line 10:  "From

13  there, the subject refusing to stop.  He runs.  He

14  refuses to stop.  He attempts to ram different police

15  vehicles and then he runs this red light."

16          At that point is he driving reckless?

17     A.   At that time, per this statement, yes.

18     Q.   Okay.  And ma'am, you used the words, "he

19  attempts to ram different police vehicles," didn't

20  you?

21     A.   Yes, I did.

22     Q.   That was under oath, correct?

23     A.   Correct.

24     Q.   And you understood what the word, "ram"

25  means, correct?



Page 290

1      A.    I clarified it on my deposition on

2  February 2nd.

3      Q.    Ma'am, when you testified under oath on

4  the 1st of October, 2017, you used the word, ram.  And

5  that was your own language, correct?

6          MR. RODRIGUEZ:  Object to form:

7          THE WITNESS:  Yes, I used the word, ram,

8      because that's a common word to use -- ram,

9      ramming -- common practice.

10 BY MR. SWITKES:

11     Q.    And in your I.A., you know what the word

12 means don't you --

13     A.    I couldn't hear you.  The first part, you're

14 breaking up.  I couldn't hear you.  Sorry.

15     Q.    You used that same word in your I.A.  I just

16 read it to you.  So you've used the word.  You know

17 what it means.

18     A.    Well, I'm telling you how I've used it.

19 I've used it a lot.  That's the way we use it in

20 Hialeah.  It's common practice -- ramming.

21     Q.    It's not how anybody else -- it's how you

22 use it.  You understand the word, ram; don't you?

23     A.    It's how Hialeah uses it.  You heard the

24 whole recording of the other officers.  And you saw

25 the video that there is no ramming.  We all used the



Page 291

1  word, ramming, correct?

2      Q.   So it's asked on Line 14:  "Which red light.

3  At East 4th and 32nd, when he runs that light, he

4  makes a wide turn, going onto oncoming traffic, which

5  there wasn't that much traffic.  But there was another

6  vehicle in that lane.  So he put a citizen at risk."

7          Is that a lie, or is that the truth?

8      A.   That's the truth.

9      Q.   And then he is still refusing to stop,

10  correct?

11     A.   Yes, he is still refusing to stop.

12     Q.   Now in your testimony in your deposition,

13  taken by the plaintiff's attorney you went to consult

14  with, you indicated that there really wasn't a risk

15  and this chase should have been called off, correct?

16     A.   Say that again.

17     Q.   In your deposition you gave your consulting

18  attorney, you testified there wasn't any risk during

19  this chase and it should have been called off; do you

20  remember testifying that?

21         MR. RODRIGUEZ:  Form.

22         THE WITNESS:  Well, you're asking me about

23     the incident on East 4 and 32.  So you're

24     narrowing it down to Line Number 14.  And now

25     you're talking about the chase in general.



Page 292

```
 1          At East 4 and 32, yes, he makes a wide right
 2     turn.  So you need to be a little bit more
 3     specific with your question.  You're saying,
 4     East 4 and 32, but then you're talking about the
 5     chase in general, sir.
 6  BY MR. SWITKES:
 7     Q.   Ma'am, I just read your testimony.  And you
 8  could read along with me.  It's right up there on the
 9  screen.
10          It says:  "So we took the citizen" --
11     A.   I read that.
12     Q.   Okay.  And if he put citizens at risk and
13  he's running red lights and he's making wide turns and
14  he refuses to stop with police officers behind him,
15  are you telling me at that point the chase should have
16  been called off and there was no reason for it?
17          MR. RODRIGUEZ:  Form.
18          THE WITNESS:  Yes.
19  BY MR. SWITKES:
20     Q.   So in response to that, you, as a
21  responsible law officer of Hialeah, who is being paid
22  by the casino, immediately, stopped the pursuit, left
23  the chase, and went back to the casino, correct?
24          MR. RODRIGUEZ:  Form.
25          THE WITNESS:  Excuse me.  I didn't
```



Page 293

1      understand that.

2  BY MR. SWITKES:

3      Q.   Read it back.  Well, let me ask it again,

4  so we don't keep wasting time, listen to my

5  questions.

6           If there was no need for a chase at that

7  point in time, and you were being paid by the casino

8  to work off duty for their security, I assume at that

9  point you broke off the chase and went back to the

10  casino, right?

11      A.   No, I did not do that.

12      Q.   Well, I thought you just said, there was no

13  reason to pursue this and --

14           MR. RODRIGUEZ:  Objection to form.

15      Argumentative.

16           MR. SWITKES:  Who's talking over me?

17           Is that Domingo?

18           MR. RODRIGUEZ:  I objected.  I made an

19      objection.

20           MR. SWITKES:  Let me finish my question, so

21      then you cannot say the question is garbled.

22  BY MR. SWITKES:

23      Q.   If you say there was no reason to chase, and

24  you're working off duty for the security of the

25  casino, why didn't you go back to the casino if



Page 294

1  there's no reason for the chase?

2          MR. RODRIGUEZ:  Objection to form.

3          THE WITNESS:  I was already done at the

4      casino.

5  BY MR. SWITKES:

6      Q.   You were already what?

7      A.   Done -- finished my shift at that casino.

8      Q.   What time did the shift start?

9      A.   Oh, I don't remember.  You'll have to look

10  to see.  I don't remember.

11     Q.   What time did it end?

12     A.   I don't remember what time it ended.

13     Q.   What time is --

14     A.   You have to count the hours of it.  It was

15  either a three-hour or four-hour shift.  I don't

16  remember.

17     Q.   So in your testimony, when you said that you

18  left the casino while you were on duty, now you're

19  saying the shift was over and that's why you didn't

20  leave the shift --

21          MR. RODRIGUEZ:  Objection to form.

22          THE WITNESS:  I had a few minutes left.  I

23      had a few minutes left.  A few minutes left.  So

24      by the time I go back to the casino, I was done

25      at the casino.

Page 295

1  BY MR. SWITKES:

2      Q.   So if the chase shouldn't have proceeded,

3  you could have personally left the chase and gone

4  home?

5           MR. RODRIGUEZ:  Form.

6           THE WITNESS:  Or wherever I wanted to go.

7  BY MR. SWITKES:

8      Q.   Or wherever you wanted to go, but you didn't

9  do that, did you?

10     A.   No, I did not.  Because the chase wasn't

11  called off.

12     Q.   That doesn't mean anything.  You have --

13     A.   Yes, it does.  When an officer asks for --

14  if an officer asks for back-up and you are working off

15  duty, extra duty, on the road, it's your duty as an

16  officer to respond to back up that officer.

17           Now if an officer asks for back-up and you

18  don't respond, sorry, but you're a coward.  And you're

19  in the wrong line of work.

20     Q.   Or if you're a responsible police officer,

21  and you say the chase is not appropriate, then you

22  stop chasing, regardless of what anybody asks for

23  back-up; isn't that true?

24           MR. RODRIGUEZ:  Objection to form.

25           Argumentative.



Page 296

1           THE WITNESS:  No, that is not true.  If an

2      officer asks for back-up, you go as back-up.

3  BY MR. SWITKES:

4      Q.   And when the chase continues after that

5  request and you believe in your own opinion that chase

6  is inappropriate, you just keep chasing, because the

7  original call was for a back-up; that's your

8  testimony?

9           MR. RODRIGUEZ:  Objection to form.

10          THE WITNESS:  Excuse me?

11          MR. RODRIGUEZ:  It's a wild

12      mischaracterization of the testimony.

13          MR. SWITKES:  That's a speaking objection.

14      And it was an absolutely simple question.

15          So your answer is, after that speaking --

16          THE WITNESS:  I didn't get your question,

17      sir.  You went on and on.  I didn't get your

18      question.

19          You gave your opinion -- you gave your

20      opinion, you said a question, and you gave

21      another opinion.  What is your question?

22  BY MR. SWITKES:

23      Q.   If you think the chase is inappropriate,

24  even if you were called, or the general call for

25  back-up came out over the radio, you still continued



Page 297

1  to chase, is your statement?

2      A.   If an officer asks for back-up, yes.  If an

3  officer asks for back-up, yeah, I'm going to continue

4  to go.

5      Q.   And then you go on to say, and you seem to

6  have a lot of trouble confirming that today --

7      A.   Having trouble confirming what?

8      Q.   Don't interrupt me.

9      A.   I can't hear you, sir.

10      Q.   Line 23, follow along.  You have it right up

11  there on the screen on Page 5.

12          MR. SWITKES:  Go to the next page, please.

13  BY MR. SWITKES:

14      Q.   Can you read the words without even being

15  asked, on Line 23, your answer, while you're

16  paralleling, this chase, what you said?  Read it out

17  loud.

18      A.   (No audible response.)

19      Q.   Are you going to read it, ma'am?

20      A.   (No audible response.)

21      Q.   Hello?

22      A.   Can I read please?  Thank you.

23      Q.   Read it out loud.

24      A.   I'm not going to read it out loud.  I'm

25  going to read it to myself.



Page 298

1      Q.   No, you're going to read it out loud.  That
2  was what I asked you to do.

3      A.   Okay.  I'm going to read it to myself, sir.
4  Thank you.

5      Q.   So you're refusing to read the words that
6  you gave out loud?

7           I'm going to read it to you, since you
8  refuse:  "To be able to stop him because he's a threat
9  to the citizens, to be able to stop him on East 8th."

10          Now that you've read it and I've said it out
11  loud, ma'am, wasn't that your sworn testimony?

12     A.   (Reading quietly.)

13     Q.   I can't hear you, you're mumbling.

14     A.   (Reading quietly.)

15     Q.   What are you reading?

16          What are we listening to?

17     A.   What was your question, sir?

18     Q.   Isn't that your sworn testimony on Lines 23
19  through 25 on Page 5?

20     A.   Yes, it is.

21     Q.   So you just read that in the last two
22  minutes; were you lying when you said he became a
23  threat to citizens?

24          MR. RODRIGUEZ:  Objection to form.

25          THE WITNESS:  No.



Page 299

1  BY MR. SWITKES:

2      Q.   So why did you say the chase shouldn't have

3  been pursued?

