**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 19-24047-CIV-COOKE/GOODMAN**

YOLAISY PEREZ,

     Plaintiff,

v

CITY OF HIALEAH, et al.,

     Defendants.

_____/

## <u>ORDER ON MOTION TO STRIKE WITNESS</u>

*"I don't mind being called a liar. I am. I am a marvelous liar. But I hate being called a liar when I'm telling the perfect truth."*

-   Patrick Rothfuss, American epic fantasy writer, from <u>Wise Man's Fear</u>

*"I'm not upset that you lied to me, I'm upset that from now on I can't believe you."*

-   Friedrich Nietzsche, German philosopher (1844 – 1900)

*"Ask me no questions and I'll tell you no lies."*

-   Well-known idiom

Should a jury determine the credibility of a former police officer fact witness who purportedly perjured herself in a police department investigation of the fatal police shooting at the heart of this wrongful death lawsuit? Or should the Court grant a motion to strike [ECF No. 140] filed by Defendants (the City of Hialeah and eleven current and former police officers), who say she is so untrustworthy that total exclusion of her

testimony from trial is necessary to preserve the integrity of the litigation process?

This choice concerns Maria Benitez, who the Mayor of Hialeah fired after the Police Department's Professional Compliance Bureau ("PCB") recommended that she be dismissed from the police force for lying in an unrelated PCB proceeding. An arbitrator sustained Benitez's termination. Plaintiff initially named Benitez as a defendant in this lawsuit but later voluntarily dismissed her after learning she had been fired as a City of Hialeah police officer.

For the reasons outlined below, the Undersigned **denies** Defendants' Joint Motion to strike Benitez and exclude her testimony from the scheduled jury trial.

For purposes of introductory summary, however, the Undersigned notes (and emphasizes) that Benitez is a fact **witness**, not a party. Therefore, Defendants want the Court to, in effect, punish Plaintiff (by excluding testimony favorable to her) for the alleged pre-trial misconduct of a non-party witness.

Moreover, assessing credibility is a quintessential jury function, even if the jury is evaluating the testimony of a witness who has a history of lying. Indeed, juries are routinely permitted to evaluate the trial testimony of witnesses who are scoundrels and cheats and have a history of lying. Unless the testimony is *incredible*, the jury is directed to sort out the truth from the lies or the half-lies.

Plaintiff does not concede that Benitez committed perjury. She classifies the inconsistencies in Benitez's testimony as "discrepancies" which she "comfortably

explained." [ECF No. 166, p. 4]. And to the extent the inconsistencies were, in fact, perjurious, Plaintiff contends that the lead detective coached Benitez on what to say (and what not to say) and that "another officer urged her to falsely claim that she had thought that Machado had a gun." [ECF No. 166, p. 4].

Defendants have not sufficiently demonstrated that Benitez's testimony is "**incredible,**" a term which is strictly defined in this Circuit and means "unbelievable on its face," which, in turn, means testimony about facts that the witness "physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Reyes*, 144 F. App'x 50, 51 (11th Cir. 2005). Framed by this difficult-to-meet standard, Defendants' motion must be denied.

## Factual & Procedural Background

This civil rights lawsuit involves the October 1, 2017 death of 24-year-old Lester Jesus Machado. According to the Complaint [ECF No. 1], Machado died after a high-speed police chase; the collision of his car into a Metrorail support column; and the officers' discharge of approximately 128 rounds, which struck Machado's car more than eighty times. The medical examiner removed seven 9mm projectiles from Machado's body.

Machado's personal representative, his mother, filed this lawsuit on September 30, 2019. The Complaint named the City of Hialeah as the lead defendant. Lieutenant Antonio Luis is the highest-ranking officer named as a defendant. Benitez was named as

a defendant, but Plaintiff voluntary dismissed the claims against her without prejudice on February 18, 2020. [ECF No. 61].

Hialeah Police Department ("HPD") began its investigation into the fatal shooting a few hours after it occurred. During the investigation, HPD took sworn statements and conducted sworn video reenactments with the involved police officers, including Benitez, who gave a sworn statement at approximately 8:00 a.m., four hours after the 4:00 a.m. shooting. Benitez participated in the sworn video reenactment four days later, on October 5, 2017.

In mid-August 2018, Hialeah's mayor terminated Benitez as a police officer for lying in a PCB investigation into an unrelated incident of police misconduct. Benitez submitted her termination to arbitration under a collective bargaining agreement. The arbitrator heard testimony from eleven witnesses, including Benitez, over three days in October 2019. Both sides had counsel. The arbitrator issued his opinion on January 16, 2020, denying Benitez's grievance and sustaining her termination. The arbitrator found that the City proved that Benitez "violated City rules prohibiting untruthfulness and conduct unbecoming, justifying her discharge."

According to the initial Complaint, Benitez is one of twelve police officers who "chased, accosted, shot, and killed Machado," in violation of his civil rights. After learning that the mayor terminated Benitez, Plaintiff voluntarily dismissed her as a defendant.