4      A.   Because it was for -- well, at the time,

5  here -- well, really, we're not supposed to chase for

6  traffic infractions.  The officer at the time just

7  asked for a 315.

8           When an officer asks for a 315, which is

9  extreme back-up, the officers doesn't get on the radio

10 all into details.  The officer asks for

11 a 315.  You're responding to back up the officer.

12     Q.   So when you said he was a threat to

13 citizens, you didn't mean that; you were just saying

14 that, because you --

15     A.   No, if I was saying that he was a threat to

16 citizens, he was a threat to citizens.

17          What I'm saying is, you asked me, why did I go.

18 I went to back up the officer.

19     Q.   Page 6, you testify on Line 6:  "I can't

20 remember, he attempted to ram that police vehicle

21 also."

22          Was that your sworn testimony?

23     A.   Yes, it was.

24     Q.   On Line 11:  "he attempts to ram that

25 vehicle; was that your sworn testimony"?



Page 300

1      A.   Yes.

2      Q.   So when you use the word on the day of this

3  incident, you had no problem at all using it and

4  you're swearing again today that's what you testified

5  to, correct?

6           MR. RODRIGUEZ:  Form.

7           THE WITNESS:  Yeah.  We always use the word,

8      ram.  And I've always used the word, ramming.

9      But in this case, it's a common practice to use

10     the word, ramming.  We use ramming, but it's not

11     the actual.

12          And I believe that on my testimony from

13     February 2nd, I went into the details of saying

14     why I used the word, ramming and what does the

15     word, ramming mean.

16  BY MR. SWITKES:

17     Q.   And you think that someone needs an

18  explanation of ram and rammed?

19     A.   Well, the way that I used it, yes.

20     Q.   Okay.  And Page 7, Line 4:  "He comes out,

21  and then I see him and the when he sees me, he goes

22  head onto my car to ram me."

23          That was your sworn testimony, ma'am,

24  correct?

25     A.   Correct.



Page 301

1      Q.   And that was a lie?

2      A.   No, that was not a lie.

3      Q.   And again, you seem to be able to use the

4   word, ram, without any explanation.

5      A.   He didn't ask for an explanation on my -- he

6   didn't ask on my recorded statement or when I was

7   interviewed, what do you mean by ramming.  He didn't

8   get into that.

9           I used the word, ramming, how I was trained

10  and taught to use the word, ramming.  And that's

11  exactly why I used the word, ramming.

12     Q.   Everybody needs to explain the words they

13  use, right?

14     A.   Yes.

15     Q.   Okay.  And then on Line 9:  "Does he strike

16  you there"?  You answer:  "No, because I had to

17  swerve."

18           So you testified he tried to hit you and you

19  swerved and that's the only reason he didn't strike

20  you, correct, ma'am?

21     A.   (No audible response.)

22     Q.   Yes?

23     A.   I'm reading.  Give me just a second.

24     Q.   It's only eleven words.

25     A.   I'm reading before, so I can know where did



Page 302

1   that answer come from, did he need an explanation.

2           Okay.  What was your question?

3       Q.   That was your sworn testimony, wasn't it,

4   ma'am?

5       A.   Yes.

6       Q.   And on Page 8, Line 17:  "Now he's

7   disregarding, you know, all traffic lights and

8   disrespecting people in the street."

9           Wasn't that your sworn testimony?

10      A.   Yes, it was.

11      Q.   And so, like you've testified before in this

12  statement, he's disregarding traffic lights.  And that

13  has an "s" on it, doesn't it?

14      A.   Does what have an "s" on it?

15      Q.   Lights.  It doesn't say, light.  It says,

16  lights.

17      A.   On what line, sir?

18      Q.   Line 17 and 18, ma'am.  It's up on the

19  screen.

20      A.   Okay.  So yes, it does have a letter "s" on

21  it.

22      Q.   And he's disregarding people in the streets,

23  so there's no question, under oath on the date of this

24  incident, you're testifying how dangerous this

25  individual was, correct?



Page 303

1       A.    Well, that was -- you're asking the question

2    was this chase -- why wasn't it -- I forgot what you

3    asked me -- something about a -- that the chase was

4    called for or not, correct?

5       Q.    Ma'am, I'm asking you to swear again today,

6    that the words that you put in a sworn statement the

7    date of this incident were true, yes, or no?

8             THE WITNESS:  Yes.

9             MR. RODRIGUEZ:  Mr. Switkes, can we -- I'm

10       sorry.  I don't mean to interrupt.  But can we

11       take a two-minute break?  I need to deal with

12       something with my staff.

13            MR. SWITKES:  Okay.

14            (Pause in the Proceeding.)

15   BY MR. SWITKES:

16      Q.    Page 8, Line 17:  "Now he's disregarding,

17   you know, all traffic lights and disregarding people

18   in the streets.  There was a group of people standing

19   outside, pedestrians standing outside and it appeared

20   he was going to, like, injure one of those people."

21            Was that true, or was that a lie?

22      A.    That was true.

23      Q.    And then on Line 24, again, the word, being

24   used:  "So I stopped and then he rammed into my car.

25   When he rams into my car, he rammed like full speed



Page 304

1  into my car."

2          Was that true, or a lie?

3      A.   That was true.  It's just a little

4  exaggerated.

5      Q.   Exaggerated?

6      A.   Yes, sir.

7      Q.   "I didn't have time to reverse, he rams into

8  my car.  He rams into my -- he rams into my car

9  and --."

10          Page 9, Line 5:  "He rams into my car and

11  then when he rams into my car," -- using that word

12  three times -- "he puts his car in reverse and then he

13  was wearing, like, a black hoodie or something so he

14  tries to cover his face and then at the time, he's,

15  like, saying:  Fuck the police, fuck the police."

16          Was that true, or was that a lie?

17      A.   Can you bring the page up?

18      Q.   Excuse me?

19      A.   Can you move the page up?

20          MR. SWITKES:  Devang, are you on Page 9?

21          MR. RODRIGUEZ:  I'm on Page 8.  Do you want

22      me to go on Page 8 or 9?

23          THE WITNESS:  Nine, sir.

24          MR. SWITKES:  We just went into nine.  You

25      can hear my questions.  They're just out there to



Page 305

1        help you.  Go ahead to nine.

2              MR. RODRIGUEZ:  We're on nine.

3              MR. SWITKES:  We're on eight.  It's a little

4        slow.

5              MR. DESAI:  Oh, apologies.

6   BY MR. SWITKES:

7        Q.   So I just read through Line 9.

8        A.   (Reading quietly.)

9        Q.   Do you have to reread it to think that

10  that's the truth on that?

11       A.   I'm just making sure that what you read is

12  what the paper said.

13             And your question was, sir?

14       Q.   Was that the truth, or was that a lie?

15       A.   That was the truth that was exaggerated.

16       Q.   So you said on the tape, under oath, I'm

17  exaggerating?

18       A.   No, I'm saying -- what I'm saying is that I

19  said the truth, but it's a little exaggerating, like

20  using the word, ram, and rammed over here, and rammed

21  over there, and rammed, those are exaggerating words.

22       Q.   So you were intentionally exaggerating

23  under --

24       A.   No, sir.  I wasn't intentionally -- I was

25  coached before I gave this statement.

1    Q.   How long did you get coached for, ma'am?

2    A.   Right before my statement.

3    Q.   About what, how many minutes, two minutes?

4    A.   I wouldn't be able to tell you how many

5    minutes.

6    Q.   And at eight o'clock in the morning -- well,

7    give me your best approximation.

8    A.   I can't give you an approximation.

9    Remember, I said --

10    Q.   What do you mean you can't give me an

11   approximation?  You've -- (inaudible.)

12    A.   Can I talk?  You asked me a question.

13   Please --

14    Q.   Only if you answer the question.

15       MR. RODRIGUEZ:  What's your question,

16       Mr. Switkes?  Which one do you want her to

17       answer?

18       MR. SWITKES:  Not, which one, Counsel,

19       objection to the form.

20   BY MR. SWITKES:

21    Q.   Approximately, how long?

22    A.   How long before I gave the statement?

23   Before I was put on the record, before I was

24   Recorded, I was coached --

25    Q.   You said you were coached, ma'am.  I asked



Page 307

1  you --

2       A.   Yes, I was coached.

3       Q.   You said you don't know.  And I've asked you

4  to approximate.  That's the question before you.

5       A.   Well, I had already told the detective

6  exactly what had happened.  And then, after I tell him

7  what happened, he coaches me.  He says, well, you need

8  to say this, and you need to say that.  And these are

9  the words that you need to use.  So that's why I'm

10  saying, it's exaggerated.

11       Q.   So I asked you how long that took, ma'am.

12  And I've asked you, approximately.

13       A.   Approximate, maybe, five minutes.

14       Q.   Okay.

15       A.   Maybe four minutes.

16       Q.   Okay.  So he didn't write out a script for

17  you?

18       A.   No, it was verbal.  We talked.

19       Q.   And you raised your right hand as an officer

20  sworn to tell the truth in this statement?

21       A.   No, I did not raise my right hand.

22       Q.   Did you swear to tell the truth, ma'am?

23       A.   Yes.  And I told the truth.  Like I said, I

24  told the truth.  I never lied under oath.  I didn't

25  lie that day.  I didn't lie this day.  I swore under



Page 308

1  oath, and like I said, I was coached.  Yes, I did

2  exaggerate, but I didn't lie about it.

3      Q.   Ma'am, if someone told you to lie, does it

4  justify lying?

5      A.   Excuse me?

6      Q.   If someone tells you to lie, are you telling

7  me, as a sworn officer, that you're justifying it

8  because someone else told you to do it?

9      A.   I never said --

10          MR. RODRIGUEZ:  Objection to form.

11          THE WITNESS:  I never said he told me to

12      lie.  I said I was coached -- different --

13      coached -- lie -- I was coached.  And I just

14      told you when you said, are these the statements

15      that you said, I said, yes, they're just a bit

16      exaggerated.