Benitez claims she has no idea why she was voluntarily dismissed and cannot identify anything that would distinguish her role in the chase from that of any other non-shooting police officer who remains as a defendant. *See* Deposition Transcript of Maria Benitez dated May 3, 2021 ("5.3.21 Depo"). [ECF No. 140-6 at 160:10-25, 177:11-15] ("Q. And as you sit here today, you don't know what distinguishes your role as just a chaser from any of the other officers who are also chasers? A. Correct, sir.").

Benitez claims she: (1) later went to see Plaintiff's counsel (Domingo Rodriguez, Esq.) to seek legal advice on an unrelated "personal matter," and (2) told Mr. Rodriguez that she wanted to testify on Plaintiff's behalf "to tell [them] the correct and true story of what occurred." *See* Deposition Transcript of Maria Benitez dated February 2, 2021 ("2.2.21 Depo"). [ECF No. 140-3, at 5:1-6:25].

Benitez claims her first meeting with Mr. Dominguez did not occur until after she had been dismissed. She says her call to Mr. Dominguez was not linked to the fatal police shooting or the lawsuit, as she happened to find his name after performing a Google search. Nevertheless, she does not deny that Mr. Dominguez's name and information are found on the Notice of Voluntary Dismissal, and Benitez can offer nothing to verify when their first meeting actually took place. *See* Deposition Transcript of Maria Benitez dated April 26, 2021 ("4.26.21 Depo"). [ECF No. 140-5, at 5:1-13:25]. According to Defendants, the lack of a clear timeline for Benitez's alleged "coincidental" meeting with Plaintiff's attorneys and Benitez's diametrically changed testimony renders her voluntary dismissal

and the reasons for it "highly suspect." [ECF No. 140, p. 7, n.5].

The parties took Benitez's deposition over the course of three days. As summarized by Defendants in their motion, she "directly contradicted her previous sworn testimony concerning numerous material facts relating to" the fatal shooting. *Id.* at p. 8.

Defendants' motion includes a chart that compares some of her conflicting testimony (between her sworn statements to police investigators and her deposition testimony in this civil lawsuit). *Id.* at pp. 9-13. Benitez offered different reasons for the inconsistencies in testimony, ranging from she "told the truth," to admitting a "little exaggerating," to admitting to giving untrue statements, to saying she was "coached" to say certain incorrect things. *Id.* at pp. 13-14.

Defendants provided several specific illustrations of Benitez's varied reasons for the differences in her testimony:

• "I answered the truth, but I didn't **answer completely**." 4.26.21 Depo at 42:17-18 (emphasis added). [ECF No. 140-5].

• She didn't tell the truth because she was **trying to protect her job**. 4.26.21 Depo at 52:11-15 ("Q. You were trying to protect your job? That's why you didn't tell the truth? A. Yes. Q. Yes? A. Yes.") [ECF No. 140-5]; *see also* 5.3.21 Depo at 131:13-24 (stating that she lied and misrepresented things during her sworn statement because "[she] didn't want to lose [her] job[.]"), 178:12-18 (same). [ECF No. 140-6].

- The testimony given in her sworn statement was true, **"[i]t's just a little exaggerated."** 4.26.21 Depo at 204:3-6 (emphasis added), 305:15 ("A. That was the truth that was exaggerated."), 305:18-21 ("A. No, I'm saying – what I'm saying is that I said the truth, but it's a little exaggerating, like using the word, ram and rammed over here, and rammed over there, and rammed, those are exaggerating words."), 308:1-2 ("A. … Yes, I **did exaggerate, but I didn't lie** about it.") (emphasis added), 310:19-21 ("They were the truth and they were exaggerated…."); 313:12-16 ("A. That was the truth, like I said before. It was the truth, a little exaggerated, whether it's the truth. Q. And you don't consider exaggerating a lie? A. No, I don't.") [ECF No. 140-5]; *see also* 5.31.21 Depo at 130:1-4 (agreeing that "exaggeration is a form of misrepresentation" and "exaggeration is form of deception," but refusing to admit that "exaggeration is a form of lying."), 189:9-12 ("Q. And there are some things in that statement that are partially true, but exaggerated? A. Yes, sir."). [ECF No. 140-6].

- **"I was coached before I gave this statement."** 4.26.21 Depo at 305:25 (emphasis added), 307:2 ("Yes, I was coached."), 326:12 ("I told the truth. And I was coached.") [ECF No. 140-5]; *see also* 5.3.21 Depo at 14:2-15:1 ("That's what I was coached to say, sir."), 24:16 ("It's what I was coached to say."). [ECF No. 140-6].

- "At the time, sir, it was the truth. After viewing the videos, I can now say that **yes, it's a lie."** 5.3.21 Depo at 27:6-8, 27:11-14 ("Okay. I said that at the time that I gave my

sworn statement, it was the truth, what I believed to be the truth. But after seeing the videos, it's not the truth."). [ECF No. 140-6].