17  BY MR. SWITKES:

18      Q.   Okay.  But three or four minutes, you

19  couldn't have memorized, unless you're a professional

20  actress, that they were going to ask you every

21  question that they asked under oath and you were --

22      A.   Is that your question?

23          MR. RODRIGUEZ:  Hold on.  Let him finish

24      asking his question.

25          MR. SWITKES:  That would be nice.



Page 309

1  BY MR. SWITKES:

2      Q.   And you would, word for word, answer from a

3  script, is what you're testifying to?

4      A.   No, not --

5           MR. RODRIGUEZ:  Objection to form.

6           THE WITNESS:  Not word for word, sir.  Like

7       I said, it was exaggerated.  I never said that I

8       was coached word for word.  I was coached.  Just

9       like I said earlier that I would only answer the

10       question that they asked.

11  BY MR. SWITKES:

12      Q.   So if someone --

13      A.   Do you remember that?

14      Q.   So if someone asks you to commit perjury,

15  it's okay if someone asks you?

16           MR. RODRIGUEZ:  Objection to form.

17           THE WITNESS:  No, it's not.

18  BY MR. SWITKES:

19      Q.   Okay.  So when I asked you whether these

20  things are true, that you testified to under oath, I'm

21  assuming that you testified truthfully; wouldn't that

22  be a fair assumption?

23           MR. RODRIGUEZ:  Form.

24           THE WITNESS:  It's not an assumption.  It's

25       exactly what happened.



```
                                                   Page 310

 1  BY MR. SWITKES:

 2       Q.   Okay.  So on Line 9 --

 3       A.   I'm not done answering.  Thank you.  I said

 4  that I answered truthfully.  And I'm going to say it

 5  again.  I answered truthfully, it's just a bit

 6  exaggerated, like I said.  And I said I was coached on

 7  it.  I said it -- I'm saying it now today.  I said it

 8  on February 2nd when they took my first depo.  I said

 9  the same thing.

10       Q.   You said on February 2nd that you lied on --

11       A.   I never said that I lied.  Don't put words

12  into my mouth.  I never said that I lied.

13       Q.   So your testimony --

14       A.   I don't know where you're getting that from.

15       Q.   So let's clear this up.  So you're statement

16  on October 1st, 2017 and your statement on

17  October 5th, 2017, were the truth, correct?

18            MR. RODRIGUEZ:  Form.

19            THE WITNESS:  They were the truth and they

20       were exaggerated, because I was coached into

21       using the word, ram.

22  BY MR. SWITKES:

23       Q.   Okay.  So on Page 9, when you go on to say,

24  the question was:  "He's screaming this out the

25  window?"  Your answer was:  "Yeah, he screaming this.
```



National Reporting Service    (305) 373-7295

Page 311

1  I can hear him, and then at that point, he reverses,

2  he hits the unit that's behind him, he rams the unit

3  behind him and then he goes to open the door, like

4  he's going to jump out."

5         Was that true, ma'am?

6     A.   Yes, that was true.

7     Q.   "And I thought he was going to bail out so I

8  jump out of the car to try to beat him to bailing out

9  and then he puts the car in, like, drive and he

10 attempts to, like, run me over."

11        Was that true?

12    A.   Yes, it was true.  And what I meant by that,

13 by run me over, like I explained to the detective was,

14 I said, he drove towards my way.  I said it just like

15 that.  And that's why I jumped out of the way.

16    Q.   No, you didn't say it just like that.  You

17 said --

18    A.   Yes, I did.

19    Q.   -- it exactly -- excuse me.  You said it

20 exactly as I read it -- "the car, in like drive and he

21 attempts to, like, run me over."

22        MR. RODRIGUEZ:  Objection to form.

23 BY MR. SWITKES:

24    Q.   That's exactly what you said, isn't that

25 true, ma'am?



Page 312

1      A.    That's what it says there.  Yeah, that's

2  what I said.  But like I said, I was coached.  When I

3  said, he drove his car towards me, he says, no, you

4  need to say that he tried to run you over to justify

5  it.

6      Q.    So you're saying that when he drove towards

7  you, that was the truth.  But when you testified under

8  oath and said, he attempts to run me over, that wasn't

9  the truth?

10      A.    No, that is the truth.  If a car is

11  running -- if a car is driving in your direction,

12  right, at a high speed, what is the person attempting

13  to do?

14      Q.    Run you over.

15             Were you asking me?

16      A.    Asking you what?

17      Q.    You just said, what is the person attempting

18  to do.  And I said, run you over.  And I didn't --

19      A.    I'm saying, running -- if a car is driving

20  at a high speed towards you, right, it's the same

21  thing as trying to run you over.  You just agreed.

22      Q.    And I agreed that that was your statement

23  verbatim.  I just read it, right?

24             MR. RODRIGUEZ:  Objection to form.

25             THE WITNESS:  I need to go put money in the



National Reporting Service   (305) 373-7295

Page 313

1      meter.

2            MR. SWITKES:  You couldn't do that during

3      the last break?

4            THE WITNESS:  No, I could not.

5            (Pause in the proceeding.)

6  BY MR. SWITKES:

7      Q.   Okay.  Then Page 9, Line 17:  "I jump out of

8  the car to try to beat him to bailing out and then he

9  puts the car in, like, drive.  And he attempts to,

10 like, run me over."

11           That was the truth, ma'am, right?

12     A.   That was the truth, like I said before.  It

13 was the truth, a little exaggerated, whether it's the

14 truth.

15     Q.   And you don't consider exaggerating a lie?

16     A.   No, I don't.

17     Q.   You just consider it, what, fudging?

18           MR. RODRIGUEZ:  Objection.  Form.

19           THE WITNESS:  I consider it an

20      exaggeration.

21 BY MR. SWITKES:

22     Q.   Page 11:  "So then he comes over, he goes

23 over the railroad tracks, he's still driving

24 erratical."

25           What does erratical mean?



Page 314

1      A.   Out of control.

2      Q.   Excuse me?

3      A.   Out of control.

4      Q.   And then on Line 11, you maybe describe

5  erratical, if there's such a word:  "Like, he's

6  swerving, swerving, he's swerving because he's trying

7  to attempt to ram the other police cars that are

8  there."

9           Was that the truth or a lie?

10          MR. RODRIGUEZ:  Objection to form.

11          THE WITNESS:  That was exaggerated.

12  BY MR. SWITKES:

13     Q.   So then it was a lie.

14          MR. RODRIGUEZ:  Form.

15          THE WITNESS:  I said, exaggerated.

16  BY MR. SWITKES:

17     Q.   I'm having trouble understanding what you

18  define as exaggerating versus what is a lie; what is

19  your definition of that?

20     A.   A lie is not telling the truth.  A --

21     Q.   And exaggerating is?

22     A.   Huh?

23     Q.   And exaggerating is?

24     A.   Exaggerating is that you're making it seem

25  or appear bigger than what it is.



Page 315

1      Q.   So you're lying.

2      A.   Instead of using the word, big, you use the

3  word, huge.  You're exaggerating.  Does that state it

4  to you better?

5      Q.   Exaggerating would be you think he's

6  going 50, when he's going 35.  Saying he was speeding

7  or he wasn't speeding, between those two, was a lie;

8  do you agree with that?

9          MR. RODRIGUEZ:  Object to form.

10          THE WITNESS:  That's your opinion.  To me,

11      exaggerating is exaggerating.  Like I said,

12      something is big, where it says something is

13      huge.  That's to me, is exaggerating.  It's still

14      size.

15          You can probably say this cup is full all

16      the way to the top.  And I say, yeah, the cup is

17      full.  And I say the cup is full to the rim.

18      It's still the same thing.  I'm exaggerating,

19      that it's all the way up to the rim.

20  BY MR. SWITKES:

21      Q.   So an attempted running over of a police

22  officer, is a certain crime.  If he's just driving

23  fast, that's a different offense.  Is that an

24  exaggeration?

25          MR. RODRIGUEZ:  Objection to form.



Page 316

1          THE WITNESS:  That doesn't make any sense.

2      That's not -- that doesn't make any sense.

3      You're comparing apples to bananas.  That's what

4      you're doing right now.

5  BY MR. SWITKES:

6      Q.   Trying to run me over, as a police officer,

7  that (inaudible.)

8      A.   You're coming in and out, sir.

9      Q.   Trying to run over a police officer is an

10 aggravated felony, correct?

11     A.   Yes.

12     Q.   Is that an exaggeration?

13     A.   Well, it depends on what happened.  What are

14 you comparing it to?

15     Q.   I'm comparing it to the truth.

16     A.   That's all you said.  You didn't say --

17 you're not saying --

18     Q.   If you testified under oath, and you see it

19 in front of you, he tried to run me over, that would

20 be --

21     A.   And I said --

22     Q.   -- an attempted battery on a police officer,

23 which is a felony.  If you exaggerate, is that a

24 crime?

25          MR. RODRIGUEZ:  Objection to form.



Page 317

1          THE WITNESS:  (Speaks quietly.)

2  BY MR. SWITKES:

3      Q.   Excuse me, you can't talk to your "not

4  attorney".  You have to talk to us.

5      A.   Yeah, I'm saying that -- no, I wasn't

6  talking to him.  I was just saying, you're not saying

7  the same thing that I said.  I told you that I said

8  that he drove in my direction, toward me, at a high

9  speed.  He was accelerating.  That's what I said.

10          When I was coached, I was said, say that he

11  drove towards you to try to run you over.  Same thing,

12  he's driving high speed towards me, accelerating, as

13  to he's driving towards me.  It's the same thing --

14      Q.   If someone were --

15      A.   -- as driving towards you.  At the end of

16  the day, it's the same thing.

17      Q.   If it can be charged with a different crime,

18  is it the same thing?

19      A.   Excuse me?

20      Q.   If the individual can be charged with a

21  different crime, is it the same thing?

22          MR. RODRIGUEZ:  Objection to form.

23          THE WITNESS:  What different crime?

24  BY MR. SWITKES:

25      Q.   Well, if he's just driving, in your



Page 318

1  definition, erratical, that might be reckless driving.

2  If he's trying to run me over, that would be a serious

3  felony, correct?