• Admitting that **some things** in her recorded statement **are untrue.** *See* 5.3.21 Depo at 189:15-17 ("Q. And there are some things that you said in that statement that are untrue? A. Yes."). [ECF No. 140-6].

**The Parties Contentions**

United States District Judge Marcia G. Cooke referred the joint motion to strike to the Undersigned. [ECF No. 144]. Plaintiff filed a response to the motion and Defendants filed a reply. [ECF Nos. 166; 167]. On August 17, 2021, the Undersigned held a hearing lasting more than an hour and a half on the joint motion. [ECF No. 168].

Defendants say that Benitez has turned the events underlying the fatal shooting and this lawsuit "into a case study in witness deception and perjury." [ECF No. 140, p. 2]. They concede that the "vast majority" of cases where courts have sanctioned individuals for lying, committing perjury, perpetrating a fraud on the court, or engaging in other malfeasance, are directed toward party *litigants*, as opposed to mere fact *witnesses*. *Id.* at p. 15. Nevertheless, they say Benitez's "convenient" dismissal as a named defendant should not immunize her from sanctions. *Id.*

Defendants equate Benitez's situation to scenarios involving litigants who stand to gain something if their lies are believed or go unchallenged because her perjury "essentially rendered her a 'get out of jail free' card in the form of a voluntary dismissal."

*Id.* at pp. 15-16. According to this defense theory, Benitez would still be a named defendant if she had "not agreed to fabricating or altering her testimony." *Id.* at p. 16. Therefore, Defendants argue, Benitez should be treated no differently than if she were still a litigant – which means she should be sanctioned.

Moreover, Defendants argue that Benitez's testimony meets the "incredible" standard because part of it involves her contention that she saw certain things at the site of the fatal shooting – testimony Defendants say cannot possibly be true because they say she had not yet even arrived at the scene.

Defendants argue that Benitez's false testimony will, if left unabated, "continue to taint and compromise the truth finding process." *Id.* at p. 17. They also suggest that Plaintiff's counsel would be suborning perjury or, at a minimum, aiding and abetting perjured testimony if they were to call Benitez as a trial witness, "knowing that the witness will give perjured testimony." *Id.* at p. 17, n.9.

Urging the Court to "calibrate the scales," Defendants argue that no sanction less than striking Benitez as a witness and excluding her testimony would level the playing field. *Id.* at p. 18. They do not, however, cite any on-point cases where *witnesses* were excluded from testifying because they lied before trial.

Not surprisingly, Plaintiff opposes the motion.

Plaintiff's initial objection to the motion is a procedural one. She contends that the motion is actually a motion *in limine* and that the motion at issue does not comply with

the Court's specific requirements for *in limine* motions.

Substantively, Plaintiff contends that the true motivation for the motion "boils down to the simple fact that Benitez is a fact witness whose testimony is devastating to the Defendants' case" and that "Defendants will go to any length to prevent a jury from ever learning the truth." [ECF No. 166, p. 4].

Plaintiff also argues that Defendant Luis "uses" Benitez's testimony in support of his summary judgment motion, a development which she suggests undermines and contradicts Defendants' position that Benitez's testimony cannot be used for *any* purpose. *Id.* at p. 3, n.3.

Plaintiff's primary argument, however, is that Defendants are asking the Court to usurp the jury's role. Specifically, she contends that the issue of credibility is for the jury alone, even when the testimony "carries a question of a lack of candor, or is shaken by cross-examination, or the accuracy of the testimony is controverted." *Id.* at p. 5.

During the hearing, Plaintiff's counsel explained that Benitez's testimony actually helps *Defendants* in three ways: (1) she testified that Machado was driving recklessly; (2) she says she was in front of Machado's vehicle but had enough time to get out of his way; and (3) she got out of her car and was on the road, a position which counsel said is inconsistent with testimony saying that no officers got out of their cars.

Plaintiff's counsel also argued that Benitez stopped or slowed her car before the shooting and was rolling slowly forward, which, he says, is why her car was not seen on

surveillance video until nine minutes after the shooting. According to Plaintiff's counsel, this is a "plausible explanation" for her car's absence on the video and presents a factual issue as to the accuracy of her testimony about observations she made at the shooting scene. Therefore, Plaintiff's counsel argues, this factual uncertainty prevents the use of the "incredible" exception to the rule that juries, not judges, make credibility assessments.

Finally, Plaintiff's counsel argued that only a small percentage of Benitez's three rounds of deposition in this case concern what she saw at the final shooting scene. The remainder, he says, involves testimony about (1) the initial traffic stop at a different location than where the shooting occurred; (2) her observations from the first location to the third, and final, location (i.e., the shooting); and (3) the police "coverup."

In their Reply, Defendants disagree that their motion is actually a motion *in limine*, describing it instead as a request for the Court to exercise its inherent authority as a sanction for Benitez's false testimony. [ECF No. 167, pp. 1-2].