4           MR. RODRIGUEZ:  Form.

5           THE WITNESS:  Well, sir, here where I use

6      the word --

7  BY MR. SWITKES:

8      Q.   Answer my question.  Yes, or no?

9      A.   I can't answer your question, because you're

10  comparing apples to bananas.  I put here -- on my

11  statement it says, are you -- you're saying, driving

12  erratical.

13           And now you're bringing up on Page -- I

14  don't know what page it is because this page here that

15  we're sharing on -- okay, on Page 11, thank you.  On

16  Page 11 it states about driving erratical.

17           The page before, talks about him running

18  over, so you're comparing one incident to another

19  incident.  They're all tied in together, but you're

20  comparing one thing with another.

21           I didn't say, oh, he was driving erratical

22  and he drove in my direction to try to run me over.

23  This is talking about him swerving.  The other page is

24  talking about him driving towards me to run me over.

25      Q.   Ma'am, to make things very clear to you --



Page 319

1       A.   It's two different incidents.

2       Q.   Okay.  Let me make this very clear to you.

3  If a person can be charged with a misdemeanor, and you

4  exaggerate and give sworn testimony that he committed

5  a felony, do you think that's a lie?

6            MR. RODRIGUEZ:  Objection to form.

7            THE WITNESS:  No, if you're going to charge

8       a person with a misdemeanor, and you exaggerate

9       what happened on the misdemeanor, saying exactly

10      what happened, you're just using different words,

11      but it still has the elements of the crime and

12      exactly what he did, that's not lying.

13           Now you're talking about charging somebody

14      with a misdemeanor --

15  BY MR. SWITKES:

16      Q.   Ma'am, you answered the question.

17      A.   -- and charging somebody with a felony.

18  We're back to comparing apples and bananas.

19      Q.   Talking about somebody driving erratically

20  and somebody trying to run a police officer over are

21  two different things.  And --

22      A.   That's what I said.

23      Q.   -- the difference is very significant.  And

24  if you are lying about his intent and what you

25  observed, someone could be charged with a greater



Page 320

1  crime than what he actually did; do you agree with

2  that, or not; yes, or no?

3       A.   No, I don't agree.  Because you're talking

4  about one incident.  You're comparing one incident to

5  another.  Let's stick to one incident.  Do you want to

6  talk about driving erratical --

7       Q.   Okay.  Let's talk about --

8       A.   -- or do you want to talk about running

9  over?

10      Q.   Are you done?

11      A.   Are you done?

12      Q.   Page 13, it's real clear.  It's in black and

13 white.

14      A.   Gray and black.

15      Q.   I accept your correction.  In black, the

16 question:  "Did you fear for your life when the car

17 tried to go toward you?"  And in gray, your answer is,

18 "yes."

19      A.   What line, sir?

20      Q.   Is that a lie, or is that the truth?

21      A.   Yes, of course, I feared for my life.

22 That's why I jumped out of the way.

23      Q.   So that was the truth, correct?

24      A.   Everything's been the truth, like I said,

25 just exaggerated.  There, did you fear for your life



Page 321

1  when the car tried to go towards you.  Yes, that's why

2  my actions were to jump out of the way.

3       Q.   So your answer is true, correct?

4       A.   For --

5       Q.   Or were you exaggerating?

6       A.   For the third time, yes.

7       Q.   Third time, yes, what?  You were

8  exaggerating, or that's the truth?

9       A.   You need to listen, sir.  Listen to my

10  answer.  I said for the fourth time, I'm going to

11  repeat it.  For the fourth time, my answer is yes.

12  Yes, I did fear for my life.  And yes, what it says

13  there is exactly what happened.  So the answer is yes,

14  for the sixth time.  Yes, seventh.

15       Q.   So you weren't exaggerating, is the

16  question?

17       A.   No, I was not.

18       Q.   There we go.  Simple.  And you testified in

19  Page 14, ma'am, Line 3:  "What did you do, jump out of

20  the way?  Yes I did.  He also tried to run over

21  another female officer."

22            Is that the truth?

23       A.   Yes, it is.

24       Q.   And you identified that officer as Officer

25  T. Hernandez, correct?



 1     A.   Correct.

 2     Q.   Okay, ma'am.

 3          MR. SWITKES:  Do you have a picture that

 4     you can place up on their screen Devang?

 5          MR. DESAI:  Yes.  Right there.

 6          MR. SWITKES:  We're going to mark this in

 7     the record.

 8  BY MR. SWITKES:

 9     Q.   Ma'am, can you see that photograph?

10     A.   Yes, I can.

11     Q.   And can you see the white police vehicle?

12     A.   Yes, I can.

13     Q.   And was that your vehicle?

14     A.   Yes, it is.

15     Q.   Okay.  And where is it parked in relation to

16  the intersection where this took place, ma'am?

17     A.   Where is it parked?

18     Q.   Yes, ma'am.

19     A.   It's parked on the westbound lane, facing

20  eastbound, closer to the median.  So me and the

21  inner -- it's in the inner lane.

22     Q.   Okay.  And can you count the columns away

23  from the intersection that car is parked?

24     A.   One, two, yes, the second.

25     Q.   How about four?

Page 323

1     A.    Four, from where the car is?  It's two.

2     Q.    What car are you talking about?

3     A.    Okay.  Which car are you talking about, sir?

4     Q.    Okay.  You see the car parked there?

5     A.    Which car; there's three cars?

6     Q.    Isn't there a police car in front of yours?

7     A.    Yes, there's a police car in front of mine.

8     Q.    And whose car was that?

9     A.    I have no idea whose car that -- that's a

10    sergeant's car.

11    Q.    That was what?

12    A.    That looks like it's a sergeant's car.

13    Q.    Okay.  And he's in front of where your car

14    is parked, correct?

15    A.    Yes, because he came after everything was

16    said and done.

17    Q.    Okay.  But how much space between the

18    intersection and the front of your vehicle would you

19    say there is?

20    A.    It's a lot of space.  My vehicle was backed

21    up so that car could park there and they could put up

22    the yellow tape.  Because my car was going to get

23    towed in, because it was involved in an accident.

24          When a police vehicle is involved in an

25    accident, it gets towed in.



Page 324

1        Q.    So are you telling me that when I asked you

2    the question where your car was, you said, it was the

3    closest vehicle to the Lester Machado vehicle,

4    correct?

5        A.    Yes, it was.

6        Q.    And then you're telling me that after the

7    shooting, you moved your car away?

8        A.    No, I didn't move my car, because I wasn't

9    there.  After the shooting, and after I spoke to the

10   state attorney -- the gentleman from the state

11   attorney -- and I spoke to the chief, I had to walk

12   from there all the way to the restroom, almost at

13   East 8th and 25, to use the restroom.

14            So I didn't move the car.  And that car

15   ended up, supposedly, getting towed into the station

16   because they could not be driven, because it was

17   involved in an accident.  I know you don't want to

18   hear it, but that's the truth.

19       Q.    I don't want to hear anything about where it

20   was towed.  I'm trying to get you to define the

21   distance that vehicle is from the intersection.  I

22   don't want to know anything about it's towing or what

23   happened to it afterwards.

24            So let's get back to the question.

25       A.    Okay.



National Reporting Service   (305) 373-7295

Page 325

1      Q.   This vehicle, where it's here, would you

2    agree that if you hid behind that vehicle, on the

3    left-hand side, near the wheel well on the driver's

4    side, you could not see the Machado vehicle, passenger

5    side?  Would that be a fair statement to make?

6      A.   Yes, because that vehicle wasn't parked

7    there, or stopped there.

8      Q.   Yep.  Everybody moved their vehicles from

9    here.  And your vehicle, obviously -- there's no

10   picture that you said shows where your vehicle is in

11   the westbound lane, where you say it was, right?

12           MR. RODRIGUEZ:  Objection to form.

13   BY MR. SWITKES:

14     Q.   Right?

15     A.   Excuse me?

16           MR. SWITKES:  Take the photograph off.

17           Let's go to the re-creation statement under

18       oath.

19           MR. DESAI:  Do you want me to play it, Bob?

20           MR. SWITKES:  Play it and stop it after her

21       sworn.

22           (Video recording is played.)

23           MR. RODRIGUEZ:  Just so you know, the audio

24       is not understandable on this end.

25           MR. SWITKES:  Can you see if you can



Page 326

1      increase the volume, Devang?

2           MR. DESAI:  It's as loud as it can go.

3           MR. RODRIGUEZ:  I've got my volume turned

4      up 100 percent, as well.

5           MR. SWITKES:  Stop.

6           (Video recording is stopped.)

7  BY MR. SWITKES:

8      Q.   Do you recall being sworn to tell the truth,

9  ma'am, and raise your right hand?

10     A.   Yes.

11     Q.   Did you tell the truth?

12     A.   I told the truth.  And I was coached.  And

13  you can tell in the video when you start seeing it.

14     Q.   I'm going to ask you again, did you tell the

15  truth on the date you were sworn in to tell the truth,

16  yes, or no?

17           MR. RODRIGUEZ:  Objection to form.

18           THE WITNESS:  Yes, I told the truth.  I

19      answered their questions, only the questions that

20      they asked me.

21  BY MR. SWITKES:

22     Q.   The questions that were asked, your answers

23  were the truth, yes, or no?

24     A.   Yes.

25     Q.   Okay.



Page 327

```
 1          MR. SWITKES:  Play.

 2          (Video recording is played.)

 3          MR. RODRIGUEZ:  There is no audio at all,

 4     now, on this end, just so you know.

 5          MR. SWITKES:  Okay.  I'm just going to go

 6     through the outline that I have.

 7          Devang, if you can fix the audio, then we'll

 8     play it.  But other than that, I can do it just

 9     from my outline.

10          (Video recording is stopped.)

11  BY MR. SWITKES:

12     Q.    They asked you to locate the vehicles at the

13  scene in the re-creation; isn't that correct, ma'am?

14     A.    That they asked me what?

15     Q.    To locate where the vehicles were during

16  this incident, correct?

17     A.    Yes.

18     Q.    And you directed the vehicles to them and

19  told them where the vehicles were, truthfully,

20  correct?

21     A.    Correct.

22     Q.    And you testified that you saw Mr. Machado

23  make a right-hand turn from 7th onto 25th, correct?

24     A.    Yes.

25     Q.    And you told them, at 2:18 of this tape,
```

Page 328

1 that he rammed your vehicle; isn't that correct?