They acknowledge that courts in "most" circumstances would prefer to allow cross-examination and juror deliberation to evaluate credibility. But they distinguish their motion as one where, "before the jury even being empaneled, the court and the attorneys know that a party or witness is intent on presenting false testimony or has a demonstrated (and admitted) record for lying under oath." *Id.* at p. 2. According to Defendants, allowing the jury to determine Benitez's credibility "would be to usurp this

*Court's* authority and **obligation** to preserve the integrity of the proceedings before it." *Id.* at p. 3 (emphasis added).

Confronted with Benitez's status as a non-party witness, Defendants say, "the only reason Benitez no longer has 'a stake' in this litigation is because she seemingly traded it for her false testimony." *Id.* at p. 3.

**Applicable Legal Principles and Analysis**

Is the Joint Motion a Non-Compliant *Motion in Limine*?

The Court's Scheduling Order [ECF No. 72] governs motions *in limine* in this matter. In pertinent part, the Scheduling Order requires (1) a **joint** summary of the parties' motions *in limine*; (2) the joint summary to be separately filed; (3) the joint summary to contain an index of the motions; (4) a one-page argument identifying the evidence sought to be excluded and the supporting legal authority; (5) a one-page response; and (6) cooperation, as the parties "must work together" to prepare the joint summary.

According to Plaintiff, Defendants violated this provision in several ways:

First, a motion *in limine* must be included in a joint summary; Defendants nonetheless filed a stand-alone motion. Second, each motion may include a single page of argument and supporting authority and a single page of opposing argument and authority; Defendants filed a motion comprising nineteen pages of text. Third, it provides that motions *in limine* will not be accepted in any other form.

12

Given these purported failures, Plaintiff argues, the Court should not accept the motion.

The fundamental premise of Plaintiff's argument about the so-called violations of the Court's Scheduling Order hinges on her theory that the motion to strike is, in reality, a motion in *limine* masquerading as a motion to strike.

"A motion *in limine* is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Acevedo v. NCL (Bahamas) Ltd.*, 317 F. Supp. 3d 1188, 1192 (S.D. Fla. 2017) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)).

Because the motion to strike seeks to exclude Benitez's testimony before it is actually offered at trial, Plaintiff says, it is a motion *in limine.*

In their Reply, Defendants say they are not seeking *in limine* relief. [ECF No. 167]. They say they are not seeking that type of relief, which they define as being a request "to exclude discrete pieces of evidence or argument on grounds of inadmissibility, prejudice, lack of adequate qualifications, etc." *Id.* at p. 1.

Instead, Defendants say, they are asking the Court to exercise its inherent authority to strike Benitez as a witness and preclude her from testifying as a **sanction** for her prior perjury. *Id.* at p. 2. They argue that their motion is similar to those used to exclude a witness or evidence as a sanction, such as a sanction for failing to timely disclose a witness. This defense theory is necessarily linked to the assumption that a

13

motion *in limine* cannot be based on perjury, which, according to the logic inherent in the defense theory, must be addressed *only* through a motion to strike or a motion for sanctions.

Judge Cooke's Scheduling Order seems to contemplate a joint summary for motions *in limine*, shortly before trial, when **both** sides have taken extensive discovery, have taken positions about excluding evidence, and have engaged in a dialogue about their respective positions so that the joint summary can be prepared by both sides. The motion here does not easily fit into that expected scenario.

In addition, the cases relied upon by Defendants involve sanctions against **parties,** entered in connection with a motion to dismiss or a motion for sanctions, as opposed to a motion *in limine. See, e.g.*, *Vargas v. Peltz*, 901 F. Supp. 1572, 1578-81 (S.D. Fla. 1995) (granting motion to dismiss and for sanctions against the plaintiff after finding that the plaintiff committed numerous acts of perjury, fabrication of evidence, obstruction of justice, and obstruction of discovery which resulted in a gross abuse of the discovery and judicial process).

The Undersigned is unconvinced by Plaintiff's argument and will entertain the motion to strike on the merits rather than deny it as a disguised *in limine* motion.

### Is Defendant Luis Inconsistently "Using" Benitez's Testimony?

Plaintiff notes that Defendants say they want an order precluding Benitez from providing *any* testimony even though Defendant Luis "uses" her testimony "in support"

of his summary judgment motion. The Undersigned rejects this argument because it is not a complete portrayal of how Luis has utilized Benitez's testimony in his motion. He does not rely upon it in the typical way, where a party cites to testimony to establish a fact through a citation to record evidence. Instead, he highlights that Benitez initially testified to one thing and then said something different later. In fact, Luis' summary judgment motion notes "the changed testimony from Benitez." [ECF No. 153, p. 13]. It then points out that the video evidence shows Benitez was nowhere near Luis and Machado at the time of their impact and that she, therefore, "was not in a position to witness the accident at all." *Id.*

For all practical purposes, therefore, Luis' brief mention of Benitez's testimony is to cast it in a *negative* light and to argue that she should not be believed. In fact, Luis argues that the video evidence "discredits" Benitez's testimony, which he says means the district court must view the facts in the light depicted by the video. *Id.* at p. 14.