2          MR. RODRIGUEZ:  Form.

3          THE WITNESS:  At 2:18, you would have to

4     play it to see if that --

5 BY MR. SWITKES:

6     Q.  At 2:18 -- okay.

7          MR. SWITKES:  Let's play it.

8          MR. DESAI:  Can you guys hear that better?

9          MR. SWITKES:  Yeah.

10          MR. RODRIGUEZ:  No, it's horrible.

11          MR. SWITKES:  If he talks over it, he won't

12     hear it.  Let's try it and let's see if she can

13     hear it.  We're up to the point where I asked

14     her, where she just testified on 7th he made a

15     right onto 25th.  Go ahead.

16          (Video recording is played.)

17          MR. SWITKES:  Stop it Devang.

18          (Video recording is stopped.)

19 BY MR. SWITKES:

20     Q.  You just heard yourself say the subject

21 vehicle rammed my vehicle, correct?

22     A.  Correct.  But I was coached to say that.

23 And if you can see my body language and how I'm

24 looking around, you can tell.

25     Q.  Okay.  Was it the truth, or was it a lie,

Page 329

1  that you testified he rammed your vehicle?

2          MR. RODRIGUEZ:  Form.

3          THE WITNESS:  Yeah, he turned the corner,

4      and he impacted the front of my vehicle, yes.

5  BY MR. SWITKES:

6      Q.   Did you testify under oath he rammed my

7  vehicle, yes, or no?

8      A.   Yes, I did.

9      Q.   Okay.

10         MR. SWITKES:  Play the tape.

11         (Video recording is played.)

12         MR. SWITKES:  Stop.

13         (Video recording is stopped.)

14  BY MR. SWITKES:

15     Q.   Is that the truth; that's where you were

16  standing at that time?

17     A.   Yes.

18     Q.   Okay.

19         MR. SWITKES:  Play the tape.

20         (Video recording is played.)

21         MR. SWITKES:  Stop.

22         (Video recording is stopped.)

23  BY MR. SWITKES:

24     Q.   Was that the truth?

25     A.   The car -- yes, it was the truth.  The only



Page 330

1  thing that -- Teannie, I don't know exactly where she

2  was standing, but she was somewhere to my rear -- to

3  the side of me.  Exactly where, I can't locate her,

4  exactly where.  But she was close to me, behind me to

5  the side.  She wasn't in front of me.  She was behind

6  me to the side.

7       Q.   Okay.  So if you testified in your

8  deposition that she was parallel with you, that

9  wouldn't be correct?

10      A.   That she was parallel to me?

11      Q.   Yeah.

12      A.   She was next to me, but I can't tell you,

13  like, I can't tell you exactly where.  But she was --

14  on this scene here, she was a little behind me, to the

15  side.  But she wasn't parallel that we could hold

16  hands, no, not like that.

17      Q.   Okay.

18           MR. SWITKES:  Play the tape.

19           (Video recording is played.)

20           MR. SWITKES:  Stop.

21           (Video recording is stopped.)

22  BY MR. SWITKES:

23      Q.   Okay.  So the question was just posed to

24  you, could he have escaped by going over the median,

25  and your answer was yes; was that the truth?



Page 331

1      A.   Well, common sense, yeah.  When I told

2   him -- when I was asked if he could go off the record,

3   I said, you would have to ask him that question.  And

4   they said, well, use your common sense, yeah, he can

5   go the other way.  He can go up off the other side.

6      Q.   So are you saying this tape that I'm

7   watching and that you're watching was stopped, and

8   then you had a discussion with --

9      A.   No, it was not stopped.  It was --

10     Q.   -- whoa, whoa, whoa, let me finish --

11  Detective Garcia, and then they started the tape

12  again?

13     A.   No, I never said the tape was stopped.  This

14  tape was never stopped.  We were coached before --

15  before they recorded this.  And even before this, we

16  had a meeting at the training building where they

17  discussed that we were going to do a re-enacting of

18  what took place that night at 7 and 25.

19          We only did a re-enactment of 7 and 25.

20  They didn't do a re-enacting at the final stop.  It

21  was just here.

22          And in that meeting, that's where they

23  talked -- they said, okay, we're going to place the

24  cars.  And then I was told, why didn't you say that

25  Lester Machado had a gun.  And I said, I'm not saying



Page 332

1  that, I didn't see a gun.

2      Q.   Ma'am, let's try to stay with the question.

3  Because you have --

4      A.   You were listening up until now when I said

5  the part about the gun.

6      Q.   You're going on and on about things that

7  have nothing to do with the question.

8      A.   Well, you're asking so I had to explain to

9  you that --

10      Q.   You're explaining what happened at a meeting

11  that we haven't discussed at all.  You want to say

12  these things, but it has nothing to do with my

13  question.

14      A.   No, I'm trying to answer your question and

15  make it clear.  It's not what I want to, I'm telling

16  you what I have to.

17      Q.   Somehow telling me about a meeting that you

18  had -- are you saying in the meeting with all of the

19  officers, they told you what to say?

20      A.   Yes, we talked about it.  And then when we

21  came back here -- when we came back here to the scene

22  that we pulled into that parking lot, when we were

23  sitting in Carlos Hernandez's vehicle, it was myself

24  and Teannie, yes.  Does that answer your question,

25  sir?



Page 333

1           MR. SWITKES:  Play the tape.

2           (Video recording is played.)

3           MR. SWITKES:  Stop.

4           (Video recording is stopped.)

5  BY MR. SWITKES:

6      Q.   Was that the truth?

7      A.   What part?

8      Q.   That I just played for you, you jumped out

9  of the way.

10     A.   Yes, I jumped out of the way.

11     Q.   Okay.  Because the car was coming right at

12  you, correct?

13     A.   Correct.

14     Q.   Okay.

15          MR. SWITKES:  Devang, play the tape.

16          (Video recording is played.)

17          MR. SWITKES:  Stop.

18          (Video recording is stopped.)

19  BY MR. SWITKES:

20     Q.   Okay.  The question was asked, did we hear

21  gun fire.  And you use both of your arms to

22  demonstrate, pointing west, that the shots were coming

23  from the west; isn't that correct?

24     A.   Yes, because that's what I was coached.  And

25  that's why he did the same thing, and the officer that



Page 334

1  was on the other side, that you cannot see on the

2  camera, did the same thing.

3       Q.   Ma'am, I'm --

4       A.   I'm answering your questions.

5       Q.   No, you're not.  You're --

6       A.   Yes, I am.  I'm answering your questions,

7  sir.

8       Q.   I didn't ask you anything but, did you just

9  hear on the video that you said shots were fired, and

10  you pointed both arms in the direction of west.  Was

11  that the truth?

12           MR. RODRIGUEZ:  Objection to form.

13           THE WITNESS:  It was northwest.

14  BY MR. SWITKES:

15       Q.   Okay, northwest.  And the Machado car was

16  further west of you at the point where you're

17  re-creating this, correct?

18       A.   Where I'm what?

19           MR. RODRIGUEZ:  Objection to form.

20  BY MR. SWITKES:

21       Q.   You're doing this re-creation.  At this

22  point, you're just about parallel with the front of

23  your car.  At this point, the Machado's vehicle is

24  further west of you, correct?

25       A.   Further west, a little bit --



Page 335

1      Q.   Do you see where you're standing on the

2  roadway, ma'am?

3      A.   I said, a little bit, sir.  Did you hear me?

4      Q.   Do you see where you're standing in the

5  roadway, as this video was stopped right here?

6      A.   Of course, I see it.

7      Q.   Okay.  Do you see the Machado vehicle in

8  this video?

9      A.   No, I do not.

10     Q.   And that's because it's further west of

11  where you're standing in the roadway; isn't that

12  correct?

13     A.   No, it's not.  It's because of the angle of

14  the person holding the camera.

15     Q.   So you're saying the Machado vehicle is

16  further east from where you're standing at this point

17  in the re-creation?

18          MR. RODRIGUEZ:  Objection to form.

19          THE WITNESS:  No, it's west.  Do you have

20      the -- sir, let me ask you a question.  Do you

21      have the video from Hialeah Hospital that

22      shows -- they have good video --

23          MR. SWITKES:  Ma'am --

24          THE WITNESS:  -- that has other incidents

25      that I've worked.  Do you have the video that



Page 336

1       will show where all the cars are at?

2             MR. SWITKES:  Ma'am, this is a --

3             THE WITNESS:  Or the one from the strip

4       club, or the one from there from the corner, from

5       the doctor's office?

6             MR. SWITKES:  Ma'am, I don't know why you

7       want to delay this.

8  BY MR. SWITKES:

9       Q.   It's a very simple question.  In this video,

10 where I've stopped it at 5:07, is the Machado vehicle

11 further west of where you're standing, yes, or no?

12      A.   A little bit, west, yes.

13      Q.   Okay.  That was the question.

14      A.   Okay.

15      Q.   And as you're pointing west, you're saying

16 you heard shot, correct?

17            MR. RODRIGUEZ:  Form.

18            THE WITNESS:  Correct.

19 BY MR. SWITKES:

20      Q.   How many shots did you hear at this time?

21      A.   I heard one shot first, one shot.

22      Q.   Okay.  And then how much time is it between

23 the first shot you heard and the next shot?

24      A.   Oh, I don't know.  Let me finish answering

25 your question, your first question, when you said how

Page 337

1  many shots did I hear.

2        I heard one shot first.  That was supposed

3  to be a warning shot.  That's what they labeled it, a

4  warning shot.  And then after, I heard about four

5  shots.

6        Q.   Okay, ma'am, now, answer my question.

7        A.   So it's a total of five shots.

8        Q.   You heard a total of five shots, but you

9  heard one shot, and then how long a time was it

10  between the first shot and the second shot?

11        A.   It was quick.  It was rapid.  It was one

12  shot, and then the other shots came.  It was, like,

13  one shot, pause, and then the other shots.