Therefore, this "use" of Benitez's testimony by one Defendant is not inconsistent with the argument that the Court should exclude all of Benitez's testimony.

<u>Does Benitez's Prior Perjury[1] Mean She Cannot Appear as a Fact Witness at Trial?</u>

Defendants concede, in their Reply, that in "many, if not most," circumstances

---

[1]    As noted earlier, Plaintiff does not admit that Benitez provided perjured testimony. She acknowledges some apparent inconsistencies but argue that Benitez provided an acceptable explanation not involving perjury. By using the term "perjury" in the section title and in other portions of this Order, the Undersigned is not expressing an opinion that Benitez **actually** committed perjury. Rather, the discussion hinges on

courts would prefer to use the tool of cross-examination and juror deliberation to evaluate testimony. [ECF No. 167, p. 2]. But this defense acknowledgment understates the applicable legal principles, as "[i]t is well established that '[c]redibility determinations are the exclusive province of the jury.'" *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (quoting *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990)) (some alterations in original).

In fact, Defendants did not cite any case in which the trial testimony of a witness was excluded because of the witness' prior perjury (in the absence of affirmative misconduct by the attorney who called the witness to testify and who intentionally suborned perjury).

Given Defendants' attack on Benitez's testimony, it is appropriate to discuss *United States v. Hewitt*, 663 F.2d 1381, 1385-86 (11th Cir. 1981), where the Court held that a judgment of acquittal was not required merely "because the government's case includes testimony by an 'array of scoundrels, liars and brigands.'"

Because of this rule, trial courts permit witnesses to testify despite substantial pre-trial misconduct, such as perjury and other criminal activity, and appellate courts "do not

---

whether Defendants are entitled to an order excluding all her testimony *if* she provided perjured testimony. There is, of course, little doubt that Benitez provided inconsistent testimony on several significant points.

Thus, the analysis here is based on the **hypothetical** supposition that Benitez did provide perjurious testimony in the investigation of Machado's police-shooting death.

review the jury's credibility determination unless such testimony is **incredible as a matter of law**." *United States v. Hampton*, 828 F. App'x 687, 689 (11th Cir. 2020) (citing *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014)) (emphasis added).

Testimony is incredible when it is "unbelievable on its face, such as where the witness could not have possibly observed certain events or the events are contrary to the laws of nature." *Hampton,* 828 F. App'x at 689 (citing *Feliciano*, 761 F.3d at 1206).

Significantly (for purposes of the instant motion), "the fact that a witness has **lied** in the past and thought the present testimony would **benefit** her does <u>not</u> make **the testimony incredible."** *Hampton*, 828 F. App'x at 689 (citing *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005)) (emphasis supplied).

Therefore, granting Defendants' motion would require this Court to predict that Benitez would commit perjury at the trial and conclude that this perjury from a non-party fact witness is incredible as a matter of law. Setting aside the problematic fact that Defendants have not provided authority to support such relief when a *fact witness* commits perjury, the Undersigned is far from convinced that the purported perjury meets the "incredible on its face" standard.

To the contrary, the perjury pinpointed by Defendants appears to largely be the garden variety type of perjury which juries factor into their credibility determinations in myriad trials. The jury is free to believe or disbelieve Benitez's testimony, and "there the matter ends." *United States v. Rivera*, 775 F.2d 1559, 1562 (11th Cir. 1985) (rejecting defense

argument that witness' perjurious character, previous felonious acts, other evidence which undermined his testimony, and preferential treatment provided by the prosecutors rendered the testimony incredible as a matter of law).

Defendants say the "gravity" of Benitez's misconduct justifies an order preventing her from participating in the trial. [ECF No. 140, p. 8]. But much of the alleged misconduct is either less egregious or equally egregious as the perjury permeating myriad cases in which juries were permitted to assess the credibility of the witness' trial testimony, believed the witness, and appellate courts affirmed the verdict. The following examples illustrate the point.

First, in *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009), our appellate court affirmed a criminal conviction in the face of a challenge over credibility concerning a critical government witness who previously lied to police and **caused two persons to go to jail for a killing they did not commit**. In doing so, the Court relied upon the basic rules discussed above: that credibility determinations are left to the jury and will not be disturbed unless the testimony is incredible as a matter of law. *Id.*

Recognizing that many of the witnesses were criminals and gang members, the *Flores* Court, citing *Hewitt*, held that testimony is not incredible "solely because it is proffered by 'an array of scoundrels, liars and brigands.'" *Id.* at 1263. The Court explained that "[t]he witnesses' criminal past and prior inconsistent statements were made known to the jury, and the jury was entitled to weigh their testimonies accordingly." *Id.*

Second, in *Calderon*, the Eleventh Circuit affirmed convictions and rejected the argument that the testimony was inherently incredible even though (1) a witness had multiple prior convictions and admitted that his entire testimony in an earlier case was untruthful; (2) the witness had long been involved in drug smuggling and lied on his income tax return; (3) the witness received extensive immunity from the government; (4) the witness admitted he "would lie to save himself;" (5) another witness was a cocaine dealer and user; and (6) this second witness also repeatedly lied to law enforcement agents. 127 F.3d at 1324-25.