14        Q.   Okay.  So there was one shot, and then there

15  was four shots?

16        A.   There was one shot.  There was a pause.  And

17  then there was four shots.

18        Q.   Have you listened to the audio of the

19  shooting at this scene?

20        A.   Yes, I have.

21        Q.   So you know what you just testified to is

22  totally wrong, right?

23        A.   I'm testifying to the day.  I'm not going

24  off the video.  Or I'm testifying as me being there,

25  what I heard, and what I saw.



Page 338

1      Q.   Ma'am, I just asked you a specific question.

2   Did you listen to the audio of the shots at 7th

3   and 25th, yes, or no?

4      A.   I've heard it before.  Yes, I have.

5      Q.   And during that audio, did you hear one

6   shot, followed by a pause, and then four shots?

7      A.   You would have to play the video.  I'm

8   telling you the way that I can see it.  There was one

9   shot.  There was a pause, quick pause, and then it

10  was, shot, shot, shot, shot.

11     Q.   Okay.  And I just told you -- and I don't

12  have to do anything.  I asked you if you've listened

13  to the audio of the shots at 7 and 25th, and you said,

14  yes.

15     A.   Yes, I listened to them on February 2nd, was

16  the last time that I heard it, when I did my depo and

17  they played it.

18     Q.   And you just testified there was one shot

19  and then a pause and then four shots.

20     A.   Well, I didn't say that's what I heard on

21  the tape.  You asked me, how many shots did you hear.

22  I said, I heard one shot, a pause, and then I heard

23  four shots.

24          Then you asked me, did you hear the tape of

25  the shooting.  I said, yes, I did.



Page 339

1              And you're saying, so you are not testifying

2    that, well, you know, you lied because you said you

3    heard one and then you heard four and that's not

4    what's on there.

5              I'm not testifying to what I heard on the

6    tape.  I'm testifying to me being there and what

7    happened and how many shots I heard.

8         Q.   Okay.  We got that explanation.  Now the

9    question is, when you heard the tape, the tape was

10   totally inconsistent to what you just testified to;

11   isn't that correct?

12             MR. RODRIGUEZ:  Objection to form.

13             THE WITNESS:  I can't answer that question.

14        I would have to listen to the tape, and then I

15        could tell you if I said one and then four, what

16        the tape said.

17   BY MR. SWITKES:

18        Q.   The tape says there were four shots in

19   succession, and a slight pause, and then another shot,

20   and a slight pause, and another shot.

21        A.   Well, I --

22        Q.   Excuse me, I'm not done.

23             The four original shots were in succession,

24   you're not aware of that?

25        A.   No.  It was one shot, a pause, and four



Page 340

1  shots.

2       Q.   So --

3       A.   One officer shot one.  And then the other

4  four shots, I don't know which officer shot them.

5       Q.   But you testified in your deposition, one

6  officer shot a warning shot from his holster, correct?

7       A.   Say the last part?

8       Q.   From his holster?  That was your testimony,

9  into the ground, from his holster.

10      A.   From his holster?  No, I didn't say from his

11  holster.  I never said the gun was in his holster.

12  That word never came out of my mouth.  I never said

13  that he shot while the gun was in his holster.  No,

14  sir.

15      Q.   So you testified someone fired a warning

16  shot into the ground first, right?

17      A.   Yes, but not from the holster.

18      Q.   And then the other officers fired, correct?

19  That's what you testified to on February 2nd, right?

20      A.   That's what I said: other officers shot.

21      Q.   But now today, your testimony is trying to

22  embellish a little bit --

23      A.   No, it's not.

24      Q.   Let me finish my question.

25           It was one shot, and then there was a pause,



Page 341

1  and then there were four shots.  When the physical

2  evidence, the audio of that, shows that's a lie; are

3  you aware of that?

4          MR. RODRIGUEZ:  Objection.  Argumentative.

5          MR. SWITKES:  You can answer the question,

6      ma'am.

7          THE WITNESS:  Well, okay.  So what is your

8      question?

9          MR. SWITKES:  You heard it.  Answer the

10     question.

11         THE WITNESS:  I don't know your question.

12     You don't need to give me the whole story you

13     just gave me of the past minute.  All I just need

14     is the question.

15  BY MR. SWITKES:

16     Q.   The audio is inconsistent with your false

17  testimony; do you understand that?

18     A.   It's not false testimony.  I'm telling you

19  exactly what happened.

20     Q.   But if the audio shows there were four shots

21  shot in concession, then that's inconsistent with what

22  you just testified to, isn't it?

23         MR. RODRIGUEZ:  Objection to form.

24         THE WITNESS:  Well, I'm telling you when I

25     was there what happened and how it happened.



Page 342

1  BY MR. SWITKES:

2      Q.   Yep.  But you didn't say anything about a

3  warning shot in this video, did you?

4      A.   I couldn't say that.  I said it at the

5  training building, and they told me not to say

6  anything.

7      Q.   You didn't say in this video, or in your

8  first statement, that anybody shot a warning shot, did

9  you?

10     A.   I said it in the training building.  Carlos

11 was aware that there was a warning shot -- Hialeah

12 police was aware that there was a warning shot --

13     Q.   You didn't hear the question.

14     A.   -- and they didn't want me to say that.  I

15 did not say that.  If not, I was going to lose my job.

16 That's why I did not say that there was a warning

17 shot.

18     Q.   Let me --

19     A.   I had to take care of my career.  So I

20 wasn't lying.  They didn't ask me, so I didn't say it,

21 plain and simple.

22     Q.   So you're saying, you did lie under oath?

23     A.   No, I didn't say I lied under oath.  They

24 never asked me, did somebody shoot a warning shot,

25 after they already knew the answer.  They knew



Page 343

1   already.

2           MR. SWITKES:  Play the audio, please.

3           MR. DESAI:  For the police dispatch tape?

4           MR. SWITKES:  No.  No.  No.  Play this.  We

5       know what the audio shows.

6           (Video recording is played.)

7           MR. SWITKES:  Stop.

8           (Video recording is stopped.)

9   BY MR. SWITKES:

10      Q.   Was that the truth, ma'am?

11      A.   I couldn't hear it.

12          MR. RODRIGUEZ:  We couldn't hear it on this

13      end.

14          MR. SWITKES:  Play it again.

15          (Video recording is played.)

16          MR. SWITKES:  Stop.

17          (Video recording is stopped.)

18  BY MR. SWITKES:

19      Q.   Was that the truth, or was that a lie?

20      A.   Which part?

21      Q.   When you just testified under oath that you

22  believe that shots were fired when the car was still

23  stopped.

24      A.   Can you play it again?

25      Q.   Sure.



Page 344

1          (Video recording is played.)

2          MR. SWITKES:  Stop.

3          (Video recording is stopped.)

4          THE WITNESS:  I don't know what it says.

5          MR. RODRIGUEZ:  We can't understand.

6          MR. SWITKES:  Play it back, Devang.

7          (Video recording is played.)

8          (Video recording is stopped.)

9          MR. RODRIGUEZ:  We can't hear on this end,

10     what is being said.

11          MR. SWITKES:  We're going to play it again

12     for you.

13          (Video recording is played.)

14          MR. SWITKES:  Stop.

15          (Video recording is stopped.)

16  BY MR. SWITKES:

17     Q.   Did you hear it that time, ma'am?

18     A.   Yes, I hear it, but the train -- so what is

19  the part that you want me to testify to?

20     Q.   He asked you, did you hear the gunshots when

21  the vehicle was stopped.  And you said, yes, when the

22  vehicle was stopped.  Was that the truth?

23     A.   Yeah, the car was accelerating as it was

24  moving, okay.  And like I said, the reason why that's

25  being answered like that is because I was told what to



Page 345

1  say.  I was coached to say, even after the car had

2  left and drove off, there was still shooting.

3       Q.  Okay, ma'am --

4       A.  And you can hear the 911 tape.  You can hear

5  it on there, perfectly fine.

6       Q.  Ma'am --

7       A.  Yes?

8       Q.  I just showed you a very short clip of your

9  testimony.

10      A.  Okay.

11      Q.  The question was, where was the vehicle, the

12  Machado vehicle, when the shots were fired.  You

13  testified he was west of me --

14      A.  A little bit west on the --

15      Q.  Stop.  We went through that, correct?

16      A.  Excuse me?

17      Q.  We went through that and you pointed with

18  both arms, it was west of you, correct?

19      A.  No, I didn't point west.  If I was pointing

20  west, I would be pointing -- my body wouldn't be at an

21  angle, my body would be straight --

22      Q.  So -- and you corrected me and I apologize.

23  You were pointing northwest, is what you corrected?

24      A.  Yeah, but I said, like you told me now --

25  you keep jumping from one thing to another.  If you



Page 346

1  want me -- you have to ask me a question, let me

2  answer, ask me the second question, let me answer,

3  then you ask me another question.

4           You can't ask me a question, I'm answering,

5  then you throw another question at me for me to

6  answer.  And then you throw another question.

7      Q.   I know this is very hard for you.  Just try

8  to --

9      A.   No, it's not very hard.  The -- listen, the

10  truth is, the truth is going to come out regardless.

11  The evidence are there, sir.  So even if you want to

12  lie, or not, the evidence says it all.

13           I have no reason to lie.  And that's why you

14  keep asking me these questions.  You keep hammering me

15  on it.  You can ask me my testimony is going to be the

16  same.  The evidence showed the same exact thing.  I

17  have no reason to lie or to cover this up, no reason

18  whatsoever.

19      Q.   Okay.  So let's go back.  Because I'm

20  showing you you're sworn testimony and I'm asking you

21  if it was true.