The *Calderon* Court cited the fundamental rules outlined above and explained that "by their verdict, the jury determined, albeit implicitly, that the testimony those witnesses gave was credible." 127 F.3d at 1325.

Third, in *Feliciano*, two government witnesses both admitted that they "had at times not told the truth." 761 F.3d at 1206. In addition, part of one witness' testimony was "obviously wrong." *Id.* at 1207 Specifically, the witness provided testimony, which, if believed, would mean that he had been driving at an average speed of 200 miles per hour. *Id.* The Court explained that a part of the explanation was that the witness "had some mental difficulties, and often had trouble remembering the order of an event." *Id.* In addition, the Court explained that the witness "seems to have simply mixed up the day" when he took the defendant to an appointment. *Id.* The Court affirmed the conviction.

In doing so, the *Feliciano* Court explained that "it was for the jury to determine the

significance of this mistake, and it is not the province of this Court to disturb that decision." *Id.* The Court also explained that the defendant's counsel was able to demonstrate that both witnesses "were not always truthful," but then concluded that "still, the jury chose to credit their testimony." *Id.*

Fourth, in *United States v. Zaldivar*, 292 F. App'x 868 (11th Cir. 2008), the Court affirmed a conviction even though at trial the government's witnesses recanted their previous statements identifying a defendant as the operator of a boat used in an alien-smuggling operation.

Fifth, in *Rivera*, the appellate court noted that a key witness was "a drug dealer and an outlaw" who had been involved in several drug trafficking schemes. 775 F.2d at 1562. Presented with the defense argument that the witness had lied, the Court held that "the charge that Weiss perjured himself or that the defense evidence undermined Weiss' testimony, while bearing on Weiss' credibility[,] are not factors in determining incredibility as a matter of law and were certainly matters wholly within the province of the jury." And, in a related holding, the Court explained: "In the face of extensive impeachment of Weiss on cross examination concerning Weiss' bad acts and bad character[,] the jury chose to believe him. **There the matter ends**." *Id.* (emphasis supplied).

Because a jury determines the credibility of witnesses, courts in criminal cases (where most of the case law authority has been developed) "accept the jury's credibility

determinations unless the testimony credited 'is so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.'" *United States v. Joseph*, 445 F. App'x 301, 305 (11th Cir. 2011) (quoting *United States v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983)) (affirming conviction in the face of purported "serious discrepancies" in the police testimony and explaining that "credibility determinations are for the jury"); *cf. United States v. Davila-Soza*, 378 F. App'x 981, 983 (11th Cir. 2010) (describing as "unavailing" the defense argument that witnesses were incredible because they "initially lied to the government, were known drug traffickers, and received benefits for their testimony.").

Defendants have not demonstrated that Benitez's prior testimony is so riddled with fundamental perjury that it meets the "incredible as a matter of law standard." There may, at most, be one category where Benitez might have provided testimony that meets the steep "incredible" hurdle, but the testimony on this point is somewhat fuzzy. The Undersigned is not completely convinced that there is a well-developed record establishing that Benitez affirmatively said she specifically saw something when other facts indisputably establish that she could not possibly have seen what she said she saw.

Perhaps a jury will agree with Defendants that Benitez was not in a location where she was able to see the shooting-related events outlined in her testimony and therefore disregard all her testimony. Perhaps the jury will agree with Plaintiff's counsel and credit

as plausible the explanation about her car slowly rolling forward. Or perhaps the jury will be confronted with several sources of video footage and be uncertain about the veracity of Benitez's testimony and will therefore be reluctant to discard all her testimony.

That's why there are trials.

The Undersigned is not prepared to render a dispute-free conclusion that Benitez was unable to see events at the shooting because she was without question not there.

Moreover, even if there is one instance of Benitez providing false testimony about purported observations at a location, Defendants have not persuaded me that one instance of incredible answers about one category of questions is sufficient to preclude *all* testimony.

Defendants appear to assume that Benitez's alleged prior perjury means that she will commit perjury during the trial. But that is a huge assumption. According to the testimony which Defendants submitted, Benitez *admitted* in deposition that some of her prior testimony was incorrect, false, incomplete, or exaggerated. Given these concessions, Benitez may well testify truthfully in the upcoming trial. Presumably, she will not repeat the initial testimony, which she later said was false or incorrect.

This type of scenario – where a *witness* commits perjury or otherwise lies *before* trial (e.g., to police officers, government officials, or prosecutors) – is a common one, as reflected in many of the cases discussed above. But in these circumstances, the prior lies or perjury do not prevent the witness from appearing at trial. *See e.g., Flores*, 572 F.3d at

1263; *Calderon*, 127 F.3d at 1325, *Hampton*, 828 F. App'x at 689; *Rivera* 775 F.2d at 1562; and

*Davila-Soza*, 378 F. App'x at 983.