22           So we just went through the direction of

23  travel.  And I grossly apologize for saying --

24      A.   No need to apologize.

25      Q.   Okay.  And now we're going to play the



Page 347

```
 1  portion where you said, the vehicle was stopped when
 2  the shooting occurred; you heard that, didn't you?
 3       A.   Yes, I did.
 4       Q.   Okay.  And here's the real tough question:
 5  Was that the truth?
 6            MR. RODRIGUEZ:  Objection to form.
 7            THE WITNESS:  That the vehicle -- why is it
 8       a tough question?
 9            MR. SWITKES:  I don't know.  I seem to ask
10       you --
11            THE WITNESS:  Well, you said it's a tough
12       question, so in order to answer your question, I
13       need to know why is it a tough question, so I can
14       answer correctly.
15            MR. SWITKES:  So answer it.  Was it the
16       truth, ma'am?
17            THE WITNESS:  Can you answer why is it
18       tough, so I can answer you correctly?
19            MR. SWITKES:  It --
20            THE WITNESS:  Let me finish talking, sir, so
21       then you can talk.  We can take turns.
22            You said it's a difficult question for me to
23       answer; what is difficult?  You want me to answer
24       your question.  You want me to answer a difficult
25       question.  I need to know, what is difficult
```



Page 348

1   about the question so I can answer it.

2       MR. SWITKES:  Because you give explanations,

3   when it just meant --

4       THE WITNESS:  Because you don't want to hear

5   the truth.

6       MR. SWITKES:  Just --

7       THE WITNESS:  You don't want to hear the

8   truth.

9       MR. SWITKES:  I'm playing back your

10  testimony under oath --

11      THE WITNESS:  That I was coached on, and

12  told not to say --

13      MR. SWITKES:  Excuse me.  I let you talk a

14  long time.  Now, I'm going to respond to you.

15      THE WITNESS:  Okay.

16      MR. SWITKES:  When I played back a segment

17  of this, and it's a very short segment --

18      THE WITNESS:  Yes.

19      MR. SWITKES:  -- and I ask you whether it's

20  the truth or not --

21      THE WITNESS:  Yes.

22      MR. SWITKES:  -- and you give me a long

23  explanation, your answer could be, yes, it's the

24  truth, or no, it's a lie.  There's no difficulty

25  in answering that question, but I get a long



Page 349

1    explanation.

2         THE WITNESS:  That you don't want to hear.

3  BY MR. SWITKES:

4    Q.   So I ask you for the third time, when you

5  said that the vehicle was stopped when the shots were

6  being fired, is that true?

7         MR. RODRIGUEZ:  Objection to form.

8    Argumentative.

9         MR. SWITKES:  Nothing could be less

10   argumentative.

11        Answer the question.

12        MR. RODRIGUEZ:  I did not understand what

13   you just said, Mr. Switkes.

14        MS. WELSTEAD:  There's a question pending.

15   Answer it.

16        THE WITNESS:  Okay.  What is the question,

17   ma'am?

18 BY MR. SWITKES:

19   Q.   Did you just hear on the video when you were

20 asked was the vehicle stopped when the shots were

21 fired, and you said, yes, it was stopped --

22   A.   The first shot that was -- I'm going to

23 answer you.  The first shot, the vehicle was stopped,

24 but the vehicle was accelerating.

25   Q.   Okay.



```
                                          Page 350
 1      A.   Then the vehicle moves forward, correct?  I
 2  jumped out of the way, and then the other shots come
 3  and the vehicle takes off.
 4           MR. SWITKES:  Can you play the video one
 5       more time when the question is asked, when the
 6       shots were fired, were you stopped, and her
 7       answer?
 8           (Video recording is played.)
 9           (Video recording is stopped.)
10  BY MR. SWITKES:
11      Q.   Was that the truth, ma'am?
12      A.   Which part?
13           MR. RODRIGUEZ:  Object to form.
14           MR. SWITKES:  What we just played to you.
15           THE WITNESS:  Was it the truth that the
16       vehicle was stopped --
17  BY MR. SWITKES:
18      Q.   What you just said on the road, was it the
19  truth, yes, or no?
20      A.   About the shots being fired when the vehicle
21  was stopped?
22      Q.   Yes, ma'am.
23      A.   Yes, but not all the shots.  There was more
24  than one shot, like I told you from the get-go.
25           MR. SWITKES:  Play the video.
```



```
                                              Page 351
 1            (Video recording is played.)

 2            (Video recording is stopped.)

 3            MR. RODRIGUEZ:  I didn't hear the question

 4       or the answer.

 5            MR. SWITKES:  Play it again.

 6            (Video recording is played.)

 7            (Video recording is stopped.)

 8            THE WITNESS:  What was I saying?

 9            MR. RODRIGUEZ:  I -- I -- I --

10            MR. SWITKES:  I don't recall.

11            MR. DESAI:  The question was asked, do you

12       recall hearing more shots as the vehicle moved

13       forward.  Answer:  I don't recall.

14  BY MR. SWITKES:

15       Q.   Is that the truth?

16       A.   (No audible response.)

17       Q.   Why are you looking at your "not attorney"?

18       A.   Because I was trying to figure out who said

19  that.

20       Q.   If you have any questions, you ask me.

21            The question was, did you hear any more

22  shots after that.  And you said, I don't recall; was

23  that the truth or was that a lie?

24       A.   I don't recall -- I didn't answer the

25  question.  That's why I said, I don't recall.  I was
```



Page 352

1  set there -- they were telling me to say no and I was

2  not going to say no.  So I said, I do not recall.

3      Q.   I asked you whether it was true or a lie.

4           MR. RODRIGUEZ:  Objection to form.

5           THE WITNESS:  I was going to say -- they

6       wanted me to say an answer which I was not going

7       to say.  So I said, I do not recall.

8  BY MR. SWITKES:

9      Q.   So, I do not recall, is a lie?

10          MR. RODRIGUEZ:  Objection to form.

11          THE WITNESS:  I chose not to answer the

12      question.

13          MR. SWITKES:  No, you did answer the

14      question.

15          THE WITNESS:  And I said, I do not recall.

16      I didn't say, yes.  I didn't say, no.  I said, I

17      don't recall.  If I don't recall, I don't recall.

18  BY MR. SWITKES:

19      Q.   Ma'am, when you're asked a question as a

20  police officer under oath, and you know the

21  information, but then you lie and say, I don't recall,

22  is that perjury?

23          MR. RODRIGUEZ:  Objection to form.

24          THE WITNESS:  I don't know.  Is it perjury?

25  BY MR. SWITKES:



1      Q.   If you're asking me, the answer is yes.  But
2  I'm asking you.
3      A.   When you're asked to answer and you're given
4  an order to answer a certain way, when you're given an
5  order, you have to follow that order, sir.
6      Q.   So you --
7      A.   Sorry to tell you, but that's the way that
8  it works.
9      Q.   So you committed perjury because --
10     A.   No, I did not commit perjury.  I was told to
11 answer -- that' why I said -- if I would have said,
12 no, or if I would have said, yes, then you can sit
13 there and say that I lied.  I never lied.  I said, I
14 don't know.  Even though, as you can see, if you let
15 the tape continue playing, you'll see that there's
16 people there walking around, okay, telling me what to
17 say and how to answer.
18          You can tell, you can even see how I'm
19 looking around because I'm getting answers and I'm
20 trying not to answer the question.  You can clearly
21 see it.  You show this video to anyone, and anyone's
22 going to tell you the same thing.  I'm not just
23 answering.  I stop, I pause, so I didn't lie, plain
24 and simple.
25          I was given an order: this is what you're



Page 354

1  going to say, this is the story you're going to stick

2  to, okay?  And what did I do?  I just didn't answer.

3  When they wanted me to lie, I didn't answer the

4  question.

5      Q.   So if you said, I refuse to answer the

6  question, that would be honest, correct?

7      A.   No.  No.  No.  If you said I refuse to

8  answer the question, you get fired, sir.  You get --

9      Q.   So you --

10      A.   -- fired because the chief put out an email,

11  they're going to ask for a public request that if you

12  are a witness officer in any case, and you are called

13  to give a testimony, you will give that testimony, if

14  you have representation or not.

15      Q.   So you say, I can commit perjury because I

16  was ordered to do it, correct?

17          MR. RODRIGUEZ:  Objection to form.

18          THE WITNESS:  I never said that I committed

19      perjury.  I said, I didn't answer the question.

20  BY MR. SWITKES:

21      Q.   You said, I don't remember, I don't

22  recall --

23      A.   I don't recall.

24      Q.   -- which was a lie because you were afraid

25  to be fired?



Page 355

1           MR. RODRIGUEZ:  Objection to form.

2           THE WITNESS:  That I would be fired and

3      retaliation.  So I said -- I didn't lie.  I did

4      not lie.  I did not answer the question.

5  BY MR. SWITKES:

6      Q.   No, you answered the question with the

7  verbiage, I don't recall --

8      A.   I don't recall doesn't mean yes or no.  I

9  don't know means I don't recall.

10     Q.   You can't answer the question when I'm in

11 the middle.  So listen to the question.

12     A.   Okay.

13     Q.   If you know the answer to a question and you

14 say, I don't recall, that is a lie, isn't it?

15          MR. RODRIGUEZ:  Objection to form.

16          THE WITNESS:  No, it's not.

17 BY MR. SWITKES:

18     Q.   Okay.  So you did recall, but you thought

19 you were ordered to do something and lie under oath --

20     A.   It was unethical and yes, I was ordered to.

21          Yes, sir, I was.  I was ordered to do

22 something unethical, unmoral.  And that's why I didn't

23 answer the question.  That's why I answered, I do not

24 recall.

25     Q.   And you did it.  You were ordered to lie,



```
                                                      Page 356
 1  and you did it.  That's your testimony?
 2            MR. RODRIGUEZ:  Objection to form.
 3            THE WITNESS:  I did what?
 4  BY MR. SWITKES:
 5       Q.  You lied.
 6            MR. RODRIGUEZ:  Objection to form.
 7            THE WITNESS:  No, I didn't lie.
 8            MR. SWITKES:  Play the tape.
 9            (Video recording is played.)
10            (Video recording is stopped.)
11  BY MR. SWITKES:
12       Q.  Was that a lie, or was that the truth?
13       A.  That's the truth.
14       Q.  So he was deliberately trying to run me
15  over?
16            MR. RODRIGUEZ:  Objection to form.
17            THE WITNESS:  Yes, at the time.  Yes, at the
18       time he was accelerating.  Yep, that's what I
19       could see at the time.
20  BY MR. SWITKES:
21       Q.  At your deposition you said that's not true.
22       A.  Right.  Because after the fact, when I'm
23  walking near, I see that there's the tire marks of his
24  back tire being stuck on the median of the car.
25  That's why he's accelerating.  That car is not moving.
```



Page 357

1           So my perception is he is accelerating to

2    run me over, sir.