Defendants have not called this Court's attention to a case where a non-party fact

witness, who committed perjury or lied before trial, was prevented from testifying as a

sanction. Indeed, at the hearing, in response to a question from the Undersigned, defense

counsel conceded that they had not cited any cases involving this circumstance.

At the hearing, counsel for Defendant City of Hialeah cited a case, not mentioned

in Defendants' motion or reply, which he argued is persuasive: *Tambourine Comércio*

*Internacional S.A. v. Solowsky*, No. 06-20682, 2007 WL 9701095, at *6 (S.D. Fla. Oct. 29, 2007).

The Undersigned is not convinced. That case involved the Court's decision to use the

sham affidavit rule to strike portions of an affidavit of an interested witness.

The sham affidavit rule is straightforward: "When a party has given clear answers

to unambiguous questions which negate the existence of any genuine issue of material

fact, that party cannot thereafter create such an issue with an affidavit that merely

contradicts, without explanation, previously given clear testimony." *Van T. Junkins &*

*Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). The *Tambourine Comércio*

affidavit was submitted in opposition to a summary judgment motion, a situation where

*the Court* must determine if there are genuine issues of material fact.

As the *Tambourine Comércio* Court explained, "the purpose of summary judgment

motions is to 'weed out unfounded claims, specious denials, and sham defenses.'" *Id.*

(citing *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir. 1988)). Striking an affidavit as a sham so that the Court cannot rely upon it to find a disputed material fact to preclude a summary judgment is analytically dissimilar from preventing a fact witness from testifying at all at a trial and allowing the jury to evaluate credibility.

Defendants argue in their motion that Benitez "should be *treated* no differently than if she were still a litigant" and "sanctioned accordingly" because she benefitted from her misconduct through a voluntary dismissal of the lawsuit against her (which Defendants call a "get out of jail free" card). [ECF No. 140, p. 16] (emphasis added).

But the mere fact that Benitez benefitted is no different from the myriad cases where cooperating witnesses, cooperating defendants, and/or informants received benefits (such as immunity agreements, non-prosecution agreements, recommendations for lenient sentences, etc.). But those benefit-receiving witnesses were still permitted to testify, and the jury was allowed to determine their credibility.

The lawyers in those cases unsuccessfully raised the same arguments which Defendants assert here. *See, e.g., Calderon,* 127 F.3d at 1324-25 (rejecting the argument that a witness was inherently incredible because he "sought and received extensive immunity from the government for himself and his wife despite the government's knowledge [of] their misdeeds");*see also Hampton,* 828 F. App'x at 689 (permitting testimony from a fact witness who gave prior inconsistent statements to the FBI and instructing the jury that witness was testifying in the hope of receiving a lesser sentence); *United States v. Dees,* 131

F. App'x 170, at 177 (11th Cir. 2005) (advising the jury that it was "free to disbelieve witnesses" but the jury believed the witnesses' testimony even though counsel conducted "vigorous" cross-examination which implied that their testimony "was offered solely to avoid a sentence of life imprisonment.").

Assuming that Defendants' theory is correct (and that Benitez is providing testimony as part of a secret deal in which a voluntary dismissal is exchanged for favorable but false testimony), the benefit she has already received is arguably *less* valuable than the benefits received by the witnesses in the cases discussed here – where they received immunity from prosecution or a reduction in a jail sentence. If a witness who receives a sentence reduction or exemption from prosecution can testify even though she committed perjury or lied to police before trial, then surely a witness who receives only a voluntary dismissal from a civil case should be allowed to give trial testimony. *See e.g., Davila-Soza*, 378 F. App'x 981 (permitting witnesses who initially lied to the government and received benefits for their testimony to testify at trial).

Presumably, defense counsel (and there are several, each representing separate defendants or groups of defendants) will vigorously cross-examine Benitez at trial and confront her with her supposed prior perjury and earlier misstatements and the benefit she received from the voluntary dismissal. The jury is free to believe her, to reject all her trial testimony, or to accept some of it. *See generally Flores*, 572 F.3d at 1263 ("[T]he witnesses' criminal pasts and prior inconsistent statements were made known to the jury,

and the jury was entitled to weigh their testimonies accordingly[.]").

There are, of course, cases in which a court will dismiss a lawsuit, strike an answer, or enter a default because of a **party's** perjury or misconduct. But this is quite different than the situation here, involving alleged perjury by a non-party witness. *See, e.g., Vargas v. Peltz*, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) (dismissing plaintiff's claim after an evidentiary hearing because of a persistent pattern of perjury, fabrication of evidence, obstruction of the discovery process, and fraud on the court by the plaintiff and a third-party defendant, and explaining that federal courts may "sanction litigants for their misconduct); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (affirming order that dismissed action for fraud on the court where the plaintiff filed a lawsuit based on a bogus purchase agreement attached to the complaint, explaining that a fraud on the court occurs when "a *party* has sentiently set in motion some unconscionable scheme.") (emphasis added); *see also Cemtall Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1410 (S.D. Ga. 1998) (striking defendant's answer for perjury and misconduct); *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1048-49 (8th Cir. 1991) (affirming order dismissing lawsuit because of plaintiff's fraud on the court by committing perjury in two depositions regarding two pivotal issues in the case).