3           MR. SWITKES:  Play the tape.

4           (Video recording is played.)

5           (Video recording is stopped.)

6    BY MR. SWITKES:

7      Q.    You're still there and then you have said,

8    he's coming towards me, I hear the shots fired, so I

9    jump on the sidewalk, in that sequence, correct?

10     A.    That's what it said, yes.

11     Q.    And that was the truth, correct?

12     A.    Yes, that was the truth.

13     Q.    Not after he left the scene you heard shots.

14     A.    No, there were shots after the scene also.

15   We haven't gotten there.  Now he's asking me did the

16   car take off in that direction.  Let it finish.  Don't

17   get ahead of the tape.

18          MR. SWITKES:  Play the tape.

19          (Video recording is played.)

20          (Video recording is stopped.)

21   BY MR. SWITKES:

22     Q.    You said he deliberately backed into the

23   Rodriguez vehicle, correct, at a high speed?

24     A.    Excuse me?

25     Q.    You just testified that he deliberately put



Page 358

1  his car in reverse and moved backward in reverse and

2  struck the Rodriguez vehicle at a high speed, correct?

3       A.   Correct.

4       Q.   That was the truth?

5       A.   Yes, that was the truth.

6            MR. SWITKES:  Play the tape.

7            (Video recording is played.)

8            MR. SWITKES:  Stop.

9            (Video recording is stopped.)

10  BY MR. SWITKES:

11       Q.   Did you hear your testimony, ma'am?

12       A.   No, you need to play it again.  I couldn't

13  hear.

14       Q.   I'd be more than happy to play it again.

15            (Video recording is played.)

16            (Video recording is stopped.)

17  BY MR. SWITKES:

18       Q.   Did you hear your testimony, ma'am?

19       A.   Yes, I did.

20       Q.   Was it the truth?

21       A.   Yes, it came from that direction.

22       Q.   And you testified you thought the subject

23  was the one shooting, correct?

24       A.   That I thought, yes, I thought.  Not that it

25  was; that I thought.



Page 359

1       Q.   Okay.  But that was the truthful testimony

2  on October 5th, 2017, when you were doing this

3  re-creation, correct?

4            MR. RODRIGUEZ:  Objection.  Form.

5            THE WITNESS:  Correct.

6  BY MR. SWITKES:

7       Q.   You said the subject, you thought, was

8  firing the shots, not another officer, and certainly

9  not one identifiable officer, correct?

10            MR. RODRIGUEZ:  Objection to form.

11            THE WITNESS:  Correct.  That's what I said.

12  BY MR. SWITKES:

13       Q.   And that was truth under oath?

14            MR. RODRIGUEZ:  Form.

15            THE WITNESS:  That's what I was told to say,

16      yes.

17  BY MR. SWITKES:

18       Q.   Okay.  Don't say it's what -- I'm asking you

19  not what --

20       A.   I'm answering your --

21       Q.   I told you, what you're supposed to, or what

22  you think you're supposed to, I asked you a very

23  simple question.

24            Today, as you watch the re-creation, what

25  you just testified to, was that true, yes, or no?



Page 360

```
 1          MR. RODRIGUEZ:  Objection to form.

 2          THE WITNESS:  (No audible response.)

 3          MS. WELSTEAD:  There's a question pending.

 4     Don't look on your phone.  Answer it.

 5          THE WITNESS:  You said you would need me

 6     here tomorrow, so you need to wait.

 7          MR. SWITKES:  No.  I don't want any phone

 8     looks during your testimony.  If you need a

 9     break, we'll take a break.

10          MS. WELSTEAD:  Just answer the question.

11          THE WITNESS:  I need a break.

12          MR. SWITKES:  Ma'am, if you answer my

13     question --

14          THE WITNESS:  I need to take a break.  I'm

15     trying to plan how I can come back tomorrow.

16          MR. SWITKES:  After you answer the question.

17          THE WITNESS:  Okay.  So I'm not available

18     tomorrow.

19          MR. SWITKES:  After you answer the question.

20          MR. RODRIGUEZ:  Just answer his question and

21     we'll take a break.

22          THE WITNESS:  Okay.  What is your question,

23     sir?

24  BY MR. SWITKES:

25     Q.   Was the testimony you gave under oath true
```



Page 361

1  just now that we played for you?

2      A.   It was true.  And like I said, I was coached

3  to say that part.  So yes, it was true.  And I was

4  coached to say that -- not to say where the officer --

5  yeah, it was -- when I said there was an officer

6  standing over there that shot, okay?  That's it.  You

7  just say it came from the subject's direction.  That's

8  it.  That's why I said I thought it came from the

9  subject's direction.

10      Q.   And you thought it was the subject firing

11  the shots; that's what you testified under oath,

12  ma'am; is that correct, or is that a lie?

13          MR. RODRIGUEZ:  You asked her to answer your

14      last question and she did.  And she asked you for

15      a break.  So we're going to take a break now and

16      then you can ask your next question.

17          MR. SWITKES:  That's an outrageous -- she's

18      trying to evade a simple question, ma'am, just

19      for the record.

20          MR. RODRIGUEZ:  There's nothing outrageous

21      about it, Mr. Switkes.  We all agreed that we

22      were going to try to regroup for tomorrow and

23      she's getting a phone call about trying to

24      arrange childcare so we can reconvene this

25      deposition tomorrow and conclude it.



Page 362

1        (Pause in the Proceeding.)

2        MR. RODRIGUEZ:  Well, it's after six folks.

3    Ms. Benitez is trying to arrange for childcare

4    for tomorrow and we're not going to know for

5    probably a couple of hours, so I suggest that we

6    adjourn and hopefully we will be able to regroup

7    tomorrow and knock this out in another

8    two-and-a-half to three hours, or so; does that

9    sound reasonable?

10        MR. SWITKES:  Can we just wait about ten or

11    fifteen minutes so we can finish this segment, so

12    we can get finished with it; or is that too much

13    to ask?

14        MR. RODRIGUEZ:  She's got to go pick up her

15    kids.  She's already going to be late.  So we'll

16    finish it tomorrow.

17        MR. SWITKES:  Ma'am, you're under oath, you

18    know.  You're not supposed to speak to anybody.

19        THE WITNESS:  I don't.

20        MR. RODRIGUEZ:  We know the rules,

21    Mr. Switkes.  Thank you.

22        MR. SWITKES:  I was talking to your

23    "non client".

24        MR. RODRIGUEZ:  Thank you.  I appreciate

25    that.  It's considerate of you.



Page 363

1          (Thereupon, the deposition was concluded

2     at 6:03 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



CERTIFICATE OF REPORTER

STATE OF FLORIDA                :

COUNTY OF MIAMI-DADE            :

     I, LORI HART, Certified Electronic Reporter and
Notary Public in and for the State of Florida at
Large, do hereby certify that I reported the
deposition of MARIA BENITEZ, a witness called by the
Defendant in the above-styled cause; that said witness
was duly sworn in by me; and that the foregoing pages,
numbered from 189 to 363, inclusive, constitute a true
and correct transcription of my shorthand notes of the
deposition by said witness.

     I further certify that I am not an attorney or
counsel of any of the parties, nor a relative or
employee of any attorney or counsel connected with the
action, nor financially interested in the action.

     WITNESS my hand and official seal in the City of
Miami, County of Miami-Dade, State of Florida,
this 26th day of April, 2021.


_____
LORI HART, C.E.R.



AFFIDAVIT


STATE OF FLORIDA                )


COUNTY OF MIAMI-DADE            )

     I, MARIA BENITEZ, being first duly sworn, do
hereby acknowledge that I did read a true and
certified copy of my deposition and the corrections I
desire to make are as indicated on the attached Errata
sheet.
     Done and signed this _____ day of
_____, 2021.




_____
MARIA BENITEZ




                      CERTIFICATE


     The foregoing certificate was acknowledged before
me this _____ day of _____, 2021,
by MARIA BENITEZ, who has been identified as such.




     _____
     Notary Public - State of Florida
     My Commission Expires:



Page 366

ERRATA SHEET


DEPOSITION OF:  MARIA BENITEZ, April 26, 2021

CASE STYLE:  YOLAISY PEREZ, as the presumptive
Personal Representative of the estate of
LESTER MACHADO,
 V.
CITY OF HIALEAH, et al.,

CASE NO.:  1:19-cv-24047-MGC

     At the time of the reading and signing of the
deposition, the following changes were noted:

PAGE#      LINE #                    CORRECTION REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
     Under penalties of perjury, I have read my
deposition in this matter and it is true and correct,
subject to any changes in form or substance as
reflected above.




_____

Date                                      Signature



National Reporting Service   (305) 373-7295

Page 367

NATIONAL REPORTING SERVICE
66 West Flagler Street, Suite 310
Miami, Florida 33130
Telephone (305) 373-7295

May 28th, 2021

DOMINGO C. RODRIGUEZ, ESQUIRE
RODRIGUEZ LAW OFFICE, LLC
95 Merrick Way, Suite 720
Miami, Florida  33134
domingo@rlomiami.com

In Re:  Yolaisy Perez,
 v.
City of Hialeah, et al.

Dear Mr. Rodriguez:

     With reference to the deposition of Maria
Benitez, taken on April 26, 2021, in connection with
the above-captioned case, please be advised that the
transcript of the deposition has been completed and is
awaiting signature.

          Ms. Benitez should read a copy of the
transcript denoting any corrections by page and line
number on the Errata sheet.  Correction page must be
signed by him and notarized for filing with the
original.  If this has not been taken care of,
however, within the next 30 days or by the time of the
trial, whichever comes first, we shall then conclude
that the reading, subscribing and notice of filing
is waived.


National Reporting Service



National Reporting Service   (305) 373-7295