The inherent powers doctrine used to impose the type of sanction Defendants seek here "is most often invoked when a **party** commits perjury or destroys or doctors evidence." *Quantum Communications Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249,

1269 (S.D. Fla. 2007); *cf. Quiroz v. Superior Building Maintenance, Inc.*, No. 06-21594, 2008 WL 3540599, at *16-17 (S.D. Fla. Aug. 12, 2008) (granting motion to dismiss because plaintiff witness tampered by offering to pay bribes to at least three witnesses in exchange for favorable testimony).

If an attorney for a party becomes embroiled in a conspiracy to present perjured testimony, then a court can undoubtedly impose sanctions for fraud on the court. *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (holding that perjury by a witness will not suffice to constitute a fraud on the court, but an attorney's knowing involvement in a scheme to suborn perjury should certainly be considered a fraud on the court).

To avoid the rule that a court will not interfere with a jury's credibility determinations unless the testimony is incredible as a matter of law, Defendants argue in their Reply that Plaintiff's counsel, "before the jury even being empaneled," knows that Benitez is "intent on presenting false testimony" at trial (**or** "has a demonstrated (and admitted) record for lying under oath"). [ECF No. 167, p. 2].

The first prong of Defendants' alternate theory assumes that Plaintiff's counsel now knows with certainty that Benitez will commit perjury at the trial (as opposed to having already perjured herself before trial and then explaining, at trial, why she previously lied). Accusing Plaintiff's counsel of suborning perjury (or implicitly suggesting it as an alternate possibility, as outlined above) is a substantial and dramatic

accusation, and the Undersigned has seen no evidence to support it.

Defendants say that the "most telling" aspect of Benitez's opposition is that she did not deny that she previously lied under oath. But that in no way supports Defendants' carefully crafted accusation that Plaintiff's counsel possibly[2] knows now that she will perjure herself again at trial but plans on plunging ahead anyway with more perjury at trial.

Under Defendants' apparent view, no prosecutor could ever safely and ethically call as a trial witness a cooperating defendant or informant who earlier lied to police about a criminal investigation. But prosecutors often present trial testimony from witnesses who committed perjury or lied to police earlier in the investigation (or in other investigations). Indeed, that very scenario, or one strikingly similar to it, is involved in many of the cases cited in this Order for the rule that a jury determines credibility.

Defendants' arguments also overlook the critical point that, according to Plaintiff,

---

[2]     Defendants' motion does not *expressly* allege that Plaintiff's counsel will, in effect, be suborning perjury from Benitez at trial. Instead, it phrases this theory as a *possible* scenario – i.e., counsel knows Benitez will commit perjury at the trial *or* knows that she has *lied in the past.*

Those are two dramatically different scenarios, with huge differences in consequences. An attorney cannot knowingly put on trial testimony he knows in advance will be perjurious. Florida Bar Rule 4–3.3(a)(4). Allowing a client to perpetrate fraud upon the court by introducing false testimony warrants disbarment. *The Fla. Bar v. Agar*, 394 So. 2d 405, 406 (Fla. 1980) (citing *Dodd v. The Florida Bar*, 118 So. 2d 17 (Fla.1960)). But an attorney who solicits testimony from a witness who testified falsely in the past but who the attorney believes will testify truthfully at trial is doing nothing different than prosecutors routinely do in both federal and state courts.

Benitez "comfortably explained the discrepancies" and the explanation, if true, places blame for the perjury on other police officers – who (according to Benitez) coached her on what to say and how to say it, and to omit certain things from her recorded statement.

Thus, if Benitez's later explanations are correct, Defendants are seeking to exclude Benitez from testifying at trial because she lied before trial at the direction of the Defendants and/or other supervisory police officers.

Defendants have not cited any authority to justify a witness-exclusion order under those extreme circumstances.

The mere fact that Benitez's testimony might be inconsistent with the accounts of other officers "is not a reason for exclusion," as "the existence of inconsistent accounts is precisely the reason there are factual disputes that a jury must resolve in this case." *Brown v. Passmore*, No. 09-20936, 2012 WL 12962921, at *1 (S.D. Fla. May 30, 2012) (denying, in a federal civil rights lawsuit involving a warrantless search of a house, defendant police officers' motion to exclude two witnesses because the testimony was allegedly unreliable and untrustworthy); *cf. Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1505 (11th Cir. 1988) (noting that trial court's directed verdict in the defendant's favor did not consider the credibility of the witnesses, but "that evaluation is for the jury, not the court").

For purposes of promoting a symmetry-in-writing approach, the Undersigned will close with a quote from Bohdi Sanders, an author and fifth-degree black belt: "Truth is universal. Perception of truth varies."

**Conclusion**

The Undersigned denies Defendants' motion. The jury will decide whether to believe all, some, or none of Benitez's testimony.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on August 24, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All Counsel of Record

30